Max Kleven v. Daphne Hereford, et al
Court File No. 13-CV-02783 – AB (AGRx)

# EXHIBIT A

**FREDRIKSON & BYRON, P.A.**
 Lora M. Friedemann (MN# 259615)
  E-Mail: lfriedemann@fredlaw.com
Paul E. Thomas (SB# 208577)
  E-Mail: pthomas@fredlaw.com
200 South Sixth Street, Suite 4000
Minneapolis, MN 55042
Telephone: 612.492.7000

*Attorneys for Defendant*
BELLEAIR TRADING
INTERNATIONAL LLC

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

MAX KLEVEN, an individual; RIN, INC., a California corporation,

Plaintiffs,

vs.

DAPHNE HEREFORD, an individual; RIN TIN TIN, INC., a Texas Corporation; BELLEAIR TRADING INTERNATIONAL, LLC, a Florida limited liability company; DOES 1 through 20, inclusive,

Defendants.

CASE NO. 13-CV-02783-AB (AGRx)

**DECLARATION OF PATRICIA COTTON AS AN EXPERT WITNESS FOR DEFENDANT BELLEAIR TRADING INTERNATIONAL LLC**

Trial Date:     December 2, 2014
Time:           8:30 am
Location:       Courtroom of the Honorable André Birotte, Jr., United States District Judge

**Introduction**

I, Patricia Cotton, declare as follows:

1.     I have been an attorney since 1991, when I graduated *magna cum laude* from the University of Santa Clara School of Law and passed the California State Bar exam.  I have been practicing law at Pillsbury Winthrop Shaw Pittman LLP since 1991.  My practice focuses on the protection and enforcement of trademark assets of the firm's clients in the United States and throughout the world.  Specifically for clients with United States interests, I assist them in developing trademarks, in establishing ownership through use, in obtaining federal registration for the marks to enhance their value and enforceability, and, in some cases, in enforcing their trademark rights either through opposition and cancellation proceedings filed with the Trademark Trial and Appeal Board ("**TTAB**") at the United States Patent and Trademark Office ("**PTO**") or in federal courts.  I have worked as a trademark prosecution specialist for more than twenty years, I am attorney of record in nearly 1000 trademark records at the PTO, and I am familiar with all aspects of trademark practice before the PTO.

2.     I have been engaged by defendant Belleair Trading International, LLC ("**Belleair**") to provide, based on a chronological review of the salient documents and records, expert testimony in regard to the trademark ownership issues which need to be resolved before the Court can determine whether, and to what extent, it will order the cancellation of one or more of Belleair's federal registrations for the RIN TIN TIN trademark ("**the Mark**").

3.     I have reviewed the following materials: the case docket; the complaint and its attached exhibits, including the transcript of the appearance of January 8, 1996 before Judge Marshall; the amended complaint in intervention; the other pleadings and case filings on the case docket which have direct bearing on the matters on which I will be giving an expert opinion;  the prosecution history and

1  case files for the following United States trademark registrations owned by Belleair:

2  1763135, 1763378, 2265042, 2384745, 2538312, 2969852, 311161, 3215700,

3  3380788, 3582436, 3789458; the case histories of Trademark Trial and Appeal

4  Board cancellation actions 92043569, 92045578, and opposition proceeding

5  91167615; the 2006 Agreement (defined below); the prosecution history and case

6  files of the TITANIC mark registrations obtained by Twentieth Century Fox Film

7  Corporation; various registrations of TITANIC trademarks owned by other parties;

8  and a press release related to the THE RMS TITANIC trademark.

9       4.    I am being paid for my services at the rate of $576 per hour, both for

10  my preparation and for my testimony.

11      5.    In the last four years, I have not testified as an expert witness at trial or

12  in deposition.

13

14  **A.    <u>Daphne Hereford's Common Law Trademark Rights</u>.**

15      6.    The Complaint alleges that "The sole source or "basis" of the multiple

16  attempts to unlawfully exploit the name and fame of the character Rin Tin Tin is the

17  purchase by the grandmother of Defendant Daphne Hereford ("**Hereford**") of a

18  German Shepherd dog which may have been a descendant of the dog Rin Tin Tin."

19  (Complaint, at 3.)  Later, the Complaint alleges that "In 1957" Lee Duncan, the

20  owner of Rin Tin Tin, sold to Brodsgaard, Hereford's grandmother, "a puppy which

21  he represented as being one of Rin Tin Tin IV's puppies," that "this was the first of

22  four puppies that he sold to her," and that "Brodsgaard and eventually her

23  granddaughter, Hereford, began to breed and sell the puppies with the apparent

24  intent of preserving the purported Rin Tin Tin bloodline."  (Complaint, at 10.)

25      7.    In the United States, ownership of a trademark may only be established

26  through the use of a trademark in commerce in connection with providing goods

27  and/or services.  To say it another way, in the United States, trademark ownership

28

1    rights arise under state law and are based solely on actual use of a trademark in

2    interstate commerce, and, therefore, common law trademark rights are recognized

3    under both state laws of unfair competition and under the federal Lanham Act.  The

4    1957 sale, by Lee Duncan, of a German Shepherd puppy to Hereford's grandmother

5    for the purpose of breeding and raising dogs related to the famous Rin Tin Tin, a

6    fact alleged by Plaintiffs in this case, allows the conclusion that Hereford defines her

7    common law trademark rights as stemming (a) from that 1957 transaction, and (b)

8    from her grandmother Jannietta Brodsgaard's consent to her breeding efforts.[1]   This

9    conclusion is supported by the fact that the earliest common-law use-in-commerce

10   rights that Hereford claims for the Mark are related to breeding, raising, and training

11   dogs.  As stated in the federal registrations she obtained later, Hereford claims that

12   at least as early as December 17, 1980, she used the Mark in commerce in

13   connection with "live German Shepherd puppies", "Live German Shepherd dogs of

14   Rin Tin Tin lineage," "Animal exhibitions and live animal performances featuring a

15   German Shepherd dog," "Mail order fan club services to promote the breeding,

16   training, and raising of German Shepherd puppies", and "Mail order fan club

17   service[s] providing materials promoting the breeding, training, raising and showing

18   of the authentic RIN TIN TIN German Shepherd dog lineage." (Exhibits 74, 76, 81,

19   109, 111, 112.)  If Hereford's use of the Mark in commerce was continuous from

20   this claimed date of first use until the time she sold the Mark and her federal

21   registrations corresponding to the Mark to Belleair, Hereford has established more

22   than three decades of ownership of the Mark which is protected under federal and

23   state laws.

24

25

26   ───────────────

27   [1] Letter of June 26, 1957 from Mrs. Carl Brodsgaard to Lee Duncan; and, Letter of
     July 2, 1957 from Lee Duncan to Mrs. Carl Brodsgaard.

28

DECLARATION OF PATRICIA COTTON AS AN EXPERT WITNESS FOR DEFENDANT BELLEAIR

1

2     **B.   Hereford's 1992 Applications for Federal Trademark Registration**.

3         8.    I am going to discuss the documents and records in a generally

4     chronological order so that my discussion progresses in accordance with the

5     sequence of events which occurred prior to Plaintiffs' filing the Complaint on April

6     19, 2013.  Adopting this approach means that my starting point is April 27, 1992,

7     the date on which Hereford filed her first two applications to register the Mark with

8     the PTO.

9         **(a).   U.S. Reg. No. 1763135 for Live Puppies**

10        9.    The first application which Hereford filed on April 27, 1992 was filed

11    in Class 31 in connection with "Live German Shepherd puppies."[2]

12        10.    The application was filed on a basis of actual use in commerce since at

13    least as early as December 17, 1980, and that filing basis was supported by a

14    specimen of use deemed acceptable by the PTO, because the application was

15    approved for publication.

16        11.    The application published for opposition on January 12, 1993, was not

17    opposed by any of the Plaintiffs or by any other party, and achieved registration on

18    April 6, 1993.  (Exhibit 74, 111.)

19        **(b).   U.S. Reg. No. 1763378 for Fan Club Services**

20        12.    On the same day, Hereford also filed an application to register the Mark

21    in Class 41 in connection with "Mail order fan club services to promote the

22    breeding, training, and raising of German Shepherd puppies."[3]

23        13.    The application was filed the basis of actual use in commerce since at

24    least as early as December 17, 1980, and that filing basis was supported by a

25    _____

26    [2] PTO case history for U.S. Reg. No. 1763135: available at www.uspto.gov.
      (Certificate of Registration included in Exhibit 74 and 111.)

27    [3] PTO case history for U.S. Reg. No. 1763378: available at www.uspto.gov.

28

DECLARATION OF PATRICIA COTTON AS AN EXPERT WITNESS FOR DEFENDANT BELLEAIR

1  specimen of use that was deemed acceptable by the PTO because the application

2  was approved for publication.

3      14.    The application published for opposition on January 12, 1993, was not

4  opposed by any of the Plaintiffs or by any other party, and it achieved federal

5  registration on April 6, 1993.  (*Id.*)

6

7                 **C.**    <u>**The 1996 Transcript**</u>

8      15.    The Complaint alleges that Herbert Leonard, the producer of the 1950s

9  television series called "The Adventures of Rin Tin Tin," sued Hereford in 1994

10  after learning about her activities in regard to the Mark, and that the suit "dragged

11  on for more than two years before it was dropped pursuant to a purported settlement

12  agreement that was placed on the record in open court," and although Plaintiffs refer

13  to this as a "purported settlement," Plaintiffs define it as "the <u>Leonard v. Hereford</u>

14  Settlement", and Plaintiffs attach the transcript to the Complaint as an Exhibit.

15  (Complaint, at 10-11.)  I will refer to this "purported settlement" as the "**1996**

16  **Transcript**."

17      16.    The 1996 Transcript indicates that both Leonard and Hereford own

18  rights in the Mark.  The delineated points of agreement in the 1996 Transcript

19  indicate that Leonard was assigned rights in the Mark and the character in the 1950s

20  by Lee Duncan and in 1978 by Eva Duncan, Lee Duncan's widow.  (1996

21  Transcript, at 5.)  The delineated points also indicate that Hereford has been

22  breeding, training, and selling dogs descended from Rin Tin Tin IV since at least as

23  early as 1977, and that her continued use of the Mark in connection with such

24  services "is not likely to cause confusion with Herbert B. Leonard's use of the Rin

25  Tin Tin mark and character." (1996 Transcript, at 5.)  The 1996 Transcript does not

26  contain any references to the occurrence of actual confusion among consumers in

27  regard to the source of goods or services due to the use of the Mark by Leonard and

28

DECLARATION OF PATRICIA COTTON AS AN EXPERT WITNESS FOR DEFENDANT BELLEAIR

1  Hereford, so, according to the delineated points of agreement in the 1996 Transcript,

2  by the time Leonard and Hereford had come together before the Court, Leonard and

3  Hereford had already been sharing ownership rights in the Mark for almost twenty

4  years, possibly without the occurrence of any notable instance of confusion among

5  consumers in all that time.

6      **D.  1996 – 2006.**

7        **(a).  Declarations of Continuing Use and Incontestability**

8      17.  In the years following the January 8, 1996 appearance before Judge

9  Marshall which produced the 1996 Transcript, the first registration maintenance

10  filings were due for Hereford's two federal registrations.  When a trademark

11  achieves federal registration, the initial statutory period of validity is ten years.

12  However, Congress wants assurance during that decade-long period that trademark

13  owners are continuing to use the trademarks they register.  Therefore, Section 8 of

14  the Lanham Act requires a trademark owner to file an affidavit or declaration of

15  continuing use during the sixth year of the registration period.  If the trademark

16  owner fails to make this filing either during the sixth year filing window or during

17  the six month grace period after the sixth year, the PTO will automatically cancel

18  the registration.  The PTO regulations allow a trademark owner to combine a

19  Section 8 declaration with another declaration under Section 15 of the Lanham Act

20  to attest that use of the mark has been continuous for five consecutive years after the

21  date of registration.  Section 15 of the Trademark Act states that "the right of the

22  owner to use such registered mark in commerce for the goods or services on or in

23  connection with which such registered mark has been in continuous use for five

24  consecutive years subsequent to the date of such registration and is still in use in

25  commerce, shall be incontestable."  Incontestability is a statutorily conferred status

26  which is only available to registered trademarks that have been in continuous use in

27  commerce for five years, and which are still in continuous use at the time the

28

DECLARATION OF PATRICIA COTTON AS AN EXPERT WITNESS FOR DEFENDANT BELLEAIR

Section 15 affidavit is filed, provided that none of the following conditions exist: the mark has been deemed by a court or the PTO to be generic for the goods and/or services it identifies; there has been no final decision, issued by a court or the PTO, adverse to the owner's trademark rights; and/or there is no pending proceeding at the PTO or in a court which concerns the owner's rights in the trademark.  If none of those conditions apply at the time the Section 15 affidavit is filed, the trademark owner's right to use the mark in commerce in connection with the goods and/or services identified in the registration is deemed to be incontestable after the date on which the Section 15 affidavit is accepted by the PTO.  Achieving incontestable status means that the grounds on which the federal registration can be cancelled, in whole or in part, are limited under the Lanham Act.

> **(b).    More on '378 - Fan Club Services, and '135 - Live Puppies**

18.    Hereford did not file a Section 8 declaration during the sixth year of the registration period for her U.S. Reg. No. 1763378 for fan club services when the filing was required, and the PTO automatically cancelled that registration on October 11, 1999.[4]

19.    On April 16, 1998, during the sixth year of the registration period for U.S. Reg. No. 1763135 for live puppies, Hereford filed a combined Sections 8 and 15 declaration to maintain the registration.  (Exhibit 74, at 2.)  It was supported by a specimen of use and was accepted by the PTO on June 30, 1998.[5]  As of that date, this registration was deemed to be incontestable.  Even if the 1996 Transcript is not deemed by the Court to be a finalized Agreement, Hereford's actions in regard to maintaining this registration appear to comply with the points of delineated agreement set forth in the 1996 Transcript.

---

[4] PTO case history for U.S. Reg. No. 1763378: available at www.uspto.gov.
[5] PTO case history for U.S. Reg. No. 1763135: available at www.uspto.gov.

DECLARATION OF PATRICIA COTTON AS AN EXPERT WITNESS FOR DEFENDANT BELLEAIR

1

2

3 **(c).   U.S. Reg. No. 2265042 for Dog Food**

4      20.   On August 4, 1998, Hereford filed a new application to register the

5 Mark in connection with "Dog Food."[6]  She filed on the basis of actual use in

6 commerce since at least as early as May 1, 1998, and she supported that basis with a

7 specimen deemed to be acceptable by the PTO because the application was

8 approved for publication and published on May 4, 1999.  The application was not

9 opposed by any of the Plaintiffs or by any other party, and it achieved registration

10 on July 25, 1999.  (*Id.*)

11 **(d).   RIN TIN TIN CANINE AMBASSADOR CLUB**

12      21.   On October 22, 1998, Hereford filed an application to register the

13 trademark RIN TIN TIN CANINE AMBASSADOR CLUB in Class 41 for use in

14 connection with services for the "Promotion of responsible dog ownership through

15 programs presented to schools and groups." (Exhibit 75, at 7-12.)   The application

16 was filed on the basis of actual use in commerce since at least as early as May 8,

17 1998, and that filing basis was supported by a specimen of use deemed to be

18 acceptable by the PTO because the application was approved for publication and

19 published for opposition on June 20, 2000.  It was not opposed by any of the

20 Plaintiffs or by any other party, and it achieved federal registration on September

21 12, 2000 as U.S. Reg. No. 2384745.  (Exhibit 75, at 3.)  Hereford timely filed a

22 combined Sections 8 and 15 declaration on February 16, 2006, along with a

23 specimen of use to support the filing, which filing was accepted by the PTO on

24 April 12, 2006.  As of that date, this registration was deemed to be incontestable.[7]

25

26

27 [6] PTO case history for U.S. Reg. No. 2265042: available at www.uspto.gov.

28 [7] PTO case history for U.S. Reg. No. 2384745: available at www.uspto.gov.

1

2                      **(e).    U.S. Reg. No. 2538312 for Fan Club Services**

3         22.    On August 8, 2001, Hereford filed an application to register the Mark

4 in Class 41 for use in connection with "Mail order fan club service[s] providing

5 materials promoting the breeding, training, raising and showing of the authentic RIN

6 TIN TIN German Shepherd dog lineage." (Exhibit 76, at 8-28.)  Hereford filed on

7 the basis of actual use in commerce since at least as early as December 17, 1980,

8 and that basis was supported by a specimen of use deemed to be acceptable, because

9 the PTO approved the application for publication, and it published for opposition on

10 November 20, 2001. (*Id.*)  It was not opposed by any of the Plaintiffs or by any

11 other party, and it achieved federal registration on February 12, 2002.  (Exhibit 76,

12 at 3.)  Hereford timely filed a combined Sections 8 and 15 declaration on April 9,

13 2007, along with a specimen of use to support the filing, which filing was accepted

14 by the PTO on May 10, 2007.  As of that date, this registration was deemed to be

15 incontestable.[8]

16              **(f).    U.S. Reg. No. 2969852 for Books, Cards, and Movies**

17         23.    On June 9, 2003, Hereford filed an application to register the Mark in

18 Class 16 for use in connection with "Printed publication, namely, magazines,

19 pamphlets, books, activity and coloring books, posters, stickers, cards and business

20 cards" and in Class 41 for use in connection with "Entertainment services in the

21 nature of television or motion pictures using a depiction of Rin Tin Tin as a live or

22 animated character."  (Exhibit 77, 6-11.)

23         24.    Hereford filed the application on the basis of actual use since at least as

24 early as November 23, 2002 in connection with these goods and services. (*Id.*)

25

26

27    [8] PTO case history for U.S. Reg. No. 2538312: available at www.uspto.gov.

28

DECLARATION OF PATRICIA COTTON AS AN EXPERT WITNESS FOR DEFENDANT BELLEAIR

25.     Hereford supported the actual use filing basis with a Class 16 specimen deemed acceptable to the PTO, but the PTO required that the clarified term "playing cards" be moved to Class 28.  Hereford later supported these Class 28 goods with a specimen deemed to be acceptable by the PTO.[9]

26.     The PTO rejected Hereford's Class 41 specimen, which consisted of photo stills of a German Shepherd, because the specimen did not make direct reference to an ongoing television series or to motion pictures.  In response, Hereford submitted two tickets to a showing of a "serial" film entitled "King of the Park Rangers" and displaying the Mark.  Hereford also submitted an image of the October – December 2000 issue of "Rinty's News, The Official Publication of the Rin Tin Tin Fan Club," which discusses the production of "King of the Park Rangers" and Hereford's plans to "release all twelve chapters in Video in February." (*Id.*)  These materials were deemed to be acceptable as a specimen of use in support of the Class 41 services.  The PTO also required a clarifying amendment to the Class 41 services: "Entertainment services in the nature of an ongoing television series in the field of variety and motion pictures featuring a German Shepard dog as a live or animated character."  (*Id.*)

27.     Once Hereford had properly supported all three Classes of goods and services with specimens of use deemed to be acceptable by the PTO, the application was approved for publication and published for opposition on January 4, 2005.  (*Id.*)

28.     Although an extension of time to oppose was filed by CPT Holdings, Inc., the application was not opposed by CPT Holdings, Inc. or by any of the Plaintiffs or by any other party, and it achieved federal registration on July 19, 2005. (Exhibit 77, at 3.)

---

[9] PTO case history for U.S. Reg. No. 2969852: available at www.uspto.gov.

DECLARATION OF PATRICIA COTTON AS AN EXPERT WITNESS FOR DEFENDANT BELLEAIR

29.     Max Kleven filed a cancellation proceeding against this registration on February 28, 2006 (Cancellation No. 92045578) but the proceeding was terminated with prejudice on May 23, 2006 because Hereford agreed to assign the Class 41 component of the registration to plaintiff Max Kleven in a Settlement Agreement executed on May 1, 2006.  (Exhibit 98, at 1.)

### E.   The 2006 Settlement Agreement.

30.     On May 1, 2006, Leonard, Kleven, and Hereford executed an agreement to settle not only Cancellation No. 92045578, but also two competing federal lawsuits, one filed in Texas by Hereford, and one filed in California by Kleven.  This agreement is hereinafter referred to as "**the 2006 Agreement**" (Exhibit 98.)

31.     Section 2.2.1 of the 2006 Agreement provides for Hereford to assign the Class 41 "Entertainment services in the nature of an ongoing television series in the field of variety and motion pictures featuring a German Shepard dog as a live or animated character" of U.S. Reg. No. 2969852 to Plaintiffs so that Plaintiffs will have a federal registration for the Mark to use in connection with "motion pictures, "television programs or series, or any newly derived processes that provide a dynamic visual image."  (*Id.*, at 1.)

32.     Section 2.2.1 also provides Plaintiffs with the exclusive right to use the Mark "for any products or services that derive from said motion pictures, television programs or series, or any newly derived processes, and Section 2.2.4 lists examples of such products or services: "stuffed animals, books, costumes, video and computer games, song books and all other manner of toys for the relevant age group." (*Id.*, at 1.)

33.     Section 2.2.3 provides for and confirms that Hereford possesses substantial and extensive trademark ownership rights in the Mark outside of Plaintiffs' area of rights: "Hereford may exercise any other intellectual property

DECLARATION OF PATRICIA COTTON AS AN EXPERT WITNESS FOR DEFENDANT BELLEAIR

1  rights owned by Hereford as to the use of the mark Rin Tin Tin against anyone,

2  other than those relating to motion pictures, television, or other video products, or

3  other products related thereto, produced by Kleven or its successor, assigns and

4  licensees." (*Id.*) This provision is the most important language in the 2006

5  Agreement in regard to Hereford's ownership rights in the Mark because it confirms

6  Plaintiffs' consent to Hereford's continuing use of the Mark in connection with the

7  goods and services in which she has established ownership rights, and, because the

8  2006 Agreement is signed by Leonard, it confirms Plaintiffs' consent to Hereford's

9  history of use of the Mark in connection with the goods and services in which

10 Hereford has established ownership rights, some of which extend back to at least as

11 early as December 17, 1980, as declared in two of her applications which achieved

12 registration in the PTO before 2006, notwithstanding the existence of, and

13 Leonard's participation in, the settlement discussion recorded in the 1996

14 Transcript.

15                    **(a).  U.S. Reg. No. 3215700 for Dog Products**

16        34.     The broad language used in provision 2.2.3 of the 2006 Agreement –

17 "Hereford may exercise any other intellectual property rights owned by Hereford as

18 to the mark Rin Tin Tin against anyone" – allows the conclusion that Hereford

19 relied upon provision 2.2.3 when she filed additional applications to register the

20 Mark after the May 1, 2006 execution of the 2006 Agreement, the first of which she

21 filed only nine days later on May 10, 2006.  Hereford filed that application on the

22 basis of actual use of the Mark in commerce in four Classes for four different kinds

23 of dog-related products for which she had established common law rights in the

24 Mark prior to the execution of the 2006 Agreement: "Dog clothing; Dog collars;

25 Dog leashes; Dog shoes; Handbags; Purses; Tote bags" (in Class 18 -- First Use in

26 Commerce: March 18, 2004); "Bowls; Brushes for pets; Cups; Mugs; Pet brushes;

27 Pet feeding dishes"  (in Class 21 -- First Use in Commerce: January 5, 2001); "Caps

28

; Hats; Jackets; Muffs; Scarves; Slippers; Sweat shirts; T-shirts" (in Class 25 -- First Use in Commerce: March 18, 2004); and "Board games; Dog toys; Plush toys; Puzzles; Soft sculpture plush toys" (in Class 28 -- First Use in Commerce: February 1, 2006). (Exhibit 79, at 5-18.)   Hereford supported the filing basis with specimens deemed acceptable to the PTO, because the application was approved for publication and published on December 19, 2006.[10]   The application was not opposed by any of the Plaintiffs or by any other party, and it achieved federal registration on March 6, 2007, less than a year after the execution of the 2006 Agreement. (*Id.*)   The fact that Plaintiffs did not oppose the application allows the conclusion that Plaintiffs did not perceive Hereford's application as an encroachment on Plaintiffs' merchandising rights under the 2006 Agreement.

### (b).   The PTO and the Class 41 Services in U.S. Reg. No. 2969852

35.   Hereford's actions subsequent to the execution of the 2006 Agreement stand as evidence of Hereford's good faith effort to fulfill her obligations under the 2006 Agreement.  As required, Hereford prepared and executed a trademark assignment agreement to convey her Class 41 "Entertainment services in the nature of an ongoing television series in the field of variety and motion pictures featuring a German Shepard [sic.] dog as a live or animated character" of U.S. Reg. No. 2969852 to Kleven.  (Exhibit 98, at 7-8.)

36.   On May 11, 2006, after Kleven had signed the assignment, Hereford recorded the assignment of the Class 41 film & television services with the PTO, where it became identified by the reel/frame number 3306/0964.  (Exhibit 98, at 9.)

37.   On May 22, 2006, Hereford filed with the PTO a request to divide the Class 41 services from the registration and enclosed a check to pay the required fee for dividing a registration into two separate registrations.  For reasons undiscernible

---

[10] PTO case history for U.S. Reg. No. 3215700: available at www.uspto.gov.

DECLARATION OF PATRICIA COTTON AS AN EXPERT WITNESS FOR DEFENDANT BELLEAIR

in the prosecution history, the PTO did not act upon Hereford's request to divide, and, consequently, the Class 41 film & television services remained in U.S. Reg. No. 2969852. [11]

38.     On January 15, 2011, Hereford filed the required sixth-year declaration of continuing use combined with a voluntary declaration of continuous use under Sections 8 and 15 of the Lanham Act to maintain this registration.  Hereford deleted the Class 41 services from the registration when she made that filing, in accordance with the terms of the 2006 Agreement, and paid the official fees for only two Classes (16 and 28) rather than three.  As occurs somewhat regularly, the PTO neglected to update the online records for the registration to reflect the cancelled Class 41 services, and so the PTO record for the registration still indicates that it covers three classes of goods and services when, in fact, in only covers two.  (*Id.*)

39.     The two attempts that Hereford made to divide and remove the Class 41 film & television services from U.S. Reg. No. 2969852 are evidence of her good-faith efforts to fulfill her obligations under the 2006 Agreement.

### (c).     The January 20, 2012 Application Filing.

40.     The failure of the PTO to act either upon the request to divide the Class 41 services from U.S. Reg. No. 2969852 or to update the online record for the registration to reflect the cancellation of the Class 41 services in the registration when Hereford filed her Sections 8 and 15 affidavit may have precipitated some of the later events which resulted in this litigation.

41.     Because the Class 41 film and television services were not divided out into a separate federal registration in the name of Max Kleven, it is possible that, with the passage of time, Kleven forgot about the assignment that he and Hereford executed in 2006 after they executed the 2006 Agreement and which Hereford

---

[11] PTO case history for U.S. Reg. No. 2969852: available at www.uspto.gov.

recorded with the PTO.  It is also possible that Kleven was not knowledgeable in the

procedures of the PTO in regard to the transfer of a Class of services named in a

registration from one party to another, or with the requirements for maintaining a

federal registration.  In any event, it appears that Kleven never followed up in regard

to the asset assigned to him pursuant to Section 2.2.1 of the 2006 Agreement.

42.     As discussed in Paragraph 17 above, the PTO requires a maintenance

filing for all federal trademark registrations.  If the required sixth-year Section 8

affidavit is not made on a timely basis, the PTO automatically cancels the

registration.  For U.S. Reg. No. 2969852, the filing window for the required Section

8 affidavit was between July 19, 2010 and July 19, 2011.  Hereford timely filed a

combined Sections 8 and 15 affidavit for Classes 16 and 28, but Kleven failed to

support his Class 41 services with a Section 8 (or a Sections 8 and 15) affidavit.

(*Id.*)   The PTO provides a six month grace period for filing the Section 8 affidavit

late, so the grace period for U.S. Reg. No. 2969852 expired at midnight on January

19, 2012.  On the very next date, January 20, 2012, Hereford filed a new application

for the Mark in Class 41 for "Entertainment services in the field of motion pictures

featuring a German Shepherd dog," which application matured into Registration No.

4263551 on December 25, 2012.  (Exhibit 83, at 3, 7-12.)  While the trademark

prosecution histories for U.S. Reg. Nos. 2969852 and 4263551 do not allow me to

determine conclusively what Hereford's thought process was in filing the new

application in Class 41, Hereford may have reasonably believed that Kleven had

either given up or lost his trademark rights in the Mark by failing to file the Section

8 affidavit for the Class 41 services in Reg. No. 2969852, that those Class 41 rights

were now available to be claimed by others, and that she was merely acting in good

faith to protect the Mark and her own trademark ownership rights by filing the new

application in Class 41.

1

2       **F.   Belleair's Other Federal Registrations.**

3       43.     Because of the direct connection between the events which occurred

4   after Hereford's 2003 filing of the application which became U.S. Reg. No.

5   2969852, the 2006 Settlement Agreement, and the consequent filing of the

6   application on January 20, 2012 which became U.S. Reg. No. 4263551, my

7   discussion of those directly related events has led me to pass over four additional

8   federal trademark registrations which Hereford obtained between 2006 and 2010.

9                  **(a).   U.S. Reg. No. 3111161 for Children's Books.**

10      44.     On March 30, 2004, Hereford filed an application to register the Mark

11  in connection with "Printed publications, namely, children's books." (Exhibit 78, at

12  6-13.)  She filed on the basis of actual use in commerce since at least as early as

13  April 6, 2001, and she supported the actual-use filing basis with a specimen which

14  was deemed to be acceptable by the PTO because the application published for

15  opposition on April 19, 2005.[12]  The application was opposed by Herbert Leonard

16  on August 17, 2005, but Leonard failed to respond when Hereford filed a motion to

17  dismiss in the opposition proceeding.[13]  Consequently, the Board granted the motion

18  to dismiss as conceded and dismissed the opposition with prejudice on May 17,

19  2006, just a few weeks after execution of the 2006 Agreement. (*Id.*)  The

20  registration issued on July 4, 2006.  (Exhibit 78, at 3.)  In 2011, Hereford filed the

21  combined affidavit under Sections 8 and 15, supported the filing with a specimen

22  which was accepted by the PTO on September 6, 2011, and as of that date this

23

24

25  _____

26  [12] PTO case history for U.S. Reg. No. 3111161: available at www.uspto.gov.

27  [13] Trademark Trial and Appeal Board ("TTAB") case history for Opposition
    91167615: available at www.uspto.gov.

28

DECLARATION OF PATRICIA COTTON AS AN EXPERT WITNESS FOR DEFENDANT BELLEAIR

1 | registration is deemed to be incontestable.[14]

2 | **(b).   U.S. Reg. No. 3380788 for Dog Food.**

3 | 45.   On May 31, 2007, Hereford filed a new application to register the Mark

4 | in connection with "Dog food." (Exhibit 80, at 6-13.)  She filed on the basis of

5 | actual use in commerce since at least as early as May 1, 1998, and she supported the

6 | actual use filing basis with a specimen which was deemed to be an acceptable

7 | specimen of use by the PTO. (*Id.*, at 14-22.)  The application published for

8 | opposition on November 27, 2007.[15]   The application was not opposed by any of

9 | the Plaintiffs or any other party, and the application achieved registration on

10 | February 12, 2008.   (Exhibit 80, at 3.)

11 | **(c).   U.S. Reg. No. 3582436 for Rin Tin Tin Lineage Shepherds**

12 | 46.   On February 1, 2008, Hereford filed an application to register the Mark

13 | in connection with "Live German Shepherd dogs of the Rin Tin Tin lineage" in

14 | Class 31 and "Animal exhibitions and live animal performances featuring a German

15 | Shepherd dog" in Class 41.  (Exhibit 81, at 6-15.)  She filed on the basis of actual

16 | use in commerce since at least as early as December 17, 1980, and she supported the

17 | actual-use filing basis with specimens of use for both the goods and the services

18 | which were accepted by the PTO.  (*Id.* at 16-31.)  The application published for

19 | opposition on December 16, 2008, but it was not opposed by any of the Plaintiffs or

20 | by any other party.[16]  The application achieved federal registration on March 3,

21 | 2009.  (Exhibit 81, at 3.)

22 | **(d).   U.S. Reg. No. 3789458 for the RINTY Mark**

23 | 47.   On April 19, 2009, Hereford filed an application for the mark RINTY

24 | in connection with "Animal exhibitions and live animal performances featuring a

25 | _____

26 | [14] PTO case history for U.S. Reg. No. 3111161: available at www.uspto.gov.

27 | [15] PTO case history for U.S. Reg. No. 3380788: available at www.uspto.gov.
[16] PTO case history for U.S. Reg. No. 3582436: available at www.uspto.gov.

28 |

DECLARATION OF PATRICIA COTTON AS AN EXPERT WITNESS FOR DEFENDANT BELLEAIR

German Shepherd dog." (Exhibit 82, at 6-13.)  She filed based on actual use in commerce since at least as early as April 30, 2000, and she supported the actual-use filing basis with a specimen of use that was accepted by the PTO. (*Id.*, at 14-24.) The application published for opposition on March 2, 2010, but it was not opposed by any of the Plaintiffs or by any other party.[17]  The application achieved federal registration on May 18, 2010.  (Exhibit 82, at 3.)

### G. Incontestability

48.    In 2013, Hereford conveyed various trademark assets, including all of her federal trademark registrations for the Mark, to Belleair.  The following is a chart summarizing the portfolio of federal registrations that Belleair acquired:

//
//
//
//
//
//
//
//
//                          *{chart begins on following page}*
//
//
//
//
//
//

---

[17] PTO case history for U.S. Reg. No. 3789458: available at www.uspto.gov.

DECLARATION OF PATRICIA COTTON AS AN EXPERT WITNESS FOR DEFENDANT BELLEAIR

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

| Mark: | Filing Date: | U.S. Reg. No. And Reg. Date: | Status: | First Use in Commerce Date: | Classes and Descriptions of Goods and Services: |
|---|---|---|---|---|---|
| RIN TIN TIN | April 27, 1992 | 1763135 April 6, 1993 | Incontestable. | December 17, 1980 | **Class 31:** Live German shepherd puppies |
| RIN TIN TIN | April 27, 1992 | 1763378 April 6, 1993 | Cancelled on October 11, 1999 due to failure to file Section 8 affidavit. | December 17, 1980 | **Class 41:** Mail order fan club services to promote the breeding, training and raising of German shepherd puppies. |
| RIN TIN TIN | August 4, 1998 | 2265042 July 27, 1999 | Cancelled on June 22, 2007 due to failure to file Section 8 affidavit. | May 1, 1998 | **Class 31:** Dog food. |
| RIN TIN TIN CANIN E AMBAS - SADOR CLUB | October 22, 1998 | 2384745 June 20, 2000 | Incontestable. | February 25, 1998 | **Class 41:** Promotion of responsible dog ownership through programs presented to schools and groups. |
| RIN TIN TIN | August 8, 2001 | 2538312 February 12, 2002 | Incontestable. | December 17, 1980 | **Class 41:** Mail order fan club service providing materials promoting the breeding, training, raising and showing of the authentic RIN TIN TIN German Shepherd dog lineage. |

DECLARATION OF PATRICIA COTTON AS AN EXPERT WITNESS FOR DEFENDANT BELLEAIR

| Mark: | Filing Date: | U.S. Reg. No. And Reg. Date: | Status: | First Use in Commerce Date: | Classes and Descriptions of Goods and Services: |
|---|---|---|---|---|---|
| RIN TIN TIN | June 9, 2003 | 2969852 July 19, 2005 | Incontestable. | November 23, 2002 | **Class 16:** Printed publications, namely, magazines, pamphlets, books and comic books about German Shepard dogs; activity and coloring books, posters, stickers, business cards, and cards in the nature of greeting cards and trading cards.<br><br>**Class 28:** Playing cards.<br><br>**[Class 41:** Entertainment services in the nature of an ongoing television series in the field of variety and motion pictures featuring a German Shepard dog as a live or animated character.] – *Class 41 services assigned to Max Kleven in 2006 Agreement but still listed in USPTO record.* |
| RIN TIN TIN | March 30, 2004 | 3111161 July 4, 2006 | Incontestable. | April 6, 2001 | **Class 16:** Printed publications, namely, children's books. |

DECLARATION OF PATRICIA COTTON AS AN EXPERT WITNESS FOR DEFENDANT BELLEAIR

| Mark: | Filing Date: | U.S. Reg. No. And Reg. Date: | Status: | First Use in Commerce Date: | Classes and Descriptions of Goods and Services: |
|---|---|---|---|---|---|
| RIN TIN TIN | May 10, 2006 | 3215700<br><br>March 6, 2007 | Incontestable. | (See next column) | **Class 18:** Dog clothing; Dog collars; Dog leashes; Dog shoes; Handbags; Purses; Tote bags. (First Use in Commerce: March 18, 2004)<br><br>**Class 21:** Bowls; Brushes for pets; Cups; Mugs; Pet brushes; Pet feeding dishes. (First Use in Commerce: January 5, 2001)<br><br>**Class 25:** Caps ; Hats; Jackets; Muffs; Scarves; Slippers; Sweat shirts; T-shirts. (First Use in Commerce: March 18, 2004)<br><br>**Class 28:** Board games; Dog toys; Plush toys; Puzzles; Soft sculpture plush toys. (First Use in Commerce: February 1, 2006) |
| RIN TIN TIN | May 31, 2007 | 3380788<br><br>February 12, 2008 | Valid and current. Section 8 affidavit filed July 15, 2014 | May 1, 1998 | **Class 31:** Dog food. |
| RIN TIN TIN | February 1, 2008 | 3582436<br><br>March 3, 2009 | Valid and current. | December 17, 1980 | **Class 31:** Live German Shepherd dogs of Rin Tin Tin lineage.<br><br>**Class 41:** Animal exhibitions and live animal performances featuring a German Shepherd dog. |

DECLARATION OF PATRICIA COTTON AS AN EXPERT WITNESS FOR DEFENDANT BELLEAIR

1
2
3

| Mark: | Filing Date: | U.S. Reg. No. And Reg. Date: | Status: | First Use in Commerce Date: | Classes and Descriptions of Goods and Services: |
|---|---|---|---|---|---|
| RINTY | April 19, 2009 | 3789458 May 18, 2010 | Valid and current. | April 30, 2000 | Class 41: Animal Exhibitions and Live Animal Performances Featuring a German Shepherd Dog. |
| RIN TIN TIN | January 20, 2012 | 4263551 December 25, 2012 | Valid and current. | April 3, 2007 | Class 41: Entertainment services in the field of motion pictures featuring a German Shepherd dog. |

49.     The portfolio contains ten active, valid, and current federal trademark registrations.  Six of the registrations have achieved incontestable status because affidavits of continuous use under Section 15 of the Trademark Act were timely filed together with the required sixth year affidavits of continuing use under Section 8 of the Trademark Act.

50.     As discussed above, achieving incontestable status means that the grounds on which a federal registration can be cancelled, in whole or in part, are limited under the Lanham Act.  The available grounds are listed in Section 14(3) of the Lanham Act.  An incontestable registration can be cancelled only if the trademark that is the subject of the registration has become the generic term for the goods or services it identifies; if the trademark is functional rather than a symbolic identifier of the source of the relevant goods and/or services; if the trademark has been abandoned; if the registration was obtained by means of fraud practiced on the PTO; or, if the trademark is being used to misrepresent the source of the identified goods or services.

51.     Plaintiffs have requested cancellation of Belleair's federal trademark registrations based on alleged grounds of misrepresentation of source and fraud on

23

1  the PTO.  I will address each of these in turn.

2  ## H.  Request for Cancellation for Misrepresentation of Source

3  52.  Section 14(3) (or 15 USC § 1064(3)) of the Lanham Act allows a

4  plaintiff to request cancellation of a federal trademark registration, even an

5  incontestable registration, if the registrant is using the mark to "misrepresent the

6  source of the goods or services on or in connection with which the mark is used."

7  Count X of Plaintiff's Complaint is a request for cancellation of Belleair's

8  trademark registrations based on Section 14(3): "Defendants are using Defendants'

9  Federal Registrations for the mark RIN TIN TIN in a manner that misrepresents the

10  source of the associated goods."  (Complaint, at 35.)

11  53.  Plaintiffs' attempt to support their cancellation request for

12  misrepresentation of source with a discussion of the www.rintintin.com website, on

13  which Plaintiffs assert, Defendants have included content which suggests to the

14  website visitor that Defendants "are associated or affiliated with the iconic fictional

15  German Shepherd character featured in multiple copyrighted works owned by

16  Plaintiffs." (*Id.*)  Thus, Plaintiffs' claim is nearer to a general Section 43(a) claim for

17  false association rather than a true claim for misrepresentation of source under

18  Section 14(3).  To cancel an incontestable trademark registration under the

19  misrepresentation-of-source grounds available in Section 14(3), a petitioner must

20  show that the defendant "deliberately sought to pass off its goods as those of the

21  petitioner." (*McCarthy on Trademarks*, § 20:60 at 20-157-58.)  In other words, a

22  misrepresentation-of-source claim stands most appropriately in circumstances

23  involving counterfeit goods.  The instant case does not involve passing-off

24  circumstances.  Plaintiffs in this case do not manufacture or sell any of the dog food

25  and dog-related goods manufactured and sold by Belleair.  Belleair does not produce

26  motion pictures or television programs.  Neither Belleair nor Hereford represented

27  that their products or services were produced by any of the Plaintiffs.  Neither

28

Belleair nor Hereford have represented that they have produced or distributed any of Plaintiffs' copyrighted works.  In Count X of their Complaint, Plaintiffs are attempting to evade the narrow grounds under which incontestable trademarks may be cancelled by shoehorning a general likelihood-of-confusion claim into a misrepresentation of source claim.  Plaintiffs cannot properly bring a Section 14(3) claim for misrepresentation of source, and they cannot properly support it.

## I.   Request for Cancellation for Fraud

54.     Plaintiffs have requested cancellation of Belleair's federal trademark registrations based on an allegation that Hereford obtained them by means of fraud on the PTO.   It is my opinion that the PTO records for Hereford's registrations do not support a finding that she obtained them by means of fraud on the PTO.

## J.   No Fraud in the Application Declarations.

### (a).   The Application Declaration

55.     When an applicant submits an application for federal trademark registration to the PTO, regardless of the basis upon which the application is submitted, the applicant is required to sign an oath regarding the accuracy and validity of the details submitted in the application.  Here is the form of the declaration that Hereford signed when she submitted all of her applications:

> "The undersigned, being hereby warned that willful false statements and the like so made are punishable by fine or imprisonment, or both, under 18 U.S.C. Section 1001, and that such willful false statements, and the like, may jeopardize the validity of the application or any resulting registration, declares that he/she is properly authorized to execute this application on behalf of the applicant; he/she believes the applicant to be the owner of the trademark/service mark sought to be registered, or, if the application is being filed under 15 U.S.C. Section 1051(b), he/she believes applicant to be entitled to use such mark in commerce; to the best of his/her knowledge and belief no other person, firm, corporation, or association has the right to use the mark in commerce, either in the identical form thereof or in such near resemblance thereto as to be likely, when used on or in connection with the goods/services of such other person, to cause confusion, or to cause mistake, or to deceive; and that all statements made of his/her own knowledge are true; and that all statements made on information and belief are believed to be true."

DECLARATION OF PATRICIA COTTON AS AN EXPERT WITNESS FOR DEFENDANT BELLEAIR

56.     This declaration requires an applicant to have a good faith belief that she or he has the right to use the mark in commerce for the goods and services identified in the application, and that no third party has the right to use either the same or a similar mark in such a way and with such similar goods and services that the applicant's simultaneous use will cause confusion among consumers, will cause consumers to form mistaken ideas about the source of applicant's goods or services, or will deceive consumers.  In short, the declaration requires the applicant to have a good faith belief that her or his use of the mark will not create a likelihood of confusion in the marketplace.

**(b).     Two Components: Priority and Likelihood of Confusion.**

57.     The trademark application declaration does not require the applicant to believe that he or she is the first and only user of the mark.  Plaintiffs therefore cannot assert that because Hereford was aware of *The Adventures of Rin Tin Tin* television series, her statements in her applications "that to the best of her knowledge and belief, no other person has the right to use the mark in commerce," were not true.

58.     In addition, the declaration does not require the applicant to disclose to the PTO other owners of the mark.  The PTO imposes no such disclosure requirement on trademark applicants.  Section 818 of the Trademark Manual of Examining Procedure provides a checklist of all the requirements for an application, and such a disclosure of other users is not a required item.[18]

59.     The declaration that Hereford was required to sign has five clauses separated by semi-colons.  The important third clause contains two components, both of which are central to trademark law.  The first component is priority (i.e., does a third party already have the right to use the same or a similar mark in

_____

[18] TMEP § 818: available at www.uspto.gov.

1  commerce?), and the second component is likelihood of confusion (i.e., does such

2  third party right involve sufficiently related goods and/or services such that use of

3  the mark is likely to cause consumer confusion?).  Because Plaintiffs' predecessor in

4  interest, Herbert Leonard, produced *The Adventures of Rin Tin Tin* television series

5  in the 1950s and Daphne Hereford claims trademark rights from 1980, Plaintiffs and

6  place the emphasis of their arguments on priority.  However, priority and likelihood

7  of confusion must always be taken together.  These concepts reflect the twin

8  foundational policies of trademark law which strive to balance the rights of

9  trademark owners in the marketplace while simultaneously protecting consumers

10  from deceptive trade practices.

11             **(c).**   **Priority: Rights of the First User of a Trademark.**

12       60.    Priority can be important for establishing trademark rights, and, in

13  circumstances where consumers are actually confused or likely to be confused,

14  priority can be the most important consideration for a court in making a

15  determination of whose trademark rights should carry the day.  However, priority is

16  not and cannot be the only consideration.  If priority were the only consideration,

17  then the first user of any mark would immediately be able to claim superior and

18  exclusive rights in the trademark even over subsequent users of the same mark on

19  unrelated goods and services in an unrelated industry.  Such a situation, if allowed

20  under trademark law, would incentivize people to rush to be the first to claim

21  trademark rights in a particular term because being the <u>first</u> user would equate to

22  being the <u>only</u> lawful user.  Indeed, there would be no reason to limit the scope of a

23  trademark registration to any particular goods or services, since use as a trademark

24  for any good or service effectively would confer rights in the mark for all possible

25  goods and services.  This fictional and untenable system for conferring trademark

26  rights would be likely to stifle the marketplace, create widespread injustice, and

27  constrict the use of words in general business communications.  Thus, being the first

28

DECLARATION OF PATRICIA COTTON AS AN EXPERT WITNESS FOR DEFENDANT BELLEAIR

1  to use a trademark in commerce (i.e., having "priority") is not and cannot be the be-

2  all-and-end-all of trademark ownership.

3           **(d).    Likelihood of confusion: Balancing Trademark Rights**

4       61.    The limitation on the importance of priority flows from the use-in-

5  commerce basis for trademark ownership in the United States: trademark rights arise

6  under state law through actual use in commerce.  The limitation is supported by

7  several policy reasons, the primary one being the need to accommodate and balance

8  the rights of many trademark owners in the marketplace.

9       62.    The common and long-standing prevalence of the use of surnames as

10  trademarks serves as a good example of the need for trademark law to balance the

11  rights of multiple trademark owners in the marketplace, because many people in the

12  United States have the same surnames and want to use their surnames as trademarks

13  and trade names.  So, consider, for example, a trademark owner named Smith who

14  establishes a grocery store named "Smith's."  Even if Smith the grocer is the very

15  first person to sell groceries under that name, because Smith is a common surname,

16  Smith the grocer does not have the absolute right under trademark law to prevent

17  persons outside his geographical area of trade from selling groceries under the same

18  name.  Further, Smith the grocer does not have the absolute right under trademark

19  law to prevent persons within his geographical area of trade from selling goods

20  and/or services unrelated to groceries under the same name, particularly if

21  consumers are not likely to be confused by, for example, "Smith's" the grocery store

22  and "Smith's" the automobile dealership both doing business under the same

23  trademark in the same locality.  Trademark law balances the rights of different

24  trademark owners within the marketplace, and even a surname trademark like

25  MCDONALD'S, which, since its beginnings in the 1950s, has achieved global

26  recognition in connection with  restaurant services and food products, coexists under

27  the law and on the federal trademark register with other similar surname marks used

28

DECLARATION OF PATRICIA COTTON AS AN EXPERT WITNESS FOR DEFENDANT BELLEAIR

on different goods or services, such as, this mark --



-- which has been used in commerce in the United States in connection with water works valves and pipe fittings since at least as early as 1969 and is U.S. Reg. No. 2434934.[19]

63.     The extensive use of English words as trademarks or components of trademarks provides another example of the need to balance the rights of trademark owners in the marketplace, sometimes regardless of priority.  Consider, for example, the English word "holiday," which has a variety of common meanings.  Because of its festive connotation, the term has proved to be a popular component of trademarks: the federal trademark register contains more than 2000 records of marks containing the term.  One well-known trademark in this group is HOLIDAY INN, which has been in use in commerce since at least as early as 1949 in connection with lodging services and has been a registered trademark as U.S. Reg. No. 1061893 since 1977.[20]  Despite its priority and its prominence as the primary mark for a national hotel chain, the HOLIDAY INN mark coexists in a balance of rights with many other newer marks which contain the term HOLIDAY.  For example, the mark HOLIDAY COTTAGE, has only been in use in commerce since 2013, but because it is used in connection with "magazines in the field of home and garden decorating," and therefore consumers are not likely to be confused by simultaneous use of similar trademarks with virtually identical meanings, the PTO granted

---

[19] PTO case history for U.S. Reg. No. 2434934: available at www.uspto.gov.
[20] PTO case history for U.S. Reg. No. 1061893: available at www.uspto.gov.

DECLARATION OF PATRICIA COTTON AS AN EXPERT WITNESS FOR DEFENDANT BELLEAIR

1   registration to HOLIDAY COTTAGE as U.S. Reg. No. 4465026 on January 14,

2   2014.[21]

3        (e). **An Illustrative Analogy: the TITANIC mark applications**

4      64. The circumstances surrounding the release of the 1997 motion picture

5   *Titanic* by Twentieth Century Fox Film Corporation ("Fox") and the corresponding

6   applications for federal trademark registration which Fox filed for a TITANIC mark

7   can, when viewed in the full context of other filings for TITANIC marks made by

8   other mark owners both before and after the release of the motion picture, serve  as

9   an illustrative example of the need to consider both priority and the likelihood of

10  confusion to achieve a proper balance of ownership rights among multiple

11  trademark owners of the same or similar marks.  If priority were the only

12  consideration, then, hypothetically, it might have been possible for Fox to have

13  asserted that applicants who filed to register TITANIC marks after the December

14  19, 1997 release date of the motion picture were opportunists who took advantage of

15  the popularity of the motion picture by fraudulently filing federal trademark

16  applications for a mark in which they had no rights merely to ride on the coattails of

17  the success of the film.  However, that hypothetical argument cannot stand because

18  priority of use is not the only consideration in the analysis for determining

19  trademark rights.

20        **{1}.  Priority Cannot Control Common Words.**

21     65. One reason why a prior trademark rights holder cannot claim to be the

22  only rights holder in a mark like TITANIC is that "titanic" is a common English

23  adjective stemming from ancient references to the Titans, the gods who preceded the

24  Olympian gods in Greek mythology.[22]  As such, the word "titanic," like "holiday,"

25

---

26  [21] PTO case history for U.S. Reg. No. 4465026: available at www.uspto.gov.

27  [22] The *Oxford Universal Dictionary* defines the adjective "titanic" as "Pertaining to, resembling, or characteristic of the Titans of mythology; gigantic, colossal." (Oxford: Clarendon Press, 1933)

28  (footnote continued)

DECLARATION OF PATRICIA COTTON AS AN EXPERT WITNESS FOR DEFENDANT BELLEAIR

1    is a word that belongs to everyone, and has connotations which make it attractive as

2    a brand.  The term TITANIC has been adopted and registered as a trademark by

3    many people operating in diverse industries.  Indeed, the federal trademark register

4    contains at least 137 active and inactive records of marks which include the term

5    TITANIC.  Consequently, trademark law balances the rights of these trademark

6    owners under the likelihood of confusion principle, often regardless of priority.

7        66.    For many years before the *Titanic* film was in production, TITANIC

8    was used and registered in connection with diverse products: with beer since 1993

9    (U.S. Reg. No. 2018187), with golf clubs since 1989 (U.S. Reg. No. 2007032), and

10   with men's cosmetics and toiletries since 1996 (U.S. Reg. No. 2107419).[23]  On June

11   10, 1998, Fox filed fourteen applications to register the TITANIC mark in

12   connection with a variety of goods and services.[24]  Despite the clear priority of the

13   three registrations cited immediately above, nine of the fourteen TITANIC

14   applications filed by Fox achieved federal registration because of the principle under

15   discussion here: the importance of priority is limited by the balancing of trademark

16   rights which occurs in the application of the likelihood of confusion analysis.  The

17   PTO considered the Fox applications in light of the prior TITANIC registrations for

18   beer, golf clubs, and men's cosmetics and toiletries, determined that consumers were

19   not likely to be confused by Fox's use of the TITANIC mark for its desired goods

20   and services, and granted the nine registrations.[25]  If priority were the foremost

---

p. 2199.

[23] PTO case histories for U.S. Reg. Nos. 2018187, 2007032, and 2107419: available at www.uspto.gov.

[24] PTO case histories for U.S. App. Ser. Nos. 75500075, 75500076, 75500077, 75500078, 75500079, 75500080, 75500081, 75500082, 75500083, 75500084, 75500085, 75500086, 75500087, and 75505763: available at www.uspto.gov.

[25] The five Fox TITANIC mark applications which did not achieve registration were all abandoned because of actions Fox failed to take and not because of final refusals by the PTO: in three cases, Fox did not file a Statement of Use after the Notice of Allowance had issued; in two other cases, Fox did not respond to PTO office (footnote continued)

DECLARATION OF PATRICIA COTTON AS AN EXPERT WITNESS FOR DEFENDANT BELLEAIR

consideration for trademark ownership, Fox would not have been allowed to register its TITANIC mark because of the prior rights holders.

67.   Just before the release of the *Titanic* film, on October 23, 1997, an application was filed for TITANIC in connection with cigars and other tobacco products, and the applicant, Copan Direct Imports, Inc., declared actual use in commerce since at least as early as September 1, 1997 (U.S. Reg. No. 2252799).[26] Was this trademark owner an opportunist who wanted to ride on the coattails of the advance hype of the film and blatantly lied, under oath, to the PTO?  Or, was this owner, Copan Direct Imports, Inc., a legitimate distributor of tobacco products who just happened to begin using a TITANIC mark right before the release of the film? The case history of this registration is not available for review on the PTO website, but this owner simultaneously registered the mark CIGAR-TER for a cigar holder in the shape of an item of lingerie (U.S. Reg. No. 2312894), which would seem to suggest an ongoing legitimate business.[27]   In any event, there is no extant evidence which supports an assertion that the applicant committed fraud on the PTO in the acquisition of its TITANIC registration.

68.   Just after the *Titanic* film was released, several more applications were filed.  The first, filed on January 29, 1998 and only a month after the theatrical release, was for TITANIC in connection with audio recordings featuring music.[28] Was this filing also a manifest usurpation of Fox's rights in traditional movie soundtrack merchandise and thus a blatant lie under oath before the PTO?  The owner filed on the basis of actual use in commerce since at least as early as 1973,

---

actions.  In all cases, if an applicant does not respond within a PTO response deadline, the PTO automatically deems the application abandoned.

[26] PTO case history for U.S. Reg. No. 2252799: available at www.uspto.gov.

[27] PTO case history for U.S. Reg. No. 2312894: available at www.uspto.gov.

[28] PTO case history for U.S. Reg. No. 2244480: available at www.uspto.gov.

DECLARATION OF PATRICIA COTTON AS AN EXPERT WITNESS FOR DEFENDANT BELLEAIR

1  twenty-five years before the release of the *Titanic* film, and submitted a specimen of

2  use which was deemed to be acceptable to the PTO.  These facts do not support

3  fraud or coattail-riding; rather, they support a finding of good faith use and an effort

4  to enhance, via registration as U.S. Reg. No. 2244480, common law rights that were

5  established long before the production and release of the *Titanic* film.  (*Id.*)

6

7                    {2}.   **The USPTO Only Looks at the Federal Register**

8            69.    On February 23, 1998, two months after the theatrical release of the

9  *Titanic* film, an intent-to-use application was filed for TITANIC in connection with

10 candy.[29]  The detailed case history of this application is not available for review on

11 the PTO website, but the application was not opposed by Fox or by any other party,

12 and a specimen of use was filed on March 11, 1999 which was deemed to be

13 acceptable by the PTO, and the certificate of registration issued on June 15, 1999 for

14 this mark as U.S. Reg. No. 2254496.  (*Id.*)

15           70.    This TITANIC application for candy sheds light on another reason why

16 priority of use is not the sole consideration: the USPTO does not consider common

17 law, unregistered uses in the marketplace when evaluating applications for federal

18 registration, so, it cannot be asserted that subsequent applications to register

19 TITANIC, such as this application for candy, would have been refused if the

20 USPTO examiner had known about the release of the *Titanic* motion picture.  Had

21 the PTO Examining Attorney for the TITANIC mark in connection with candy been

22 informed of the release of the *Titanic* film during the evaluation of the candy

23 application, she would have ignored such information.  PTO Examining Attorneys

24 do not consider common law rights when conducting a likelihood of confusion

25 analysis.  Examining Attorneys consider only current registrations and pending

26

27 [29] PTO case history for U.S. Reg. No. 2254496: available at www.uspto.gov.

28

DECLARATION OF PATRICIA COTTON AS AN EXPERT WITNESS FOR DEFENDANT BELLEAIR

applications when performing their analysis.  See Section 1715.01(b) of the PTO's *Trademark Manual of Examining Procedure* ("**TMEP**"), which discusses topics that are inappropriate to raise before a PTO Examining Attorney in a letter of protest against an application: "The examining attorney can only consider registrations and prior-pending applications when determining likelihood of confusion" during the evaluation of an application, and "Earlier common-law use, state registrations, and other claims based on evidence other than federal registrations and prior-pending applications for federal registration are not appropriate for presentation to examining attorneys during ex parte examination."  (TMEP § 1715.01(b.).)   The Examining Attorney for the candy application performed a likelihood of confusion analysis and, because she did not find a likelihood of confusion with any prior registrations or pending applications for TITANIC, she approved the candy application for publication, and it went on to registration.  Even if the PTO Examining Attorney had just come from a screening of the *Titanic* motion picture at a local theater when she began the evaluations of the candy application, her knowledge of the movie would have no bearing on her analysis because Examining Attorneys only consider what is on the register – current registrations and pending applications – in a likelihood of confusion analysis.  Thus, there is no basis for asserting either that the candy application was filed under fraudulent circumstances or that the Examining Attorney would have considered the candy application as trespassing into an area of proprietary rights owned by Fox, because Fox had nothing on the register when the candy application was filed.

71.    Analogously, had Plaintiffs provided the Examining Attorneys assigned to Hereford's post-1996 applications for the Mark with copies of the 1996 Transcript, the Examining Attorneys would have ignored such evidence under TMEP § 1715.01(b) as inappropriate for consideration during an evaluation of an application.  And, as discussed above, because Hereford is only obligated to have,

DECLARATION OF PATRICIA COTTON AS AN EXPERT WITNESS FOR DEFENDANT BELLEAIR

1  and declare under oath, a good-faith belief that her use of the Mark will not create a

2  likelihood of confusion in the marketplace, Hereford was not obligated to inform the

3  PTO of the existence of Plaintiffs.  The TMEP imposes no such requirement on an

4  applicant: see TMEP § 818.   Consequently, bad faith and fraud on the PTO cannot

5  be alleged on this basis.  Further, because Hereford supported all of her trademark

6  filings with specimens of use which were accepted by the PTO, the evidence that

7  was properly before the Examining Attorneys raised no concerns about potential bad

8  faith or fraud on the PTO.

9  **{3}.   Popularity Does Not Confer Exclusivity.**

10      72.    Two additional applications filed shortly after the release of the *Titanic*

11  film illustrate, by way of analogy, another flaw in Plaintiffs' argument: by having

12  created popular television shows, Plaintiffs did not acquire exclusive rights in the

13  history of the dog Rin Tin Tin or his famous name.

14      73.    On February 27, 1998 an application was filed for the mark TITANIC

15  THE BOARD GAME for use in connection with a board game based on the history

16  of the famous ship.[30]  The application was filed based on actual use in commerce

17  since as early as February 24, 1998, only three days before the application filing

18  date.  The specimen of use was deemed to be acceptable to the PTO, the application

19  was not opposed by Fox or by any other party, and the mark registered as U.S. Reg.

20  No. 2266626.  (*Id.*)

21      74.    On March 10, 1998, an application was filed for the mark THE RMS

22  TITANIC for use in connection with furniture.[31]  The application was filed based on

23  actual use in commerce since at least as early as November 14, 1997, less than one

24  month prior to the release of the *Titanic* film, and the actual-use filing basis was

25

26

27  [30] PTO case history for U.S. Reg. No. 2266626: available at www.uspto.gov.

    [31] PTO case history for U.S. Reg. No. 2284792: available at www.uspto.gov.

28

DECLARATION OF PATRICIA COTTON AS AN EXPERT WITNESS FOR DEFENDANT BELLEAIR

1  supported by a specimen of use deemed to be acceptable to the PTO.  The

2  application was not opposed by Fox or by any other party, and it registered as U.S.

3  Reg. No. 2284792.  (*Id.*)

4      75.     The sinking of the Titanic was a historical event which may inspire

5  use of the term TITANIC as a trademark for various goods and services and which

6  inspiration could be entirely unrelated to the release of a motion picture about that

7  same historical event.  As a matter of history, the facts regarding the sinking of the

8  RMS Titanic, including the fact that the term "Titanic" was the name of the ocean

9  liner, are items of information that belong to everyone, are not proprietary, and do

10  not function as trademarks entitling anyone to exclusive rights therein, unless and

11  until a particular term is used as a source identifier in connection with particular

12  goods or services.  Similarly, facts are not subject to copyright protection under the

13  Copyright Act (17 USC § 102(b)).   In both the cases of the TITANIC THE

14  BOARD GAME mark and the THE RMS TITANIC mark, and as further indicated

15  below, the applicants drew upon references to historical fact, which are not subject

16  to the exclusive or proprietary ownership of anyone, to inspire their use of TITANIC

17  as a trademark for their respective goods.

18      76.     The mark THE RMS TITANIC for furniture was registered by Classic

19  Leather, Inc., and while most of the case file is not available for review on the PTO

20  website, a press release from that time indicates that Classic Leather produced

21  furniture which replicated the furniture of the famous ship.[32]

22      77.     Similarly, the mark TITANIC THE BOARD GAME is based on the

23  historical event.  The specimen filed in this application and accepted by the PTO

24  includes the cover of the board game which describes the game with the following

25  text:

26  ────────────────

27  [32] See press release published on Furniture World website on May 25, 2004:
    http://furninfo.com/Furniture%20Industry%20News%20Archive/285

28

1
2
3

"Welcome aboard the R.M.S. Titanic.  Gossip with other passengers, receive telegrams, and collect all five pieces of your personal property to advance from Second Class to the First Class section of the ship.  But watch out, you might get put back into steerage, or worse yet, never make it to your lifeboat on time . . ."[33]

4
5
6

78.    Based on the foregoing description, this board game not only draws solely on the history of the event, it does not refer to the *Titanic* film, and it even distinguishes itself from the *Titanic* film in the mark itself.

7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

79.    The making of a motion picture about a historical event does not give the producers of the film a proprietary right in the facts of the historical event itself, or the exclusive right to use those facts as source identifying trademarks for all possible goods and services, regardless of the success and popularity of the film. Despite the global success of the *Titanic* film in 1997-98, that success did not make the history of the sinking of the Titanic the property of Fox.  The same can be said of the context of Rin Tin Tin, which, like the Titanic ocean liner, has a historical source.  By producing the *Adventures of Rin Tin Tin* television series and the *Rin Tin Tin: K-9 Cop* series, Plaintiffs did not acquire proprietary rights in the history of Rin Tin Tin or the exclusive right to use the designation RIN TIN TIN as a source identifying trademark for all possible goods and services.  The name "Rin Tin Tin" was not coined by Lee Duncan but originated as part of the cultural history of World War I.[34]  The facts of the life of Rin Tin Tin, including the facts that the dog achieved fame as a star of motion pictures and that his stardom in the 1920s created the opportunity for Herbert Leonard to produce the *Adventures* series in the 1950s are matters of history and items of information which are not proprietary or exclusive to anyone.  Just as the above-discussed TITANIC marks for furniture and

25
26
27
28

---

[33] PTO case history for U.S. Reg. No. 2266626: available at www.uspto.gov.
[34] Orlean, Susan. *Rin Tin Tin: The Life and the Legend* (New York: Simon & Schuster, 2011) pp. 29-30.  For photographs of historical "Nenette & Rintintin" dolls, see: http://www.mamalisa.com/blog/nenette-rintintin-good-luck-charm-dolls/

DECLARATION OF PATRICIA COTTON AS AN EXPERT WITNESS FOR DEFENDANT BELLEAIR

board games refer to the historical sinking of the RMS Titanic and not to Fox's theatrical motion picture, Hereford's RIN TIN TIN trademarks refer to the real, historical dog and not to any intellectual property owned by the Plaintiffs. As a result, there is no basis for concluding that Hereford's registrations were obtained fraudulently or that Hereford claimed rights in such registrations that she did not possess.

### (f).  The Third Clause of the Declaration

80.    The third clause of the declaration that Hereford signed when she filed her trademark applications must be viewed in its entirety. The sentence does not stop, as Plaintiffs would prefer, after the first phrase: "to the best of his/her knowledge and belief no other person, firm, corporation, or association has the right to use the mark in commerce . . ." If the declaration stopped there, and priority were the foremost consideration for trademark ownership as Plaintiffs want it to be, then Fox would be as guilty of having committed fraud on the PTO as Plaintiffs assert Hereford to be. When Fox filed applications to register the TITANIC mark, Fox signed the same declaration that Hereford signed. Did Fox commit fraud on the PTO because it knew that the term "titanic" had been used and registered as a trademark in connection with beer since 1993 (U.S. Reg. No. 2018187), with golf clubs since 1989 (U.S. Reg. No. 2007032), and with men's cosmetics and toiletries since 1996 (U.S. Reg. No. 2107419)? Did Fox commit fraud by failing to disclose those registrants whose rights were established prior to the rights of Fox? The answer to both questions is "no." Disclosure of any and all prior users of the mark is not a requirement imposed on U.S. trademark applicants. (TMEP § 818.) Moreover, the third clause of the declaration in a U.S. trademark application, taken in its full context, does not require the applicant to attest that no other person has the right to use the mark. It only requires that the applicant have a good faith belief that no likelihood of confusion will occur from the use of the mark: ". . . either in the identical

1   form thereof or in such near resemblance thereto as to be likely, when used on or in

2   connection with the goods/services of such other person, to cause confusion, or to cause

3   mistake, or to deceive".   Just as Fox did not commit fraud when it signed the

4   declarations to register its TITANIC trademark applications, Hereford did not

5   commit fraud when she signed the declarations for her applications to register the

6   Mark.

7                    **K.      No Fraud in Connection with U.S. Reg. No. 4263551**

8          81.    It cannot be asserted that Hereford made a misrepresentation in filing

9   the application for "Entertainment services in the field of motion pictures featuring a

10  German Shepherd dog" which became U.S. Reg. No. 4263551, and that, as a result,

11  this registration was obtained fraudulently.  Specifically, it cannot be asserted that

12  Hereford's reference in the application to motion pictures in plural form is a

13  misrepresentation because Hereford was only involved with the production of a

14  single documentary DVD, or that she made her misrepresentation to avoid a refusal

15  under TMEP § 1202.08, which states that "The title . . . of a single creative work

16  must be refused registration . . . unless the title has been used on a series of creative

17  works."  Hereford made no misrepresentation in the application; nor did the

18  application violate TMEP § 1202.08.  As indicated by the language of that TMEP

19  section, the PTO will register a trademark in connection with a single motion

20  picture, so long as the mark being registered does not function merely as the title of

21  the motion picture.   The specimen which Hereford filed for U.S. Reg. No. 4263551

22  displays the Mark on the back cover of the DVD case, a use which clearly is not the

23  title of the film.[35]  Accordingly, Hereford's use of the phrase "in the field of motion

24  pictures" was not an attempt to suggest a "series" of motion pictures, nor was it an

25  attempt to avoid a refusal under TMEP § 1202.08.   The "series" requirement of §

26

27  _____

    [35] PTO case history for U.S. Reg. No. 4263551: available at www.uspto.gov.

28

DECLARATION OF PATRICIA COTTON AS AN EXPERT WITNESS FOR DEFENDANT BELLEAIR

1202.08 applies only when the mark being registered is used solely as the title of the creative works for which the mark is being registered.  (TMEP § 1202.08(f).)  The mark which Hereford registered in U.S. Reg. No. 4263551 was not the title of the DVD, which is *Rin Tin Tin: A Living Legacy*, and so TMEP § 1202.08(f) does not apply.  (*Id.*)  Moreover, the phrase "motion pictures" in the application appears in the context of the longer phrase "entertainment services in the field of motion pictures" and so it describes the particular field in which the entertainment services fall.  This is not a misrepresentation, because entertainment services related to the distribution of even a single film can be said to fall in the broader category of the "field of motion pictures."

82.     Finally, as discussed above, Hereford's filing of the application which became U.S. Reg. No. 4263551 on the day after the grace period during which Max Kleven could have filed to maintain his Class 41 film and television services in U.S. Reg. No. 2969852 was not filed under circumstances of fraud if Hereford was only trying to safeguard her rights and protect the Mark.  The full history of facts surrounding that filing tends to support a finding that Hereford filed the application in good faith.

## L.     Conclusion

83.     The case histories of Daphne Hereford's trademark applications and the surrounding facts support a finding that Daphne Hereford obtained her trademark registrations in good faith and not under circumstances of fraud practiced on the PTO.

84.     In my opinion, Plaintiffs have not demonstrated that Belleair's trademark registrations at issue should be cancelled either on grounds of misrepresentation of source or on grounds of fraud.

85.     It is my understanding that Belleair is willing to assign U.S. Reg. No. 4263551 for the Mark for use in connection with "Entertainment services in the field

1  of motion pictures featuring a German Shepherd dog" to Plaintiffs.  Belleair's

2  willingness to take this step would allow the parties to continue to co-exist in a

3  manner that is not likely to create a likelihood of confusion in the marketplace.

4

5       I declare under penalty of perjury of the laws of the United States that the

6  foregoing is true and correct.

7       Executed on October 24, 2014, at Palo Alto, California.

8

9

10

11  PATRICIA L. COTTON

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28  51024105

DECLARATION OF PATRICIA COTTON AS AN EXPERT WITNESS FOR DEFENDANT BELLEAIR