Max Kleven v. Daphne Hereford, et al
Court File No. 13-CV-02783 – AB (AGRx)

# EXHIBIT B

1

2  **FREDRIKSON & BYRON, P.A.**
    Lora M. Friedemann (MN# 259615)
      E-Mail: lfriedemann@fredlaw.com
3  Paul E. Thomas (SB# 208577)
      E-Mail: pthomas@fredlaw.com
4  200 South Sixth Street, Suite 4000
    Minneapolis, MN 55042
5  Telephone: 612.492.7000

6  *Attorneys for Defendant*
    BELLEAIR TRADING
7  INTERNATIONAL LLC

8                    **UNITED STATES DISTRICT COURT**

9        **CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION**

10

11  MAX KLEVEN, an individual; RIN,           CASE NO. 13-CV-02783-AB (AGRx)
12  INC., a California corporation,
                                              **DECLARATION OF**
13              Plaintiffs,                   **MICHAEL C. DONALDSON AS AN**
                                              **EXPERT WITNESS FOR**
14          vs.                               **DEFENDANT BELLEAIR**
                                              **TRADING INTERNATIONAL LLC**
15  DAPHNE HEREFORD, an individual;
    RIN TIN TIN, INC., a Texas               Trial Date:  December 2, 2014
16  Corporation; BELLEAIR TRADING            Time:        8:30 am
    INTERNATIONAL, LLC, a Florida            Location:    Courtroom of the
17  limited liability company; DOES 1                     Honorable André
    through 20, inclusive,                                Birotte, Jr., United
18                                                        States District Judge
                Defendants.
19

20

21

22

23

24

25

26

27

28

**Introduction**

I, Michael C. Donaldson, declare as follows:

1.     I have been an attorney since 1967, when I graduated from the University of California Berkeley School of Law, Boalt Hall.  I am a founding partner of the firm of Donaldson + Callif, LLP.  My practice embraces all aspects of the film and television production industry, including transactions which involve the intellectual property components inherent in motion picture and television productions, which are primarily trademark and copyright assets.  I am the author of a widely used guidebook on copyright aspects of film and television production, entitled *Clearance & Copyright: Everything You Need to Know for Film and Television*, which is now in its fourth edition.  I am the co-author, along with my law partner Lisa Callif, of another reference guide which is entitled *The American Bar Association's Guide to Independent Filmmaking*.  In addition, I am the author of *The E-Z Legal Guide to Trademarks and Copyrights*, a volume which covers the basic topics of trademark registration before the United States Patent and Trademark Office.  I am a member of the Executive Committee and also the Treasurer of the Copyright Society of the U.S.A., I serve on the Advisory Committee of the Stanford Fair Use Project, which concerns all aspects of the fair use doctrine in copyright law, and I was the only U.S. attorney to serve on the committee which drafted the Rome Resolution of 2007, which launched the efforts to harmonize copyright fair use practices throughout the European Union.

2.     I have been engaged by defendant Belleair Trading International, LLC ("**Belleair**") to provide, based on a review of the salient documents and records, and based on my own research, expert testimony in regard to significant issues in this case.  Because the Plaintiffs have pleaded a claim for copyright infringement, I will discuss some of the copyright matters relevant to the case and their impact on the

1   requests for cancellation of Belleair's trademarks.  In particular, because Plaintiffs

2   claim their common law trademark rights in the RIN TIN TIN trademark based on

3   the distribution of their copyrighted works, I will address their request for

4   cancellation based on likelihood of confusion.   In addition, because the Plaintiffs

5   claim, at several points in their Complaint, that, due to the activities of the

6   Defendants, the Plaintiffs have suffered damage and injury because of the "loss of

7   use, exploitation and commercialization of the RIN TIN TIN intellectual property"

8   (Complaint, at 22, 23, 25-27, 30, 31, and 32-33), I will discuss some of the motion

9   picture merchandising issues relevant to the case.

10          3.      I have reviewed the following materials: the case docket; the Complaint

11  and its attached exhibits, including the transcript of the appearance of January 8,

12  1996 before Judge Marshall; the amended complaint in intervention; the other

13  pleadings and case filings on the case docket which have direct bearing on the

14  matters on which I will be giving an expert opinion; documents submitted in

15  discovery which are relevant to this declaration; the 1996 transcript of the settlement

16  discussion before Judge Marshall which Plaintiffs appended to their complaint; the

17  2006 Settlement Agreement; Belleair's website at www.rintintin.com and the

18  Internet Archive for Belleair's website at www.archive.org; the Internet Movie

19  Database ("**IMDB**") Website entry for Rin Tin Tin; the American Film Institute's

20  online records of the filmography of Rin Tin Tin at www.afi.com, the summary

21  volumes published by the United States Copyright Office which list all registrations

22  and renewals filed in each calendar year of publication, the online catalog of records

23  at the U.S. Copyright Office website at www.usco.gov, and the Declaration of

24  Patricia Cotton as an Expert Witness for Belleair.

25          4.      I am being compensated for my services at the rate of $595 per hour,

26  for my preparation, and I am being compensated $2,500 for each half day or portion

27

28

DECLARATION OF MICHAEL DONALDSON AS AN EXPERT WITNESS FOR DEFENDANT BELLEAIR

1  thereof on which I am required to testify.

2  **A.  Rin Tin Tin and Copyright Law**

3  5.  A fundamental principle of copyright law is that copyright protects the

4  expression of ideas and not the ideas themselves. (17 USC § 102(b)).  Abstract ideas

5  are not copyrightable as abstractions but are copyrightable when they are expressed

6  in tangible media.  From this fundamental principle flows another, which is related:

7  facts are not copyrightable.  Facts are distinct items of information and are part of

8  the common property of humankind, and because they belong to all of us, they

9  cannot be the exclusive property of any individual.  A fact can be discovered, but

10 that does not make the discoverer an "author" of the fact.  Congress has codified

11 both rules in Section 102(b) of the Copyright Act: "In no case does copyright

12 protection for an original work of authorship extend to any idea, procedure, process,

13 system, method of operation, concept, principle, or discovery, regardless of the form

14 in which it is described, explained, illustrated, or embodied in such work."

15 **(a).  The Dog Named Rin Tin Tin**

16 6.  This case partly concerns the historical facts of the life of an actual dog

17 named Rin Tin Tin who was born in September of 1918 in Fluiry, France, and died

18 on August 10, 1932 in Los Angeles, California.[1]  The facts of the dog's rescue as a

19 newborn puppy by U.S. Air Corps Corporal Lee Duncan and his journey to his new

20 home in Los Angeles after the end of the First World War, the facts of his fortuitous

21 entrance into the film industry, the facts of his being featured in at least twenty-

22 seven motion pictures made between 1922 and 1931, and the facts of his consequent

23 stardom as an on-screen performer – all of these historical facts are items of

24 information which belong to everyone in common and cannot be exclusively

25

26 _____

27 [1] Orlean, Susan. *Rin Tin Tin: The Life and the Legend*. (New York: Simon & Schuster, 2011) pp. 27-113.

28

1  appropriated by any person or entity.  (*Id.*)  The facts of Rin Tin Tin's life are not

2  subject to copyright protection under Section 102(b) of the Copyright Act.

3                              **(b).   Rin Tin Tin and His Films**

4        7.      Rin Tin Tin must be distinguished from the films he appeared in

5  between 1922 and 1930 because each has a different relationship to copyright law.

6  None of the facts of the life of Rin Tin Tin are subject to copyright, including the

7  fact that the dog became a film star.  However, the films in which Rin Tin Tin

8  appeared are subject to copyright.

9        8.      The films were produced and distributed as copyrightable works under

10  the Copyright Act of 1909, and they are categorically considered to be copyrightable

11  works under the Copyright Act of 1976, which now applies to the films.   Under the

12  Copyright Act of 1909, copyright was available for a twenty-eight year period if the

13  copyright owner complied with the statutory formalities by publishing the work with

14  proper notice of copyright and then registering the copyright with the U.S.

15  Copyright Office within five years of the date of the first publication of the work.

16  At the end of the twenty-eight year period, a renewal period was available under the

17  Copyright Act of 1909 if the appropriate filing was made in a timely manner.

18        9.      The oldest copyrightable works that were protected under the

19  Copyright Act of 1909 and continue to be protected under the current Copyright Act

20  of 1976 are qualifying works which were in their renewal terms as of January 1,

21  1978, when the current Copyright Act became effective.  By the expression

22  "qualifying work", I mean a work created under the Copyright Act of 1909 which

23  was published with proper notice of copyright, was registered properly with the U.S.

24  Copyright Office, and then was renewed in a timely manner.  So, the oldest

25  qualifying works protected under the current Copyright Act of 1976 are qualifying

26  works published fewer than 56 years (that is, 28 years of the registration term plus

27  another 28 years of the renewal term, which equals 56 years) prior to January 1,

28

1  1978, or, more concisely, qualifying works published after January 1, 1923 (See: 17

2  USC § 304(b)).  This means that, in the context of Rin Tin Tin's films, the first two

3  films in which Rin Tin Tin appeared, *The Man from Hell's River* and *My Dad*, are

4  now too old to qualify for copyright protection because, according to the IMDB

5  website and AFI records, they were produced and distributed in 1922.[2]

6  Accordingly, if the IMDB and AFI website records are accurate about the dates of

7  production, the films *The Man from Hell's River* and *My Dad*, including all

8  photographic and filmed images of Rin Tin Tin contained in those films, have

9  passed out of U.S. copyright protection and into the public domain.  Consequently,

10  under copyright law, any person or entity, including Belleair, can use the images of

11  Rin Tin Tin from those two films for any purpose whatsoever without having to

12  obtain advance permission from anyone.

13  ### (c).  Rin Tin Tin and Warner Brothers Pictures, Inc.

14      10.    All of the films in which Rin Tin Tin appeared between 1922 and 1930

15  were produced by Warner Brothers Pictures, Inc. ("**Warner Brothers**").  In addition

16  to the two 1922 films discussed above, two other Warner Brothers films featuring

17  Rin Tin Tin are now in the public domain and unprotected by copyright: *Shadows of*

18  *the North*, produced and distributed in 1923, and *A Race for Life*, produced and

19  distributed in 1928.[3]  However, twenty-two of the Warner Brothers films in which

20  Rin Tin Tin appeared are still protected by copyright, and those copyrights are still

21  owned by Warner Brothers or one of its related entities.[4]

22  _____

23  [2] See the 26 titles in the filmography of Rin-Tin-Tin at www.afi.com and the entry

24  for the actor Rin Tin Tin at www.imdb.com.

    [3]  My survey of U.S. Copyright Office records indicates that the renewals for the

25  copyright registrations for these films were not filed.

    [4]  The U.S. Copyright Office Catalog contains a 2003 entry which indicates an

26  assignment of nineteen of the Rin Tin Tin films to other Warner Brothers entities:

27  the parties are Warner Communications, Inc. and Time Warner Entertainment

    Company, L.P.  The actual assignment is not accessible but the titles assigned are

28  listed.  This assignment included all of the Rin Tin Tin films except for *The Show of*

    (footnote continued)

DECLARATION OF MICHAEL DONALDSON AS AN EXPERT WITNESS FOR DEFENDANT BELLEAIR

1    11.    The protected films are all qualifying works as I am defining that term

2   here.  In other words, Warner Brothers registered the copyrights in the films and

3   then filed timely renewals of those copyrights, and the renewal terms were

4   subsisting on January 1, 1978 when the current Copyright Act became effective.[5]

5    12.    Because the films owned by Warner Brothers are qualifying works,

6   Section 304(b) of the Copyright Act protects them for 95 years after the date of their

7   initial registrations.  Accordingly, the Warner Brothers films will not pass out of

8   copyright protection and into the public domain for several more years, as indicated

9   on the following chart:

10

11

12

13

14

15

16

17  _____

18  *Shows*, *While London Sleeps*, *Tiger Rose*, and *On the Border*.  The Catalog indicates
    that *The Show of Shows* was the subject of a 2004 assignment between Warner
19  Brothers, Inc. and Warner Communications, Inc.

20  [5] All of the copyright renewal filings made by Warner Brothers are publicly
    available records catalogued in the following publications of the United States
    Copyright Office at the Library of Congress in Washington, D.C.: *CATALOG OF*
21  *COPYRIGHT ENTRIES, Third Series, Motion Pictures and Filmstrips*: --
    Volume 5, Parts 12-13, Number 1, January – June, 1951.
22  Volume 5, Parts 12-13, Number 2, July – December,  1951.
    Volume 6, Parts 12-13, Number 2, July – December, 1952.
23  Volume 7, Parts 12-13, Number 1, January – June, 1953.
    Volume 7, Parts 12-13, Number 2, July – December, 1953.
24  Volume 8, Parts 12-13, Number 1, January – June, 1954.
    Volume 8, Parts 12-13, Number 2, July – December, 1954.
25  Volume 9, Parts 12-13, Number 1, January – June, 1955.
    Volume 9, Parts 12-13, Number 2, July – December, 1955.
26  Volume 10, Parts 12-13, Number 1, January – June, 1956.
    Volume 10, Parts 12-13, Number 2, July – December, 1956.
27  Volume 11, Parts 12-13, Number 2, July – December, 1957.
    Volume 12, Parts 12-13, Number 1, January – June, 1958.

28

DECLARATION OF MICHAEL DONALDSON AS AN EXPERT WITNESS FOR DEFENDANT BELLEAIR

| Title: | Date of Publication: | Date of Expiration of Copyright under § 304(b): |
|---|---|---|
| Where the North Begins | 1923 | December 31, 2018 |
| The Lighthouse by the Sea | 1924 | December 31, 2019 |
| Find Your Man | 1924 | December 31, 2019 |
| Clash of the Wolves | 1925 | December 31, 2020 |
| Below the Line | 1925 | December 31, 2020 |
| Tracked in the Snow Country | 1925 | December 31, 2020 |
| While London Sleeps | 1926 | December 31, 2021 |
| The Night Cry | 1926 | December 31, 2021 |
| A Hero of the Big Snows | 1926 | December 31, 2021 |
| Tracked by the Police | 1927 | December 31, 2022 |
| A Dog of the Regiment | 1927 | December 31, 2022 |
| Hills of Kentucky | 1927 | December 31, 2022 |
| Jaws of Steel | 1927 | December 31, 2022 |
| Rinty of the Desert | 1928 | December 31, 2022 |
| Land of the Silver Fox | 1928 | December 31, 2023 |
| The Million Dollar Collar | 1929 | December 31, 2024 |
| The Show of Shows | 1929 | December 31, 2024 |
| Tiger Rose | 1929 | December 31, 2024 |
| Frozen River | 1929 | December 31, 2024 |
| The Man Hunter | 1930 | December 31, 2025 |
| On the Border | 1930 | December 31, 2025 |
| Rough Waters | 1930 | December 31, 2025 |

13.     Only four of Warner Brother's twenty-six films in which Rin Tin Tin was an actor are not now protected by copyright law: *The Man from Hell's River* and *My Dad*, which were produced and distributed (that is, published) in 1922 and are too old for protection, and the two films for which the copyright renewals were not filed: *Shadows of the North* (1923) and *A Race for Life* (1928). These four films are now in the public domain and, as said above, any person or entity, including

1  Belleair, may lawfully use these three works for any purpose without having to
2  obtain advance permission from anyone.[6]

3  ### (d).  Rin Tin Tin and His Characters

4        14.     According to the plot summaries included in the AFI records, Rin Tin
5  Tin portrayed multiple characters in his films.  For example, in *Where the North*
6  *Begins*, Rin Tin Tin plays a dog that was lost as a puppy in Alaska and then raised
7  by wolves but that, when given the opportunity to attack a helpless man, chooses
8  instead to befriend the man.[7]  In *While London Sleeps*, Rin Tin Tin plays the abused
9  dog of a notorious criminal, but he is later rescued from his cruel master by the
10  daughter of a Scotland Yard police inspector.   In *Jaws of Steel*, Rin Tin Tin plays a
11  dog that, having been lost as a puppy in the California desert, has grown up to be a
12  wild killer that is hunted by local townspeople.  And, as yet another example, in
13  *Land of the Silver Fox*, Rin Tin Tin plays an abused police dog of the Canadian
14  Mounted Police.[8]

15        15.     The characters portrayed by Rin Tin Tin may be copyrightable.  A
16  fictional character is copyrightable if sufficiently well delineated to cross the
17  threshold of originality required for copyright protection, as was confirmed by this
18  Court earlier this year in a case that concerned a fictional sportscaster character
19  created by actor Hank Azaria (See: *Azaria v. Bierko*, Case No. 12-cv-09732-GAF-
20  (RZx), CD Cal. 2014).  My opinion does not extend to whether or not the characters

21  _____

22  [6]   The Internet Movie Database, but not AFI, lists a serialized motion picture
23  entitled *The Lightning Warrior*, which was produced in twelve episodes and
distributed in 1931 by Mascot Pictures, and which featured Rin Tin Tin.  A survey
24  of the Catalog of Copyright Entries for 1959 indicates that this work, if it was
originally registered, was not renewed with a timely filing in the Copyright Office,
and therefore it is likely that *The Lightning Warrior* is now out of copyright
25  protection and in the public domain.

26  [7]   The first 13.5 minutes of *Where the North Begins* is currently accessible on
YouTube: https://www.youtube.com/watch?v=hXVfDim2GfM.

27  [8]   See plot summaries of films featuring Rin Tin Tin by accessing individual film
titles within the Rin-Tin-Tin filmography provided at www.afi.com.
28

1  portrayed by Rin Tin Tin in his films are copyrightable, because it is sufficient to

2  say here that the characters portrayed by Rin Tin Tin <u>may</u> be copyrightable, and, if

3  so, those copyrighted characters are owned by Warner Brothers, because the

4  characters are fixed in a tangible medium of expression and inherent in the films

5  which are copyrighted assets of Warner Brothers.

6          (e).    **The Character in *The Adventures of Rin Tin Tin***

7        **16.**    Rin Tin Tin and the characters he portrayed are both different from and

8  distinguishable from the "Rin Tin Tin" character portrayed by other dogs in the

9  1954-59 television series entitled *The Adventures of Rin Tin Tin* in which

10  Defendants assert copyright ownership (the series shall be referred to hereinafter as

11  "*Adventures*").  In *Adventures*, the character named Rin Tin Tin is the dog of a boy

12  named Rusty who is orphaned when his parents are killed during a frontier raid by

13  Native Americans, and Rusty and his dog become the wards of the United States

14  Cavalry stationed at Fort Apache in Arizona in the years after the Civil War.[9]  This

15  *Adventures* character is distinguishable from Rin Tin Tin because Rin Tin Tin,

16  having died in 1932, obviously did not portray the *Adventures* character.  The

17  *Adventures* character is also distinguishable from the multiple characters portrayed

18  by Rin Tin Tin because the filmography of the Rin Tin Tin does not include a

19  character set in Fort Apache in Arizona during the post-Civil-War era.[10]

20

21

22

23

24

25

---

26  [9] See Wikipedia article on *The Adventures of Rin Tin Tin*:
http://en.wikipedia.org/wiki/The_Adventures_of_Rin_Tin_Tin

27  [10] See plot summaries of films featuring Rin Tin Tin by accessing individual film

28  titles within the Rin-Tin-Tin filmography provided at www.afi.com.

DECLARATION OF MICHAEL DONALDSON AS AN EXPERT WITNESS FOR DEFENDANT BELLEAIR

### B.   The "Iconic Fictional German Shepherd Character"

### (a).  Plaintiff's Meaning and Scope of the Term

17.    Rin Tin Tin, the characters Rin Tin Tin portrayed in his films, and the *Adventures* character are all different from what the Plaintiffs refer to numerous times in their Complaint as "the iconic fictional German Shepherd character named Rin Tin Tin". (Complaint, at 15-17 *et seq*.)  Based on the Complaint, Plaintiffs appear to use that phrase to indicate the totality of the intellectual property rights – including both copyright and trademark rights – in which Plaintiffs assert ownership, because Plaintiffs refer to "The Rin Tin Tin copyright and common law trademarks [sic] rights in and to the iconic fictional German Shepherd character named Rin Tin Tin" as the "Rin Tin Tin Rights", and Plaintiffs assert that they "have been using the common law trademark in the name and image of the iconic fictional German Shepherd character named Rin Tin Tin continuously in United States (and international) commerce from the date of the creation of the various works, beginning in 1923 and continuing to this very day." (Complaint, at 16.)  The Plaintiffs assert that because "Many of the multiple copyrighted works featuring the iconic fictional German Shepherd character named Rin Tin Tin have been available for purchase and/or viewing in one form or another continuously, since their very creation for decades," that, therefore, Plaintiff's common law trademark rights "in the name and image of the iconic fictional German Shepherd character named Rin Tin Tin" extend continuously all the way back from the present to 1923. (*Id*.)  In sum, Plaintiffs appear, on the face of their Complaint, to assert ninety-one years of continuous trademark use of the RIN TIN TIN mark, ninety-one years of continuous trademark use of the image of Rin Tin Tin as a design trademark, and ninety-one years of copyright ownership of what they refer to as the iconic fictional German Shepherd character named Rin Tin Tin.

**(b).  Plaintiffs' Broken Chain of Title for the Term**

18.     Plaintiffs assert a continuous chain of title to support their ninety-one year claim of ownership of the word trademark, the image trademark, and of the character consisting of the iconic fictional German Shepherd character named Rin Tin Tin, "beginning in 1923 and continuing to this very day." (*Id.*) The chain, Plaintiffs assert, runs "via the assignment from Duncan to Leonard, from Leonard to Kleven and from Kleven to Kleven and Rin, Inc." (*Id.*)

**{1}  Warner Brothers' Copyright Rights.**

19.     The glaring omission in Plaintiffs' chain of names is Warner Brothers. Plaintiffs' Complaint is silent in regard to Warner Brothers and its ongoing copyright rights in the films of Rin Tin Tin.  The Report on the Filing or Determination of an Action or Appeal Regarding a Copyright, which contains more than one hundred registrations of copyright assets owned by Plaintiffs, contains no entries of a recordation of an assignment of rights from Warner Brothers to Plaintiffs.[11] In discovery, Plaintiffs provided no documents regarding Lee Duncan's relationship with Warner Brothers or their own relationship with Warner Brothers. In particular, there is no assignment from Warner Brothers to Duncan which conveys to Duncan the kind of comprehensive rights which Plaintiffs assert they own in the iconic fictional German Shepherd character named Rin Tin Tin, rights which Duncan could then have conveyed to Plaintiffs.  Despite the fact that Warner Brothers owns copyrights in Rin Tin Tin films and may also own copyrights in characters portrayed by Rin Tin Tin until the end of 2025, the Plaintiffs provide no explanation or clarification of their relationship to Warner Brothers.  Not only have the Plaintiffs left Warner Brothers out, but also Plaintiffs have gone so far as to claim as their own the rights established and still owned by Warner Brothers, as the

---

[11] Report on the filing of Determination of an Action or Appeal Regarding a Copyright, Docket No. 8.

1    records of the U.S. Copyright Office demonstrate.  In asserting rights that extend

2    back to 1923 and thus through the entire era of Warner Brothers' Rin Tin Tin films,

3    Plaintiffs are claiming rights they do no own.

4    **{2}  Warner Brothers and Trademark Rights.**

5         20.     When Rin Tin Tin appeared in his first Warner Brothers film, *The Man*

6    *from Hell's River*, that appearance did not create and vest in Warner Brothers any

7    intellectual property rights in the RIN TIN TIN name as a trademark.  Rin Tin Tin

8    was a dog actor.  He had a name, just like every other actor, and his name appeared

9    in the credits of the film along with those of the other actors.  The same applies to

10    the other Warner Brothers films because the use of an actor in a film and the

11    appearance of the actor's name in the credits does not constitute trademark use of

12    the actor's name: in other words, the appearance of the actor's name in the credits is

13    not a brand which identifies the source of the motion picture.

14         21.     However, Warner Brothers appears to have made use of a RIN TIN

15    TIN trademark in connection with collectable movie posters advertising its motion

16    pictures.[12]  Warner Brothers did not file to register a RIN TIN TIN trademark, but

17    the conspicuous use of the name in publicity posters for the purpose of promoting

18    the films and Warner Brothers as the source of the films may constitute trademark

19    use and may indicate that Warner Brothers had established common law trademark

20    use of a RIN TIN TIN trademark in connection with movie posters which were

21    publicly distributed.

22    **{3}  Lee Duncan and Trademark Rights.**

23         22.     Lee Duncan raised Rin Tin Tin, who became a successful dog actor in

24    motion pictures, and whose name was recognized internationally.  The name of Rin

25

26

27

28

---

[12] A Google images search for "Rin Tin Tin movie posters" at www.google.com produces a variety of images of original Warner Brothers posters for movies featuring Rin Tin Tin.

13

1    Tin Tin achieved sufficient stardom that Lee Duncan was able to raise two other
2    offspring of Rin Tin Tin who had successful movie careers because of their
3    connection to Rin Tin Tin: Rin Tin Tin Junior and Rin Tin Tin III.[13]

4           23.      But stardom and trademark use are two different things, and having a
5    famous name does not automatically mean you have a famous trademark, even if
6    you are a dog famous enough to pass your name on to your puppy offspring so that
7    they can appear in motion pictures too.  An actor who enjoys wide public
8    recognition for her or his name does not automatically have trademark rights to his
9    or her name because the public's recognition is recognition of the person and not of
10   any goods or services provided to consumers under the person's name.  Of course,
11   actors and celebrities have used their names as trademarks, but, to be trademark use,
12   the use of the name must be as a source identifier of goods or services and not
13   merely surname use identifying the celebrity.

14          24.      A good example is Paul Newman.  After having gained global fame as
15   an actor, Newman launched a food products company under the mark NEWMAN'S
16   OWN, starting with a line of salad dressings:



23   But NEWMAN'S OWN as a trademark is separate from Paul Newman the famous
24   actor, even though Newman's face appears in the logo, and the goodwill value of the

27   [13] See the filmographies for the actors "Rin Tin Tin Jr." and "Rin Tin Tin III" at
     www.imdb.com.

1  trademark consists of the public recognition given to the mark for quality food

2  goods, not the public recognition given to Newman the film star.[14]

3      25.    Lee Duncan did not do with the name Rin Tin Tin what Paul Newman

4  did with his own name.  Lee Duncan raised dogs who became successful film actors

5  and who had a famous name, but he did not use that name as a trademark to identify

6  goods or services separate from the dogs themselves.  Lee Duncan's use of the Rin

7  Tin Tin name was always with the dogs.  Consequently, Lee Duncan did not

8  establish common law trademark rights in the RIN TIN TIN trademark.

9                    **{4}  Duncan's Agreement with Leonard.**

10      26.    On March 21, 1954, Duncan executed an intellectual property rights

11  agreement with Herbert Leonard Productions, Inc., which Herbert Leonard then

12  used as his basis for beginning production of the *The Adventures of Rin Tin Tin*

13  television series later that year. (Exhibit 1.)  In the agreement Duncan grants

14  Leonard's company the exclusive right, forever, to use "the name, title, character

15  and likeness of RIN TIN TIN" in television and radio productions, to exercise broad

16  publication rights for works related to the television and radio programs in all

17  media, to engage in advertising for the television and radio programs, and to enter

18  into agreements for merchandising and subsidiary rights and commercial

19  endorsements and tie-ups.  (Exhibit 1, at Sections 2(a)-(d).)  Duncan did not own

20  the copyrights in Rin Tin Tin's films, and he did not own trademark rights in the

21  RIN TIN TIN trademark.  Plaintiffs are silent in regard to their or Duncan's

22  relationship with Warner Brothers. These important facts all cast doubt on the

23  legitimacy of the March 21, 1954 agreement as a conveyance of intellectual

24  property rights.

25

26

27  [14] See the NEWMAN'S OWN website at www.newmansown.com.

28

DECLARATION OF MICHAEL DONALDSON AS AN EXPERT WITNESS FOR DEFENDANT BELLEAIR

27.     The agreement begins with broad representations on the part of Lee Duncan.  The most important ones are delineated Section 1(a): "You have the sole and exclusive ownership of and right to use the name and title RIN TIN TIN, which was the name of the former canine motion picture performer and is the name of certain other dogs owned by you; and you have the sole and exclusive ownership of the character and likeness of RIN TIN TIN."  (*Id.*, at Section 1(a).)

28.     Duncan could only convey what he owned, and Plaintiffs have not demonstrated that Duncan owned the intellectual property that the March 21, 1954 agreement purports to convey.

29.     By naming his dogs Rin Tin Tin, Duncan did not obtain the exclusive right to that name as a name for a dog or for other things.  The name "Rin Tin Tin" did not originate with Duncan.  Duncan did not coin it or make it up.  Rather, the name arose as part of French local cultural history of World War I and was bestowed upon hand-made good luck dolls which were named, as a pair, "Nanette" and "Rin Tin Tin," and sold or given by children to American soldiers.[15]  Because the name Rin Tin Tin originates as part of French history, Duncan would not have had any legal grounds for preventing other pet owners from naming their pets Rin Tin Tin.

30.     Similarly, Duncan would not have had any legal grounds for claiming exclusive rights in the use of Rin Tin Tin as a title of a copyrightable work.  Warner Brothers used the name "Rinty" in the title of one of its copyrighted films, *Rinty of the Desert*.[16]  Romay Pictures used the name *The Return of Rin Tin Tin* as the title of a 1947 film which featured Rin Tin Tin III.[17]  In addition, copyright law does not

---

[15] Orlean, Susan. *Rin Tin Tin: The Life and the Legend* (New York: Simon & Schuster, 2011) pp. 29-30.  For photographs of historical "Nenette & Rintintin" dolls, see: http://www.mamalisa.com/blog/nenette-rintintin-good-luck-charm-dolls/

[16] See the entry for the 1928 film *Rinty of the Desert* at www.afi.com.

[17] See the entry for the 1947 film *The Return of Rin Tin Tin* at www.afi.com.

1    protect titles because they are not works of authorship and are considered to be

2    unprotectable ideas under Section 102(b) of the Copyright Act.  Therefore, Duncan

3    could not have prevented others from using the Rin Tin Tin name in titles under

4    copyright law; and, because he was not using a RIN TIN TIN trademark in

5    connection with a series of copyrighted works, he would not have been able to

6    prevent others from using the Rin Tin Tin name in titles under trademark law.

7         31.    Duncan did not have exclusive rights to the "character" of Rin Tin Tin.

8    Rin Tin Tin the dog actor portrayed multiple characters in the Warner Brothers

9    films, and if those characters were sufficiently well delineated to be copyrightable,

10    then the copyrights in those characters were and are owned by Warner Brothers

11    because the characters are wholly contained within copyrighted motion pictures

12    owned by Warner Brothers.  If copyrightable, those characters will remain protected

13    by copyright until at least 2018, and some will be protected until 2025.

14         32.    Further, Duncan did not have exclusive rights to the "likeness" of Rin

15    Tin Tin.  Under California law, "name and likeness" rights are generally referred to

16    as a right of publicity, and that is a right that can only vest in a human being.  A dog

17    cannot own a right of publicity, and Duncan, as Rin Tin Tin's owner, could not

18    claim a right of publicity in Rin Tin Tin under California law.  In addition, Duncan

19    was not using the likeness of Rin Tin Tin as a trademark, and Plaintiffs have not

20    shown that Duncan registered any copyrights in photographs of Rin Tin Tin or his

21    namesake offspring.  Even if Duncan had registered copyrights in photographs

22    containing images or likenesses of Rin Tin Tin, his rights would not have been

23    exclusive because Warner Brothers owns a considerable number of works

24    containing copyrighted likenesses of Rin Tin Tin.  Plus, at least one of the Warner

25    Brothers Rin Tin Tin films – *Shadows of the North* – for which copyright was not

26    renewed, had already passed out of copyright protection and into the public domain,

27    along with all of the images and likenesses of Rin Tin Tin contained within it, by

28

DECLARATION OF MICHAEL DONALDSON AS AN EXPERT WITNESS FOR DEFENDANT BELLEAIR

1  1951, three years before Duncan executed his agreement with Leonard.

2  Consequently, Duncan had no exclusivity in the "likeness" of Rin Tin Tin.

3      33.    In light of these facts, Plaintiffs have not demonstrated that the legal

4  grounds exist on which Lee Duncan could have made the representations in Section

5  1(a) of the agreement.  (Exhibit 1, at Section 1(a).)

6      34.    In addition to the Section 1(a) representations, Duncan makes the

7  additional representations in Section 1(c): "You have full right, power and authority

8  to grant to us the rights hereinafter specified . . . there are no rights, licenses and/or

9  grants of any kind in favor of any person, firm or corporation which could or might

10  in any way impair, limit, diminish or infringe upon the rights hereinafter granted to

11  us; and that the rights hereinafter granted to us will in no way violate or infringe

12  upon any copyright belonging to . . . any person, firm, or corporation." (Exhibit 1,

13  at Section 1(c).)

14      35.    Duncan made the Section 1(c) representation in regard to his authority

15  to grant Leonard rights in "the name, title, character and likeness of RIN TIN TIN"

16  without any reference to the preexisting and subsisting rights of Warner Brothers.

17  Warner Brothers owned, and continues to own, copyrights in the image and likeness

18  of Rin Tin Tin, and Warner Brothers may own rights in the characters portrayed by

19  Rin Tin Tin.  These preexisting and subsisting rights certainly "could or might" in

20  some way "impair, limit," or "diminish" the rights Duncan granted to Leonard.

21      36.    By making representations about rights ownership without legal

22  grounds for such representations, and by failing to acknowledge the existence of

23  Warner Brothers or to explain its relationship to either party, Duncan and Leonard

24  not only violated the extant rights of Warner Brothers, but they executed an

25  agreement concerning rights that Duncan could not grant and Leonard could not

26  acquire from him.

27

28

DECLARATION OF MICHAEL DONALDSON AS AN EXPERT WITNESS FOR DEFENDANT BELLEAIR

{5}   **Eva Duncan's Agreement with Leonard**

37.   The legal weaknesses inherent in the agreement Lee Duncan executed with Leonard are even more pronounced in the agreement Eva Duncan executed with Leonard twenty-four years later on April 4, 1978.  (Exhibit 10.)  Like the agreement with Lee Duncan, this agreement grants Leonard broad rights concerning "the name, title, likeness and image of the motion picture and television star "Rin Tin Tin"" which the agreement identifies as "the character"; broad publication rights for a variety of kinds of works featuring "the character"; broad merchandising rights and sublicensing rights regarding merchandising for arrangements under which a "product, commodity or service is made, manufactured, or distributed which features or in any way utilizes the character"; and, somewhat oddly phrased, broad rights to "breed and show and to cause others to breed and show the character." (*Id.*)

38.   The April 4, 1978 agreement begins with a broad representation in Section 1(b) that Eva Duncan is "the sole and exclusive owner of . . . the name, title, likeness and image of the motion picture and television star "Rin Tin Tin"". (*Id.*, at Section 1(b).)

39.   Like Lee Duncan, Eva Duncan could only convey what she owned.  If Lee Duncan could not make such a representation in 1954, his widow Eva Duncan could not make this representation twenty-four years later.  The rights of Warner Brothers in the likeness and image of Rin Tin Tin were as valid and current in 1978 as they were in 1954 and as they are today, so Eva Duncan had no grounds upon which to make the representation that she was the exclusive owner of such rights. Further, just as Lee Duncan did not possess trademark rights in the name or likeness of Rin Tin Tin, Plaintiffs have not submitted any evidence that Eva Duncan, seventeen years after her husband's death, had established any common law trademark rights in the RIN TIN TIN trademark.  As with the agreement her husband executed with Leonard twenty-four years earlier, Eva Duncan was granting

1 | rights which she did not possess and which Leonard could not acquire from her.

2 | {6}  **Copyrights as the Source of Trademark Rights.**

3 | 40.    The foregoing examination of the agreements Leonard executed with

4 | Duncan and Eva Duncan indicate that those agreements were not when they were

5 | executed and are not now a solid foundation upon which Plaintiffs can rest a claim

6 | for exclusive trademark rights in the RIN TIN TIN trademark, or in the image or

7 | likeness of Rin Tin Tin as a trademark.  The Plaintiffs' only other basis for claiming

8 | common law trademark rights is the *Adventures* series and the *Rin Tin Tin: K-9 Cop*

9 | series.  It is of course possible to establish trademark rights through the use of a

10 | mark as a source identifier for a series of copyrighted works which are distributed to

11 | consumers.  If that is Plaintiffs' basis, then the trademark rights Plaintiffs could

12 | claim would stand in the titles of these two series used as source identifiers for each

13 | series and not in the RIN TIN TIN mark.

14 | 41.    Further, Plaintiffs could not use their copyrighted series to claim

15 | exclusive trademark rights in the image or likeness of Rin Tin Tin.  Rin Tin Tin,

16 | having died in 1932, did not appear in either of Plaintiffs' television series, and

17 | therefore Plaintiffs own no copyrighted images of Rin Tin Tin.  In addition, Warner

18 | Brothers owns copyrights in a substantial number of images and likenesses of Rin

19 | Tin Tin, and many others now stand in the public domain and are thus "owned" by

20 | everyone.  For this reason, no one can claim exclusive trademark rights in the image

21 | or likeness of Rin Tin Tin based on the distribution of works containing those

22 | images because the rights in those images do not stem from a single source.

23 | 42.    The Plaintiffs' attempts to use their distribution of copyrighted works

24 | as the source of trademark rights is further diminished by the fact that Plaintiffs

25 | claim competing rights, and Plaintiffs have not fully demonstrated to each other the

26 | bases for their rights.  The Plaintiff-in-intervention, Shamrock Entertainment, Ltd.

27 | (**"Shamrock"**), has included in its complaint a claim against Kleven's company,

28 |

1   Rin, Inc., for breach of contract or anticipatory repudiation of a contract with a

2   Dutch company called Finance Corporation N.V. which Shamrock claims that

3   Leonard signed in 1997 and to which Kleven and Rin Inc. are bound.  (First

4   Amended Complaint in Intervention, at 17-18.)  Further, Shamrock's principal,

5   James P. Tierney, alleges that he has never seen the documents which Kleven claims

6   are the assignments of copyrights he obtained from Leonard. (*Id.*, at 9-10.)

7      43.   The purpose of a trademark is to identify a single source of goods or

8   services, and when the asserted basis for the establishment of common law

9   trademark rights is the distribution of copyrighted works, those works need to

10  originate from a single source.  That is not the case here.  Plaintiffs cannot claim

11  exclusive rights in the image and likeness of Rin Tin Tin because too many other

12  parties have the right to publish and distribute images of Rin Tin Tin.

13               **{7}  Consequences of the Broken Chain of Title.**

14     44.   Warner Brothers, a major owner of rights that have bearing on the

15  name, title, likeness, and image of Rin Tin Tin and characters portrayed by him, has

16  been completely left out of the Plaintiffs' account of the history of their rights.  In

17  paragraph 59 of their Complaint, Plaintiffs have claimed continuous rights

18  beginning in 1923 and continuing to this very day.  This claim is simply not true.

19  The presence of Warner Brothers and its ongoing rights have significant

20  consequences for Plaintiffs' claims of ownership.

21     45.   First, by claiming rights that extend over the entirety of the Warner

22  Brothers era of successful filmmaking with Rin Tin Tin from 1923 to 1930,

23  Plaintiffs have attempted to usurp Warner Brothers' preexisting and subsisting

24  copyright rights.  In addition, by claiming rights that extend over the Warner

25  Brothers era, Plaintiffs are claiming, without a legal basis, the common law

26  trademark rights that Warner Brothers may have established in their use of the RIN

27

28

DECLARATION OF MICHAEL DONALDSON AS AN EXPERT WITNESS FOR DEFENDANT BELLEAIR

1 TIN TIN trademark on movie posters to advertise the source of the Rin Tin Tin

2 feature films.

3        46.     Second, by leaving Warner Brothers out of their description of the

4 history of their rights and effectively claiming Warner Brothers' rights as their own,

5 Plaintiffs appear to have made a material misrepresentation of fact to the Court.

6        47.     Third, Plaintiffs cannot claim any intellectual property rights stretching

7 back to 1923.

8        48.     Fourth, Plaintiffs cannot claim exclusive copyrights in the image and

9 likeness of Rin Tin Tin because Plaintiffs do not own the copyright in any of the

10 films in which Rin Tin Tin appeared.

11        49.     Fifth, Plaintiffs cannot claim exclusive copyright in the characters

12 portrayed by Rin Tin Tin because Plaintiffs do not own the copyright in any of the

13 films in which Rin Tin Tin appeared.

14        50.     Sixth, whatever intellectual property rights Plaintiffs possess began not

15 in 1923 but in 1954, when Herbert Leonard Productions, Inc. contracted with Lee

16 Duncan; however, the validity of the Lee Duncan assignment must be held in

17 question due to the silence of that agreement on the parties' relationships with

18 Warner Brothers, whose preexisting rights the agreement appears to violate.

19        51.     Seventh, Plaintiffs' copyright rights date to 1954 with the advent of the

20 *Adventures* series.

21        52.     Eighth, if Plaintiffs own a copyright in a character portrayed by a dog,

22 it is the *Adventures* character, which is a character portrayed by the dogs who

23 appeared in the *Adventures* series and is not a character portrayed by Rin Tin Tin.

24        53.     Ninth, because, under Plaintiffs theory of the case, Plaintiffs common

25 law trademark rights originated in connection with their distribution of copyrighted

26 works, then any such common law trademark rights Plaintiff possesses originated in

27 connection with the *Adventures* series.

28

DECLARATION OF MICHAEL DONALDSON AS AN EXPERT WITNESS FOR DEFENDANT BELLEAIR

54.    Tenth, the common law trademark rights that Plaintiffs claim to have acquired from Lee Duncan and Eva Duncan in the respective assignments of 1954 and 1978 must fail not only because those assignment agreements are silent in regard to the ongoing rights of Warner Brothers, but also because Plaintiffs have entered no evidence into the record that Lee Duncan or Eva Duncan ever made trademark use of a RIN TIN TIN mark or of a logo mark consisting of the image or likeness of Rin Tin Tin.  Lee Duncan raised at least three dogs which worked as actors in motion pictures – Rin Tin Tin, Rin Tin Tin Junior, and Rin Tin Tin III – but Plaintiffs have provided no evidence in the record that Lee Duncan or Eva Duncan provided goods or services to consumers under a RIN TIN TIN trademark. Thus, those assignment agreements were attempts to convey rights that the assignors did not possess.

55.    Eleventh, Plaintiffs have not entered into the record evidence of common law trademark rights either in a RIN TIN TIN mark or in a logo mark consisting of the image or likeness of Rin Tin Tin, and, consequently, the only common law marks for which there is evidence in the record to support Plaintiffs' ownership are the THE ADVENTURES OF RIN TIN TIN mark and the RIN TIN TIN: K-9 COP mark, which are titles of the two series produced by Herbert Leonard and used by Leonard in connection with the distribution of ongoing television series productions.

56.    And, twelfth, all of these consequences of Plaintiffs' failure to acknowledge the ongoing rights of Warner Brothers indicates that Plaintiffs' use of the term "the iconic fictional German Shepherd character named Rin Tin Tin" to indicate their ownership of a unitary piece of intellectual property which they have used for ninety-one continuous years is not only false, but also non-existent, and merely an illusory label for an entirely self-serving theory which is both unsupported by the facts and also a misrepresentation of the true nature of Plaintiffs'

DECLARATION OF MICHAEL DONALDSON AS AN EXPERT WITNESS FOR DEFENDANT BELLEAIR

1  rights.  Rin Tin Tin was an icon, but he was a film icon and a celebrated actor long

2  before Plaintiffs came on the scene.  Rin Tin Tin did not play a German Shepherd;

3  he was a German Shepherd.  Rin Tin Tin did not play one single fictional character

4  in twenty-six movies; he played multiple fictional characters, some or all of which

5  may be copyrighted assets owned by Warner Brothers, and none of which are owned

6  by Plaintiffs.

7       C.    **Cancellation on Grounds of "Likelihood of Confusion"**

8       57.    Plaintiffs are requesting cancellation of Belleair's trademarks on

9  several grounds.  One of the grounds is an allegation that Belleair's use of the RIN

10 TIN TIN mark will create a likelihood of confusion which will damage Plaintiffs'

11 common law trademark rights.  Plaintiffs discuss the likelihood of confusion claim

12 in terms of false association, which is a general claim under Section 43(a) of the

13 Lanham Act.

14      58.    In supporting their claim for cancellation on these grounds, Plaintiffs

15 focus on Defendants' website in Count X of their complaint: "Defendants' website

16 claims to be the "Official Site of Rin Tin Tin" and features a scene of the famous

17 Hollywood sign and a slide show of photographs of Rinty and movie posters from

18 old Rin Tin Tin movies, thus making the representation that Defendants are

19 associated or affiliated with the iconic fictional German Shepherd character featured

20 in multiple copyrighted works owned by Plaintiffs, which is a material and

21 deceptive misrepresentation of the source of Defendants' goods."  (Complaint, at

22 35.)

23      59.    Plaintiffs' allegations are not supported by evidence.  I have reviewed

24 the www.rintintin.org website as it appeared on April 8, 2013, eleven days before

25 Plaintiffs filed their Complaint, by accessing the pages of the website preserved on

26

27

28

DECLARATION OF MICHAEL DONALDSON AS AN EXPERT WITNESS FOR DEFENDANT BELLEAIR

1  the Internet Archive.[18]  None of the images in the "slide show of photographs" is

2  either borrowed from or related to any of the copyrighted works listed by the

3  Plaintiffs in the Report on the Filing or Determination of an Action or Appeal

4  Regarding a Copyright filed in this case.  For this reason, no false association is or

5  was occurring when Plaintiffs filed their Complaint.  Further, Belleair's current

6  website, which no longer contains a "slide show of photographs" neither refers to

7  nor borrows from any of the Plaintiffs' specific copyrighted works, and,

8  consequently, no false association is occurring today either.

9        60.    In the subsequent paragraph of Count X of Plaintiffs' Complaint,

10  Plaintiffs point to the following language which appeared on the www.rintintin.com

11  website prior to Plaintiffs' filing of their Complaint: "Build your brand with RIN

12  TIN TIN and maximize the appeal and demand for your product or service by

13  incorporating this famous Hollywood icon!"  Plaintiffs then complain that this

14  promotional licensing language "is an unequivocal attempt to misrepresent the

15  source or affiliation of their goods with the iconic fictional German Shepherd

16  character named Rin Tin Tin featured in multiple copyrighted works owned by

17  Plaintiffs." (Complaint, at 35.)  As stated above, Rin Tin Tin was a Hollywood icon

18  long before Plaintiffs came on the scene or acquired any rights, and, therefore, a

19  reference to the Rin Tin Tin of the Warner Brothers era is not a misrepresentation of

20  source in regard to any goods or services provided by Plaintiffs.

21        61.    Plaintiffs request for cancellation on the grounds of likelihood of

22  confusion fails for several additional reasons.

23        62.    First, because facts are not copyrightable, Plaintiffs cannot rest a claim

24  for likelihood of confusion on Defendants' use of the facts of Rin Tin Tin's life,

25  including the fact that Rin Tin Tin became a film star.  That Rin Tin Tin was "a

26  _____

27  [18] Archived pages from the www.rintintin.com website, captured on April 8, 2013,
    can be accessed at the Internet Archive at www.archive.org.

28

DECLARATION OF MICHAEL DONALDSON AS AN EXPERT WITNESS FOR DEFENDANT BELLEAIR

Hollywood icon" is a fact which is unprotected by copyright, which belongs equally to everyone, and which everyone may use and express in media. Further, that the success of the films in the 1920s created the opportunity for the production of the *Adventures* series two decades later is also a fact to which Belleair may also refer without risking false association with Belleair's goods or services. A factual acknowledgement of the existence of Plaintiffs' copyrighted *Adventures* series is not a claim to having created them, and such a statement does not constitute a false association of Belleair's products as originating with Plaintiffs.

63.     Second, Plaintiffs cannot rest a claim for likelihood of confusion on Defendants' use of photographs of Rin Tin Tin, because Plaintiffs have not shown that they own any copyrights in photographs of Rin Tin Tin.

64.     Third, Plaintiffs cannot rest a claim for likelihood of confusion on Defendants' use of the image or likeness of Rin Tin Tin because Plaintiffs have not shown that they possess any trademark rights in the image or likeness of Rin Tin Tin or that Plaintiffs have ever used the image or likeness of Rin Tin Tin as a trademark.

65.     Fourth, Plaintiffs cannot rest a claim for likelihood of confusion on Defendants' references to characters portrayed by Rin Tin Tin in his films because Plaintiffs do not own any copyrights either in the films or in the characters portrayed by Rin Tin Tin in his films.

66.     Fifth, Plaintiffs cannot claim that by referring to Rin Tin Tin and to movies in which Rin Tin Tin appeared that Belleair is referring to any items of intellectual property owned by Plaintiffs. Belleair was not using in April 2013 and are not using now, any images from the *Adventures* series on the *www.rintintin.com* website.

67.     Sixth, Defendants make no representation that they are either filmmakers or television producers or that they are in any way affiliated with either the films or the *Adventures* series.

68.     Seventh, Plaintiffs cannot claim that Belleair is attempting to affiliate itself with Plaintiffs' "iconic fictional German Shepherd character named Rin Tin Tin" because, as demonstrated above, no such thing exists.

### D.   Merchandising

69.     Counts I-VI in Plaintiffs' Complaint are based, in part, on an assertion that Plaintiffs own broad merchandising rights for the RIN TIN TIN mark, which they acquired from Lee Duncan.  This assertion is based on an incorrect assumption that a broad merchandising right arises as a matter of course when a movie is distributed for theatrical release.  There is no such naturally arising right.  No right to merchandising automatically arises upon the theatrical release of a feature film. Any trademark rights related to the title of a film must be established through use of the title as a trademark upon goods and/or services in commerce.  In other words, trademark rights for film merchandising must be established in the same way that other kinds of trademark rights are established.

70.     Motion picture merchandising traditionally consists of products manufactured pursuant to a vendor agreement and then sold at retail.  Traditional merchandising is distinguishable from promotional items, which typically consist of T-shirts, caps, posters, and/or coffee mugs, and which are typically given away to cast, crew, friends, and premier attendees.  Promotional items accompany the release of most major motion pictures, but the vast majority of motion pictures are released without merchandising deals in place.   Movie merchandising has to be planned and undertaken through the actual use in commerce of a trademark, usually the title of the film, in connection with specific goods and services related to the film.  Therefore, the establishment of trademark rights through movie merchandising efforts is no different than the establishment of trademark rights in other industries.  Usually, no merchandising deals are made in advance because

1   most films are released without being accompanied by merchandising efforts even if

2   they are advertised by promotional items in advance of their release.

3       **E.**   **Merchandising and the 2006 Settlement Agreement**

4       71.   May 1, 2006, Leonard, Kleven and Hereford executed an agreement to

5   settle their second lawsuit and also a cancellation proceeding before the Trademark

6   Trial and Appeal Board, which agreement is hereinafter referred to as "the 2006

7   Agreement." (Exhibit 98.)

8       72.   The 2006 Agreement may be the most significant document in this case

9   for several reasons, not least of which is that it provides for a cooperative sharing of

10  ownership rights in the RIN TIN TIN trademark without friction between the

11  parties.  In addition, the 2006 Agreement appears to be the only agreement in this

12  case which is signed by all of the concerned parties whose successors are now

13  parties to this dispute: that fact gives the document a verifying authority in regard to

14  the ownership rights of the parties.

15      73.   The 2006 Agreement attempts to create separation between the goods

16  and services that Plaintiffs will identify with the Mark and those that Hereford will

17  identify with the Mark.  It does this in several ways.

18      74.   First, Section 2.2.1 provides for Hereford to assign the Class 41

19  "Entertainment services in the nature of an ongoing television series in the field of

20  variety and motion pictures featuring a German Shepard dog as a live or animated

21  character" of U.S. Reg. No. 2969852 to Plaintiffs so that Plaintiffs will have a

22  federal registration for the Mark to use in connection with "motion pictures,

23  "television programs or series, or any newly derived processes that provide a

24  dynamic visual image." (*Id.*, at 1.)

25      75.   Second, Section 2.2.1 also provides Plaintiffs with the exclusive right

26  to use the Mark "for any products or services that derive from said motion pictures,

27  television programs or series, or any newly derived processes, and Section 2.2.4 lists

28

DECLARATION OF MICHAEL DONALDSON AS AN EXPERT WITNESS FOR DEFENDANT BELLEAIR

examples of such products or services: "stuffed animals, books, costumes, video and computer games, song books and all other manner of toys for the relevant age group." (*Id.*, at 1-2.)  This is a specific and particular list regarding Plaintiffs' merchandising rights.  It sets forth the kinds of products on which Plaintiffs can use the mark.  It contains three notable aspects.  First, it consists of merchandising products which "derive" from the Plaintiffs' right to make motion pictures or television programs or series, which means that Plaintiffs' merchandising rights do not begin until Plaintiffs produce a motion picture, a television program, or a series.  Second, the list consists of traditional merchandising of products offered to persons who view motion pictures and television programs.  And, third, it does not include dog food or dog-related products.  In these ways, the merchandising provision achieves separation between Plaintiffs and Hereford (now Belleair) in a way designed to minimize friction.

76.    Third, Section 2.2.3 provides for and confirms that Hereford – and now her successor Belleair – possesses substantial and extensive trademark ownership rights in the Mark outside of Plaintiffs' area of rights: "Hereford may exercise any other intellectual property rights owned by Hereford as to the use of the mark Rin Tin Tin against anyone, other than those relating to motion pictures, television, or other video products, or other products related thereto, produced by Kleven or its successor, assigns and licensees." (*Id.*, at 1.)  This provision is the most important language in the 2006 Agreement in regard to Belleair's ownership rights in the Mark as Hereford's successor, because it confirms Plaintiffs' consent to Hereford's continuing use of the Mark in connection with the goods and services in which she has established ownership rights, some of which extend back to at least as early as December 17, 1980.

DECLARATION OF MICHAEL DONALDSON AS AN EXPERT WITNESS FOR DEFENDANT BELLEAIR

1

2       **F.   Conclusion**

3           77.    In conclusion, in my opinion Plaintiffs do not possess the legal grounds

4    upon which to claim exclusive rights in the RIN TIN TIN trademark, in the image or

5    likeness of Rin Tin Tin as a trademark, or in the character of Rin Tin Tin as a

6    copyrightable work.  Plaintiffs' claim to a ninety-one year history of ownership of

7    an iconic fictional German Shepherd character named Rin Tin Tin has no basis in

8    fact or law.

9           I declare under penalty of perjury of the laws of the United States that the

10   foregoing is true and correct.

11          Executed on October 26, 2014, at Los Angeles, California.

12

13

14

15                                   MICHAEL C. DONALDSON

16

17

18

19

20

21

22

23

24

25

26   50951002

27

28

DECLARATION OF MICHAEL DONALDSON AS AN EXPERT WITNESS FOR DEFENDANT BELLEAIR