Max Kleven v. Daphne Hereford, et al
Court File No. 13-CV-02783 – AB (AGRx)

# EXHIBIT C

**FREDRIKSON & BYRON, P.A.**
Lora M. Friedemann (MN# 259615)
  E-Mail: lfriedemann@fredlaw.com
Paul E. Thomas (SB# 208577)
  E-Mail: pthomas@fredlaw.com
200 South Sixth Street, Suite 4000
Minneapolis, MN 55042
Telephone: 612.492.7000

*Attorneys for Defendant*
BELLEAIR TRADING
INTERNATIONAL LLC

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MAX KLEVEN, an individual; RIN, INC., a California corporation,<br><br>Plaintiffs,<br><br>vs.<br><br>DAPHNE HEREFORD, an individual; RIN TIN TIN, INC., a Texas Corporation; BELLEAIR TRADING INTERNATIONAL, LLC, a Florida limited liability company; DOES 1 through 20, inclusive,<br><br>Defendants. | CASE NO. 13-CV-02783 AB (AGRx)<br><br>**DIRECT EXAMINATION DECLARATION OF DWIGHT J. ERICKSON, SR.**<br><br>Trial Date:  December 2, 2014<br>Time:  8:30 a.m.<br>Courtroom:  790 Roybal Building<br>Judge:  The Honorable André Birotte, Jr. |

I, Dwight J. Erickson, Sr., declare as follows:

1. I am the President and founder of Defendant Belleair Trading International, LLC, ("Belleair") and make this Declaration in support of Bellair. I have personal knowledge of the matters set forth in this Declaration.

2. I live in Belleair, Florida, and I am sixty-six years old. I am a sales executive by training and experience, and my background is in the consumable goods industry. I have forty years of experience running consumer goods companies, including Belleair, Grey Owl Brands and ESM Food Management, Inc.

3. Belleair's involvement with the RIN TIN TIN trademark ("the Mark") began when I read a Wall Street Journal article about Susan Orlean's 2011 book *Rin Tin Tin: The Life and the Legend*, and then later read Ms. Orlean's book. I was struck by the remarkable life story of Rin Tin Tin, with its beginning in the smoking ruins of a French village in World War I and its ending in Hollywood. It occurred to me that the colorful history of this lucky and talented dog might provide an attractive back-story to a brand of high-quality dog foods.

4. I decided to investigate further, and did some research on-line. During my research, I located the website www.rintintin.com which, at that time, was operated by Rin Tin Tin, Inc., a company owned by Daphne Hereford. The website was very thorough and included a section regarding licensing the Rin Tin Tin trademark. Still intrigued, I made contact with Rin Tin Tin, Inc. through the website. Dorothy Yanchak, Daphne Hereford's daughter, responded to my inquiry. Over the course of several weeks, we discussed a licensing agreement and ultimately signed the Merchandising License Agreement, Joint Exhibit 106. I signed the agreement on behalf of Belleair.

5. The agreement provided that Belleair would acquire no ownership rights in the Mark (Section 8.C), and that all of the goodwill that adhered to the Mark through the exercise of the license would be owned by Rin Tin Tin, Inc. (Section 11). My experience was that such provisions are fairly standard in trademark licenses, but other provisions in the proposed agreement made it clear that Daphne Hereford wanted to keep a close hold on the Mark.

6. For example, the license gave Rin Tin Tin, Inc. the right to immediate termination if Belleair failed to launch its products by May 25, 2013. (Section 5.E.)

7. As another example, the license included a detailed quality control provision, which required Belleair to provide Rin Tin Tin, Inc. with product samples each year, and which gave Rin Tin Tin, Inc. the right to terminate if Belleair did not remedy any products found to be sub-standard within thirty days. (Section 6.D.)

8. As a third example, Daphne Hereford representing Rin Tin Tin, Inc. wanted a short license term, and was hesitant to grant a license for several years, which is what I wanted on behalf of Belleair. I knew that it might take three years to build a business around the Mark as a core brand.

9. We eventually agreed to an initial three-year term, with an option to extend the agreement for an additional three years, provided that Belleair paid Rin Tin Tin, Inc. a minimum of $5,000 as a royalty in each calendar year. (Section 2.) If, in the sixth year of the agreement, the royalty payment reached a minimum of $100,000, the term would extend for another year, and if the royalty stayed at that level in subsequent years, the term could have stretched to ten years, or until 2022.

10. Before our company executed the license agreement on April 10, 2012, we did not, for two significant reasons, do extensive due diligence on the Mark and the trademark registrations owned by Rin Tin Tin, Inc.

11. First, the license agreement provided several assurances and protections for Belleair in regard to the Mark as a licensed asset. Rin Tin Tin, Inc. made warranties and representations regarding the validity of the Mark (Sections 5.A and B.) The agreement placed the obligation and expense of protecting the Mark on Rin Tin Tin, Inc. (Section 8.A.) Further, Rin Tin Tin, Inc. promised to indemnify Belleair in the event that a third party brought a claim against Belleair which challenged the validity of the Mark.

12. Second, I did not have any reason to believe that a third party would challenge Belleair's right, under the license, to use the Mark in connection with "dog treats, snacks, and related food items," because Ms. Hereford told me she had been using the Mark in connection with dog food products through an agreement with Animal Food Services of Green Bay, Wisconsin for the manufacture and sale of freeze-dried and fresh-frozen dog foods. Accordingly, I did not perceive any obvious risk in proceeding with Belleair's proposed launch of dog treats branded under the Mark.

3

13. Belleair decided to focus on the dog treats segment of the canine consumables market for the first phase of its test market because we believed that such a focus would allow Belleair to create a market presence and capture market share more quickly than if Belleair began with other segments of the canine consumables industry. Our analysis indicated that dog owners do not frequently change a dog's everyday diet once it is established but that dog owners will often impulsively purchase a new or unusual treat as a supplement to a routine dog food diet. We believed, therefore, that marketing a line of dog treats was the best way to break into the canine consumables industry and that once consumers had come to recognize our brand of high quality treats, it would be less challenging to enter other segments of the industry with other consumable items. Also, beginning with dog treats was a cost effective decision because the cost of test marketing a dog treat item is significantly less than test marketing a large bag of everyday dog food.

14. Our market research also indicated that the following points should be part of Belleair's test-market strategy. First, the treats should list meat as the first ingredient and should be grain-free to assuage growing community concerns over certain grain-related digestive problems that have been detected in older dogs. Second, to create acceptable revenue margins, the retail pouch should be eight ounces, contain approximately 80 treats, and sell for less than $4 at retail. Third, the fact that the products are "made in the U.S.A." should be emphasized due to growing community concerns over pet foods and treats imported from China. Fourth, Belleair should produce a treat line with at least six distinct products and flavors. Fifth, Belleair should utilize "cause marketing" wherever it is practicable, provided that its long term benefits can be measured. And sixth, Belleair should target the "Baby Boomer" generation in its initial test marketing phase because the United States has more than 100 million people over the age of fifty, and the Baby Boomers control almost 70% of the disposable income in the United States.

1        15.    With our license agreement and this strategy in place, Belleair began phase one of the test market for fresh baked dog treats in late fall of 2012. Initial distribution began in the first quarter of 2013. We focused on five different venues in a multi-state area: retail grocery stores (both in urban and rural settings), direct store delivery food distributors, pet specialty distributors, non-food retail specialty locations (such as hardware and liquor stores), and online sales. Our first step was to introduce all six products into a retail grocery store chain in Wisconsin with fourteen locations. We followed that with an introduction of the items into a major pet food specialty distributor in Milwaukee which had distribution relationships with more than 1200 specialty retail pet outlets in five states.

         16.    Belleair complied with all of its quality control obligations under the Merchandising License Agreement. We provided samples of our products to Rin Tin Tin, Inc., and they were approved.

         17.    Joint Exhibit 107 contains presentation materials I used to present the brand to retailers. The presentation materials contain images of our product packaging. There are two dogs that appear on our first packaging. The dogs in the photographs were dogs that Ms. Hereford had arranged to represent the Rin Tin Tin brand in personal appearances.

         18.    During the first year of the license agreement, Ms. Hereford approached Belleair about purchasing Rin Tin Tin, Inc. and all of the trademarks the company owned. Ms. Hereford has a very serious lung disease and she wanted to leave the business. We considered purchasing Rin Tin Tin, Inc. and the associated trademarks, but ultimately decided to purchase only the Mark and its corresponding federal registrations for dog food (U.S. Reg. No. 3380788) and for dog related products, clothing, and toys (U.S. Reg. No. 3215700). We wanted to strengthen our commitment to the Mark as a brand, and we wanted to earn goodwill equity in the Mark for Belleair as a trademark owner rather than earning the goodwill equity for another as a licensee. We decided not to purchase the entire company because

5

1  Belleair is a consumer goods company. Our business does not include things that
2  were included within Rin Tin Tin, Inc.'s business, such as movies and television
3  shows.

4      19. On March 22, 2013, in a "Bill of Sale" agreement, Belleair purchased
5  "all [t]rademark rights, common law and otherwise" in the Mark as "specifically
6  listed in #3215700 and #3380788" for $175,000. (Exhibit 94, at 1-2.) Ms. Hereford
7  prepared the agreement and I signed it on behalf of Belleair. On the same day,
8  March 22, 2013, we executed a trademark assignment agreement in regard to the
9  Mark and its two corresponding federal registrations that were the subjects of the
10 Bill of Sale, and in that document Ms. Hereford assigned to Belleair "all of [her]
11 right, title, and interest in and to the Marks RIN TIN TIN #3215700 and 3380788."
12 (Exhibit 94 at p. 3.) The agreement was recorded with the United States Patent and
13 Trademark Office.

14     20. Before signing the agreement, our company did further research
15 regarding Rin Tin Tin, Inc. We obtained and reviewed tax returns for the company
16 for the prior seven years. My impression at the time was that the company had
17 modest sales in each year, but that the company had not been profitable. We also
18 asked Belleair's trademark counsel, Brittany J. Maxey from Maxey Law Offices in
19 St. Petersburg, Florida, to review Rin Tin Tin, Inc.'s trademark registrations. We
20 proceeded with the transaction only after Ms. Maxey's review was complete.

21     21. We were named as a defendant in this lawsuit shortly after the March
22 2013 assignment was executed. I was surprised when we received the Complaint
23 because Belleair had (and has) no trademark rights or business activities relating to
24 movies and television shows.

25     22. After we acquired the trademark rights relating to dog food and dog
26 related products, clothing, and toys, phase one of our test-market launch accelerated.
27 Maintaining our focus on retail grocery stores as a primary target market, we got the
28 products placed in a retail grocery chain store with 220 locations in five states. We

6

also moved into Chicago, our first major market, when the largest and most dominant grocery store chain in the Chicago area approved five of our six products for its 178 locations. Then, in St. Louis, two key grocery store chains with 78 locations between them secured space for our products.

23. It was during the second quarter of 2013 that my relationship with Daphne Hereford became somewhat strained because, even though she had sold the Mark and two of its corresponding federal registrations to Belleair (U.S. Reg. Nos. 3215700 and 3380788), Ms. Hereford still behaved as though she had the right to control Belleair's use of the Mark. For example, Ms. Hereford objected to Belleair's decision to display the three words of the RIN TIN TIN name vertically on our product packaging, even though she had done the exact same thing on a tin of treats that had the Rin Tin Tin mark displayed on the front of the tin vertically.

24. I believed that Ms. Hereford would continue to attempt to control Belleair's use of the Mark as long as Rin Tin Tin, Inc. retained ownership rights in federal trademark registrations for the Mark and for the related trademarks RINTY and RIN TIN TIN CANINE AMBASSADOR CLUB. Therefore, during the summer of 2013, we were offered and decided to purchase all of the remaining rights in the Mark still owned by Ms. Hereford and Rin Tin Tin, Inc., along with the website www.rintintin.com. Given the growing success of the test-market launch, Belleair's decision was motivated by a desire to have the freedom to operate and to make business decisions without having to continue to interact with Hs. Hereford.

25. Accordingly, on August 1, 2013, in consideration of an additional payment of $50,000, we executed a second "Bill of Sale" agreement, Joint Exhibit 95. Ms. Hereford drafted the agreement and I signed it on behalf of Belleair.

26. On that same day, we executed a trademark assignment whereby Daphne Hereford and Rin Tin Tin, Inc. assigned to Belleair all of the "right, title, and interest" in and to the Mark and its related RINTY and RIN TIN TIN CANINE AMBASSADOR CLUB marks and their remaining corresponding federal trademark

7

1 registrations. The agreement was recorded with the United States Patent and
2 Trademark Office.
3       27. In the August 2013 assignment, Belleair acquired "all Trademark
4 rights, common law and otherwise, in RIN TIN TIN." (Joint Exhibit 95, p. 1.)
5 Because we had already acquired the mark and goodwill associated with dog food
6 and dog-related products, the real value in the August 2013 agreement for Belleair
7 was the website, www.rintintin.com. We negotiated the transfer of the website and
8 Ms. Hereford agreed to dissolve Rin Tin Tin, Inc. We began using the website
9 www.rintintin.com after we acquired it from Ms. Hereford in the August 2013
10 assignment.
11       28. Since acquiring all of Ms. Hereford's trademark rights and the website
12 www.rintintin.com, Belleair has considerably expanded its phase-one sales.
13 Penetrating some of our other target venues, we added 30 high-volume retail liquor
14 outlets in the Chicago area, and we added listings on Amazon.com to supplement
15 the online sales from the RinTinTin.com website. We closed 2013 by adding a 135
16 location retail grocery store chain in the Dallas area. In total, by the end of 2013,
17 Belleair's products were on shelves in more than 700 retail grocery stores in nine
18 states. In 2014, we began a small test market with Walmart stores, which is
19 presently ongoing. Although this ongoing litigation is an impediment to Belleair's
20 growth, I believe that the future is promising for Belleair in the canine consumables
21 market.
22       29. In regard to the litigation, Belleair has always believed that it should be
23 possible for both Plaintiffs and Belleair to use the Rin Tin Tin trademark without
24 conflict or friction. Plaintiff Max Kleven acknowledged that the parties can co-exist
25 peacefully in a telephone conversation in September 2014. I received several
26 telephone calls from Mr. Kleven in the month of September. Mr. Kleven originally
27 left messages for me on my work voice mail. Later, he somehow obtained my home
28 telephone number and called me at home. My first telephone conversation with Mr.

8

Kleven was on September 9, 2014. In that call, Mr. Kleven said he "did not care" if Belleair used the Rin Tin Tin trademark on dog food and canine consumables and even offered to help Belleair produce, and star in, a television commercial for its products.

30. I had several more telephone conversations with Mr. Kleven during the month of September. Mr. Kleven indicated that he did not agree with the way the lawsuit was being handled, and said that he had documents proving that James Tierney, the principal of Shamrock, does not have any rights in Rin Tin Tin.

31. Plaintiffs do not appear to have an interest in entering the canine consumables industry, and I can assert with confidence that Belleair does not have interest in making motion pictures or television programs. As I explained above, Belleair's acquisition of the remainder of the trademark rights owned by Daphne Hereford and Rin Tin Tin, Inc. in the August 2013 agreements, including the acquisition of the federal registration for the Mark in connection with entertainment services in the field of motion pictures (U.S. Reg. No. 4263551), was motivated by a desire to buy-out Ms. Hereford completely so that Belleair could have complete freedom to operate and not by a desire to produce movies and television. Belleair has always been willing to relinquish its rights in U.S. Reg. No. 4263551, because Belleair has no intention of making movies or television shows under the RIN TIN TIN trademark.

I declare under penalty of perjury of the laws of the United States that the foregoing is true and correct.

Dated: November 10, 2014

Dwight J. Erickson, Sr.

9