David L. Gernsbacher   CA Bar No. 89596
E-Mail: dgernsbacher@dlglaw.com
LAW OFFICE OF DAVID L. GERNSBACHER
9107 Wilshire Blvd Ste 450
Beverly Hills CA 90210-5535
Tel:  310-550-0125
Fax: 310-550-0608

Attorney for Plaintiffs and Counter-Defendants
MAX KLEVEN and RIN, INC.

Kirk M. Hallam   CA Bar No. 108975
E-Mail: kmhallam@aol.com
LAW OFFICES OF KIRK M. HALLAM
201 Santa Monica Blvd Ste 300
Santa Monica CA 90401-2224
Tel:  310-393-4006
Fax: 310-564-7623

Attorney for Intervenor
SHAMROCK ENTERTAINMENT, LTD.

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**WESTERN DIVISION**

| | |
|---|---|
| MAX KLEVEN, an individual; RIN, INC., a California corporation,<br><br>Plaintiffs,<br><br>vs.<br><br>DAPHNE HEREFORD, an individual; RIN TIN TIN, INC., a Texas Corporation; BELLEAIR TRADING INTERNATIONAL, LLC, a Florida limited liability company DOES 1 through 20, inclusive<br><br>Defendants.<br><br>AND COUNTERCLAIMS AND CLAIMS IN INTERVENTION | Case No. CV13-02783 ABC (AGRx)<br><br>**TRIAL DECLARATION OF JEFF MILLER**<br><br>Date: December 2, 2014<br>Time: 8:30 a.m.<br><br>Courtroom of the Honorable<br>André Birotte Jr.<br>United States District Judge |

# DECLARATION OF JEFF MILLER

I, Jeff Miller, hereby declare and state as follows:

1. I have personal knowledge of the following facts and could competently testify to these facts if called upon to do so.

2. I am one of three principals of Rin, Inc., a Plaintiff in this action.

3. The other two principals of Rin, Inc. are Sasha Jenson, a close friend of mine for more than 25 years and with whom I have worked on various entertainment projects, and Casey LaScala, a former Disney executive, writer and director and Sasha Jenson's close friend and writing partner.

4. I am also founding owner and Managing Director of Interrogate, a production company that specializes in producing television commercials, and also produces television shows and movies. Interrogate represents a roster of directors that includes the award winning Vince Gilligan, creator of *Breaking Bad*.

5. I have produced several feature films, among them *The Destiny of Marty Fine* (with Mark Ruffalo and Catherine Keener), as well as having optioned my screenplay *Ironmen* with Walt Disney Pictures and ABC Television. I am currently an executive producer on the *Team Hoyt* movie for HBO Films. I have filmed and/or produced projects throughout the U.S. and all over the world.

6. In 2009, Sasha Jenson told me about a project he was working on and which he identified as a movie featuring the character Rin Tin Tin. Over the next two or so years, Sasha Jenson and I discussed his progress on the project, Rin Tin and Rin Tin Tin's history. During that time I became aware of (and read) the first Rin Tin Tin script that Sasha Jenson and Casey LaScala had written and I was further aware of a second Rin Tin Tin script Sasha Jenson and LaScala were working for a more moderately priced Rin Tin Tin movie.

7. In 2011, Sasha Jenson and Casey LaScala introduced me to Max Kleven a semi-retired stunt coordinator, second unit director and writer/director. Shortly after meeting Max Kleven, I agreed to become directly involved in the Rin Tin

1

project, and, in 2012, Max Kleven, Sasha Jenson, Casey LaScala and I entered into a joint venture agreement that included Max Kleven's assignment to me, Sasha Jenson and LaScala, of a 50% interest in his Rin Tin Tin rights.

8. Our agreement was later memorialized in four documents. See, Plaintiffs' Trial Exhibit 63, "Confirmation of Assignment of Rights & Joint Venture Agreement-02/01/2013;" Plaintiffs' Trial Exhibit 64, "Amendment to Confirmation of Assignment of Rights & Joint Venture Agreement-02/27/2013;" Plaintiffs' Trial Exhibit 58, "IP Assignment from MK to SJ, CLS & JM & Acceptances-03/23/2013; and Plaintiffs' Trial Exhibit 62, "TM Assignment from MK to SJ, CLS & JM & Acceptances-03-23-2013," attached hereto as Exhibits A, B, C and D, respectively. Later, Sasha Jenson, Casey LaScala and I formed Rin, Inc. to hold our Rin Tin Tin rights.

9. Prior to our meeting with Mr. Kleven, Sasha Jenson told me that Mr. Kleven had acquired the rights in Rin Tin Tin from Herbert Leonard, who was the creator of the television series, *The Adventures of Rin Tin Tin*. In conjunction with our work with Mr. Kleven we received documents memorializing Mr. Kleven's ownership interest in the Rin Tin Tin intellectual property. True and correct copies of these documents are attached hereto as Exhibit E (Plaintiffs' Trial Exhibit 65 "Purchase and Assignment Agreement") and Exhibit F (Plaintiffs' Trial Exhibit 73 "Intellectual Property Assignment Agreement").

10. What intrigued me about the Rin Tin Tin project was not only the opportunity to present the heroic Rin Tin Tin character to a new generation and with new adventures, but that Rin Tin Tin is a natural for movie merchandising, which is an important and crucial way of obtaining financing for a movie.

11. From my experience working with advertising agencies, marketing consultants and consumer products companies in connection with producing movies and television shows, I knew that while financing a movie entails promising the financier or studio the chance to recoup its investment from receipts from the

exploitation of a movie, the ability to also receive payment for merchandise associated with the movie greatly increases the ability to obtain financing and a studio's interest. For example, the producers of Star Wars and many other movies are able to generate substantial monies from the sale of merchandise associated with the movies long after the movies have left the theaters. These products could, in turn, maintain enough interest to warrant further movie and television productions, thus further enhancing Rin Tin Tin's appeal to both the public and the companies whose products the public buys.

12. In other words, Rin Tin Tin has the potential of becoming a modern entertainment and branding franchise, like *Cars*, *Toy Story*, Disney's *Princesses* franchise and *Power Rangers*. Rin Tin Tin deserves the right to participate in the dog food market; indeed, the name Rin Tin Tin has been associated with dog food products for more than a half-century, including the recent sponsorship by Ralston Purina of the *Rin Tin Tin K-9 Cop* television series (see Plaintiffs' Trial Exhibit 52 attached as Exhibit L to the concurrently filed Declaration of James P. Tierney). Indeed, I have personally viewed on the internet vintage 1950's Rin Tin Tin dog food and dog treat commercials, including Ken-L-Ration, Gravy Train and Milk Bone dog biscuits. The sale of those sorts of authorized Rin Tin Tin products is as natural a fit as the Willy Wonka movies and Willy Wonka candy. Rin Tin Tin's participation in the market has only been interrupted as a direct result of the interference of Daphne Hereford and her purported successor, Belleair, but will resume with great vigor once that interference is permanently terminated by this lawsuit.

13. Initially, the Rin Tin Tin project with Max Kleven, Sash Jenson, Casey LaScala and myself received a great deal of attention from agencies, managers and advertising/marketing agencies. Among them were:

    a. William Morris Endeavor Agency ("WME"). who subsequently advised us that WME had had initial discussions with Purina, who was interested in discussing opportunities regarding the Rin Tin Tin *brand;*

    b. BBDO, who handles the Pedigree account for Mars, Inc.;

    c. Fallon Advertising, who handles the Purina (Nestle) account; and,

    d. Saatchi & Saatchi, who handles the Iams account.

All of them expressed interest in the project and brand.

  14. On April 23, 2012, I scheduled a meeting with Creative Artists Agency ("CAA"). CAA also represents Susan Orlean, the writer of the NY Times best seller, *Rin Tin Tin: The Life and the Legend*. However, CAA notified me that it was cancelling the meeting as a result of the agents' concerns about defendant Daphne Hereford's adverse claims to the Rin Tin Tin rights.

  15. That same day, April 23, 2012, I contacted a leading intellectual property attorney, Gary Hecker, to review the matter. Although I reviewed some preliminary information in June 2012 regarding Hereford's post-1996/pre-2006 US Trademark Registrations, it was not until the end of the of the year that I found out that on December 25, 2012, Hereford had obtained a new US Trademark Registration No. 4263551 for Rin Tin Tin for "Entertainment services in the field of motion pictures featuring a German Shepherd dog in international class 041."

  16. When Sasha Jenson and I informed Max Kleven, he was devastated and angry about Daphne Hereford's filing of Trademark Registration No. 4263551.

  17. On or about January 10, 2013, I filed a Petition to Cancel trademark Registration No. 4263551 for RIN TIN TIN with the Trademark Trial and Appeal Board ("TTAB"), TTAB No. 92056642.

  18. Three months later we filed this lawsuit against Daphne Hereford and Belleair. Within a month, Belleair's attorney (who also at the time represented defendants Hereford and Rin Tin Tin, Inc.) told our attorney that Hereford had sold the Rin Tin Tin dog food Trademark Registration to Belleair and that Belleair was planning on selling Rin Tin Tin-labeled dog treats. This was later confirmed by documents produced in discovery in this lawsuit, including the agreements between Hereford and Belleair.

4

19. I was shocked by the news that Daphne Hereford had sold trademark registrations for dog treats because dog food and dog treats, as I stated earlier, are products that would naturally be associated with and arise out of a Rin Tin Tin feature motion picture and/or television series or show and be part of the merchandising efforts for such picture, series or show.

20. When I found out that Belleair was going to be selling its products on line, I went on the Internet beginning in late May 2013 to see if there was any information about Belleair and dog treats. In the course of my investigation, I came across Belleair's web site ads. Attached hereto as Exhibit G (Plaintiffs' Trial Exhibit 71) and Exhibit H (Plaintiffs' Trial Exhibit 72) are recent screen shots of Belleair's ads with packaging showing images of Rin Tin Tin DVD covers and references to the Rin Tin Tin film and TV history. I concluded from my review of these materials that Belleair was attempting to sell its treats using the Rin Tin Tin film and television images and projects, as we had planned to do upon making our Rin Tin Tin film and television projects.

21. When I tried to purchase a bag of Belleair's treats in May 2013, the on-line system could not process the purchase and I could not buy the product.

22. On or about October 14, 2013, Kevin Welch, an attorney for Rin, Inc., filed a number of applications with the United States Patent and Trademark Office ("USPTO") for Trademark Registrations for the service mark "Rin Tin Tin." *See*, attached Exhibit I (Plaintiffs' Trial Exhibit 91), "Rin, Inc.'s Applications for the Service Mark Rin Tin Tin."

23. From my review of the documents that have been produced in this case and other communications received from the USPTO rejecting Rin, Inc.'s applications, I can confirm that the USTPO rejected Rin, Inc.'s applications on the ground that the marks would cause confusion in the marketplace due to the existence of Hereford's Trademark Registrations. *See*, attached Exhibit J (Plaintiffs' Trial Exhibit 92), "USPTO's Rejections of Rin, Inc.'s Applications for the Service Mark

5

Rin Tin Tin."

24. I have reviewed the USTPO certified copies of Hereford and Rin Tin Tin, Inc.'s Federal Trademark Registrations and Applications that we have received from the USPTO. These documents, which include Daphne Hereford's purported specimens of use for the trademarks, include the following attached exhibits:

    a. Exhibit K – Plaintiffs' Trial Exhibit 74, "Daphne Hereford's Federal Trademark Registration No. 1763135 for service mark Rin Tin Tin and Application;"

    b. Exhibit L – Plaintiffs' Trial Exhibit 75, "Rin Tin Tin, Inc.'s Federal Trademark Registration No. 2384745 for the service mark Rin Tin Tin Canine Ambassador Club & Application;"

    c. Exhibit M – Plaintiffs' Trial Exhibit 76, "Daphne Hereford's Federal Trademark Registration No. 2538312 for the service mark Rin Tin Tin and Application;"

    d. Exhibit N – Plaintiffs' Trial Exhibit 77, "Daphne Hereford's Federal Trademark Registration No. 2969852 for service mark *Ri*n Tin Tin and Application;"

    e. Exhibit O – Plaintiffs' Trial Exhibit 78, "Daphne Hereford's Federal Trademark Registration No. 3111161 for service mark Rin Tin Tin and Application;"

    f. Exhibit P – Plaintiffs' Trial Exhibit 79, "Daphne Hereford's Federal Trademark Registration No. 3215700 for service mark Rin Tin Tin and Application;"

    g. Exhibit Q – Plaintiffs' Trial Exhibit 80, "Daphne Hereford's Federal Trademark Registration No. 3380788 for service mark Rin Tin Tin and Application;"

    h. Exhibit R – Plaintiffs' Trial Exhibit 81, "Daphne Hereford's Federal Trademark Registration No. 3582436 for service mark Rin Tin Tin and Application;"

    i. Exhibit S – Plaintiffs' Trial Exhibit 82, "Daphne Hereford's Federal Trademark Registration No. 3789458 for service mark Rinty, and Application."

25. Based upon my experience in the television and motion picture industry, as well as my involvement in our Rin Tin Tin project, I believe that Daphne Hereford's purported trademark registrations involve precisely the same subject

matter that would be covered by merchandising deals for our project. Indeed, we have attempted to file our own trademark applications to cover the subject matters of these trademarks.

26. I have reviewed Daphne Hereford's responses to the discovery propounded by Intervenor Shamrock Entertainment, Ltd. in this matter. For example, I reviewed her response to Shamrock's Interrogatory No. 2, which asked her to "set forth all facts upon which [Hereford] base[d] [the] contention" that she used "the phrase 'Rin Tin Tin' as a mark in commerce." In that response, Daphne Hereford stated (after objections) that her "use of the marks in Interstate Commerce are a matter of public record through various Internet sites that are readily accessible to Intervenor." In her responses to Shamrock's Request for Production of Documents, Daphne Hereford also stated that "Defendant's use of the marks in Interstate Commerce are a matter of public record through various Internet sites that are readily accessible to Intervenor." After reviewing these responses, which are dated January 31, 2014, I did a search on the Internet and was unable to find any evidence of Daphne Hereford using in commerce any of the trademarks described in the discovery responses.

I declare under penalty of perjury under the laws of the United State of America that the foregoing is true and correct.

Executed on November 10, 2014, in Los Angeles, California.


/s/ Jeff Miller_____
Jeff Miller

7

PROOF OF SERVICE

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

I am employed in the County of Los Angeles, State of California and my business address is 100 Wilshire Boulevard, Suite 2010, Santa Monica, CA 90401. I am over the age of 18 and not a party to this action.

On November 10, 2014, I served the foregoing document described **TRIAL DECLARATION OF JEFF MILLER**, on interested parties in this action by placing a true copy thereof enclosed in a sealed envelope at Santa Monica, California, addressed as follows:

> Daphne Hereford
> Individually and as President
> Rin Tin Tin, Inc.
> P.O. Box 27
> Crockett, TX 75836
>
> (with a copy by e-mail to
> Daphne@Hereford.com)

I caused such envelope with postage thereon fully prepaid to be placed in the United States mail. I am "readily familiar" with the firm's practice of collection and processing of correspondence for mailing with the United States Postal Service. Correspondence for mailing is deposited with the United States Postal Service on that same day in the ordinary course of business. The foregoing document was sealed and placed for collection and mailing on the foregoing date, following the firm's ordinary practices. I am aware that on motion of any party served, service is presumed invalid if the postal cancellation date or postage meter date is more than one day after the date of deposit for mailing in the affidavit.

Executed on November 10, 2014 at _____, California. I declare under penalty of perjury that the above is true and correct.

_____