# PLAINTIFFS' TRIAL EXHIBIT 63

EXHIBIT A

**9**

## CONFIRMATION OF ASSIGNMENT OF RIGHTS AND JOINT VENTURE AGREEMENT

This Confirmation of Assignment of Rights and Joint Venture Agreement (this "Agreement") is effective as of February 1, 2013, by and between Max Kleven ("Kleven") on the one hand, and Sasha Jenson and/or assignee(s) ("Jenson"), Casey La Scala and/or assignee(s) ("La Scala") and Jeff Miller and/or assignee(s) ("Miller") (collectively, "Producers"), on the other hand, (collectively, as applicable, the "Parties" and singularly, "Party"), with reference to the following:

RECITALS:

A.   The subject of this Agreement is the entirety of the intellectual property based upon, in connection with, related to, associated with and/or involving the icon "Rin-Tin-Tin" of whatever kind or nature, world-wide, including, without limitation, the story, published works, titles, themes, contents, characters, trademarks, copyrights, trade dress, all characters and ideas associated therewith and any and all related intellectual property and brands, including without limitation, all translations, adaptations, drafts and other versions thereof, whether now existing or hereafter created including any and all renewals and extensions of such rights that may be secured under the laws now or hereafter pertaining thereto in the United States or in any other country as well as any right to use or exploit any of the foregoing, and any other proprietary right, whether arising under the laws of the United States or any other country (collectively, the "Intellectual IP") held by Kleven (the "IP").

B.   The purpose of this Agreement is to confirm, memorialize and give effect to the assignment of Fifty percent of the IP to Producers in equal shares in order that the Parties may effectively and fully   undertake the protection and Exploitation of the IP. The term "Exploitation" shall be given the broadest meaning possible and shall include, without limitation, the development, licensing, sale and distribution of the IP in any and all medium, now and hereinafter known and all ancillary sources of revenue derived from, without limitation, all live action, animated and mixed theatrical, video, pay television, DVD, VOD, free television, audio, literary, sound tract, licensing, music, live performance, animation, merchandising, branding, sequels/spin-offs, television, digital and electronic productions and ventures and any and all other and further Exploitation of the IP for the mutual benefit of the Parties.

C.   The Parties previously entered into one or more Attachment Agreements whereby Producers agreed to make efforts to arrange for the financing, development, production, distribution and/or exploitation of one or more entertainment and related projects related to the IP.  Based upon Producers' efforts to date and based upon their future efforts in that regard, Kleven acknowledges that such efforts warrant the assignment of Fifty percent of the IP to Producers.

AGREEMENT:

NOW, THEREFORE, for good, adequate and mutual consideration, it is mutually agreed by and between the parties hereto as follows:

1.   Recitals.  The foregoing Recitals are hereby fully incorporated herein by this reference.

2.   Term: The term of the Joint Venture shall commence as of the effective date of this Agreement and, unless sooner terminated in accordance with the provisions hereof, shall continue until any and all rights, interests, and Exploitation of the IP are exhausted (the "Term").

3.   Assignment of Title to IP: Kleven hereby irrevocably grants, transfers and assigns without reservation all right, title, and interest in and to Fifty percent (50%) of the IP to Producers in equal shares, and shall execute such documentation as necessary to give full and complete effect to such assignment including, without, limitation, any and all applicable assignments, grants and transfers as necessary and required by Producers in their discretion in the United States or in any other country.

EXHIBIT A

4.   Contributions of Kleven: Kleven or his related entity hereby contributes the following to the Joint Venture:

a.   The grant, assignment and transfer of the IP as set forth above and delivery to Producers of any and all instruments and documents as required by Producers to evidence said grant, assignment and transfer;

b.   Kleven's full and complete participation, support and assistance in the protection and Exploitation of the IP.

5.   Contributions of Producers: Producers and/or their related entities shall contribute Producers' reasonable best efforts in the protection and Exploitation of the IP.

6.   No Obligation: Other than as set forth above, the Parties shall not be obligated to make any additional contributions. If a need for additional capital arises, each Party may contribute whatever portion of the total sum required that each elects to contribute, in its sole discretion.

7.   Creation of Entity.  At such time as Producers deem it necessary, the Parties shall create a separate and distinct legal entity in a form approved by the Parties and transfer thereto the IP to further the purposes of this Joint Venture. Nothing in the by-laws, operating agreement or other entity governing documentation shall conflict the terms of this Agreement.

8.   Distribution of Net Proceeds:  "Net Proceeds" shall include any and all monies received or credited to either Kleven and/or Producers in perpetuity from any and all sources now known or hereafter devised in connection with the exploitation of the IP and/or any and all projects related thereto including without limitation, any and all revenue, license fees, acquisition, prices, contingent compensation and other participations, merchandising, sponsorships, product placements or integration fees, and branding and licensing fees and commitments, minus the approved cost of production and the following payments in the following order, all as applicable: to the extent then due and payable, unrelated third parties will receive/deduct from the said revenue on a continuing basis their negotiated distribution fees, sales agent fees, sales agent expenses, distribution expenses (including residuals), collection account fees, taxes, and other customarily and negotiated fees and expenses, all of which will be subject to the prior written approval of Producers; next there will be a reserve for residuals (not to exceed 5% of the gross revenues) as approved by Producers; next distribution and marketing expenses, if any; next all third Party deferments, contingent compensations, participations, interest and/or fees, next Kleven's initial payment of One Million Dollars ($1,000,000.00) and then Kleven, on the one hand, and Producers on the other hand, shall divide 50/50 any and all remaining revenues of any and all exploitation of the Project. Any and all tax credits and/or deductions to which the Parties shall become entitled shall be allocated in accordance and consistent with the allocation of net profit or net losses set forth above.

9.   Books, Records, Bank Accounts.

a.   At all times during the term hereof, the Parties shall keep or cause to be kept, at the principal place of business of the Joint Venture or at such other place as the Parties may determine, books and accounting records for the business and operations of the Parties. Such books shall be open to inspection by the Parties, or their authorized representatives, during reasonable working hours. The accounting for purposes of the Parties, including the determination of profits and losses, shall be in accordance with generally accepted accounting principles consistently applied. The Parties shall engage the services of an accountant who shall be selected with the mutual approval of both parties.

b.   There shall be maintained for each Party a capital account and an income account. Each Party's distributive share of profits and losses, and monthly and end-of-the-year withdrawals not previously posted shall be credited or debited to the respective Party's income account as of

2

the close of the calendar year. Thereafter, any debit or credit balance remaining in the income account of a Party's shall be debited, or credited, as the case may be, to its respective capital account.

c.  The accounts shall be on a calendar year basis for accounting purposes (the "fiscal year"). As soon after the close of each fiscal year as is reasonably practical, a full and accurate accounting shall be made of the affairs of the Parties as of the close of each fiscal year. On such accounting being made, the net profit or the net loss sustained by the Parties during such fiscal year shall be ascertained and credited or charged, as the case may be, in the books of account of the Parties in the proportions hereinabove specified.  The parties hereto shall mutually select an accounting firm for the purpose of this venture.

d.  From time to time, but no less than annually, the Parties shall make distributions from the capital of the Parties which shall be in excess of the reasonable needs of the Parties for working capital and reserves as mutually determined by the Parties consistent with the terms of this Agreement.

e.  All funds of the Joint Venture shall be deposited in an account or accounts in the name of the Joint Venture or such names as determined by the Parties.

10.  Management and Responsibilities of the Parties.  The Parties hereby establish a Management Committee (the "Management Committee") to determine overall policies, objectives, procedures, methods and actions under this Agreement including, without limitation, Exploitation of the IP, and all subsidiary and ancillary rights thereto and all Exploitation thereof  The Management Committee shall consist of Producers and each of said Producers shall have an equal vote.

11.  Warranties, Indemnification:

a.  Each Party hereby warrants and represents to the other(s) that he/it:

(1)  Has the right and capacity to enter into this agreement;

(2)  Shall not encumber or sell any of the assets or intangible rights of the Joint Venture without the written consent of the other Party(s);

(3)  Shall not assign, mortgage, hypothecate or encumber its interest in the Joint Venture without the written consent of the other Party(s);

(4)  Shall not loan any funds or extend the credit of the Joint Venture to any person or entity without the written consent of the other Party(s);

(5)  Shall not incur any cost, expense, liability or obligation in the name or on the credit of the Joint Venture without the written consent of the other Party(s);

(6)  Is not presently involved in financial difficulties as evidenced by its not having admitted its inability to pay its debts generally as they become due or otherwise not having acknowledged its insolvency or by its not having filed or consented to a petition in bankruptcy or for reorganization or for the adoption of an arrangement under Federal Bankruptcy Act (or under any similar law of the United States or any other jurisdiction, relating to liquidation or reorganization or to modification or alteration of the rights of creditors) or by its not being involved in any bankruptcy, liquidation, or other similar proceeding relating to it or its assets, whether pursuant to statute or general rule of law, nor does it presently contemplate any such proceeding or have any reason to believe that any such proceeding will be brought against it or its assets.

b.  In addition to the foregoing warranties and representations, Kleven further represents and warrants to Producers, their successors, licensees and assigns as follows:

(1)   Unrestricted Right to Grant: Kleven is the sole and absolute owner of the Project, any and all applicable copyrights pertaining thereto and all rights associated with or relating to its production, distribution and Exploitation and has the absolute right to grant to and vest in the Joint Venture, all the rights, licenses and privileges granted to the Joint Venture under this Agreement, and Kleven has not heretofore sold, assigned, licensed, granted, encumbered or utilized the Picture, the Project or any of the literary or musical properties used therein in any way that may affect or impair the rights, licenses and privileges granted to the Joint Venture hereunder and Kleven will not sell, assign, license, grant or encumber or utilize the rights, licenses and privileges granted to Joint Venture hereunder.

(2) Trademarks, Trade names, Copyrights, Licenses, Privileges:

(a)   The IP will be valid and subsisting during the Term, and no part of any thereof is in the public domain.

(b)   Kleven has not heretofore transferred its ownership in and to any or all of the IP throughout the world, including, without limitation, the rights to secure copyright and trademark registration and all other necessary rights and licenses anywhere in the world with respect to the IP and to secure any renewals and extensions thereof wherever and whenever permitted. Kleven warrants that upon delivery of the IP granted to Producers hereunder, Kleven will own all such IP throughout the world for the full period of the IP and all extensions and renewals thereof.

(c)   The Joint Venture shall have the right to take all reasonable steps to protect such Rights from infringement by unauthorized parties and in particular, to take such action and proceedings as may be reasonable to prevent any unauthorized use, reproduction, performance, exhibition or exploitation by third parties of the IP or any part thereof or the material on which the same is based which may be in contravention of the exclusive rights granted to Producers and the Joint Venture hereunder.

(d)   No Infringement:   To the best of Kleven's knowledge and belief the Picture, no part of the IP nor the exercise of any right, license or privilege herein granted, violates or will violate or infringe or will infringe any trademark, trade name, contract, agreement, copyright (whether common law or statutory), patent, literary, artistic, dramatic, personal, private, civil or property right or right of privacy or "moral rights of authors" or any other right whatsoever of or slanders or libels any person, firm, corporation or association whatsoever.

(e)   No Impairment of Rights Granted:   There are and will be no agreements, commitments or arrangements whatever with any person, firm, corporation or association that may in any manner or to any extent affect Producer's rights hereunder or Producers' share of the proceeds of the Picture or IP.   Kleven has not and will not exercise any right or take any action which might tend to derogate from, impair or compete with the rights, licenses and privileges herein granted to the Joint Venture.

(f)   Peaceful Enjoyment: Producers and the Joint Venture will be fully entitled to the quiet and peaceful enjoyment and possession of each and all of the Rights herein granted or purported to be granted to the Joint Venture throughout the Term without interference by any third Party.

11.  Indemnification. Each Party hereby indemnifies and holds harmless the other Party from and against any and all claims, liabilities, damages and costs (including but not limited to reasonable attorneys' fees and court costs) arising from any breach by such Party of any representation, warranty or agreement made by such Party hereunder.

12.  Exclusivity: None of the Parties shall be exclusive to the Joint Venture and each Party may develop other properties and engage in other activities in the entertainment and other industries separate and apart from the Joint Venture and the other Parties. However, it is agreed by the

Parties that each Party shall devote as much time as shall be reasonably necessary to fulfill its duties and obligations in connection with the Joint Venture and the Exploitation of the IP.

13. Dissolution and Termination of the Joint Venture:

a.   The Joint Venture shall be dissolved and terminate and its business wound up upon the first to occur of the following:

(1)   The expiration of the term referred to in Paragraph 2, above;

(2)   Mutual agreement of the Parties;

(3)   Operation of law;

(4)   Material breach of this Agreement by any Party, which breach is not cured within fifteen (15) days after written notice thereof from the non-defaulting Party; provided, however, it is understood that only the non-defaulting Party shall have the right to terminate the Joint Venture pursuant to this paragraph. Such termination shall not release the defaulting Party from any obligations or liabilities to the other Party, whether pursuant to the provisions of this Agreement or at law or in equity.

b.   Upon termination of the Joint Venture, the business of the Joint Venture shall be wound up and assets and properties of the Joint Venture shall be liquidated. Upon the happening of any one of the events mentioned in Paragraph 13.a hereof, the Joint Venture shall engage in no further business, other than that necessary to protect the assets of the Joint Venture, wind-up its business and distribute its assets as provided herein.

14. Distribution of Assets on Dissolution and Liquidation: Upon any dissolution and liquidation of the Joint Venture, the assets of the Joint Venture shall be liquidated in an orderly manner (subject, however, to the terms of Paragraph 19. c hereof), with a view toward maximizing the proceeds from such liquidation, and the proceeds thereof shall be distributed in the following order of priority:

a.   First, the expenses of liquidation and the debts of the Joint Venture, other than debts owing to the Parties, shall be paid;

b.   Second, debts owing to the Parties, if any;

c.   Third, any funds remaining after the amounts described in the foregoing sub-paragraphs a. and b. have been paid shall be distributed to the Parties in the proportion in which the Parties share the net proceeds of the Joint Venture at the time of such distribution.

d.   If the Parties have not sold the assets of the Joint Venture, except as otherwise provided in this paragraph, within two (2) years following dissolution, then the remaining assets shall be distributed to the Parties as tenants in common in accordance with their above-described interests.

15. Gain or Loss During Dissolution: Any gain or loss arising out of the disposition of assets of the Joint Venture during the course of dissolution shall be borne by the Parties in the same proportions as such gain or loss was shared by the Parties hereunder immediately prior to the dissolution.

16. Opportunities and Conflicts of Interest:

a.   Any of the Parties may engage or possess an interest in any other business venture of every kind, nature and description, including ventures or enterprises which may be competitive in nature with the Joint Venture, and neither the Joint Venture nor any of the Parties shall have any rights in and to said business ventures, or to the income or profits derived therefrom.

b. No Party shall be obligated to offer any investment or business opportunities to the other Parties or to the Joint Venture. Any Party may invest or otherwise participate in such opportunities without notice to the Joint Venture or to the other Party, without affording the Joint Venture or the other Parties an opportunity of participating in same and without any liability whatsoever to the Joint Venture or to any other Party. Each Party hereby waives any right he may have against the other Party(s) for capitalizing on information learned as a consequence of its connection with the affairs of the Joint Venture.

17. Miscellaneous:

a. In the event of a default by either Party, the non-defaulting Party shall give written notice to the defaulting Party of said default. The defaulting Party shall have Fifteen (15) days to cure such default unless the parties agree in writing otherwise to a longer cure period. In the event the default cannot reasonably be cured in Fifteen (15) days, the defaulting Party shall have a reasonable time to cure such default unless (1) such default and/or additional time will result in damage to the non-defaulting Party or (2) the defaulting Party does not with all due speed seek to cure the default or (3) the default was intentional or resulted from the gross negligence or recklessness of the defaulting Party, in which case(s) no additional time shall be afforded the defaulting Party to cure.

b. All notices which any Party is required or may desire to serve hereunder shall be in writing and shall be served by personal delivery to the other Party or by prepaid registered or certified mail addressed to the other Party as follows:

To Kleven: *Chris Klein*
*33150 Barber Rd Agua Dulce 9390*

To Producers: *JEFF MILLER C/O INTERROGATE FILMS*
*6374 ARIZONA CIRCLE*
*LOS ANGELES, CA 90045*

c. The captions of the various paragraphs and sections of the Agreement are intended to be used solely for convenience of reference and are not intended and shall not be deemed for any purpose whatsoever to modify or explain or to be used as an aid in the construction of any provisions.

d. ANY AND ALL DISPUTES ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT OR ITS PERFORMANCE OR INTERPRETATION SHALL BE EXCLUSIVELY SETTLED BY ARBITRATION TO BE HELD IN LOS ANGELES, CALIFORNIA UNDER THE COMMERCIAL ARBITRATION RULES OF THE AMERICAN ARBITRATION ASSOCIATION (THE "AAA RULES). IF A PARTY DESIRES TO COMMENCE ARBITRATION, IT SHALL GIVE THE OTHER PARTY AND THE AAA WRITTEN NOTICE OF SUCH DESIRE, AND THE PARTIES SHALL JOINTLY APPOINT ONE (1) ARBITRATOR (WHO SHALL EITHER BE A RETIRED JUDGE OR AN ATTORNEY WITH AT LEAST TEN (10) YEARS OF EXPERIENCE IN THE MOTION PICTURE INDUSTRY). IF THE PARTIES CANNOT AGREE ON AN ARBITRATOR WITHIN THIRTY (30) DAYS OF SUCH NOTICE, THEN ON THE WRITTEN REQUEST OF EITHER PARTY TO THE AAA (A COPY OF WHICH SHALL BE SIMULTANEOUSLY SENT TO THE OTHER PARTY), SUCH ARBITRATOR SHALL BE APPOINTED IN ACCORDANCE WITH THE AAA RULES. PENDING A SUBMISSION OF A DISPUTE TO ARBITRATION AND, THEREAFTER, UNTIL THE ARBITRATOR PUBLISHES AN AWARD, THE PARTIES SHALL CONTINUE TO PERFORM ALL OF THEIR RESPECTIVE OBLIGATIONS UNDER THIS AGREEMENT WITHOUT PREJUDICE TO A FINAL JUDGMENT

m.   This Agreement contains the sole and only agreement of the Parties relating to the Joint Venture and correctly sets forth the rights, duties and obligations of each to the other(s) as of its date. Any prior agreements, promises, amendments, negotiations or representations not expressly set forth in this Agreement are of no force and effect.

By signing in the spaces provided below, the parties accept and agree to all the terms and conditions of this Agreement as of the effective date set forth above.

Max Kleven

Sasha Jenson

Casey La Scala

Jeff Miller

# PLAINTIFFS' TRIAL EXHIBIT 64

EXHIBIT B

## AMENDMENT TO CONFIRMATION OF ASSIGNMENT OF RIGHTS AND JOINT VENTURE AGREEMENT

This Amendment to Confirmation of Assignment of Rights and Joint Venture Agreement (this "Amendment") is effective as of February 27, 2013, by and between Max Kleven ("Kleven"), Sasha Jenson (and/or related entity/assignee) ("Jenson"), Casey La Scala (and/or related entity/assignee) ("La Scala") and Jeff Miller (and/or related entity/assignee) ("Miller") (Jenson, La Scala and Miller are sometimes collectively referred to herein as "Producers," and all four parties hereto are collectively referred to herein as the "Parties" and singularly as "Party"), with reference to the following:

**RECITALS:**

A.    Effective as of February 1, 2013, the Parties entered into that certain Confirmation of Assignment of Rights and Joint Venture Agreement (the "JV Agreement") with respect to the formation of a Joint Venture to exploit the entirety of the intellectual property based upon, in connection with, related to, associated with and/or involving the icon "Rin-Tin-Tin" of whatever kind or nature, world-wide, including, without limitation, the story, published works, titles, themes, contents, characters, trademarks, copyrights, trade dress, all characters and ideas associated therewith and any and all related intellectual property and brands, including without limitation, all translations, adaptations, drafts and other versions thereof, whether now existing or hereafter created including any and all renewals and extensions of such rights that may be secured under the laws now or hereafter pertaining thereto in the United States or in any other country as well as any right to use or exploit any of the foregoing, and any other proprietary right, whether arising under the laws of the United States or any other country (collectively, the "Intellectual IP") held by Kleven (the "IP").

B.    As an integral and necessary part of the JV Agreement, Kleven granted, transferred and assigned Fifty percent (50%) of the IP to Producers in equal shares in order that the Parties may effectively and fully undertake the protection and exploitation of the IP.

C.    Since entering into the JV Agreement, Kleven has requested that the Parties agree to (1) a provision for reversion to Kleven of the IP in the event that certain goals are not reached with respect to the exploitation of the IP, (2) certain restrictions on the sale of Producer's interests in the IP, (3) clarifying the source or sources of the initial payment of One Million Dollar ($1,000,000) to Kleven, as referenced in paragraph 8 of the JV Agreement, (4) clarifying the Parties' rights and obligations in the event of Kleven's death, incapacity or disability and (5) clarifying various terms and correcting some typographical errors in the JV Agreement.

D.    Producers have agreed to acquiesce to Kleven's request, as set forth below, and under the following express terms and conditions.

**AMENDMENT:**

NOW, THEREFORE, for good, adequate and mutual consideration including, without limitation, the Parties mutual covenants, and the additional representations and warranties by Kleven set forth below, it is mutually agreed by and between the Parties that the JV Agreement is and shall be amended in the following respects only, and otherwise will remain in full force and effect under all terms, covenants and conditions set forth therein:

1.    Recitals. The foregoing Recitals are hereby fully incorporated herein by this reference.

EXHIBIT B

2.     Right of Reversion. Subject to and conditioned upon Kleven's full and faithful performance of his obligations set forth in the JV Agreement and the covenants, representations and warranties set forth herein, the Fifty percent (50%) of the IP previously granted, transferred and assigned to Producers shall revert back to Kleven if, within Eighteen (18) months of the final resolution of third-party trademark and IP disputes/claims including, without limitation, the disputes with and claims of Daphne Herford and Rin Tin Tin, Inc., Producers' efforts have not resulted in one or more substantive agreements for the development, licensing, production, distribution, merchandising, branding and/or licensing of and/or based upon and/or on account of the IP.

3.     Restriction on Sale During Kleven's Lifetime. Subject to and conditioned upon Kleven's full and faithful performance of his obligations set forth in the JV Agreement and the covenants, representations and warranties set forth herein, during Kleven's lifetime neither Kleven nor Producers shall sell, convey or transfer title to the IP without the express written consent of all Parties.

4.     Sources of $1,000,000 Payment to Kleven.  Subject to and conditioned upon Kleven's full and faithful performance of his obligations set forth in the JV Agreement and the covenants, representations and warranties set forth herein, the sources of the payment of One Million Dollar ($1,000,000) to Kleven referenced in paragraph 8 of the JV Agreement may include, in whole or in part, rights fees or any other source of funds received from a third-party on account of the IP.

5.     Death, Legal Incapacity or Total Disability of Kleven. Upon the death, legal incapacity or total disability of Kleven, the Joint Venture shall not dissolve but shall continue with Kleven's successor(s) in interest as a party to the Joint Venture.  Such successor(s) shall be entitled to the same economic rights, preferences as to distribution, capital and profits interest in the Joint Venture as was Kleven but shall not be entitled to vote on any Joint Venture matters or participate in the management of the Joint Venture business including, without limitation, the sale or other disposition of all or any of the Joint Venture's assets.

6.     Clarifications and Typographical and Phrasing Corrections:

       a.    At paragraph 8 of the JV Agreement, the phrase "(not to exceed 5% of the gross revenues)" is hereby changed to "(not to exceed 5% of the gross revenues upon which payment of residuals would be based)";

       b.    At paragraph 8 of the JV Agreement, the phrase ", next Kleven's initial payment of One Million Dollars ($1,000,000.00)," is hereby changed to "; next a recoupment payment to Kleven of One Million Dollars ($1,000,000.00); next, recoupment by Miller of expenses incurred in connection with protection of the IP, estimated to be approximately $75,000";

       c.    At paragraph 8 of the JV Agreement, the last word of the second to the last sentence, "Project" is hereby changed to "IP";

       d.    Paragraph 9.a of the JV Agreement is hereby replaced with the following: "At all times during the term hereof, the Parties shall keep or cause to be kept, at the principal place of business of the Joint Venture or at such other place as the Parties may determine, the books and accounting records for the business and operations of the Joint Venture. Such books shall be open to reasonable inspection by the Parties, or their authorized representatives, during reasonable working hours. The accounting for purposes of the Joint Venture, including the determination of profits and losses, shall be in accordance with generally accepted accounting

principles consistently applied.  The Joint Venture shall engage the services of an accountant who shall be selected by vote of the Parties."

e.    Paragraph 9.c of the JV Agreement is hereby replaced with the following: "The accounts shall be on a calendar year basis for accounting purposes (the "fiscal year"). As soon after the close of each fiscal year as is reasonably practical, a full and accurate accounting shall be made of the affairs of the Joint Venture as of the close of each fiscal year. On such accounting being made, the net profit or the net loss sustained by the Joint Venture during such fiscal year shall be ascertained and credited or charged, as the case may be, in the books of account of the Joint Venture in the proportions hereinabove specified."

f.    Paragraph 9.d of the JV Agreement is hereby replaced with the following: "From time to time, but no less than annually, the Joint Venture shall make distributions to the Parties from that portion of the Joint Venture's capital, if any, which exceeds the amount of capital necessary for the ongoing reasonable needs of the Joint Venture for working capital and reserves."

g.    Paragraph 10 of the JV Agreement is hereby replaced with the following: "Management and Responsibilities of the Parties.  Subject to the provisions of paragraph 5 of the Amendment, all matters under this Agreement and with respect to any and all Joint Venture matters and management including, without limitation, the management of the Joint Venture business, policies, objectives, procedures, methods, decisions and actions, Exploitation of the IP, and all subsidiary and ancillary rights thereto and all Exploitation thereof, shall be decided by a majority  vote of the Parties, each of the four (4) Parties having a single, equal vote, irrespective of each Party's ownership interest";

h.    At paragraphs 11.b (1) and 11.b (2) (d) and (e) of the JV Agreement, the words "Project" and "Picture" are hereby changed to "IP";

i.    The second paragraph 11 entitled "Indemnification" in the JV Agreement is hereby made a part of the prior paragraph 11 and renumbered as paragraph 11.c;

j.    At paragraph 14 of the JV Agreement, the following phrase is hereby deleted: "(subject, however, to the terms of Paragraph 19. c hereof)";

k.    At paragraph 17.b of the JV Agreement, the following names and addresses are hereby inserted:

| | | |
|---|---|---|
| To Kleven: | Max Kleven | |
| | 33150 Barber Road | |
| | Agua Dulce, CA 91390 | |
| | with copy to: | Richard LeRoy |
| | | 10340 Santa Monica Blvd |
| | | Los Angeles, CA 90025 |
| To Producers: | Sasha Jenson, Casey La Scala and Jeff Miller | |
| | c/o Interrogate | |
| | 6374 Arizona Circle | |
| | Los Angeles, CA 90045 | |
| | with copy to: | David L. Gernsbacher |
| | | 9107 Wilshire Blvd Ste 450 |
| | | Beverly Hills CA 90210 |

7. Further Representations and Warranties. With respect to the JV Agreement and this Amendment, each of the four Parties agrees, and represents and warrants to the other Parties that:

a. Each of the Parties affirms the terms and conditions of the JV Agreement and this Amendment and that the same are fully in force, binding and enforceable.

b. Each of the Parties has had the opportunity to review the JV Agreement and this Amendment and consult with said Party's legal or other advisers concerning the JV Agreement and this Amendment, and has relied solely upon the advice of said Party's own legal and other advisers, and said Party's own reading and understanding of the JV Agreement and this Amendment, and not upon any representation or statement by the other Party or such Party's attorneys or agents.

c. The terms of the JV Agreement and this Amendment have been drafted and reviewed with the mutual negotiation and cooperation of each of the Parties and shall not be construed for or against any Party by reason of such Party's participation or lack of participation in the drafting of the JV Agreement and this Amendment.

8. JV Agreement. Save and except as specifically set forth above, the terms and conditions of the JV Agreement are and shall remain in full force and effect, binding and enforceable.

_____
Max Kleven

_____
Sasha Jenson

_____
Casey La Scala

_____
Jeff Miller

7.    Further Representations and Warranties.  With respect to the JV Agreement and this Amendment, each of the four Parties agrees, and represents and warrants to the other Parties that:

a.    Each of the Parties affirms the terms and conditions of the JV Agreement and this Amendment and that the same are fully in force, binding and enforceable.

b.    Each of the Parties has had the opportunity to review the JV Agreement and this Amendment and consult with said Party's legal or other advisers concerning the JV Agreement and this Amendment, and has relied solely upon the advice of said Party's own legal and other advisers, and said Party's own reading and understanding of the JV Agreement and this Amendment, and not upon any representation or statement by the other Party or such Party's attorneys or agents.

c.    The terms of the JV Agreement and this Amendment have been drafted and reviewed with the mutual negotiation and cooperation of each of the Parties and shall not be construed for or against any Party by reason of such Party's participation or lack of participation in the drafting of the JV Agreement and this Amendment.

8.    JV Agreement.  Save and except as specifically set forth above, the terms and conditions of the JV Agreement are and shall remain in full force and effect, binding and enforceable.

_____
Max Kleven


_____
Sasha Jenson

_____
Casey La Scala


_____
Jeff Miller

# PLAINTIFFS' TRIAL EXHIBIT 58

EXHIBIT C

## INTELLECTUAL PROPERTY ASSIGNMENT

This Intellectual Property Assignment is entered into freely by and between by and between Max Kleven ("Kleven") on the one hand, and Sasha Jenson (and/or related entity/assignee), Casey La Scala (and/or related entity/assignee) and Jeff Miller (and/or related entity/assignee) (collectively, "Producers"), on the other hand, with reference to the following:

A.   On or about February 1, 2013, the parties hereto entered into that certain Confirmation of Assignment of Rights and Joint Venture Agreement (the "JV Agreement"), which the parties hereto subsequently amended by that certain Amendment to Confirmation of Assignment of Rights and Joint Venture Agreement (the "Amendment");

B.   Pursuant to the terms of the Joint Venture Agreement, Kleven represented and warranted to Producers that he solely and exclusively owned all right, title, and interest in and to all intellectual property based upon, in connection with, related to, associated with and/or involving the icon "Rin-Tin-Tin" of whatever kind or nature, world-wide, including, without limitation, the story, published works, titles, themes, contents, characters, trademarks, copyrights, trade dress, all characters and ideas associated therewith and any and all related intellectual property and brands, including without limitation, all translations, adaptations, drafts and other versions thereof, whether now existing or hereafter created including any and all renewals and extensions of such rights that may be secured under the laws now or hereafter pertaining thereto in the United States or in any other country as well as any right to use or exploit any of the foregoing, and any other proprietary right, whether arising under the laws of the United States or any other country (collectively, the "IP");

C.   Further pursuant to the terms of the Joint Venture Agreement, Kleven irrevocably granted, transferred and assigned to Producers in equal shares, without reservation all right, title, and interest, Fifty percent (50%) of the IP;

D.   Further pursuant to the terms of the Joint Venture Agreement, Kleven agreed to execute such documentation as necessary to give full and complete effect to such grant, transfer and assignment of the IP including, without, limitation, any and all applicable assignments, grants and transfers as necessary and required by Producers in their discretion in the United States or in any other country;

E.   Further pursuant to the terms of the Joint Venture Agreement, Producers have requested that Kleven execute this Intellectual Property Assignment.

NOW, THEREFORE, subject to the terms of the Amendment, and in consideration of the payment of Ten Dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, including, without limitation, the mutual promises, covenants and agreements set forth in the Joint Venture Agreement Assignment, Kleven does hereby irrevocably grant, transfer and assign to Producers in equal shares, without reservation Fifty percent (50%) of all right, title, and interest in and to the IP and any and all registration rights with respect to the IP, and the registrations and applications and assignments therefor, including, without limitation, that certain Trademark Assignment dated May 1, 2006, from Daphne Hereford to Kleven recorded in the United States Patent and Trademark Office on or about May 11, 2006, together with the goodwill of the business connected with the use of the IP; and together with all claims, damages and/or causes of action for the infringement and/or wrongful use and registration of the IP, past, present and future, as well as all rights to prepare derivative marks, all goodwill and all other rights, in and to the IP; as well as fully undertake the protection and Exploitation of the IP. The term "Exploitation" shall be given the broadest meaning possible and shall include, without limitation, the development, licensing, sale and distribution of the IP in any and all medium, now and hereinafter known and all ancillary sources of revenue derived from, without limitation, all live action, animated and mixed theatrical, video, pay television, DVD, VOD, free television, audio, literary, sound tract, licensing, music, live

1 of 2

EXHIBIT C

performance, animation, merchandising, branding, sequels/spin-offs, television, digital and electronic productions and ventures, all licensing and, merchandising of goods and services in connection with, based upon and or arising from the IP and any and all other and further Exploitation of the IP.

In addition to the representations and warranties by Kleven to Producers set forth the Joint Venture Agreement, Kleven hereby represents and warrants to Producers as follows:

(1)    Kleven has the right, power and authority to enter into and execute this Intellectual Property Assignment;

(2)    Kleven is the exclusive owner of all right, title and interest, including all intellectual property rights, in the IP;

(3)    The IP is free of any liens, security interests, encumbrances or licenses;

(4)    The IP and any and all exploitation of same does not infringe the rights of any person or entity;

(5)    There are no claims, pending or threatened, with respect to Kleven's rights in the IP, with the exception of claims of Daphne Hereford;

(6)    This Intellectual Property Assignment is valid, binding and enforceable in accordance with its terms in all jurisdictions pertaining hereto; and

(7)    Kleven is not subject to any agreement, judgment or order inconsistent with the terms of this Intellectual Property Assignment.

Dated: _March 26-13_      _____
                          Max Kleven

## ACKNOWLEDGMENT

State of California
County of Los Angeles

On March 26th, 2013, before me, _Alethea Roberton, notary public_ personally appeared Max Kleven, who proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature on the instrument the person, or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

_____(Seal)



ALETHEA ROBERTSON
NOTARY PUBLIC - CALIFORNIA
LOS ANGELES COUNTY
COMMISSION # 1865373
MY COMM. EXPIRES SEPT. 18, 2013

2 of 2

**25**

## ACCEPTANCE OF INTELLECTUAL PROPERTY ASSIGNMENT:

The undersigned hereby accept the foregoing Intellectual Property Assignment.

Sasha Jensen

Casey La Scala

Jeff Miler

**ACCEPTANCE OF INTELLECTUAL PROPERTY ASSIGNMENT:**

The undersigned hereby accept the foregoing Intellectual Property Assignment.


_____

Sasha Jensen


_____

Casey La Scala


_____

Jeff Miller

**ACCEPTANCE OF INTELLECTUAL PROPERTY ASSIGNMENT:**

The undersigned hereby accept the foregoing Intellectual Property Assignment.

_____

Sasha Jensen

_____

Casey La Scala

_____

Jeff Miller

# PLAINTIFFS' TRIAL
# EXHIBIT 62

EXHIBIT D

**TRADEMARK ASSIGNMENT**

This Trademark Assignment is entered into freely by and between by and between Max Kleven ("Kleven") on the one hand, and Sasha Jenson (and/or related entity/assignee), Casey La Scala (and/or related entity/assignee) and Jeff Miller (and/or related entity/assignee) (collectively, "Producers"), on the other hand, with reference to the following:

A. On or about February 1, 2013, the parties hereto entered into that certain Confirmation of Assignment of Rights and Joint Venture Agreement (the "JV Agreement"), which the parties hereto subsequently amended by that certain Amendment to Confirmation of Assignment of Rights and Joint Venture Agreement (the "Amendment");

B. Pursuant to the terms of the JV Agreement, Kleven represented and warranted to Producers that he solely and exclusively owned all right, title, and interest in and to all intellectual property based upon, in connection with, related to, associated with and/or involving the icon "Rin-Tin-Tin" of whatever kind or nature, world-wide, including, without limitation, the story, published works, titles, themes, contents, characters, trademarks, copyrights, trade dress, all characters and ideas associated therewith and any and all related intellectual property and brands, including without limitation, all translations, adaptations, drafts and other versions thereof, whether now existing or hereafter created including any and all renewals and extensions of such rights that may be secured under the laws now or hereafter pertaining thereto in the United States or in any other country as well as any right to use or exploit any of the foregoing, and any other proprietary right, whether arising under the laws of the United States or any other country (collectively, the "IP");

C. Further pursuant to the terms of the JV Agreement, Kleven irrevocably granted, transferred and assigned to Producers in equal shares, without reservation all right, title, and interest, Fifty percent (50%) of the IP;

D. Further pursuant to the terms of the JV Agreement, Kleven agreed to execute such documentation as necessary to give full and complete effect to such grant, transfer and assignment of the IP including, without, limitation, any and all applicable assignments, grants and transfers as necessary and required by Producers in their discretion in the United States or in any other country;

E. Further pursuant to the terms of the JV Agreement, Producers have requested that Kleven execute this Trademark Assignment.

NOW, THEREFORE, subject to the terms of the Amendment, and in consideration of the payment of Ten Dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, including, without limitation, the mutual promises, covenants and agreements set forth in the JV Agreement, Kleven does hereby irrevocably grant, transfer and assign to Producers in equal shares, without reservation all right, title, and interest, Fifty percent (50%) of all right, title, and interest in, to and under any and all registration rights with respect to the trademark, Rin Tin Tin, and the registrations and applications therefor and all assignments thereof including, without limitation, that certain Trademark Assignment dated May 1, 2006, from Daphne Hereford to Kleven recorded in the United States Patent and Trademark Office on or about May 11, 2006, together with the goodwill of the business connected with the use of and symbolized by the trademark(s); and together with all claims, damages and/or causes of action for the infringement and/or wrongful use and registration of such trademark(s), past, present and future, as well as all rights to prepare derivative marks, all goodwill and all other rights, in and to said trademark(s) and together with all claims, damages and/or causes of action for the infringement and/or wrongful use and registration of said trademark(s), past, present and future, as well as all rights to prepare derivative marks, all goodwill and all other rights, in and to said trademark(s); as well as fully undertake the protection and Exploitation of said trademark(s). The term "Exploitation"

1 of 2

EXHIBIT D

shall be given the broadest meaning possible and shall include, without limitation, the development, licensing, sale and distribution of said trademark(s) in any and all medium, now and hereinafter known and all ancillary sources of revenue derived from, without limitation, all *live* action, animated and mixed theatrical, video, pay television, DVD, VOD, free television, audio, literary, sound tract, licensing, music, live performance, animation, merchandising, branding, sequels/spin-offs, television, digital and electronic productions and ventures, all licensing and, merchandising of goods and services in connection with, based upon and or arising from said trademark(s) and any and all other and further Exploitation of said trademark(s).

In addition to the representations and warranties by Kleven to Producers set forth the JV Agreement, Kleven hereby represents and warrants to Producers as follows:

(1) Kleven has the right, power and authority to enter into and execute this Trademark Assignment;

(2) Kleven is the exclusive owner of all right, title and interest, including all intellectual property rights, in the trademark(s);

(3) The trademark(s) is/are free of any liens, security interests, encumbrances or licenses;

(4) The Trademark(s) does/do not infringe the rights of any person or entity;

(5) There are no claims, pending or threatened, with respect to Kleven's rights in the trademark(s), with the exception of claims of Daphne Hereford;

(6) This Trademark Assignment is valid, binding and enforceable in accordance with its terms in all jurisdictions pertaining hereto; and

(7) Kleven is not subject to any agreement, judgment or order inconsistent with the terms of this Trademark Assignment.

Dated: _Mach 26 - 13_    _____
                          Max Kleven

## ACKNOWLEDGMENT

State of California
County of Los Angeles
On March 26, 2013, before me, _Alethea Roberton, Notary Public_ personally appeared Max Kleven, who proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature on the instrument the person, or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

_____ (Seal)

ALETHEA ROBERTSON
NOTARY PUBLIC - CALIFORNIA
LOS ANGELES COUNTY
COMMISSION # 1865373
MY COMM. EXPIRES SEPT. 18, 2013

2 of 2

31

**ACCEPTANCE OF TRADEMARK ASSIGNMENT:**

The undersigned hereby accept the foregoing Trademark Assignment.

Sasha Jensen

Casey La Scala

Jeff Miller

**ACCEPTANCE OF TRADEMARK ASSIGNMENT:**

The undersigned hereby accept the foregoing Trademark Assignment.


_____
Sasha Jensen


_____
Casey La Scala


_____
Jeff Miller

**ACCEPTANCE OF INTELLECTUAL PROPERTY ASSIGNMENT:**

The undersigned hereby accept the foregoing Intellectual Property Assignment.


_____

Sasha Jensen


_____

Casey La Scala


_____

Jeff Miller

# PLAINTIFFS' TRIAL EXHIBIT 65

EXHIBIT E

## PURCHASE AND ASSIGNMENT AGREEMENT

*This Purchase and Assignment Agreement* (the "Agreement") is signed and made effective on this /0th day of December, 2005, by and between Herbert Leonard, an individual, and on behalf of (a) any and all fictitious or other names under which he has operated or done business and (b) any and all business entities of any type whatsoever that he presently controls, is the beneficiary of or owns in full or in part (collectively, the "Assignor"), and Max Kleven and TRG Management, LLC (collectively, the "Assignee").

### *RECITALS*

1.      Assignor is the owner of all rights, including but not limited to copyright, in the United States and worldwide to each and every episode of the three television series (a) Rin Tin Tin, (b) Naked City and (c) Route 66, including, by way of illustration but not limitation, all of the particular episodes of those series delineated in Appendix I hereto (the "Property").

2.      Assignor desires to assign to Assignee and Assignee desires to acquire from Assignor all such rights, as well as the chain of title, to and for the Property in order to (a) satisfy a now existing judgement held by Max Kelven against Herbert Leonard and to (b) cause to be generated an income stream to assist in the care and support of Herbert Leonard.

3.      Assignor has exclusive right and full authority to sell his ownership interests and rights in the Property as well as the ownership interests and rights held by (a) any and all fictitious or other names under which Herbert Leonard has operated or done business and (b) any and all business entities of any type whatsoever that he presently controls, is the beneficiary of, or owns in full or in part.

*NOW, THEREFORE*, in consideration of the foregoing, of the covenants, promises and undertakings set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Assignor and Assignee agree as follows:

### *ARTICLE 1.*

### *DEFINITIONS*

As used in this Agreement, the following terms shall have the following meanings:

1.1     "Case" shall refer to LASC Case No. PC023018 entitled *Max J. Kleven vs. Herbert Leonard.*

1.2     "Judgment" shall refer to the judgment against Herbert Leonard issued on or about March 4, 2004 in the Case.

---

*Page 1 of 9*          *Assignor's Initials* ____  *Assignee's Initials:* ____

1.3    "Rights" shall refer to the following rights on an exclusive basis throughout the world in perpetuity: the entire copyright and all rights, title and interest, of every type and nature now known or hereafter devised, in and to the Property, including but not limited to the following:

1.3.1    the entire copyright and all right, title and interest, of every type and nature now known or hereafter devised, in and to the Property;

1.3.2    all copyrights, all motion picture rights of every kind, including, without limitation, theatrical motion picture rights, television motion picture rights, and home video rights, and all allied, subsidiary and derivative rights, including, without limitation, sequel and remake rights, novelization and publication rights, music publishing rights, soundtrack album rights, merchandising rights (including, without limitation the exploitation and/or licensing of characters and other elements of the Property for all types of goods, services and theme parks and other types of attractions), stage rights, radio rights, and promotional and advertising rights (including, without limitation, the right to broadcast, over radio, television and all other media, advertisements with respect to motion pictures or other productions produced hereunder);

1.3.3    the right(s) to change, alter and modify the Property, and distribute, transmit, exhibit, broadcast, and otherwise exploit all motion pictures or other productions produced pursuant to this Agreement (including, but not limited to, ancillary or derivative works) by means of any and all media and devices whether now known or hereafter devised, including, without limitation, in theatres, on television, video cassettes and discs, computer and/or electronic assisted media, including, without limitation, CD-ROM, DVD-ROM and other similar disc systems or digital media, interactive cable, interactive media, on-line services, character, theme park and in any and all markets, methods or media whatsoever now known or hereafter devised;

1.3.4    the right to make, in Assignee's exclusive discretion any and all changes in, additions to, and deletions from the Property;

1.3.5    any and all new, changed, altered or modified rights to the Property that may come into being and/or be recognized in the future, under the law and/or in equity (the "New Exploitation Rights"), and Assignor intends to and does hereby grant and convey to Assignee any and all such New Exploitation Rights to the Property granted by Assignor hereunder. Assignor and Assignee are also aware and do hereby acknowledge that new (or changed) (a) technology, (b) uses, (c) media, (d) formats, (e) modes of transmission, and (f) methods of distribution, dissemination, exhibition or performance (the "New Exploitation Methods") are being and will inevitably continue to be developed in the future, which would offer new opportunities for exploiting the Property;

1.3.6    the right to require Assignor to execute any document consistent herewith which Assignee reasonably deems in its interest to confirm the existence of the preceding and to effectuate its purpose to convey such rights to Assignee, including without limitation the New Exploitation Rights and any and all New Exploitation Methods;

1.3.7   the right to obtain the full benefit of applicable protection under copyright, trademark and any other applicable law throughout the world with respect to any exercise of Assignee's rights hereunder in the name of Assignee and/or Assignee's designees; and

1.3.8   the right to manufacture, sell, license, advertise, promote, furnish, supply and distribute products, by-products, services, facilities, merchandise and commodities of every nature and description, including, without limitation, video games, artwork, toys, games, items of wearing apparel, food, beverages and similar items which make reference to or are based upon or adapted from the Property or any part thereof or any motion picture or television program based on the Property or any part thereof (including the title thereof) (the "Merchandising Rights").

## *ARTICLE 2.*

### *OBLIGATIONS OF,*
### *AND REPRESENTATIONS AND WARRANTIES BY,*
### *ASSIGNOR*

2.1   Assignment of All Rights.   Upon execution of this Agreement subject to the terms and conditions as defined hereunder, and for the consideration herein set forth, Assignor hereby sells, grants, conveys and assigns all of the Rights and the complete chain of title to the Property.

2.2   All Rights Conveyed.   Assignor agrees that to the fullest extent permitted by law, this Agreement constitutes the assignment and conveyance of all of Assignor's right, title and interest in and to the Property throughout the world in perpetuity.

2.3   No Duty to Exploit.   Nothing contained in this Agreement shall be construed as requiring Assignee to exercise or exploit any of the rights granted to or acquired by Assignee under this Agreement.

2.4   Chain of Title.   Assignor will provide to Assignee as quickly as is practicable, but in no event later than December 30, 2005, a clean and complete chain of title to the Property and each element or episode thereof, including:  (i) a written summary of the Property's development history; (ii) all documentation, including, but not limited to: transfers of rights agreements, writers agreements, option/purchase agreements, publisher's releases, and all other agreements demonstrating that Assignor holds the exclusive worldwide rights to the Property without limitation,

2.5   Other Material.   Assignor further agrees to provide all other documents or materials, in any and all forms and/or media, in Assignor's possession or control, or within the possession or control of any of Assignor's employees, agents, attorneys or any other persons under the control of Assignor, which comprise, concern or relate to the Property in any way or manner.

2.6    Representations and Warranties.    Assignor represents, warrants and agrees that:

2.6.1    Neither the Property, nor any part or element thereof: (i) infringes upon or violates the copyright or trademark rights of any person or entity; or (ii) to the best knowledge of Assignor after due inquiry, contains any element or material which in any manner constitutes a libel, slander or other defamation of any person or entity or infringes on the personal or property rights or any other rights of any person or entity (including, without limitation, privacy or publicity);

2.6.2    The Property, the Rights and all other rights and privileges granted or to be granted to Assignee hereunder are free and clear of any liens, claims, charges or encumbrances;

2.6.3    No claims, litigation or other proceedings have heretofore been asserted and/or brought and no claims, litigation or proceedings are pending or threatened relating to the Property, the Rights and/or to any of the other rights and privileges granted or to be granted to Assignee hereunder;

2.6.4    Assignor is the sole and exclusive owner of the Property, and all of the Rights, and of all other rights and privileges granted or to be granted to Assignee hereunder and Assignor has full right, power and authority to make and perform this Agreement without obtaining the consent or approval of any person or entity;

2.6.5    No part of the Property is in the public domain (except for minor and incidental material therein);

2.6.6    Assignor has not heretofore in any way exercised or disposed of the Rights or any part thereof. Without limiting the generality of the foregoing, the Property has not previously been performed, exploited or exhibited as a motion picture, television production, audio-visual production, play or other form, except as originally previously exploited and therefore already an element of the Property itself, and no rights have been granted or licensed to any third party to do so;

2.6.7    The Property may be validly copyrighted and registered for copyright in the United States of America and may similarly be protected elsewhere to the maximum extent that the laws of other countries provide for such protection;

2.6.8    Assignor has not done or omitted to do, nor will Assignor do or omit to do, any act or thing which would impair, encumber or diminish Assignee's full enjoyment of the Rights and all other rights and privileges granted and to be granted to Assignee under this Agreement.

///

## ARTICLE 3.

### OBLIGATIONS OF,
### AND REPRESENTATIONS AND WARRANTIES BY,
### ASSIGNEE

3.1     Judgment.     Upon acceptance of this Agreement by the United States Copyright Office, Max Kleven shall cause to be filed in the Los Angeles Superior Court a Notice of Satisfaction of Judgment in the Case.

3.2     Payment.     Assignee has previously paid to Assignor the sum of ten thousand dollars ($10,000.00) as consideration for this Agreement, the receipt of which is hereby acknowledged by Assignor.

3.3     Other Payments.     Assignee will use such efforts as they in their exclusive discretion deem appropriate to cause money to be generated from the Property.  From the proceeds thereof may, but are not obligated to, make periodic non-assignable and non-transferrable payments to Herbert Leonard during his lifetime in such amounts as they in their exclusive discretion deem appropriate.

3.4     Net Payment. Assignee will pay to Herbert Leonard an amount to be determined by Assignee in their exclusive discretion up to Two Hundred Thousand Dollars ($200,000.00) out of the net proceeds that are regularly realized from the successful distribution of the first film created as a result of the acquisition of the Property.

3.5     No Other Obligations.     Assignor acknowledges that Assignee has no obligations under this Agreement other than those particularly and specifically delineated in this Article 3 of the Agreement, that the obligations detailed in paragraphs 3.3 and 3.4 immediately hereinabove are neither assignable nor transferrable and co-exist the life of Herbert Leonard.

## ARTICLE 4.

### MISCELLANEOUS PROVISIONS

4.1     Signatory Authority.     Each individual and entity executing this Agreement hereby represents and warrants that he has the capacity set forth on the signature pages hereof with full power and authority to bind the party on whose behalf he is executing this Agreement without duress to the terms hereof.

4.2     Entire Agreement.     This Agreement, together with the Exhibits attached hereto, all of which are incorporated by reference, represents the entire agreement between the parties with respect to the subject matter hereof, and no alteration, modification or interpretation hereof shall be binding unless in writing and signed by both parties.  This Agreement is the result of negotiations between the parties and, accordingly, shall not be construed for or against either

party regardless of which party drafted this Agreement, or any portion thereof. The making, execution and delivery of this Agreement by the parties hereto has been induced by no representations, statements, warranties or agreements other than those expressly set forth herein.

4.3     Severability.     If any provision of this Agreement or application to any party or circumstances shall be determined by any court of competent jurisdiction to be invalid or unenforceable to any extent, the remainder of this Agreement or the application of such provision to such person or circumstances, other than those as to which it is so determined invalid or unenforceable, shall not be affected thereby, and each provision hereof shall be valid and shall be enforced to the fullest extent permitted by law.

4.4     Interpretation.     Wherever possible, each provision of this Agreement shall be interpreted in such a manner as to be valid under applicable law. The language in all parts of this Agreement shall be in all cases construed simply according to its fair meaning and not strictly for or against any of the parties hereto for any reason.     Section headings of this Agreement are solely for convenience of reference and shall not govern the interpretation of any of the provisions of this Agreement.

4.5     Applicable Law; Venue.     This Agreement shall be governed by and construed in accordance with the laws of the State of California, without reference to the conflicts-of-laws rules and principles of such state. This Agreement shall be deemed executed and performed within the County of Los Angeles and venue shall be deemed proper in the state and/or federal courts located therein.

4.6     Assignability.     Assignee may assign this Agreement in any manner Assignee shall choose in their exclusive discretion. No assignment shall release Assignee herein named from any obligation or liability under this Agreement. Any assignee shall be deemed to have made any and all representations and warranties made by Assignee hereunder, as if the assignee were the original signatory hereto.

4.7     Successors Bound.     This Agreement shall be binding upon and inure to the benefit of each of the parties hereto and to their respective transferees, successors, and assigns subject to the limitations specifed in this Agreement.

4.8     Captions.     The captions in this Agreement are inserted only as a matter of convenience and for reference and in no way define, limit or describe the scope of this Agreement or the scope or content of any of its provisions.

4.9     Attorney's Fees.     If either Assignee or Assignor brings any suit or other proceeding relating to or arising out of this Agreement, the transactions described herein or the enforcement hereof, or with respect to a breach of a representation or warranty hereunder, the prevailing party (as determined by the court, agency or other authority before which such suit or proceeding is commenced) shall, in addition to such other relief as may be awarded, be entitled to recover attorneys' fees, expenses and costs.

4.10   Cooperation Between Assignor and Assignee.   Assignor and Assignee agree to fully cooperate with each other and utilize their best efforts in regard to the satisfaction of the conditions precedent to Assignee's obligation to purchase the Property by Assignor.

4.11   Notice.   Any notice required or permitted to be given hereunder shall be deemed to be given when hand delivered, received within normal business hours by facsimile transmission at such numbers as shall be provided by and between the parties, or one (1) business day after pickup by overnight express mail services such as Federal Express, in either case addressed to the parties at their respective addresses referenced below:

If to Assignee:                     Max Kleven
                                    33150 Barber Road
                                    Agua Dulce, CA 91390

                                    *and*

                                    TRG Management, LLC
                                    33136 Barber Road
                                    Agua Dulce, CA 91390

If to Assignor:                     Herbert Leonard
                                    33150 Barber Road
                                    Agua Dulce, CA  91390
                                    Phone: 661-268-1681

4.12   No Partnership.   Notwithstanding anything to the contrary contained or implied herein, this Agreement shall not be deemed or construed to make the parties hereto partners or joint venturers, or to render either party liable for any of the debts or obligations of the other, it being the intention of the parties to merely create the relationship of Assignor and Assignee with respect to the Property to be conveyed as contemplated hereby.

4.13   Time of Essence.   Time is of the essence in this Agreement.

4.14   Counterparts.   This Agreement may be executed and delivered in any number of counterparts, each of which so executed and delivered shall be deemed to be an original and all of which shall constitute one and the same instrument.

4.15   Effect of Waiver.   No waiver of any provision of this Agreement shall be considered a waiver of any subsequent breach of the same or breach of any other provision of this Agreement.

4.16   Representation by Counsel.   This Agreement shall be deemed drafted as a result of the mutual negotiations of the parties and each party agrees that this Agreement was negotiated in good faith by and between the parties.  No party shall claim any benefit or injury resulting from having any particular party's attorney(s) involved in the preparation of this Agreement.  Each party acknowledges that he/it has been advised to seek legal counsel prior to signing this

---

*Page·7 of 9*          *Assignor's Initials:*          *Assignee's Initials:*

Agreement, has been given the opportunity to do so and that by signing this Agreement each party acknowledges that either he/it did seek independent legal counsel or counsciously and purposefully did not do so.

4.17   Joint and Several Liability.   If either party to this Agreement consists of more than one person, each such person shall be jointly and severally liable under this Agreement.

4.18   Amendment.   This Agreement may be amended only by a written instrument executed by the party or parties to be bound.

4.19   No Third Party Beneficiary.   This Agreement is for the sole benefit of Assignee and Assignor and is not for the benefit of any third party.

4.20   Exhibits and Scheduling.   All Exhibits and schedules attached hereto are incorporated herein by reference.

///

## SIGNATURES

IN WITNESS WHEREOF, Assignee and Assignor have executed this Agreement on the date set forth in the first paragraph above.

ASSIGNEE:                                                ASSIGNOR:

TRG Management, LLC                                       Herbert Leonard

ASSIGNEE:

Max Kleven

## NOTARY

STATE OF CALIFORNIA          )

                             )

COUNTY OF LOS ANGELES        )

On December 10, 2005 this Agreement was acknowledged before me by Herbert Leonard, who is personally known to me or who produced valid form(s) of identification as acceptable subject to the laws of the State of California.

(SEAL)

Notary Public

Debbie L. Skinberg
(Printed Name)

DEBBIE L. STEINBERG
Commission # 1434399
Notary Public - California
Los Angeles County
My Comm. Expires Aug 11, 2007

My Commission Expires:

August 11, 2007
Date

Assignor's Initials: _____ Assignee's Initials: _____

**44**

# PLAINTIFFS' TRIAL EXHIBIT 73

EXHIBIT F

**45**

# INTELLECTUAL PROPERTY ASSIGNMENT AGREEMENT

*This Intellectual Property Assignment Agreement* (the "Assignment Agreement") is signed and made effective on this __ day of March, 2008, by and between TRG Management, LLC, RTT Movie One, LLC, Rodney Rosa and Ronnie Belarmino (collectively the "Assignors") and Kleven Productions, Inc. ("KPI").

## *RECITALS*

**WHEREAS**, Assignors and KPI (collectively, the "Parties") are parties to certain litigation (the "Litigation") concerning, among other things, the intellectual property and other rights to Rin Tin Tin owned by Assignors;

**WHEREAS**, the Parties are entering into a Confidential Settlement Agreement (the "Settlement Agreement") concurrently with entering into this Assignment Agreement in order to resolve all matters between them arising from the Litigation;

**WHEREAS**, Herbert Leonard ("Leonard") assigned certain intellectual property rights relating to "Rin Tin Tin" to TRG Management, LLC ("TRG") and Max Kleven, pursuant to one or both of two assignment agreements executed on or about September 23, 2005 and December 10, 2005, respectively (collectively, the "Leonard Assignment Agreements"); and

**WHEREAS**, it is a condition of entering into the Settlement Agreement that Assignors assign and transfer to KPI all of their rights, title and interest in "Rin Tin Tin," if any, that had been transferred to TRG by Leonard pursuant to the Leonard Assignment Agreements.

*NOW, THEREFORE*, in consideration of the covenants, promises and undertakings set forth in the Settlement Agreement and herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Assignors and KPI agree as follows:

## *ARTICLE 1.*

### *DEFINITIONS*

For purposes of this Assignment Agreement, the following terms shall have the following meanings:

EXHIBIT F

Intellectual Property Assignment Agreement

1.   "Property" shall be construed in the broadest possible sense to mean and to include any manifestations of the character "Rin Tin Tin" in any manner or context whatsoever, as set forth in the Leonard Assignment Agreements, and as transferred to TRG by Leonard pursuant to the Leonard Assignment Agreements, including by way of illustration, but not limitation, any of the following rights to the extent transferred by one or both of the Leonard Assignment Agreements:

       (a)   the mark "Rin Tin Tin,"

       (b)   the words, name and character Rin Tin Tin,

       (c)   the television series "The Adventures of Rin Tin Tin,"

       (d)   motion picture(s) or television program(s) based on Rin Tin Tin,

       (e)   the goodwill associated with Rin Tin Tin,

       (g)   the right to produce motion picture(s) or television program(s) based on Rin Tin Tin,

       (h)   all other rights, title and interest in and to the goodwill and all other intangible assets associated with Rin Tin Tin, any and all trade secrets, inventions, designs, copyrights, registered or not, trademarks or service marks, registered or not, and other intellectual property, know-how, manufacturing methods and processes,

       (i)   all Internet Sites and Domain Names associated, related, concerning or referring in any manner to Rin Tin Tin.

2.   "Rights" shall refer to the following:

       a.   the entire copyright, trademark rights and all other rights, title and interest, of every type and nature, now known or hereafter devised, in and to the Property;

b.     all copyrights, whether registered or not registered, for all television programs or motion picture rights of every kind, including, without limitation, theatrical motion picture rights, television motion picture rights, and home video rights, and all allied, subsidiary and derivative rights, including, without limitation, sequel and remake rights, novelization and publication rights, music publishing rights, soundtrack album rights, merchandising rights (including, without limitation the exploitation and/or licensing of characters and other elements of the Property for all types of goods, services and theme parks and other types of attractions), stage rights, radio rights, and promotional and advertising rights (including, without limitation, the right to broadcast, over radio, television and all other media, of type now known or known in the future, advertisements with respect to motion pictures or other productions produced hereunder) in each case in and to the Property;

c.     the right(s) to change, alter and modify the Property, and distribute, transmit, exhibit, broadcast, and otherwise exploit all motion pictures or other productions produced pursuant to this Assignment Agreement (including, but not limited to, ancillary or derivative works) by means of any and all media and devices whether now known or hereafter devised, including, without limitation, in theatres, on television, video cassettes and discs, computer and/or electronic assisted media, including, without limitation, CD-ROM, DVD-ROM and other similar disc systems or digital media, interactive cable, interactive media, on-line services, character, theme park and in any and all markets, methods or media whatsoever now known or hereafter devised;

d.     the right to make any and all changes in, additions to, and deletions from the Property;

e.     any and all new, changed, altered or modified rights to the Property that may come into being and/or be recognized in the future, under the law and/or in equity (the "New Exploitation Rights"), and Assignor intends to and does hereby grant and convey to KPI any and all such New Exploitation Rights to the Property currently held by Assignor hereunder. Assignor and KPI are also aware and do hereby acknowledge that new (or changed) (i) technology, (ii) uses, (iii) media, (iv) formats, (v) modes of transmission, and (vi) methods of

Page 3 of 8

distribution, dissemination, exhibition or performance (the "New Exploitation Methods") are being and will inevitably continue to be developed in the future, which would offer new opportunities for exploiting the Property;

       f.     the right to obtain the full benefit of applicable protection under copyright, trademark and any other applicable law throughout the world with respect to any exercise of KPI's rights hereunder in the name of KPI and/or KPI's designees; and

       g.     the right to manufacture, sell, license, advertise, promote, furnish, supply and distribute products, by-products, services, facilities, merchandise and commodities of every nature and description (including, without limitation, video games, artwork, toys, games, items of wearing apparel, food, beverages and similar items) which make reference to or are based upon or adapted from the Property or any part thereof or any motion picture or television program based on the Property or any part thereof (the "Merchandising Rights").

### ARTICLE 2.

### OBLIGATIONS OF AND REPRESENTATIONS
### AND WARRANTIES BY ASSIGNOR

       **1.**     **Assignment Agreement of All Rights**. Assignors hereby transfer, convey and assign to KPI all Rights and Property that are held by any one or more of the Assignors as of the date of this Agreement.

       **2.**     **All Rights**. Assignors acknowledge and agree that upon execution of this Assignment Agreement KPI will own all of the Rights and Property that any one or more of the Assignors own on the date of this Agreement or has ever owned prior to the date of this Agreement concerning the Rights and Property and Assignors will never assert or claim to the contrary.

       **3.**     **No Prior Disposal; Disclaimers**. Assignors warrant that they have not heretofore in any way disposed of, sold, assigned, encumbered or granted any licenses of or regarding any rights that any one or more of the Assignors has held prior to the date hereof in the Property or

the Rights or any part thereof. Except for the warranty expressly set forth in this paragraph, Assignors assign any interest that any one or more of them hold in the Property or the Rights on an **AS IS** basis. Without limitation to the foregoing, (a) Assignors expressly disclaim any representation or warranty that Assignors hold any interest in or title to the Property or the Rights, (b) Assignors expressly disclaim any representation or warranty that KPI or any other person will be free to exercise or utilize the Property or Rights without securing licenses, consents or other forms of authorization from third parties, and (c) Assignors expressly disclaim any representation or warranty that the Property or Rights are free of any element or material which constitutes a libel, slander or other defamation of any person or entity or infringes on the personal or property rights or any other rights of any person or entity (including, without limitation, privacy or publicity).

**4.** **No Contest.** Under no circumstances will Assignors dispute that this Agreement transferred any and all the Rights and Property that any one or more of the Assignors own on the date of this Agreement to KPI.

## *ARTICLE 3.*

## *OBLIGATIONS OF, AND REPRESENTATIONS AND WARRANTIES BY KPI*

**1.** **No Obligations.** KPI and Max Kleven have no obligations whatsoever to Assignor under this Assignment Agreement. Any obligations owed by KPI and Max Kleven under the Settlement Agreement are set forth in the Settlement Agreement.

## *ARTICLE 4.*

## *MISCELLANEOUS PROVISIONS*

**1.** **Signatory Authority.** Each individual and entity executing this Assignment Agreement hereby represents and warrants that he has the capacity set forth on the signature pages hereof with full power and authority to bind the party on whose behalf he is executing this Assignment Agreement without duress to the terms hereof.

**2.** **Entire Assignment Agreement.** This Assignment Agreement represents the

Page 5 of 8

entire Assignment Agreement between the parties with respect to the subject matter hereof, and no alteration, modification or interpretation hereof shall be binding unless in writing and signed by all of the affected parties.

    **3.**    **No Preference.**    This Assignment Agreement is the result of negotiations between the parties and, accordingly, shall not be construed for or against either party regardless of which party drafted this Assignment Agreement, or any portion thereof.

    **4.**    **Severability.**    If any provision of this Assignment Agreement or application to any party or circumstances shall be determined by any court of competent jurisdiction to be invalid or unenforceable to any extent, the remainder of this Assignment Agreement or the application of such provision to such person or circumstances, other than those as to which it is so determined invalid or unenforceable, shall not be affected thereby, and each provision hereof shall be valid and shall be enforced to the fullest extent permitted by law.

    **5.**    **Interpretation.**    Wherever possible, each provision of this Assignment Agreement shall be interpreted in such a manner as to be valid under applicable law. The language in all parts of this Assignment Agreement shall be in all cases construed simply according to its fair meaning and not strictly for or against any of the parties hereto for any reason. Section headings of this Assignment Agreement are solely for convenience of reference and shall not govern the interpretation of any of the provisions of this Assignment Agreement.

    **6.**    **Governing Law; Venue.**    This Assignment Agreement shall be governed by and construed in accordance with the laws of the State of California, without reference to the conflicts-of-laws rules and principles thereof. This Assignment Agreement shall be deemed executed and performed within the County of Los Angeles and venue shall be deemed proper in the state and/or federal courts located therein. To the extent permitted by law, the parties waive any provision of law that renders any such provision prohibited or unenforceable in any respect.

    **7.**    **Assignability.**    KPI may assign this Assignment Agreement in any manner KPI shall choose in its exclusive discretion.

    **8.**    **Successors Bound.**    This Assignment Agreement shall be binding upon and inure to the benefit of each of the parties hereto and to their respective transferees, successors, agents and assigns. This listing shall be construed in the most inclusive manner subject only to

the provisions of this Assignment Agreement and the Settlement Agreement.

9.     **Captions.** The captions in this Assignment Agreement are inserted only as a matter of convenience and for reference and in no way define, limit or describe the scope of this Assignment Agreement or the scope or content of any of its provisions.

10.     **No Business Relationship.** Notwithstanding anything to the contrary contained or implied herein, this Assignment Agreement shall not be deemed or construed to make the parties hereto partners or joint venturers, or to render either party liable for any of the debts or obligations of the other, it being the intention of the parties to merely create the relationship of Assignor and KPI with respect to the Property to be conveyed as contemplated hereby. Further, Assignor shall under no circumstances claim any rights or relationship to KPI, the Rights or to the Property.

11.     **Counterparts.** This Assignment Agreement may be executed and delivered in any number of counterparts, each of which so executed and delivered shall be deemed to be an original and all of which shall constitute one and the same instrument.

12.     **Effect of Waiver.** No waiver of any provision of this Assignment Agreement shall be considered a waiver of any subsequent breach of the same or breach of any other provision of this Assignment Agreement.

13.     **Several Liability.** Each of the Assignors shall be severally but not jointly liable under this Assignment Agreement.

**IN WITNESS WHEREOF**, the parties have executed this Assignment Agreement as of the date first written above.

Intellectual Property Assignment Agreement

**IN WITNESS WHEREOF**, the parties have executed this Assignment Agreement as of the date first written above.

_____        _____
DATED                                RODNEY ROSA


_____        _____
DATED                                RONNIE BELARMINO


_____        RTT MOVIE ONE, LLC
DATED

                                    By:_____


_____        TRG MANAGEMENT, LLC
DATED

                                    By:_____


_____        _____
DATED                                KLEVEN PRODUCTIONS, INC.

                                    By: Max Klern

LA 595893v.1

Intellectual Property Assignment Agreement

IN WITNESS WHEREOF, the parties have executed this Assignment Agreement as of
the date first written above.

DATED _____          _____ RODNEY ROSA

3/07/08
DATED _____          _____ RONNIE BELARMINO

3/07/08
DATED _____          RTT MOVIE ONE, LLC

By: _____
RONNIE BELARMINO, MANAGING MEMBER

TRG MANAGEMENT, LLC

3/07/08
DATED _____          By: _____
RONNIE BELARMINO, MANAGING MEMBER

DATED _____          KLEVEN PRODUCTIONS, INC.

By: _____

LA 595893v.1

Page 8 of 8

54

Intellectual Property Assignment Agreement

IN WITNESS WHEREOF, the parties have executed this Assignment Agreement as of
the date first written above.

MARCH 07, 2008

DATED                                    RODNEY ROSA


DATED                                    RONNIE BELARMINO


                                         RTT MOVIE ONE, LLC
DATED

                                         By:_____


                                         TRG MANAGEMENT, LLC
DATED

                                         By:_____


DATED                                    KLEVEN PRODUCTIONS, INC.

                                         By:_____


LA 595893V.1

Page 8 of 8

# PLAINTIFFS' TRIAL EXHIBIT 71

EXHIBIT G

**56**



# PLAINTIFFS' TRIAL EXHIBIT 72

EXHIBIT H





# PLAINTIFFS' TRIAL EXHIBIT 91

EXHIBIT I

PTO Form 1478 (Rev 9/2006)
OMB No. 0651-0009 (Exp 12/31/2014)

# Trademark/Service Mark Application, Principal Register

**Serial Number: 86091209**
**Filing Date: 10/14/2013**

---

### The table below presents the data as entered.

| Input Field | Entered |
|---|---|
| **SERIAL NUMBER** | 86091209 |
| **MARK INFORMATION** | |
| *MARK | RIN TIN TIN |
| **STANDARD CHARACTERS** | YES |
| **USPTO-GENERATED IMAGE** | YES |
| **LITERAL ELEMENT** | RIN TIN TIN |
| **MARK STATEMENT** | The mark consists of standard characters, without claim to any particular font, style, size, or color. |
| **REGISTER** | Principal |
| **APPLICANT INFORMATION** | |
| *OWNER OF MARK | Rin, Inc. |
| **INTERNAL ADDRESS** | c/o The Law Office of Keivn M. Welch |
| *STREET | P.O. Box 494 |
| *CITY | Hermosa Beach |
| *STATE (Required for U.S. applicants) | California |
| *COUNTRY | United States |
| *ZIP/POSTAL CODE (Required for U.S. applicants only) | 90254 |
| **LEGAL ENTITY INFORMATION** | |

EXHIBIT I

62

| TYPE | corporation |
|---|---|
| STATE/COUNTRY OF INCORPORATION | California |
| **GOODS AND/OR SERVICES AND BASIS INFORMATION** | |
| INTERNATIONAL CLASS | 041 |
| *IDENTIFICATION | Movies, television shows, live performances, audio recorded performances, video recorded performances, live shows, plays, videos, books, comic books, graphic novels, licensing, merchandising, marketing, advertising for third parties, all featuring the image of and/or text having as the subject the television and movie icon and character Rin Tin Tin and related characters and written publications. |
| FILING BASIS | SECTION 1(b) |
| **ATTORNEY INFORMATION** | |
| NAME | Kevin M. Welch |
| ATTORNEY DOCKET NUMBER | RINTI-T8330 |
| FIRM NAME | The Law Office of Kevin M. Welch |
| STREET | P.O. Box 494 |
| CITY | Hermosa Beach |
| STATE | California |
| COUNTRY | United States |
| ZIP/POSTAL CODE | 90254 |
| PHONE | (310) 929-0553 |
| FAX | (310) 698-1626 |
| EMAIL ADDRESS | kevin@kmwlawoffice.com |
| AUTHORIZED TO COMMUNICATE VIA EMAIL | Yes |
| **CORRESPONDENCE INFORMATION** | |
| NAME | Kevin M. Welch |

| FIRM NAME | The Law Office of Kevin M. Welch |
|---|---|
| STREET | P.O. Box 494 |
| CITY | Hermosa Beach |
| STATE | California |
| COUNTRY | United States |
| ZIP/POSTAL CODE | 90254 |
| PHONE | (310) 929-0553 |
| FAX | (310) 698-1626 |
| EMAIL ADDRESS | kevin@kmwlawoffice.com |
| AUTHORIZED TO COMMUNICATE VIA EMAIL | Yes |
| **FEE INFORMATION** | |
| NUMBER OF CLASSES | 1 |
| FEE PER CLASS | 325 |
| *TOTAL FEE DUE | 325 |
| *TOTAL FEE PAID | 325 |
| **SIGNATURE INFORMATION** | |
| SIGNATURE | /Kevin M. Welch/ |
| SIGNATORY'S NAME | Kevin M. Welch |
| SIGNATORY'S POSITION | Attorney of Record, California bar member |
| DATE SIGNED | 10/14/2013 |

**Trademark/Service Mark Application, Principal Register**

**Serial Number: 86091209**
**Filing Date: 10/14/2013**

**To the Commissioner for Trademarks:**

**MARK:** RIN TIN TIN (Standard Characters, see mark)
The literal element of the mark consists of RIN TIN TIN.
The mark consists of standard characters, without claim to any particular font, style, size, or color.

The applicant, Rin, Inc., a corporation of California, having an address of
    c/o The Law Office of Keivn M. Welch,
    P.O. Box 494
    Hermosa Beach, California 90254
    United States

requests registration of the trademark/service mark identified above in the United States Patent and Trademark Office on the Principal Register established by the Act of July 5, 1946 (15 U.S.C. Section 1051 et seq.), as amended, for the following:

    International Class 041:  Movies, television shows, live performances, audio recorded performances, video recorded performances, live shows, plays, videos, books, comic books, graphic novels, licensing, merchandising, marketing, advertising for third parties, all featuring the image of and/or text having as the subject the television and movie icon and character Rin Tin Tin and related characters and written publications.
Intent to Use: The applicant has a bona fide intention to use or use through the applicant's related company or licensee the mark in commerce on or in connection with the identified goods and/or services. (15 U.S.C. Section 1051(b)).

The applicant's current Attorney Information:
    Kevin M. Welch of The Law Office of Kevin M. Welch
    P.O. Box 494
    Hermosa Beach, California 90254
    United States
The attorney docket/reference number is RINTI-T8330.
The applicant's current Correspondence Information:

Kevin M. Welch

The Law Office of Kevin M. Welch

P.O. Box 494

Hermosa Beach, California 90254

(310) 929-0553(phone)

(310) 698-1626(fax)

kevin@kmwlawoffice.com (authorized)

A fee payment in the amount of $325 has been submitted with the application, representing payment for 1 class(es).

## Declaration

The undersigned, being hereby warned that willful false statements and the like so made are punishable by fine or imprisonment, or both, under 18 U.S.C. Section 1001, and that such willful false statements, and the like, may jeopardize the validity of the application or any resulting registration, declares that he/she is properly authorized to execute this application on behalf of the applicant; he/she believes the applicant to be the owner of the trademark/service mark sought to be registered, or, if the application is being filed under 15 U.S.C. Section 1051(b), he/she believes applicant to be entitled to use such mark in commerce; to the best of his/her knowledge and belief no other person, firm, corporation, or association has the right to use the mark in commerce, either in the identical form thereof or in such near resemblance thereto as to be likely, when used on or in connection with the goods/services of such other person, to cause confusion, or to cause mistake, or to deceive; and that all statements made of his/her own knowledge are true; and that all statements made on information and belief are believed to be true.

## Declaration Signature

Signature: /Kevin M. Welch/   Date: 10/14/2013
Signatory's Name: Kevin M. Welch
Signatory's Position: Attorney of Record, California bar member
RAM Sale Number: 86091209
RAM Accounting Date: 10/15/2013

Serial Number: 86091209
Internet Transmission Date: Mon Oct 14 21:47:45 EDT 2013
TEAS Stamp: USPTO/BAS-72.129.86.27-20131014214745778
648-86091209-5006fa68488754ca7370ebf9444

51687984e406295ec33a185578edaa740-CC-165
48-20131014214209168452

TO Form 1478 (Rev 9/2006)
OMB No. 0651-0009 (Exp 12/31/2014)

# Trademark/Service Mark Application, Principal Register

**Serial Number: 86091211**
**Filing Date: 10/14/2013**

---

**The table below presents the data as entered.**

| Input Field | Entered |
|---|---|
| **SERIAL NUMBER** | 86091211 |
| **MARK INFORMATION** | |
| *****MARK** | RINTY |
| **STANDARD CHARACTERS** | YES |
| **USPTO-GENERATED IMAGE** | YES |
| **LITERAL ELEMENT** | RINTY |
| **MARK STATEMENT** | The mark consists of standard characters, without claim to any particular font, style, size, or color. |
| **REGISTER** | Principal |
| **APPLICANT INFORMATION** | |
| *****OWNER OF MARK** | Rin, Inc. |
| **INTERNAL ADDRESS** | c/o The Law Office of Kevin M. Welch |
| *****STREET** | P.O. Box 494 |
| *****CITY** | Hermosa Beach |
| *****STATE** (Required for U.S. applicants) | California |
| *****COUNTRY** | United States |
| *****ZIP/POSTAL CODE** (Required for U.S. applicants only) | 90254 |
| **LEGAL ENTITY INFORMATION** | |

| TYPE | corporation |
| --- | --- |
| STATE/COUNTRY OF INCORPORATION | California |
| **GOODS AND/OR SERVICES AND BASIS INFORMATION** | |
| INTERNATIONAL CLASS | 041 |
| *IDENTIFICATION | Movies, television shows, live performances, audio recorded performances, video recorded performances, live shows, plays, videos, books, comic books, graphic novels, licensing, merchandising, marketing, advertising for third parties, all featuring the image of and/or text having as the subject the television and movie icon and character Rin Tin Tin and related characters and written publications. |
| FILING BASIS | SECTION 1(b) |
| **ATTORNEY INFORMATION** | |
| NAME | Kevin M. Welch |
| ATTORNEY DOCKET NUMBER | RINTI-T8340 |
| FIRM NAME | The Law Office of Kevin M. Welch |
| STREET | P.O. Box 494 |
| CITY | Hermosa Beach |
| STATE | California |
| COUNTRY | United States |
| ZIP/POSTAL CODE | 90254 |
| PHONE | (310) 929-0553 |
| FAX | (310) 698-1626 |
| EMAIL ADDRESS | kevin@kmwlawoffice.com |
| AUTHORIZED TO COMMUNICATE VIA EMAIL | Yes |
| **CORRESPONDENCE INFORMATION** | |
| NAME | Kevin M. Welch |

| FIRM NAME | The Law Office of Kevin M. Welch |
|---|---|
| STREET | P.O. Box 494 |
| CITY | Hermosa Beach |
| STATE | California |
| COUNTRY | United States |
| ZIP/POSTAL CODE | 90254 |
| PHONE | (310) 929-0553 |
| FAX | (310) 698-1626 |
| EMAIL ADDRESS | kevin@kmwlawoffice.com |
| AUTHORIZED TO COMMUNICATE VIA EMAIL | Yes |
| **FEE INFORMATION** | |
| NUMBER OF CLASSES | 1 |
| FEE PER CLASS | 325 |
| *TOTAL FEE DUE | 325 |
| *TOTAL FEE PAID | 325 |
| **SIGNATURE INFORMATION** | |
| SIGNATURE | /Kevin M. Welch/ |
| SIGNATORY'S NAME | Kevin M. Welch |
| SIGNATORY'S POSITION | Attorney of Record, California bar member |
| DATE SIGNED | 10/14/2013 |

PTO Form 1478 (Rev 9/2006)
OMB No. 0651-0009 (Exp 12/31/2014)

## Trademark/Service Mark Application, Principal Register

**Serial Number: 86091211**
**Filing Date: 10/14/2013**

**To the Commissioner for Trademarks:**

**MARK:** RINTY (Standard Characters, see mark)
The literal element of the mark consists of RINTY.
The mark consists of standard characters, without claim to any particular font, style, size, or color.

The applicant, Rin, Inc., a corporation of California, having an address of
    c/o The Law Office of Kevin M. Welch,
    P.O. Box 494
    Hermosa Beach, California 90254
    United States


requests registration of the trademark/service mark identified above in the United States Patent and Trademark Office on the Principal Register established by the Act of July 5, 1946 (15 U.S.C. Section 1051 et seq.), as amended, for the following:

    International Class 041:  Movies, television shows, live performances, audio recorded performances, video recorded performances, live shows, plays, videos, books, comic books, graphic novels, licensing, merchandising, marketing, advertising for third parties, all featuring the image of and/or text having as the subject the television and movie icon and character Rin Tin Tin and related characters and written publications.
Intent to Use: The applicant has a bona fide intention to use or use through the applicant's related company or licensee the mark in commerce on or in connection with the identified goods and/or services. (15 U.S.C. Section 1051(b)).


The applicant's current Attorney Information:
    Kevin M. Welch of The Law Office of Kevin M. Welch
    P.O. Box 494
    Hermosa Beach, California 90254
    United States
The attorney docket/reference number is RINTI-T8340.
The applicant's current Correspondence Information:

Kevin M. Welch

The Law Office of Kevin M. Welch

P.O. Box 494

Hermosa Beach, California 90254

(310) 929-0553(phone)

(310) 698-1626(fax)

kevin@kmwlawoffice.com (authorized)

A fee payment in the amount of $325 has been submitted with the application, representing payment for 1 class(es).

## Declaration

The undersigned, being hereby warned that willful false statements and the like so made are punishable by fine or imprisonment, or both, under 18 U.S.C. Section 1001, and that such willful false statements, and the like, may jeopardize the validity of the application or any resulting registration, declares that he/she is properly authorized to execute this application on behalf of the applicant; he/she believes the applicant to be the owner of the trademark/service mark sought to be registered, or, if the application is being filed under 15 U.S.C. Section 1051(b), he/she believes applicant to be entitled to use such mark in commerce; to the best of his/her knowledge and belief no other person, firm, corporation, or association has the right to use the mark in commerce, either in the identical form thereof or in such near resemblance thereto as to be likely, when used on or in connection with the goods/services of such other person, to cause confusion, or to cause mistake, or to deceive; and that all statements made of his/her own knowledge are true; and that all statements made on information and belief are believed to be true.

## Declaration Signature

Signature: /Kevin M. Welch/   Date: 10/14/2013
Signatory's Name: Kevin M. Welch
Signatory's Position: Attorney of Record, California bar member
RAM Sale Number: 86091211
RAM Accounting Date: 10/15/2013

Serial Number: 86091211
Internet Transmission Date: Mon Oct 14 21:55:51 EDT 2013
TEAS Stamp: USPTO/BAS-72.129.86.27-20131014215551167
354-86091211-500a71cf35f7465cee48eeda68f

40b4c217a8a8f73881c148836d6eb1f0fa76d5-C
C-16571-20131014214950656352

# PLAINTIFFS' TRIAL EXHIBIT 92

EXHIBIT J

| To: | Rin, Inc. (kevin@kmwlawoffice.com) |
| --- | --- |
| **Subject:** | U.S. TRADEMARK APPLICATION NO. 86091209 - RIN TIN TIN - RINTI-T8330 |
| **Sent:** | 2/13/2014 9:15:39 PM |
| **Sent As:** | ECOM102@USPTO.GOV |
| **Attachments:** | Attachment - 1 |
| | Attachment - 2 |
| | Attachment - 3 |
| | Attachment - 4 |
| | Attachment - 5 |
| | Attachment - 6 |
| | Attachment - 7 |
| | Attachment - 8 |
| | Attachment - 9 |
| | Attachment - 10 |
| | Attachment - 11 |
| | Attachment - 12 |
| | Attachment - 13 |
| | Attachment - 14 |
| | Attachment - 15 |
| | Attachment - 16 |
| | Attachment - 17 |
| | Attachment - 18 |
| | Attachment - 19 |
| | Attachment - 20 |
| | Attachment - 21 |
| | Attachment - 22 |

**UNITED STATES PATENT AND TRADEMARK OFFICE (USPTO)**
**OFFICE ACTION (OFFICIAL LETTER) ABOUT APPLICANT'S TRADEMARK APPLICATION**

**U.S. APPLICATION SERIAL NO.** 86091209

**MARK:** RIN TIN TIN

**\*86091209\***

**CORRESPONDENT ADDRESS:**
  KEVIN M. WELCH
  THE LAW OFFICE OF KEVIN M. WELCH
  PO BOX 494
  HERMOSA BEACH, CA 90254-0494

**CLICK HERE TO RESPOND TO**
http://www.uspto.gov/trademarks/teas/re

EXHIBIT J

**APPLICANT:** Rin, Inc.

**CORRESPONDENT'S REFERENCE/DOCKET NO :**
   RINTI-T8330
**CORRESPONDENT E-MAIL ADDRESS:**
   kevin@kmwlawoffice.com

# OFFICE ACTION

# STRICT DEADLINE TO RESPOND TO THIS LETTER

TO AVOID ABANDONMENT OF APPLICANT'S TRADEMARK APPLICATION, THE USPTO MUST RECEIVE APPLICANT'S COMPLETE RESPONSE TO THIS LETTER **WITHIN 6 MONTHS** OF THE ISSUE/MAILING DATE BELOW.

**ISSUE/MAILING DATE: 2/13/2014**

The referenced application has been reviewed by the assigned trademark examining attorney.  Applicant must respond timely and completely to the issue(s) below.  15 U.S.C. §1062(b); 37 C.F.R. §§2.62(a), 2.65(a); TMEP §§711, 718.03.

SUMMARY OF ISSUES that applicant must address:

- A refusal because of a likelihood of confusion with a family of registered marks
- A requirement to amend the identification of goods and services

### SECTION 2(d) REFUSAL – LIKELIHOOD OF CONFUSION

Registration of the applied-for mark is refused because of a likelihood of confusion with the marks in U.S. Registration Nos. 1763135, 2384745, 2538312, 3380788, 3582436, 2969852, 3111161, 3215700, and 4263551.  Trademark Act Section 2(d), 15 U.S.C. §1052(d); *see* TMEP §§1207.01 *et seq.*  See the enclosed registrations.

Trademark Act Section 2(d) bars registration of an applied-for mark that so resembles a registered mark that it is likely a potential consumer would be confused, mistaken, or deceived as to the source of the goods and/or services of the applicant and registrant.  *See* 15 U.S.C. §1052(d).  A determination of likelihood of confusion under Section 2(d) is made on a case-by case basis and the factors set forth in *In re E. I. du Pont de Nemours & Co.*, 476 F.2d 1357, 177 USPQ 563 (C.C.P.A. 1973) aid in this determination.  *Citigroup Inc. v. Capital City Bank Grp., Inc.*, 637 F.3d 1344, 1349, 98 USPQ2d 1253, 1256 (Fed. Cir. 2011) (citing *On-Line Careline, Inc. v. Am. Online, Inc.*, 229 F.3d 1080, 1085, 56 USPQ2d 1471, 1474 (Fed. Cir. 2000)).  Not all the *du Pont* factors, however, are necessarily relevant or of equal weight, and any one of the factors may control in a given case, depending upon the evidence of record.  *Citigroup Inc. v. Capital City Bank Grp., Inc.*, 637 F.3d at 1355, 98 USPQ2d at 1260; *In re Majestic Distilling Co.*, 315 F.3d 1311, 1315, 65 USPQ2d 1201, 1204 (Fed. Cir. 2003); *see In re E. I. du Pont de Nemours & Co.*, 476 F.2d at 1361-62, 177 USPQ at 567.

In this case, the following factors are the most relevant:  similarity of the marks, similarity and nature of the goods and/or services, and similarity of the trade channels of the goods and/or services.  *See In re Viterra Inc.*, 671 F.3d 1358, 1361-62, 101 USPQ2d 1905, 1908 (Fed. Cir. 2012); *In re Dakin's*

*Miniatures Inc.*, 59 USPQ2d 1593, 1595-96 (TTAB 1999); TMEP §§1207.01 *et seq.*

In any likelihood of confusion determination, two key considerations are similarity of the marks and similarity or relatedness of the goods and/or services. *Syndicat Des Proprietaires Viticulteurs De Chateauneuf-Du-Pape v. Pasquier DesVignes*, 107 USPQ2d 1930, 1938 (TTAB 2013) (citing *Federated Foods, Inc. v. Fort Howard Paper Co.*, 544 F.2d 1098, 1103, 192 USPQ 24, 29 (C.C.P.A. 1976)); *In re Iolo Techs., LLC*, 95 USPQ2d 1498, 1499 (TTAB 2010); *see* TMEP §1207.01.  That is, the marks are compared in their entireties for similarities in appearance, sound, connotation, and commercial impression.  *In re Viterra Inc.*, 671 F.3d 1358, 1362, 101 USPQ2d 1905, 1908 (Fed. Cir. 2012) (quoting *In re E. I. du Pont de Nemours & Co.*, 476 F.2d 1357, 1361, 177 USPQ 563, 567 (C.C.P.A. 1973)); TMEP §1207.01(b)-(b)(v).  Additionally, the goods and/or services are compared to determine whether they are similar or commercially related or travel in the same trade channels.  *See Coach Servs., Inc. v. Triumph Learning LLC*, 668 F.3d 1356, 1369-71, 101 USPQ2d 1713, 1722-23 (Fed. Cir. 2012); *Herbko Int'l, Inc. v. Kappa Books, Inc.*, 308 F.3d 1156, 1165, 64 USPQ2d 1375, 1381 (Fed. Cir. 2002); TMEP §1207.01, (a)(vi).

## Comparison of the Marks

In a likelihood of confusion determination, the marks in their entireties are compared for similarities in appearance, sound, connotation, and commercial impression.  *In re E. I. du Pont de Nemours & Co.*, 476 F.2d 1357, 1361, 177 USPQ 563, 567 (C.C.P.A. 1973); TMEP §1207.01(b)-(b)(v).

In the present case, applicant's mark is RIN TIN TIN in standard characters and registrant's mark is RIN TIN TIN in standard or typed characters.  Thus, the marks are identical in terms of appearance and sound. In addition, the connotation and commercial impression of the marks do not differ when considered in connection with applicant's and registrant's respective goods and/or services.

Therefore, the marks are confusingly similar.

## Comparison of the Goods and Services

The applicant's services are "Movies, television shows, live performances, audio recorded performances, video recorded performances, live shows, plays, videos, books, comic books, graphic novels, licensing, merchandising, marketing, advertising for third parties, all featuring the image of and/or text having as the subject the television and movie icon and character Rin Tin Tin and related characters and written publications."

The registrant's services include "Animal exhibitions and live animal performances featuring a German shepherd dog;" "Printed publications, namely, magazines, pamphlets, books and comic books about German Shepard dogs; activity and coloring books, posters, stickers, business cards, and cards in the nature of greeting cards and trading cards;
and " Entertainment services in the nature of an ongoing television series in the field of variety and motion pictures featuring a German Shepard dog as a live or animated character."

The goods and/or services of the parties need not be identical or even competitive to find a likelihood of confusion.  *See On-line Careline Inc. v. Am. Online Inc.*, 229 F.3d 1080, 1086, 56 USPQ2d 1471, 1475 (Fed. Cir. 2000); *Recot, Inc. v. Becton,* 214 F.3d 1322, 1329, 54 USPQ2d 1894, 1898 (Fed. Cir. 2000) ("[E]ven if the goods in question are different from, and thus not related to, one another in kind, the same goods can be related in the mind of the consuming public as to the origin of the goods."); TMEP §1207.01(a)(i).

The respective goods and/or services need only be "related in some manner and/or if the circumstances surrounding their marketing [be] such that they could give rise to the mistaken belief that [the goods and/or services] emanate from the same source*." Coach Servs., Inc. v. Triumph Learning LLC*, 668 F.3d 1356, 1369, 101 USPQ2d 1713, 1722 (Fed. Cir. 2012) (quoting 7-Eleven Inc. v. Wechsler, 83 USPQ2d 1715, 1724 (TTAB 2007)); *Gen. Mills Inc. v. Fage Dairy Processing Indus. SA*, 100 USPQ2d 1584, 1597 (TTAB 2011); TMEP §1207.01(a)(i).

Where the marks of the respective parties are identical or virtually identical, the relationship between the relevant goods and/or services need not be as close to support a finding of likelihood of confusion. *See In re Shell Oil Co.,* 992 F.2d 1204, 1207, 26 USPQ2d 1687, 1689 (Fed. Cir. 1993); *In re Davey Prods. Pty Ltd*., 92 USPQ2d 1198, 1202 (TTAB 2009); *In re Thor Tech, Inc., 90 USPQ2d 1634, 1636 (TTAB 2009); TMEP §1207.01(a).*

The applicant's goods and services and the registrant's goods and services are the same and  closely related goods and services.

With respect to applicant's and registrant's goods and/or services, the question of likelihood of confusion is determined based on the description of the goods and/or services stated in the application and registration at issue, not on extrinsic evidence of actual use. *See, e.g., Coach Servs., Inc. v. Triumph Learning LLC*, 668 F.3d 1356, 1369-70, 101 USPQ2d 1713, 1722 (Fed. Cir. 2012); *Octocom Sys. Inc. v. Hous. Computers Servs. Inc.,* 918 F.2d 937, 942, 16 USPQ2d 1783, 1787 (Fed. Cir. 1990).

Absent restrictions in an application and/or registration, the identified goods and/or services are "presumed to travel in the same channels of trade to the same class of purchasers." *In re Viterra* Inc., 671 F.3d 1358, 1362, 101 USPQ2d 1905, 1908 (Fed. Cir. 2012) (quoting *Hewlett-Packard Co. v. Packard Press, Inc.,* 281 F.3d 1261, 1268, 62 USPQ2d 1001, 1005 (Fed. Cir. 2002)).  Additionally, unrestricted and broad identifications are presumed to encompass all goods and/or services of the type described.  *See In re Jump Designs*, LLC, 80 USPQ2d 1370, 1374 (TTAB 2006) (*citing In re Elbaum*, 211 USPQ 639, 640 (TTAB 1981)); *In re Linkvest S.A.,* 24 USPQ2d 1716, 1716 (TTAB 1992).

In this case, the identification set forth in the application and registration(s) clearly indicate that the movies, shows, performances, and books, feature a German shepherd dog.  Consumers of performances by a German Shepherd marketed under the name "RIN TIN TIN" are likely to think that all of the performances emanate from a common RIN TIN TIN source.  Registration is therefore denied because there is a likelihood of confusion as to the source of the services.

Although applicant's mark has been refused registration, applicant may respond to the refusal by submitting evidence and arguments in support of registration.

Applicant must respond to the requirement set forth below.


**MULTIPLE – CLASS APPLICATION** REQUIREMENTS

The application identifies goods and/or services that are classified in at least 5 classes; however, the fees submitted are sufficient for only 1 class.  In a multiple-class application, a fee for each class is required. 37 C.F.R. §2.86(a)(2); TMEP §§810.01, 1403.01.

Therefore, applicant must either (1) restrict the application to the number of classes covered by the fee(s) already paid, or (2) submit the fees for the additional class(es).

The filing fees for adding classes to an application are as follows:

> (1) $325 per class, when the fees are submitted with an electronic response filed online at http://www.uspto.gov/teas/index.html, via the Trademark Electronic Application System (TEAS); or

(2) $375 per class, when the fees are submitted with a paper response.

37 C.F.R. §2.6(a)(1)(i)-(a)(1)(ii); TMEP §§810, 1403.02(c).

For an application with more than one international class, called a "multiple-class application," an applicant must meet all of the requirements below for those international classes based on an intent to use the mark in commerce under Trademark Act Section 1(b):

> (1)   LIST GOODS AND/OR SERVICES BY INTERNATIONAL CLASS:  Applicant must list the goods and/or services by international class; and

> (2)   PROVIDE FEES FOR ALL INTERNATIONAL CLASSES:  Applicant must submit an application filing fee for each international class of goods and/or services not covered by the fee(s) already paid (confirm current fee information at http://www.uspto.gov, click on "View Fee Schedule" under the column titled "Trademarks").

*See* 15 U.S.C. §§1051(b), 1112, 1126(e); 37 C.F.R. §§2.34(a)(2)-(3), 2.86(a); TMEP §§1403.01, 1403.02(c).

## IDENTIFICATION OF SERVICES

The wording "movies, television shows, live performances, audio recorded performances, video recorded performances, live shows, plays, videos, books, comic books, graphic novels, licensing, merchandising, marketing, advertising for third parties" in the identification of services needs clarification because it is too broad and could include services classified in other international classes.  See TMEP §§1402.01, 1402.03.

The wording "videos" is indefinite and must be amended to specify the nature of the goods, e.g., pre-recorded videos featuring the television and movie icon and character Rin Tin Tin.

The nature of the books must be specified, e.g., printed books in class 16, or electronic books recorded on computer media in class 9.

Comic books and graphic novels are class 16 goods.

The specified licensing services are class 45 legal services. Merchandising, marketing, and advertising services are class 35 services.

The "catch-all" wording, "all featuring the image of and/or text having as the subject the television and movie icon and character Rin Tin Tin and related characters and written publications," is unclear and must be modified where appropriate, as suggested below, especially because the wording, "and written

publications," at the end of the wording is confusing.

The applicant may amend the identification of goods and services as follows, if accurate:

Class 9:     Motion picture films featuring the television and movie icon and character, Rin Tin Tin, and related characters; Pre-recorded audio and video digital media featuring the television and movie icon and character, Rin Tin Tin, and related characters; Electronic books recorded on computer media, comic books and graphic novels, all featuring the television and movie icon and character, Rin Tin Tin, and related characters;

Class 16:     Printed books, comic books, and graphic novels featuring the television and movie icon and character, Rin Tin Tin, and related characters;

Class 35:     Product merchandising, marketing and advertising for others in the field of goods featuring the image of and/or text having as the subject the television and movie icon and character, Rin Tin Tin, and related characters;

Class 41:     Entertainment services, namely, the provision of continuing {indicate form of the entertainment, e.g., programs, segments, movies, shows} featuring the image of the television and movie icon and character, Rin Tin Tin, and related characters delivered by {indicate form of broadcast medium, e.g., television, radio, satellite, the internet, etc.}; Entertainment in the nature of live stage performances in the nature of plays featuring the television and movie icon and character, Rin Tin Tin, and related characters; Production and distribution of television shows and movies featuring the image of the television and movie icon and character, Rin Tin Tin, and related characters;

Class 45:     Licensing of {indicate specific goods or concept being licensed featuring the image of and/or text having as the subject the television and movie icon and character, Rin Tin Tin, and related characters}

An applicant may amend an identification of goods and services only to clarify or limit the goods and services; adding to or broadening the scope of the goods and/or services is not permitted.  37 C.F.R. §2.71(a); *see* TMEP §§1402.06 *et seq.*, 1402.07 *et seq.*

For assistance with identifying and classifying goods and services in trademark applications, please see the USPTO's online searchable  *U.S. Acceptable Identification of Goods and Services Manual* at http://tess2.uspto.gov/netahtml/tidm.html.  *See* TMEP §1402.04.

## RESPONSE GUIDELINES

For this application to proceed toward registration, applicant must explicitly address each refusal and/or requirement raised in this Office action.  If the action includes a refusal, applicant may provide arguments and/or evidence as to why the refusal should be withdrawn and the mark should register.  Applicant may also have other options for responding to a refusal and should consider such options carefully.  To respond to requirements and certain refusal response options, applicant should set forth in writing the required changes or statements.

If applicant does not respond to this Office action within six months of the issue/mailing date, or responds by expressly abandoning the application, the application process will end, the trademark will fail to register, and the application fee will not be refunded.  *See* 15 U.S.C. §1062(b); 37 C.F.R. §§2.65(a),

2.68(a), 2.209(a); TMEP §§405.04, 718.01, 718.02.  Where the application has been abandoned for failure to respond to an Office action, applicant's only option would be to file a timely petition to revive the application, which, if granted, would allow the application to return to active status.  *See* 37 C.F.R. §2.66; TMEP §1714.  There is a $100 fee for such petitions.  *See* 37 C.F.R. §§2.6, 2.66(b)(1).

/rscb/
Robin S. Chosid-Brown
Trademark Examining Attorney
Law Office 102
571-272-9252
robin.chosid-brown@uspto.gov

**TO RESPOND TO THIS LETTER:  Go to** http://www.uspto.gov/trademarks/teas/response_forms.jsp.  Please wait 48-72 hours from the issue/mailing date before using the Trademark Electronic Application System (TEAS), to allow for necessary system updates of the application.  For *technical* assistance with online forms, e-mail TEAS@uspto.gov.  For questions about the Office action itself, please contact the assigned trademark examining attorney.  **E-mail communications will not be accepted as responses to Office actions; therefore, do not respond to this Office action by e-mail.**

**All informal e-mail communications relevant to this application will be placed in the official application record.**

**WHO MUST SIGN THE RESPONSE:**  It must be personally signed by an individual applicant or someone with legal authority to bind an applicant (i.e., a corporate officer, a general partner, all joint applicants).  If an applicant is represented by an attorney, the attorney must sign the response.

**PERIODICALLY CHECK THE STATUS OF THE APPLICATION:**  To ensure that applicant does not miss crucial deadlines or official notices, check the status of the application every three to four months using the Trademark Status and Document Retrieval (TSDR) system at http://tsdr.uspto.gov/.  Please keep a copy of the TSDR status screen.  If the status shows no change for more than six months, contact the Trademark Assistance Center by e-mail at TrademarkAssistanceCenter@uspto.gov or call 1-800-786-9199.  For more information on checking status, see http://www.uspto.gov/trademarks/process/status/.

**TO UPDATE CORRESPONDENCE/E-MAIL ADDRESS:**  Use the TEAS form at http://www.uspto.gov/trademarks/teas/correspondence.jsp.

**Print: Feb 13, 2014**                               **74269369**

**DESIGN MARK**

**Serial Number**
74269369

**Status**
CANCELLATION PENDING

**Word Mark**
RIN TIN TIN

**Standard Character Mark**
No

**Registration Number**
1763135

**Date Registered**
1993/04/06

**Type of Mark**
TRADEMARK

**Register**
PRINCIPAL

**Mark Drawing Code**
(5) WORDS, LETTERS, AND/OR NUMBERS IN STYLIZED FORM

**Owner**
BELLEAIR TRADING INTERNATIONAL, LLC LIMITED LIABILITY COMPANY FLORIDA
8 BELLEVIEW BOULEVARD SUITE 508 BELLEAIR FLORIDA 33756

**Goods/Services**
Class Status -- ACTIVE.  IC 031.  US  001.  G & S: live German
shepherd puppies.  First Use: 1980/12/17.  First Use In Commerce:
1980/12/17.

**Colors Claimed**
Color is not claimed as a feature of the mark.

**Section 2f Statement**
2(F) ENTIRE MARK

**Filing Date**
1992/04/27

**Examining Attorney**
FRIEDMAN, RICHARD A.

**Attorney of Record**

-1-

**Print: Feb 13, 2014**                    **74269369**

Brittany J Maxey

-2-

# RIN TIN TIN

**Print: Feb 13, 2014**                              **75576774**

**DESIGN MARK**

**Serial Number**
75576774

**Status**
CANCELLATION PENDING

**Word Mark**
RIN TIN TIN CANINE AMBASSADOR CLUB

**Standard Character Mark**
No

**Registration Number**
2384745

**Date Registered**
2000/09/12

**Type of Mark**
SERVICE MARK

**Register**
PRINCIPAL

**Mark Drawing Code**
(1) TYPED DRAWING

**Owner**
BELLEAIR TRADING INTERNATIONAL, LLC LIMITED LIABILITY COMPANY FLORIDA
8 BELLEVIEW BOULEVARD SUITE 508 BELLEAIR FLORIDA 33756

**Goods/Services**
Class Status -- ACTIVE. IC 041. US 100 101 107. G & S: EDUCATION
AND ENTERTAINMENT; NAMELY promotion of responsible dog ownership
through programs presented to schools and groups. First Use:
1998/02/25. First Use In Commerce: 1998/05/08.

**Prior Registration(s)**
1763135;2265042

**Disclaimer Statement**
NO CLAIM IS MADE TO THE EXCLUSIVE RIGHT TO USE "CANINE" and "CLUB"
APART FROM THE MARK AS SHOWN.

**Section 2f Statement**
2(F) ENTIRE MARK

**Filing Date**
1998/10/22

-1-

**Print: Feb 13, 2014**                              **75576774**

**Examining Attorney**
TINGLEY JOHN C

**Attorney of Record**
Brittany J Maxey

# RIN TIN TIN CANINE AMBASSADOR CLUB

**Print: Feb 13, 2014**                                   **76296384**

**DESIGN MARK**

**Serial Number**
76296384

**Status**
CANCELLATION PENDING

**Word Mark**
RIN TIN TIN

**Standard Character Mark**
No

**Registration Number**
2538312

**Date Registered**
2002/02/12

**Type of Mark**
SERVICE MARK

**Register**
PRINCIPAL

**Mark Drawing Code**
(1) TYPED DRAWING

**Owner**
BELLEAIR TRADING INTERNATIONAL, LLC LIMITED LIABILITY COMPANY FLORIDA
8 BELLEVIEW BOULEVARD SUITE 508 BELLEAIR FLORIDA 33756

**Goods/Services**
Class Status -- ACTIVE.  IC 041.  US  100 101 107.  G & S: mail order
fan club service providing materials promoting the breeding, training,
raising and showing of the authentic RIN TIN TIN German Shepherd dog
lineage.  First Use: 1980/12/17.  First Use In Commerce: 1980/12/17.

**Prior Registration(s)**
1763135;2265042;2383745

**Filing Date**
2001/08/08

**Examining Attorney**
STOKOLS, GWEN

**Attorney of Record**
Brittany J Maxey

-1-

# RIN TIN TIN

**Print: Feb 13, 2014**                    **77194606**

**DESIGN MARK**

**Serial Number**
77194606

**Status**
CANCELLATION PENDING

**Word Mark**
RIN TIN TIN

**Standard Character Mark**
Yes

**Registration Number**
3380788

**Date Registered**
2008/02/12

**Type of Mark**
TRADEMARK

**Register**
PRINCIPAL

**Mark Drawing Code**
(4) STANDARD CHARACTER MARK

**Owner**
BELLEAIR TRADING INTERNATIONAL LLC LIMITED LIABILITY COMPANY FLORIDA 8
BELLEVIEW BOULEVARD SUITE 508 BELLEAIR FLORIDA 33756

**Goods/Services**
Class Status -- ACTIVE.  IC 031.  US  001 046.  G & S: Dog food.
First Use: 1998/04/18.  First Use In Commerce: 1998/05/01.

**Prior Registration(s)**
1763135;2538312;3215700;AND OTHERS

**Filing Date**
2007/05/31

**Examining Attorney**
LEE, YAT SYE

**Attorney of Record**
Brittany J. Maxey

-1-

# RIN TIN TIN

**Print: Feb 13, 2014**                          **77386979**

**DESIGN MARK**

**Serial Number**
77386979

**Status**
CANCELLATION PENDING

**Word Mark**
RIN TIN TIN

**Standard Character Mark**
Yes

**Registration Number**
3582436

**Date Registered**
2009/03/03

**Type of Mark**
TRADEMARK; SERVICE MARK

**Register**
PRINCIPAL

**Mark Drawing Code**
(4) STANDARD CHARACTER MARK

**Owner**
BELLEAIR TRADING INTERNATIONAL, LLC LIMITED LIABILITY COMPANY FLORIDA
8 BELLEVIEW BOULEVARD SUITE 508 BELLEAIR FLORIDA 33756

**Goods/Services**
Class Status -- ACTIVE.  IC 031.  US  001 046.  G & S: live German
Shepherd dogs of Rin Tin Tin lineage.  First Use: 1980/12/17.  First
Use In Commerce: 1980/12/17.

**Goods/Services**
Class Status -- ACTIVE.  IC 041.  US  100 101 107.  G & S: Animal
exhibitions and live animal performances featuring a German Shepherd
dog.  First Use: 1980/12/17.  First Use In Commerce: 1980/12/17.

**Prior Registration(s)**
1763135;2538312;3111161;AND OTHERS

**Filing Date**
2008/02/01

**Examining Attorney**
FARRELL, ANNE

-1-

**Print: Feb 13, 2014**                    **77386979**


**Attorney of Record**
Brittany J Maxey

-2-

# RIN TIN TIN

**Print: Feb 13, 2014**                               **78259868**

**TYPED DRAWING**

**Serial Number**
78259868

**Status**
CANCELLATION PENDING

**Word Mark**
RIN TIN TIN

**Standard Character Mark**
No

**Registration Number**
2969852

**Date Registered**
2005/07/19

**Type of Mark**
TRADEMARK; SERVICE MARK

**Register**
PRINCIPAL

**Mark Drawing Code**
(1) TYPED DRAWING

**Owner**
BELLEAIR TRADING INTERNATIONAL, LLC LIMITED LIABILITY COMPANY FLORIDA
8 BELLEVIEW BOULEVARD SUITE 508 BELLEAIR FLORIDA 33756

**Goods/Services**
Class Status -- ACTIVE.  IC 016.  US  002 005 022 023 029 037 038 050.
G & S: Printed publications, namely, magazines, pamphlets, books and
comic books about German Shepard dogs; activity and coloring books,
posters, stickers, business cards, and cards in the nature of greeting
cards and trading cards.  First Use: 2002/11/18.  First Use In
Commerce: 2002/11/23.

**Goods/Services**
Class Status -- ACTIVE.  IC 041.  US  100 101 107.  G & S:
Entertainment services in the nature of an ongoing television series
in the field of variety and motion pictures featuring a German Shepard
dog as a live or animated character.  First Use: 2002/11/18.  First
Use In Commerce: 2002/11/23.

**Goods/Services**
Class Status -- ACTIVE.  IC 028.  US  022 023 038 050.  G & S: Playing
cards.  First Use: 2002/11/18.  First Use In Commerce: 2002/11/23.

-1-

**Print: Feb 13, 2014**                    **78259868**

**Prior Registration(s)**
1763135;2265042;2538312

**Filing Date**
2003/06/09

**Examining Attorney**
HAYASH, SUSAN

**Attorney of Record**
Brittany J Maxey

-2-

**Print: Feb 13, 2014**                    78393500

**DESIGN MARK**

**Serial Number**
78393500

**Status**
CANCELLATION PENDING

**Word Mark**
RIN TIN TIN

**Standard Character Mark**
Yes

**Registration Number**
3111161

**Date Registered**
2006/07/04

**Type of Mark**
TRADEMARK

**Register**
PRINCIPAL

**Mark Drawing Code**
(4) STANDARD CHARACTER MARK

**Owner**
BELLEAIR TRADING INTERNATIONAL, LLC LIMITED LIABILITY COMPANY FLORIDA
8 BELLEVIEW BOULEVARD SUITE 508 BELLEAIR FLORIDA 33756

**Goods/Services**
Class Status -- ACTIVE.  IC 016.  US  002 005 022 023 029 037 038 050.
 G & S: Printed publications, namely, children's books.  First Use:
2001/04/06.  First Use In Commerce: 2001/04/06.

**Filing Date**
2004/03/30

**Examining Attorney**
LOUGHRAN, BARBARA A.

**Attorney of Record**
Brittany J Maxey

-1-

# RIN TIN TIN

**Print: Feb 13, 2014**                                    **78880963**

**DESIGN MARK**

**Serial Number**
78880963

**Status**
CANCELLATION PENDING

**Word Mark**
RIN TIN TIN

**Standard Character Mark**
Yes

**Registration Number**
3215700

**Date Registered**
2007/03/06

**Type of Mark**
TRADEMARK

**Register**
PRINCIPAL

**Mark Drawing Code**
(4) STANDARD CHARACTER MARK

**Owner**
BELLEAIR TRADING INTERNATIONAL LLC LIMITED LIABILITY COMPANY FLORIDA 8
BELLEVIEW BOULEVARD SUITE 508 BELLEAIR FLORIDA 33756

**Goods/Services**
Class Status -- ACTIVE.  IC 018.  US  001 002 003 022 041.  G & S: Dog
clothing; Dog collars; Dog leashes; Dog shoes; Handbags; Purses; Tote
bags.  First Use: 2004/03/18.  First Use In Commerce: 2004/03/18.

**Goods/Services**
Class Status -- ACTIVE.  IC 021.  US  002 013 023 029 030 033 040 050.
 G & S: Bowls; Brushes for pets; Cups; Mugs; Pet brushes; Pet feeding
dishes.  First Use: 2004/01/05.  First Use In Commerce: 2004/01/05.

**Goods/Services**
Class Status -- ACTIVE.  IC 025.  US  022 039.  G & S: Caps ; Hats;
Jackets; Muffs; Scarves; Slippers; Sweat shirts; T-shirts.  First Use:
2004/03/18.  First Use In Commerce: 2004/03/18.

**Goods/Services**
Class Status -- ACTIVE.  IC 028.  US  022 023 038 050.  G & S: Board
games; Dog toys; Plush toys; Puzzles; Soft sculpture plush toys.

-1-

**Print: Feb 13, 2014**                    **78880963**

First Use: 2005/11/30.   First Use In Commerce: 2006/02/01.

**Prior Registration(s)**
1763135;2538312;2969852;AND OTHERS

**Filing Date**
2006/05/10

**Examining Attorney**
BLANDU, FLORENTINA

**Attorney of Record**
Brittany J. Maxey

# RIN TIN TIN

**Print: Feb 13, 2014**                          **85520875**

**DESIGN MARK**

**Serial Number**
85520875

**Status**
CANCELLATION PENDING

**Word Mark**
RIN TIN TIN

**Standard Character Mark**
Yes

**Registration Number**
4263551

**Date Registered**
2012/12/25

**Type of Mark**
SERVICE MARK

**Register**
PRINCIPAL

**Mark Drawing Code**
(4) STANDARD CHARACTER MARK

**Owner**
BELLEAIR TRADING INTERNATIONAL, LLC LIMITED LIABILITY COMPANY FLORIDA
8 BELLEVIEW BOULEVARD SUITE 508 BELLEAIR FLORIDA 33756

**Goods/Services**
Class Status -- ACTIVE.  IC 041.  US  100 101 107.  G & S:
Entertainment services in the field of motion pictures featuring a
German Shepherd dog.  First Use: 2006/09/15.  First Use In Commerce:
2007/04/03.

**Prior Registration(s)**
2969852;3111161;3215700;AND OTHERS

**Filing Date**
2012/01/20

**Examining Attorney**
HAYES, GINA

**Attorney of Record**
Brittany J Maxey

-1-

# RIN TIN TIN

| | |
|---|---|
| **To:** | Rin, Inc. (kevin@kmwlawoffice.com) |
| **Subject:** | U.S. TRADEMARK APPLICATION NO. 86091209 - RIN TIN TIN - RINTI-T8330 |
| **Sent:** | 2/13/2014 9:15:40 PM |
| **Sent As:** | ECOM102@USPTO.GOV |
| **Attachments:** | |

## UNITED STATES PATENT AND TRADEMARK OFFICE (USPTO)

## IMPORTANT NOTICE REGARDING YOUR U.S. TRADEMARK APPLICATION

USPTO OFFICE ACTION (OFFICIAL LETTER) HAS ISSUED ON **2/13/2014** FOR U.S. APPLICATION SERIAL NO. 86091209

Please follow the instructions below:

**(1) TO READ THE LETTER:** Click on this link or go to http://tsdr.uspto.gov, enter the U.S. application serial number, and click on "Documents."

The Office action may not be immediately viewable, to allow for necessary system updates of the application, but will be available within 24 hours of this e-mail notification.

**(2) TIMELY RESPONSE IS REQUIRED:** Please carefully review the Office action to determine (1) how to respond, and (2) the applicable response time period. Your response deadline will be calculated from **2/13/2014** (*or sooner if specified in the Office action*). For information regarding response time periods, see http://www.uspto.gov/trademarks/process/status/responsetime.jsp.

**Do NOT hit "Reply" to this e-mail notification, or otherwise e-mail your response** because the USPTO does NOT accept e-mails as responses to Office actions. Instead, the USPTO recommends that you respond online using the Trademark Electronic Application System (TEAS) response form located at http://www.uspto.gov/trademarks/teas/response_forms.jsp.

**(3) QUESTIONS:** For questions about the contents of the Office action itself, please contact the assigned trademark examining attorney. For *technical* assistance in accessing or viewing the Office action in the Trademark Status and Document Retrieval (TSDR) system, please e-mail TSDR@uspto.gov.

## WARNING

**Failure to file the required response by the applicable response deadline will result in the**

**ABANDONMENT of your application.** For more information regarding abandonment, see http://www.uspto.gov/trademarks/basics/abandon.jsp.

**PRIVATE COMPANY SOLICITATIONS REGARDING YOUR APPLICATION:** Private companies **not** associated with the USPTO are using information provided in trademark applications to mail or e-mail trademark-related solicitations. These companies often use names that closely resemble the USPTO and their solicitations may look like an official government document. Many solicitations require that you pay "fees."

Please carefully review all correspondence you receive regarding this application to make sure that you are responding to an official document from the USPTO rather than a private company solicitation. All official USPTO correspondence will be mailed only from the "United States Patent and Trademark Office" in Alexandria, VA; or sent by e-mail from the domain "@uspto.gov." For more information on how to handle private company solicitations, see http://www.uspto.gov/trademarks/solicitation_warnings.jsp.

| | |
|---|---|
| **To:** | Rin, Inc. (kevin@kmwlawoffice.com) |
| **Subject:** | U.S. TRADEMARK APPLICATION NO. 86091211 - RINTY - RINTI-T8340 |
| **Sent:** | 2/5/2014 7:04:47 PM |
| **Sent As:** | ECOM102@USPTO.GOV |
| **Attachments:** | Attachment - 1<br>Attachment - 2<br>Attachment - 3<br>Attachment - 4<br>Attachment - 5<br>Attachment - 6<br>Attachment - 7<br>Attachment - 8 |

**UNITED STATES PATENT AND TRADEMARK OFFICE (USPTO)**
**OFFICE ACTION (OFFICIAL LETTER) ABOUT APPLICANT'S TRADEMARK APPLICATION**

**U.S. APPLICATION SERIAL NO.** 86091211

**MARK:** RINTY

**\*86091211\***

**CORRESPONDENT ADDRESS:**
   KEVIN M. WELCH
   THE LAW OFFICE OF KEVIN M. WELCH
   PO BOX 494
   HERMOSA BEACH, CA 90254-0494

**CLICK HERE TO RESPOND TO**
http://www.uspto.gov/trademarks/teas/re

**APPLICANT:** Rin, Inc.

**CORRESPONDENT'S REFERENCE/DOCKET NO :**
   RINTI-T8340
**CORRESPONDENT E-MAIL ADDRESS:**
   kevin@kmwlawoffice.com

# OFFICE ACTION

## STRICT DEADLINE TO RESPOND TO THIS LETTER

TO AVOID ABANDONMENT OF APPLICANT'S TRADEMARK APPLICATION, THE USPTO MUST RECEIVE APPLICANT'S COMPLETE RESPONSE TO THIS LETTER **WITHIN 6 MONTHS** OF THE ISSUE/MAILING DATE BELOW.

**ISSUE/MAILING DATE: 2/5/2014**

The referenced application has been reviewed by the assigned trademark examining attorney.  Applicant must respond timely and completely to the issue(s) below.  15 U.S.C. §1062(b); 37 C.F.R. §§2.62, 2.65(a); TMEP §§711, 718.03.

SUMMARY OF ISSUES that applicant must address:

- A refusal because of a likelihood of confusion with a registered mark
- A requirement to amend the identification of goods and services

## SECTION 2(d) REFUSAL – LIKELIHOOD OF CONFUSION

Registration of the applied-for mark is refused because of a likelihood of confusion with the mark in U.S. Registration No. 3789458.  Trademark Act Section 2(d), 15 U.S.C. §1052(d); *see* TMEP §§1207.01 *et seq.*  See the enclosed registration.

Trademark Act Section 2(d) bars registration of an applied-for mark that so resembles a registered mark that it is likely a potential consumer would be confused, mistaken, or deceived as to the source of the goods and/or services of the applicant and registrant.  *See* 15 U.S.C. §1052(d).  A determination of likelihood of confusion under Section 2(d) is made on a case-by case basis and the factors set forth in *In re E. I. du Pont de Nemours & Co.*, 476 F.2d 1357, 177 USPQ 563 (C.C.P.A. 1973) aid in this determination.  *Citigroup Inc. v. Capital City Bank Grp., Inc.*, 637 F.3d 1344, 1349, 98 USPQ2d 1253, 1256 (Fed. Cir. 2011) (citing *On-Line Careline, Inc. v. Am. Online, Inc.*, 229 F.3d 1080, 1085, 56 USPQ2d 1471, 1474 (Fed. Cir. 2000)).  Not all the *du Pont* factors, however, are necessarily relevant or of equal weight, and any one of the factors may control in a given case, depending upon the evidence of record.  *Citigroup Inc. v. Capital City Bank Grp., Inc.*, 637 F.3d at 1355, 98 USPQ2d at 1260; *In re Majestic Distilling Co.*, 315 F.3d 1311, 1315, 65 USPQ2d 1201, 1204 (Fed. Cir. 2003); *see In re E. I. du Pont de Nemours & Co.*, 476 F.2d at 1361-62, 177 USPQ at 567.

In this case, the following factors are the most relevant:  similarity of the marks, similarity and nature of the goods and/or services, and similarity of the trade channels of the goods and/or services.  *See In re Viterra Inc.*, 671 F.3d 1358, 1361-62, 101 USPQ2d 1905, 1908 (Fed. Cir. 2012); *In re Dakin's Miniatures Inc.*, 59 USPQ2d 1593, 1595-96 (TTAB 1999); TMEP §§1207.01 *et seq.*

**Comparison of the Marks**

In a likelihood of confusion determination, the marks in their entireties are compared for similarities in appearance, sound, connotation, and commercial impression.  *In re E. I. du Pont de Nemours & Co.*, 476 F.2d 1357, 1361, 177 USPQ 563, 567 (C.C.P.A. 1973); TMEP §1207.01(b)-(b)(v).

In the present case, applicant's mark is RINTY and registrant's mark is RINTY.  Thus, the marks are identical in terms of appearance and sound.  In addition, the connotation and commercial impression of the marks do not differ when considered in connection with applicant's and registrant's respective goods and/or services.

Therefore, the marks are confusingly similar.

**Comparison of the Services**

The applicant's services are "Movies, television shows, live performances, audio recorded performances, video recorded performances, live shows, plays, videos, books, comic books, graphic novels, licensing, merchandising, marketing, advertising for third parties, *all featuring the image of and/or text having as the subject the television and movie icon and character Rin Tin Tin and related characters and written publications."*

The registrant's services are "Animal exhibitions and live animal performances featuring a German shepherd dog."

The goods and/or services of the parties need not be identical or even competitive to find a likelihood of confusion. *See On-line Careline Inc. v. Am. Online Inc.*, 229 F.3d 1080, 1086, 56 USPQ2d 1471, 1475 (Fed. Cir. 2000); *Recot, Inc. v. Becton*, 214 F.3d 1322, 1329, 54 USPQ2d 1894, 1898 (Fed. Cir. 2000) ("[E]ven if the goods in question are different from, and thus not related to, one another in kind, the same goods can be related in the mind of the consuming public as to the origin of the goods."); TMEP §1207.01(a)(i).

The respective goods and/or services need only be "related in some manner and/or if the circumstances surrounding their marketing [be] such that they could give rise to the mistaken belief that [the goods and/or services] emanate from the same source." *Coach Servs., Inc. v. Triumph Learning LLC*, 668 F.3d 1356, 1369, 101 USPQ2d 1713, 1722 (Fed. Cir. 2012) (quoting *7-Eleven Inc. v. Wechsler*, 83 USPQ2d 1715, 1724 (TTAB 2007)); *Gen. Mills Inc. v. Fage Dairy Processing Indus. SA*, 100 USPQ2d 1584, 1597 (TTAB 2011); TMEP §1207.01(a)(i).

Where the marks of the respective parties are identical or virtually identical, the relationship between the relevant goods and/or services need not be as close to support a finding of likelihood of confusion. *See In re Shell Oil Co.*, 992 F.2d 1204, 1207, 26 USPQ2d 1687, 1689 (Fed. Cir. 1993); *In re Davey Prods. Pty Ltd.*, 92 USPQ2d 1198, 1202 (TTAB 2009); *In re Thor Tech, Inc.*, 90 USPQ2d 1634, 1636 (TTAB 2009); TMEP §1207.01(a).

The attached Internet evidence downloaded from the www.imdb.com, the Internet movie database, demonstrates that a German shepherd named, "Rin Tin Tin," aka, "Rinty," was a very famous canine film star in the early to mid 20th century. The applicant's services include many different types of shows and performances by the German Shepherd movie icon and film star, including live performances. The registrant's services include live performances by a German shepherd dog.

With respect to applicant's and registrant's goods and/or services, the question of likelihood of confusion is determined based on the description of the goods and/or services stated in the application and registration at issue, not on extrinsic evidence of actual use. *See, e.g., Coach Servs., Inc. v. Triumph Learning LLC*, 668 F.3d 1356, 1369-70, 101 USPQ2d 1713, 1722 (Fed. Cir. 2012); *Octocom Sys. Inc. v. Hous. Computers Servs. Inc.*, 918 F.2d 937, 942, 16 USPQ2d 1783, 1787 (Fed. Cir. 1990).

Absent restrictions in an application and/or registration, the identified goods and/or services are "presumed to travel in the same channels of trade to the same class of purchasers." *In re Viterra Inc.*, 671 F.3d 1358, 1362, 101 USPQ2d 1905, 1908 (Fed. Cir. 2012) (quoting *Hewlett-Packard Co. v. Packard Press, Inc.*, 281 F.3d 1261, 1268, 62 USPQ2d 1001, 1005 (Fed. Cir. 2002)). Additionally, unrestricted and broad identifications are presumed to encompass all goods and/or services of the type described. *See In re Jump Designs, LLC*, 80 USPQ2d 1370, 1374 (TTAB 2006) (citing *In re Elbaum*, 211 USPQ 639, 640 (TTAB 1981)); *In re Linkvest S.A.*, 24 USPQ2d 1716, 1716 (TTAB 1992).

In this case, the identification set forth in the application and registration(s) has no restrictions as to nature, type, channels of trade, or classes of purchasers.  Therefore, it is presumed that these goods and/or services travel in all normal channels of trade, and are available to the same class of purchasers.  Further, the application uses broad wording to describe the goods and/or services and this wording is presumed to encompass all goods and/or services of the type described, including those in registrant's more narrow identification.

Consumers of performances by a German Shepherd marketed under the name "RINTY" are likely to think that all of the performances emanate from a common Rinty source.  Registration is therefore denied because there is a likelihood of confusion as to the source of the services.
Although applicant's mark has been refused registration, applicant may respond to the refusal(s) by submitting evidence and arguments in support of registration.

Applicant must respond to the requirement(s) set forth below.

**MULTIPLE – CLASS APPLICATION REQUIREMENTS**

The application identifies goods and/or services that are classified in at least 5 classes; however, the fees submitted are sufficient for only 1 class.  In a multiple-class application, a fee for each class is required.  37 C.F.R. §2.86(a)(2); TMEP §§810.01, 1403.01.

Therefore, applicant must either (1) restrict the application to the number of classes covered by the fee(s) already paid, or (2) submit the fees for the additional class(es).

The filing fees for adding classes to an application are as follows:

> (1)  $325 per class, when the fees are submitted with an electronic response filed online at http://www.uspto.gov/teas/index.html, via the Trademark Electronic Application System (TEAS); or

(2)  $375 per class, when the fees are submitted with a paper response.

37 C.F.R. §2.6(a)(1)(i)-(a)(1)(ii); TMEP §§810, 1403.02(c).

For an application with more than one international class, called a "multiple-class application," an applicant must meet all of the requirements below for those international classes based on an intent to use the mark in commerce under Trademark Act Section 1(b):

> (1)     LIST GOODS AND/OR SERVICES BY INTERNATIONAL CLASS:  Applicant must list the goods and/or services by international class; and

> (2)     PROVIDE FEES FOR ALL INTERNATIONAL CLASSES:  Applicant must submit an application filing fee for each international class of goods and/or services not covered by the fee(s) already paid (confirm current fee information at http://www.uspto.gov, click on "View Fee Schedule" under the column titled "Trademarks").

*See* 15 U.S.C. §§1051(b), 1112, 1126(e); 37 C.F.R. §§2.34(a)(2)-(3), 2.86(a); TMEP §§1403.01, 1403.02(c).

**IDENTIFICATION OF SERVICES**

109

The wording "movies, television shows, live performances, audio recorded performances, video recorded performances, live shows, plays, videos, books, comic books, graphic novels, licensing, merchandising, marketing, advertising for third parties" in the identification of services needs clarification because it is too broad and could include services classified in other international classes.  *See* TMEP §§1402.01, 1402.03.

The "catch-all" wording, "all featuring the image of and/or text having as the subject the television and movie icon and character Rin Tin Tin and related characters and written publications," is unclear and must be modified where appropriate, as suggested below, especially because the wording, "and written publications," at the end of the wording is confusing.

The applicant may amend the identification of goods and services as follows, if accurate:

Class 9:      Motion picture films featuring the television and movie icon and character, Rin Tin Tin, and related characters; Pre-recorded audio and video digital media featuring the television and movie icon and character, Rin Tin Tin, and related characters;  Electronic books, comic books and graphic novels featuring the television and movie icon and character, Rin Tin Tin, and related characters recorded on computer media;

Class 16:      Printed books, comic books, and graphic novels featuring the television and movie icon and character, Rin Tin Tin, and related characters;

Class 35:      Product merchandising, marketing and advertising for others in the field of goods featuring the image of and/or text having as the subject the television and movie icon and character, Rin Tin Tin, and related characters;

Class 41:      Entertainment services, namely, the provision of continuing {indicate form of the entertainment, e.g., programs, segments, movies, shows} featuring the image of the television and movie icon and character, Rin Tin Tin, and related characters delivered by {indicate form of broadcast medium, e.g., television, radio, satellite, the internet, etc.}; Entertainment in the nature of live stage performaces  in the nature of plays featuring the television and movie icon and character, Rin Tin Tin, and related characters; Production and distribution of television shows and movies   featuring the image of the television and movie icon and character, Rin Tin Tin, and related characters;

Class 45:      Licensing of {indicate specific goods or concept being licensed featuring the image of and/or text having as the subject the television and movie icon and character, Rin Tin Tin, and related characters}

An applicant may amend an identification of goods and services only to clarify or limit the goods and services; adding to or broadening the scope of the goods and/or services is not permitted.  37 C.F.R. §2.71(a); *see* TMEP §§1402.06 *et seq.*, 1402.07 *et seq.*

For assistance with identifying and classifying goods and services in trademark applications, please see the USPTO's online searchable  *U.S. Acceptable Identification of Goods and Services Manual* at http://tess2.uspto.gov/netahtml/tidm.html.  *See* TMEP §1402.04.

**RESPONSE GUIDELINES**

For this application to proceed toward registration, applicant must explicitly address each refusal and/or requirement raised in this Office action.  If the action includes a refusal, applicant may provide arguments and/or evidence as to why the refusal should be withdrawn and the mark should register.  Applicant may also have other options for responding to a refusal and should consider such options carefully.  To respond to requirements and certain refusal response options, applicant should set forth in writing the required changes or statements.

If applicant does not respond to this Office action within six months of the issue/mailing date, or responds by expressly abandoning the application, the application process will end, the trademark will fail to register, and the application fee will not be refunded.  *See* 15 U.S.C. §1062(b); 37 C.F.R. §§2.65(a), 2.68(a), 2.209(a); TMEP §§405.04, 718.01, 718.02.  Where the application has been abandoned for failure to respond to an Office action, applicant's only option would be to file a timely petition to revive the application, which, if granted, would allow the application to return to active status.  *See* 37 C.F.R. §2.66; TMEP §1714.  There is a $100 fee for such petitions.  *See* 37 C.F.R. §§2.6, 2.66(b)(1).

/rscb/
Robin S. Chosid-Brown
Trademark Examining Attorney
Law Office 102
571-272-9252
robin.chosid-brown@uspto.gov

**TO RESPOND TO THIS LETTER:**  Go to http://www.uspto.gov/trademarks/teas/response_forms.jsp.  Please wait 48-72 hours from the issue/mailing date before using the Trademark Electronic Application System (TEAS), to allow for necessary system updates of the application.  For *technical* assistance with online forms, e-mail TEAS@uspto.gov.  For questions about the Office action itself, please contact the assigned trademark examining attorney.  **E-mail communications will not be accepted as responses to Office actions; therefore, do not respond to this Office action by e-mail.**

**All informal e-mail communications relevant to this application will be placed in the official application record.**

**WHO MUST SIGN THE RESPONSE:**  It must be personally signed by an individual applicant or someone with legal authority to bind an applicant (i.e., a corporate officer, a general partner, all joint applicants).  If an applicant is represented by an attorney, the attorney must sign the response.

**PERIODICALLY CHECK THE STATUS OF THE APPLICATION:**  To ensure that applicant does not miss crucial deadlines or official notices, check the status of the application every three to four months using the Trademark Status and Document Retrieval (TSDR) system at http://tsdr.uspto.gov/.  Please keep a copy of the TSDR status screen.  If the status shows no change for more than six months, contact the Trademark Assistance Center by e-mail at TrademarkAssistanceCenter@uspto.gov or call 1-800-786-9199.  For more information on checking status, see http://www.uspto.gov/trademarks/process/status/.

**TO UPDATE CORRESPONDENCE/E-MAIL ADDRESS:**  Use the TEAS form at http://www.uspto.gov/trademarks/teas/correspondence.jsp.

**Print: Jan 31, 2014**                                **77717067**

**DESIGN MARK**

**Serial Number**
77717067

**Status**
REGISTERED

**Word Mark**
RINTY

**Standard Character Mark**
Yes

**Registration Number**
3789458

**Date Registered**
2010/05/18

**Type of Mark**
SERVICE MARK

**Register**
PRINCIPAL

**Mark Drawing Code**
(4) STANDARD CHARACTER MARK

**Owner**
BELLEAIR TRADING INTERNATIONAL, LLC LIMITED LIABILITY COMPANY FLORIDA
8 BELLEVIEW BOULEVARD SUITE 508 BELLEAIR FLORIDA 33756

**Goods/Services**
Class Status -- ACTIVE.  IC 041.  US  100 101 107.  G & S: Animal
Exhibitions and Live Animal Performances Featuring a German Shepherd
Dog.  First Use: 2000/04/30.  First Use In Commerce: 2000/04/30.

**Filing Date**
2009/04/19

**Examining Attorney**
SINGH, TEJBIR

**Attorney of Record**
Brittany J Maxey

**-1-**

# RINTY



http://www.imdb.com/name/nm0863833/bio?ref_=nm_ov_bio_sm 02/04/2014 03:01:59 PM

amazon mom You'll run out of energy before you run out of diapers.
20% off diapers and FREE Two-Day Shipping
Join now

IMDb | All | IMDbPro | IMDb Apps | Help
Movies, TV & Showtimes | Celebs, Events & Photos | News & Community | Watchlist | Login

Rin Tin Tin

# Biography

Edit

Showing all 16 items

Jump to: Overview (4) | Mini Bio (1) | Trivia (8) | Personal Quotes (3)

**Overview (4)**

| | |
|---|---|
| Date of Birth | September 1918 , Lorraine, France |
| Date of Death | 10 August 1932 , Los Angeles, California, USA |
| Birth Name | Rintintin |
| Nickname | Rinty |

**Mini Bio (1)**

The first 'Rin Tin Tin', who along with his heirs starred in numerous films and television series, was discovered during World War I, September 15, 1918, by US Air Corporal Lee Duncan and his battalion in Lorraine, France. At a bombed out dog kennel, Duncan found a mother Shepherd Dog and her scrawny litter of five pups. Duncan chose two of the dogs, a male and female, while members of his group took the mother and the others back to camp. The only survivors over the next few months were the two pups Duncan had claimed, naming them 'Rin Tin Tin' and 'Nannette' after tiny French puppets the French children would give to the American soldiers for good luck. When the war ended, Duncan made special arrangements to take his pups back to his home in Los Angeles, but during the Atlantic crossing, Nannette became ill and died, shortly after arriving in America. In 1922, Duncan and Rin Tin Tin attended an LA dog show, with 'Rinty' performing for the crowd by jumping 13 ½ feet. Following the show, producer Darryl Zanuck asked Duncan if he could try out his new 'moving pictures' camera on the dog and paid $350 to film Rinty in action. Contacting every studio in Hollywood with a Rin Tin Tin -starring script "Where The North Begins", Duncan unexpectedly stumbled onto a low-budget, Warner Bros (Vitaphone) film crew having difficulty shooting an exterior scene with a wolf. Duncan quickly approached the director and told them that Rinty could do the scene in one take. True to his word, Duncan's 'wonder' dog did the scene in

Hover to Expand
right on your TV.
chromecast
Buy Now
ad feedback

Rin Tin Tin

**Personal Details**
Biography
Publicity Listings

**Filmography**
by Year
by Job
by Ratings
by Votes
by Genre
by Keyword

http://www.imdb.com/name/nm0863833/bio?ref_=nm_ov_bio_sm     02/04/2014 03:01:59 PM

could be the scene in one take... That is his early pictures. Whisner dog did the scene in one take and both were hired for the entire shoot of "Man From Hells River". The film was a hit and Rin Tin Tin was a sensation, making 26 pictures for Warners while starring in his own live 1930s radio show "The Wonder Dog". At the peak of his popularity, Warners maintained 18 trained stand-ins to reduce any stress on their dog star, while providing Rinty with a private chef who prepared daily lunches of tenderloin steak (consumed as live classical music was played to help ease the dog's digestion.) Rin Tin Tin died in 1932 at the age of 14, returned to his birthplace in France, and interred in "The Cimetière des Chiens (et Autres Animaux Exotiques)" in the suburb of Asnieres. Today, Rin Tin Tin's continuous bloodline carries on at a Texas kennel, where a litter of 8-11 pups are born each year.

– IMDB Mini Biography By: Michael Stevens

Trivia (9)

On 15 September 1918 US Air Corps Cpl. Lee Duncan discovered a half-starved dog and her five puppies - just 5 days old - in a blasted dug-out on a World War I battlefield in France. Duncan tried to take of of the puppies, whom he named Nanette and Rin Tin Tin, back to the U.S., but only Rinty survived the trip.

A dark-coated German Shepherd dog, he made his first film in 1923 and was the world's biggest box-office draw by 1926.

He got his own radio show, "The Wonder Dog," in 1930, doing his own sound effects

Warner Bros. Pictures, saved from bankruptcy by the success of his films, maintained 18 trained stand-ins in order to reduce the strain on their star.

After he became a box-office star, he merited a private chef who prepared his daily lunch of tenderloin steak - which he consumed as an ensemble played classical music to help his digestion.

On the day he died in 1932, just a month shy of 14, Rinty was no longer strong enough to go to his master's side. Jean Harlow, who lived across the street, came over and cradled his head in her lap as he died. Years before Lee Duncan had given her one of Rinty's first puppies.

By 1926 was earning $6000 a week.

According to legend, in the very first year of voting for the Oscars, Rinty received more votes than any other actor, but to avoid any embarrassment, the Academy eventually decided to award his first Best Actor to a human thespian Emil Jannings.

French names of the puppets: 'Nénette' and 'Rintintin'. Puppets maybe created by painter Francisque Poulbot in 1913.

Personal Quotes (2)

Trainer Lee Duncan: "Rintintin has never been whipped and the wonderful things this dog



Did You Know?

Personal Quotes
Trivia

Photo & Video

Trailers and Videos

Opinion
Awards
Message Boards

Related Items
Credited With

NewsDesk
External Sites

Professional Services
Promote yourself with a resume
Add or change photos
Get more at IMDbPro

Share this page:

User Lists                    Create a list »
Related lists from IMDb users

They played in silent too
a list of 549 people created
17 May 2011

My Favourite Actors
a list of 42 people created
26 Oct 2011

Silent Stars
a list of 73 people created
21 Dec 2011

http://www.imdb.com/name/nm0863833/bio?ref_=nm_ov_bio_sm          02/04/2014 03:01:59 PM



accomplishes on the screen are accomplished through kindness and instruction - but never with the whip. Even in scenes where Rintintin is supposed to be beaten, I never permit a whip to touch the dog."

Trainer Lee Duncan, on the first film he made of the dog: "At first the dog did not know he was watching pictures of himself, but when it dawned on him his tail wagged ferociously."

**See also**

Publicity Listings

**Contribute to This Page**

Getting Started | Contributor Zone »

Edit page

**Non-human stars**
a list of 21 people created
09 Jul 2012

**Canine (dog) actors and actresses**
a list of 38 people created
19 Jan 2013

See all related lists »

amazon  You'll run out of energy before you run out of diapers.  20% off diapers and FREE Two-Day Shipping  Join now

Home | Search | Site Index | In Theaters | Coming Soon | Top Movies | Top 250 | TV | News | Message Boards | Press Room
Register | Advertising | Contact Us | Jobs | IMDbPro | Box Office Mojo | Withoutabox

IMDb Mobile: iPhone/iPad | Android | Mobile site | Windows Phone 7 | IMDb Social: Facebook | Twitter

Copyright © 1990-2014 IMDb.com, Inc.
Conditions of Use | Privacy Policy | Interest-Based Ads
An amazon.com company.

Amazon Affiliates
Amazon Instant Video    Prime Instant Video    Amazon Germany    Amazon Italy    Amazon France    Amazon India    DPReview      Audible
Watch Movies &          Unlimited Streaming    Buy Movies on     Buy Movies on   Buy Movies on   Buy Movie and  Digital       Download
TV Online               of Movies & TV         DVD & Blu-ray     DVD & Blu-ray   DVD & Blu-ray   TV Show DVDs   Photography   Audio Books

http://webcache.googleusercontent.com/search?q=cache:LReGh-l3pUcJ:www.imdb.com/name/nm0863833+&cd=3&hl=en&ct=clnk&gl=us     02/04/2014 03:02:20 PM



http://webcache.googleusercontent.com/search?q=cache:LReGh-l3pUcJ:www.imdb.com/name/nm0865833/+&cd=3&hl=en&ct=clnk&gl=us     02/04/2014 03:02:20 PM

Rinty

| | |
|---|---|
| **On the Border** Rinty | 1930 |
| **The Lone Defender** Rinty | 1930 |
| **Tiger Rose** Scotty | 1929 |
| **The Show of Shows** Rin-Tin-Tin – Introducing 'An Oriental Fantasy' Number (as Rin-Tin-Tin) | 1929 |
| **Frozen River** Lobo, a dog | 1929 |
| **The Million Dollar Collar** Rinty, a dog | 1929 |
| **Land of the Silver Fox** Rinty | 1928 |
| **Rinty of the Desert** Rinty | 1928 |
| **A Race for Life** Rinty, a dog | 1928 |
| **A Dog of the Regiment** Rinty | 1927 |
| **Jaws of Steel** Rinty | 1927 |
| **Tracked by the Police** Satan | 1927 |
| **Hills of Kentucky** The Grey Ghost | 1927 |
| **While London Sleeps** Rinty | 1926 |
| **A Hero of the Big Snows** Rinty (as Rin-Tin-Tin) | 1926 |
| **The Night Cry** Rin Tin Tin | 1926 |
| **Clash of the Wolves** Lobo - Leader of the Wolf Pack (as Rin-tin-tin) | 1925 |
| **Below the Line** | 1925 |
| **Tracked in the Snow Country** Rin Tin Tin | 1925 |
| **The Lighthouse by the Sea** Rin Tin Tin | 1924 |
| **Find Your Man** Buddy, a dog | 1924 |
| **Shadows of the North** King, the dog | 1923 |
| **Where the North Begins** The Dog (as Rin-tin-tin) | 1923 |
| **My Dad** Rin Tin Tin | 1922 |
| **The Man from Hell's River** | 1922 |



**Share** this page:

http://www.imdb.com/name/

**Related News**

George R Martin's Favorite Books Of 2012
20 December 2012 | Huffington Post

9 Movie Animals Who Outperformed Their Human Masters
14 November 2012 | Obsessed with Film

Book Review: 'Rin Tin Tin: The Life And The Legend'
1 November 2012 | Scott Feinberg

See all 66 related articles »

**User Lists**                    Create a list »

Related lists from IMDb users

**They played in silent too**
a list of 549 people created 17 May 2011

**My Favourite Actors**
a list of 42 people created 26 Oct 2011

**Silent Stars**
a list of 79 people created 21 Dec 2011

**Non-human stars**
a list of 21 people created 05 Jul 2012

**Canine (dog) actors and actresses**
a list of 38 people created 19 Jan 2013

See all related lists »

**Do you have a demo reel?**

Add it to your IMDbPage

118

http://webcache.googleusercontent.com/search?q=cache:LReGh-l3pUcJ:www.imdb.com/name/nm0863333/+&cd=5&hl=en&ct=clnk&gl=us     02/04/2014 03:02:20 PM

Rin Tin Tin

| | |
|---|---|
| Thanks (1 credit) | Show ▼ |
| Self (5 credits) | Show ▼ |
| Archive footage (11 credits) | Show ▼ |

Add it to your IMDbPage

Find out more at IMDb Pro »

**Connect with IMDb**

## Related Videos

### Personal Details                                    Edit

Alternate Names: Rin-Tin-Tin | Rin-tin-tin

### Did You Know?                                        Edit

Personal Quote: Trainer Lee Duncan: "Rintintin has never been whipped and the wonderful things this dog accomplishes on the screen are accomplished through kindness and instruction - but never with the whip. Even in scenes where Rintintin is supposed to be beaten, I never permit a whip to touch the dog." See more »

**Take The Quiz!**

Test your knowledge of Rin Tin Tin.

Trivia: Warner Bros. Pictures, saved from bankruptcy by the success of his films, maintained 18 trained stand-ins in order to reduce the strain on their star. See more »

**Related Polls**

**Favorite TV sidekick?**

Nickname: Rinty

See more polls »

## Message Boards

Recent Posts

| | |
|---|---|
| Great Actor | MurderedKurt |
| Does anyone know if The Lighthouse By the Sea | kahloesque |

Discuss Rin Tin Tin on the IMDb message boards »

## Contribute to This Page

Edit page

Getting Started | Contributor Zone »

Home | Search | Site Index | In Theaters | Coming Soon | Top Movies | Top 250 | TV | News | Message Boards | Press Room
Register | Advertising | Contact Us | Jobs | IMDbPro | Box Office Mojo | Withoutabox

IMDb Mobile: iPhone/iPad | Android | Mobile site | Windows Phone 7 | IMDb Social: Facebook | Twitter

Copyright © 1990-2014 IMDb.com, Inc.
Conditions of Use | Privacy Policy | Interest-Based Ads
An amazon.com company.

Amazon Affiliates
Amazon Instant Video    Prime Instant Video    Amazon Germany    Amazon Italy    Amazon France    Amazon India    DPReview    Audible
Watch Movies &          Unlimited Streaming    Buy Movies on      Buy Movies on   Buy Movies on   Buy Movies and   Digital      Download
TV Online                of Movies & TV         DVD & Blu-ray      DVD & Blu-ray   DVD & Blu-ray   TV Show DVDs    Photography   Audio Books

| | |
|---|---|
| **To:** | Rin, Inc. (kevin@kmwlawoffice.com) |
| **Subject:** | U.S. TRADEMARK APPLICATION NO. 86091211 - RINTY - RINTI-T8340 |
| **Sent:** | 2/5/2014 7:04:48 PM |
| **Sent As:** | ECOM102@USPTO.GOV |
| **Attachments:** | |

## UNITED STATES PATENT AND TRADEMARK OFFICE (USPTO)

## IMPORTANT NOTICE REGARDING YOUR U.S. TRADEMARK APPLICATION

### USPTO OFFICE ACTION (OFFICIAL LETTER) HAS ISSUED ON 2/5/2014 FOR U.S. APPLICATION SERIAL NO. 86091211

Please follow the instructions below:

**(1) TO READ THE LETTER:** Click on this link or go to http://tsdr.uspto.gov, enter the U.S. application serial number, and click on "Documents."

The Office action may not be immediately viewable, to allow for necessary system updates of the application, but will be available within 24 hours of this e-mail notification.

**(2) TIMELY RESPONSE IS REQUIRED:** Please carefully review the Office action to determine (1) how to respond, and (2) the applicable response time period. Your response deadline will be calculated from 2/5/2014 (*or sooner if specified in the Office action*). For information regarding response time periods, see http://www.uspto.gov/trademarks/process/status/responsetime.jsp.

**Do NOT hit "Reply" to this e-mail notification, or otherwise e-mail your response** because the USPTO does NOT accept e-mails as responses to Office actions. Instead, the USPTO recommends that you respond online using the Trademark Electronic Application System (TEAS) response form located at http://www.uspto.gov/trademarks/teas/response_forms.jsp.

**(3) QUESTIONS:** For questions about the contents of the Office action itself, please contact the assigned trademark examining attorney. For *technical* assistance in accessing or viewing the Office action in the Trademark Status and Document Retrieval (TSDR) system, please e-mail TSDR@uspto.gov.

## WARNING

**Failure to file the required response by the applicable response deadline will result in the**

**ABANDONMENT of your application.** For more information regarding abandonment, see http://www.uspto.gov/trademarks/basics/abandon.jsp**.**

**PRIVATE COMPANY SOLICITATIONS REGARDING YOUR APPLICATION:** Private companies **not** associated with the USPTO are using information provided in trademark applications to mail or e-mail trademark-related solicitations. These companies often use names that closely resemble the USPTO and their solicitations may look like an official government document. Many solicitations require that you pay "fees."

Please carefully review all correspondence you receive regarding this application to make sure that you are responding to an official document from the USPTO rather than a private company solicitation. All official USPTO correspondence will be mailed only from the "United States Patent and Trademark Office" in Alexandria, VA; or sent by e-mail from the domain "@uspto.gov." For more information on how to handle private company solicitations, see http://www.uspto.gov/trademarks/solicitation_warnings.jsp.

# PLAINTIFFS' TRIAL EXHIBIT 74

EXHIBIT K

**122**

Int. Cl.: 31

Prior U.S. Cl.: 1

United States Patent and Trademark Office

Reg. No. 1,763,135
Registered Apr. 6, 1993

## TRADEMARK
## PRINCIPAL REGISTER

# RIN TIN TIN

HEREFORD, DAPHNE (UNITED STATES CITI-
ZEN)
2904 YOST BOULEVARD
PEARLAND, TX 77581

FOR: LIVE GERMAN SHEPHERD PUPPIES,
IN CLASS 31 (U.S. CL. 1).

FIRST USE 12–17–1980; IN COMMERCE
12–17–1980.
SEC. 2(F).

SER. NO. 74–269,369, FILED 4–27–1992.

RICHARD A. FRIEDMAN, EXAMINING AT-
TORNEY

EXHIBIT K

APR. 16. 1998

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE
POST REGISTRATION SECTION

Mark:  RIN TIN TIN

Registration No:  1,763,135

Class:  International 31; Prior U.S. Cl.:  1

## DECLARATION UNDER SECTIONS 8 AND 15

I, Daphne Herford, declare that I am a citizen of the United States, and am authorized to make this declaration; that I am the owner of the above-identified registration issued on April 6, 1993, as shown by records in the Patent and Trademark Office; that the mark shown therein has been in continuous use in interstate commerce for five consecutive years from the date of said registration to the present on all the goods specified in the certificate of registration; that said mark is in use in interstate commerce as evidenced by the attached trademark specimen; that there has been no final decision adverse to Registrant's claim of ownership of said mark, to its right to register the same or maintain it on the register; and that there is no proceeding involving any of said rights pending and not disposed of either in the Patent and Trademark Office or in the courts.

I declare further that all statements made herein are true and that these statements were made with the knowledge that willful false statements and the like are punishable by fine or imprisonment, or both under Section 1001 of Title 18 of the United States Code and that such willful false statements may jeopardize the validity of this document and the registration to which it relates.

Applicant hereby appoints: David M. O'Brian, 5007 Hartwell Dr., Houston, Texas 77084 a member of the Bar of the State of Texas, to prosecute all post registration papers, to transact all business in the Patent and Trademark Office in connection therewith, and to receive all papers and communications related thereto.

Signed at Rosenberg, Texas , this 9 day of April , 1998.

By _____
Daphne Hereford

RTT02/§ 8 & 15 Decl.

04/17/1998 SHOPPER  00000199 1763135
01 FC:374                          200.00 BP