**LAW OFFICE OF CATHERINE R. LOMBARDO**
CATHERINE R. LOMBARDO  Bar No:  160461
269 West Bonita Avenue
Claremont, California  91711

Telephone Number: (909) 482-0384

Attorney for:  Plaintiff MAX KLEVEN

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MAX KLEVEN, an individual; RIN, INC., a California corporation,<br><br>　　　　Plaintiffs,<br><br>　　vs.<br><br>DAPHNE HEREFORD, an individual; RIN TIN TIN, INC., a Texas corporation; BELLEAIR TRADING INTERNATIONAL, LLC, a Florida limited liability company; and DOES 1 through 20, inclusive,<br><br>　　　　Defendants. | CASE NO:  13-CV-02783 AB (AGRx)<br><br>PLAINTIFF MAX KLEVEN'S BRIEF REGARDING RIN, INC. AND SHAMROCK ENTERTAINMENT, LTD'S LACK OF STANDING |

TO THE HONORABLE ANDRE BIROTTE, JR., UNITED STATES

DISTRICT COURT JUDGE:

　　　Pursuant to Joint Status Report filed by the Parties, Plaintiff MAX

KLEVEN ("Plaintiff") hereby submits his brief regarding RIN, INC. and

SHAMROCK ENTERTAINMENT, LTD.'S lack of standing in this matter:

///

///

///

///

# I.

## FACTUAL BACKGROUND

Plaintiff is, and at all times herein mentioned, was the owner of the intellectual property based upon, in connection with, related to, associated with and/or involving the icon "Rin-Tin-Tin" (the "IP"). Plaintiff was assigned the IP by its former owner Herbert Leonard. Plaintiff's IP has been the subject of many years of litigation involving a Texas dog breeder, who claims to breed the descendants of the German Shepherd dog, the canine that portrayed the original Rin-Tin-Tin on television and in Motion Pictures.

In early 2013, Plaintiff, who was 80 years old at the time, was approached by SASHA JENSON ("JENSON") about a potential joint venture with himself and CASEY LA SCALA ("LA SCALA"), whereby they would act as screenplay writers for Plaintiff. Plaintiff told JENSON about the complicated IP litigation, and later they brought in another individual, JEFF MILLER ("MILLER"), who claimed to know a "good attorney" to handle the IP litigation issues. At that time, Plaintiff was building and then operating a restaurant, which left him with little time to handle the IP litigation.

The original terms of the agreement that were negotiated between Plaintiff and JENSON, LA SCALA, and MILLER were that after Plaintiff received payment of $1,000,000.00 they would become 50% partners in any on-going venture with IP (the "original terms".) Prior to the Proposal, Plaintiff owned 100% of all Rights in the IP.

DAVID GERNSBACHER ("GERNSBACHER") prepared a "Confirmation of Assignment of Rights and Joint Venture Agreement" (the "Joint Venture Agreement"), which GERNSBACHER, JENSON, LA SCALA, and MILLER represented to Plaintiff as memorializing the original terms agreed upon, and based upon that representation, Plaintiff signed it on February 1, 2013. In fact, the Joint Venture did not memorialize the original terms, and instead it immediately

assigned a 50% interest in the IP in equal shares to JENSON, LA SCALA, and MILLER.based upon a future payment of $1,000,000.00 to Plaintiff. (A true and correct copy of the Joint Venture Agreement is attached hereto as Exhibit "A").

After entering into the Joint Venture Agreement, Plaintiff requested certain amendments. GERNSBACHER prepared an "Amendment to Confirmation of Assignment of Rights and Joint Venture Agreement", which the parties signed on February 27, 2013 (the "Amended Joint Venture Agreement"). (A true and correct copy of the Amended Joint Venture Agreement is attached hereto as Exhibit "B").

Subsequently, Defendants JENSON, LA SCALA, and MILLER formed Defendant RIN, INC., and assigned their 50% interest in the IP to Defendant RIN, INC. In 2013, JENSON, LA SCALA, and MILLER convinced Plaintiff that he needed to be a plaintiff, along with RIN, INC., in a federal lawsuit involving cancellation of eight United States Trademark Registrations owned by Belleair Trading International, LLC., which is before this Court (the "federal lawsuit").

GERNSBACHER is the attorney for plaintiffs in the federal lawsuit, but he was not retained by Plaintiff. GERNSBACHER told Plaintiff, in their initial meeting, that no other party had paid him any money for his services, so Plaintiff gave GERNSBACHER $5,000 because he felt bad that this attorney was "working for free".

During the pendency of the federal lawsuit, GERNSBACHER, MILLER, and one other principal of RIN, INC., drove to Plaintiff's home in Agua Dulce, and found Plaintiff working in his garden. At that time, Plaintiff did not have either his eye glasses or hearing aids; he could not read or hear.

GERNSBACHER, MILLER, and one other principal of RIN, INC., presented Plaintiff with a document entitled "Rin Tin Tin Deal Memorandum Agreement" (the "Deal Memo"), which GERNSBACHER had prepared, and represented to Plaintiff that he needed to sign it for the federal lawsuit. This Deal Memo would become effective upon the successful conclusion of the federal

lawsuit, and would form a new company in which Plaintiff would only hold a 17%
interest in the IP, and would bring in additional parties, including, SHAMROCK/
TIERNEY (17% interest), GERNSBACHER (8% interest), and KAYE (2%
interest). Without understanding the effect of the Deal Memo, and based upon the
representation that he needed to sign it for the federal lawsuit, Plaintiff executed
the Deal Memo under duress. (A true and correct copy of the Deal memo is
attached hereto as Exhibit "C").

Based upon the Deal Memo, SHAMROCK became a plaintiff-in-
intervention in the federal lawsuit. During the trial of the federal lawsuit in
December of 2014, it became apparent to Plaintiff that GERNSBACHER,
JENSON, LA SCALA, MILLER, and TIERNEY, and each of them, were not
acting in Plaintiff's best interests, and in fact were doing everything to keep him
from participating in the federal lawsuit. In fact, on December 10, 2014, Plaintiff
wrote a letter to His Honor expressing his sentiments. (A true and correct copy of
the letter is attached hereto as Exhibit "D").

Plaintiff requested inclusion in any and all meetings regarding the IP, but
was excluded from several important meetings where deals were made and
percentages agreed upon, which in fact diluted his ownership interest in the IP.
Plaintiff was also excluded from admission in the federal lawsuit hearings and
Trial, thereby necessitating Plaintiff to hire private counsel to negotiate his entry
into the Courtroom with the parties.

After consulting with the undersigned and retaining her to represent him in
the federal lawsuit, on February 2, 2015, Plaintiff caused to be served on RIN,
INC. and SHAMROCK, through GERNSBACHER, a Notice of Rescission of the
Joint Venture Agreement, the Amended Joint Venture Agreement, and the Deal
Memo, pursuant to *Civil Code* section 1691(a). (A true and correct copy of the
Notice of Rescission of the Agreements is attached hereto as Exhibit "E").

The Notice of Rescission of Agreements, stated as follows:

> "Pursuant to *Civil Code* section 1691(a), you are hereby notified that effective immediately, Mr. Kleven is unilaterally rescinding the undated Rin Tin Tin Deal Memorandum Agreement, the initial Confirmation of Assignment of Rights and Joint Venture Agreement (dated February 1, 2013) and its subsequent Amendment (dated February 27, 2013)[the 'Agreements'].
>
> The grounds for rescission of the Agreements, include, but are not limited to, the following:
>
> 'A contract is subject to unilateral rescission by a party whose consent to the contract (or the consent of another party jointly contracting with the rescinding party) was given by mistake or obtained through duress, fraud or undue influence exercised by or with the connivance of the party against whom rescission is sought or any other party to the contract jointly interested with the party against whom rescission is sought." *Civil Code section* 1689(b)(1).'"

On February 9, 2015, Plaintiff, who never received any form of consideration for executing the Agreements, filed a complaint for damages in Los Angeles County Superior Court against RIN, INC., SHAMROCK, JENSON, LA SCALA, MILLER, GERNSBACHER, JAMES TIERNEY, and others, alleging causes of action for: (1) fraud; (2) elder financial abuse; (3) to void Deal Memo pursuant to *Probate Code* section 12380; (4) restitution after rescission; (5) legal malpractice; (6) breach of fiduciary duty.

## II.

## THE EFFECT OF UNILATERAL RESCISSION

A party that believes it has been fraudulently induced to enter into a contract may rescind. ( *Village Northridge Homeowners Assn. v. State Farm Fire & Casualty Co.* (2010) 50 Cal.4th 913 , 921.) Rescission is accomplished by giving notice to the other party to the agreement and restoring or offering to restore

everything of value received. (*Civ. Code*, § 1691; *Larsen v. Johannes* (1970) <u>7 Cal.App.3d 491</u>, 503.)

**Rescission extinguishes a contract and may be accomplished unilaterally by a party who alleges his or her consent to enter into the contract was obtained by fraud.** (*Civ. Code*, §§ 1688, 1689, subd. (b)(1).) **Once a contract has been rescinded it is void *ab initio*, as if it never existed.** ( *Scollan v. Government Employees Ins. Co* . (1963) <u>222 Cal.App.2d 181</u> , 183; *Long v. Newlin* (1956) <u>144 Cal.App.2d 509</u> , 513.)

*Civil Code* section 1688 provides that "A contract is extinguished by its rescission." The term "rescission" is not defined in the *Civil Code*. "Rescission" means to "restore the parties to their former position." ( *Young v. Flickinger* (1925) 75 Cal.App. 171, 174; accord, *Sanborn v. Ballanfonte* (1929) 98 Cal.App. 482, 488.) **"Rescission" is a "retroactive termination" of a contract**, as compared to "cancellation," which is a "prospective termination." ( *Barrera v. State Farm Mut.* (1969) <u>71 Cal.2d 659</u> , 663, fn. 3.)

"The consequence of rescission is not only the termination of further liability, but also the restoration of the parties to their former positions by requiring each to return whatever consideration has been received." ( *Imperial Casualty & Indemnity Co. v. Sogomonian* (1988) <u>198 Cal.App.3d 169</u> , 184; accord, *Tippett v. Terich* (1995) <u>37 Cal.App.4th 1517</u> , 1535, disapproved on another ground in *Cortez v. Purolator Air Filtration Products Co.* (2000) <u>23 Cal.4th 163</u> , 175-178.)

## III.

## RIN, INC. AND SHAMROCK'S LACK OF STANDING

Plaintiff RIN, INC. and Plaintiff-in-Intervention, SHAMROCK, believed that they had standing to bring their Complaints herein based on the Agreements. Because their actions to obtain the signatures of Kleven on the Agreements were based in Fraud and Elder Abuse, they never had legitimate interests, and therefore

standing, in the instant matter.  Further, even if they had originally had standing

based on Plaintiff's unilateral rescission of the Agreements, these parties no longer

have any standing in this matter.

Dated:  February _6 2_, 2015

Catherine R. Lombardo, Attorney for
Plaintiff MAX KLEVEN

# EXHIBIT "A"



### CONFIRMATION OF ASSIGNMENT OF RIGHTS AND JOINT VENTURE AGREEMENT

This Confirmation of Assignment of Rights and Joint Venture Agreement (this "Agreement") is effective as of February 1, 2013, by and between Max Kleven ("Kleven") on the one hand, and Sasha Jenson and/or assignee(s) ("Jenson"), Casey La Scala and/or assignee(s) ("La Scala") and Jeff Miller and/or assignee(s) ("Miller") (collectively, "Producers"), on the other hand, (collectively, as applicable, the "Parties" and singularly, "Party"), with reference to the following:

RECITALS:

A.  The subject of this Agreement is the entirety of the intellectual property based upon, in connection with, related to, associated with and/or involving the icon "Rin-Tin-Tin" of whatever kind or nature, world-wide, including, without limitation, the story, published works, titles, themes, contents, characters, trademarks, copyrights, trade dress, all characters and ideas associated therewith and any and all related intellectual property and brands, including without limitation, all translations, adaptations, drafts and other versions thereof, whether now existing or hereafter created including any and all renewals and extensions of such rights that may be secured under the laws now or hereafter pertaining thereto in the United States or in any other country as well as any right to use or exploit any of the foregoing, and any other proprietary right, whether arising under the laws of the United States or any other country (collectively, the "Intellectual IP") held by Kleven (the "IP").

B.  The purpose of this Agreement is to confirm, memorialize and give effect to the assignment of Fifty percent of the IP to Producers in equal shares in order that the Parties may effectively and fully undertake the protection and Exploitation of the IP. The term "Exploitation" shall be given the broadest meaning possible and shall include, without limitation, the development, licensing, sale and distribution of the IP in any and all medium, now and hereinafter known and all ancillary sources of revenue derived from, without limitation, all live action, animated and mixed theatrical, video, pay television, DVD, VOD, free television, audio, literary, sound tract, licensing, music, live performance, animation, merchandising, branding, sequels/spin-offs, television, digital and electronic productions and ventures and any and all other and further Exploitation of the IP for the mutual benefit of the Parties.

C.  The Parties previously entered into one or more Attachment Agreements whereby Producers agreed to make efforts to arrange for the financing, development, production, distribution and/or exploitation of one or more entertainment and related projects related to the IP.  Based upon Producers' efforts to date and based upon their future efforts in that regard, Kleven acknowledges that such efforts warrant the assignment of Fifty percent of the IP to Producers.

AGREEMENT:

NOW, THEREFORE, for good, adequate and mutual consideration, it is mutually agreed by and between the parties hereto as follows:

1.  . Recitals.  The foregoing Recitals are hereby fully incorporated herein by this reference.

2.  Term: The term of the Joint Venture shall commence as of the effective date of this Agreement and, unless sooner terminated in accordance with the provisions hereof, shall continue until any and all rights, interests, and Exploitation of the IP are exhausted (the "Term").

3.  Assignment of Title to IP: Kleven hereby irrevocably grants, transfers and assigns without reservation all right, title, and interest in and to Fifty percent (50%) of the IP to Producers in equal shares, and shall execute such documentation as necessary to give full and complete effect to such assignment including, without, limitation, any and all applicable assignments, grants and transfers as necessary and required by Producers in their discretion in the United States or in any other country.

4.  Contributions of Kleven: Kleven or his related entity hereby contributes the following to the Joint Venture:

a.  The grant, assignment and transfer of the IP as set forth above and delivery to Producers of any and all instruments and documents as required by Producers to evidence said grant, assignment and transfer;

b.  Kleven's full and complete participation, support and assistance in the protection and Exploitation of the IP.

5.  Contributions of Producers: Producers and/or their related entities shall contribute Producers' reasonable best efforts in the protection and Exploitation of the IP.

6.  No Obligation: Other than as set forth above, the Parties shall not be obligated to make any additional contributions. If a need for additional capital arises, each Party may contribute whatever portion of the total sum required that each elects to contribute, in its sole discretion.

7.  Creation of Entity. At such time as Producers deem it necessary, the Parties shall create a separate and distinct legal entity in a form approved by the Parties and transfer thereto the IP to further the purposes of this Joint Venture. Nothing in the by-laws, operating agreement or other entity governing documentation shall conflict the terms of this Agreement.

8.  Distribution of Net Proceeds: "Net Proceeds" shall include any and all monies received or credited to either Kleven and/or Producers in perpetuity from any and all sources now known or hereafter devised in connection with the exploitation of the IP and/or any and all projects related thereto including without limitation, any and all revenue, license fees, acquisition, prices, contingent compensation and other participations, merchandising, sponsorships, product placements or integration fees, and branding and licensing fees and commitments, minus the approved cost of production and the following payments in the following order, all as applicable: to the extent then due and payable, unrelated third parties will receive/deduct from the said revenue on a continuing basis their negotiated distribution fees, sales agent fees, sales agent expenses, distribution expenses (including residuals), collection account fees, taxes, and other customarily and negotiated fees and expenses, all of which will be subject to the prior written approval of Producers; next there will be a reserve for residuals (not to exceed 5% of the gross revenues) as approved by Producers; next distribution and marketing expenses, if any; next all third Party deferments, contingent compensations, participations, interest and/or fees, next Kleven's initial payment of One Million Dollars ($1,000,000.00) and then Kleven, on the one hand, and Producers on the other hand, shall divide 50/50 any and all remaining revenues of any and all exploitation of the Project. Any and all tax credits and/or deductions to which the Parties shall become entitled shall be allocated in accordance and consistent with the allocation of net profit or net losses set forth above.

9.  Books, Records, Bank Accounts.

a.  At all times during the term hereof, the Parties shall keep or cause to be kept, at the principal place of business of the Joint Venture or at such other place as the Parties may determine, books and accounting records for the business and operations of the Parties. Such books shall be open to inspection by the Parties, or their authorized representatives, during reasonable working hours. The accounting for purposes of the Parties, including the determination of profits and losses, shall be in accordance with generally accepted accounting principles consistently applied. The Parties shall engage the services of an accountant who shall be selected with the mutual approval of both parties.

b.  There shall be maintained for each Party a capital account and an income account. Each Party's distributive share of profits and losses, and monthly and end-of-the-year withdrawals not previously posted shall be credited or debited to the respective Party's income account as of

the close of the calendar year. Thereafter, any debit or credit balance remaining in the income account of a Party's shall be debited, or credited, as the case may be, to its respective capital account.

c.   The accounts shall be on a calendar year basis for accounting purposes (the "fiscal year"). As soon after the close of each fiscal year as is reasonably practical, a full and accurate accounting shall be made of the affairs of the Parties as of the close of each fiscal year. On such accounting being made, the net profit or the net loss sustained by the Parties during such fiscal year shall be ascertained and credited or charged, as the case may be, in the books of account of the Parties in the proportions hereinabove specified.  The parties hereto shall mutually select an accounting firm for the purpose of this venture.

d.   From time to time, but no less than annually, the Parties shall make distributions from the capital of the Parties which shall be in excess of the reasonable needs of the Parties for working capital and reserves as mutually determined by the Parties consistent with the terms of this Agreement.

e.   All funds of the Joint Venture shall be deposited in an account or accounts in the name of the Joint Venture or such names as determined by the Parties.

10. Management and Responsibilities of the Parties. The Parties hereby establish a Management Committee (the "Management Committee") to determine overall policies, objectives, procedures, methods and actions under this Agreement including, without limitation, Exploitation of the IP, and all subsidiary and ancillary rights thereto and all Exploitation thereof  The Management Committee shall consist of Producers and each of said Producers shall have an equal vote.

11. Warranties, Indemnification:

a.   Each Party hereby warrants and represents to the other(s) that he/it:

(1)  Has the right and capacity to enter into this agreement;

(2)  Shall not encumber or sell any of the assets or intangible rights of the Joint Venture without the written consent of the other Party(s);

(3)  Shall not assign, mortgage, hypothecate or encumber its interest in the Joint Venture without the written consent of the other Party(s);

(4)  Shall not loan any funds or extend the credit of the Joint Venture to any person or entity without the written consent of the other Party(s);

(5)  Shall not incur any cost, expense, liability or obligation in the name or on the credit of the Joint Venture without the written consent of the other Party(s);

(6)  Is not presently involved in financial difficulties as evidenced by its not having admitted its inability to pay its debts generally as they become due or otherwise not having acknowledged its insolvency or by its not having filed or consented to a petition in bankruptcy or for reorganization or for the adoption of an arrangement under Federal Bankruptcy Act (or under any similar law of the United States or any other jurisdiction, relating to liquidation or reorganization or to modification or alteration of the rights of creditors) or by its not being involved in any bankruptcy, liquidation, or other similar proceeding relating to it or its assets, whether pursuant to statute or general rule of law, nor does it presently contemplate any such proceeding or have any reason to believe that any such proceeding will be brought against it or its assets.

b.   In addition to the foregoing warranties and representations, Kleven further represents and warrants to Producers, their successors, licensees and assigns as follows:

(1)   Unrestricted Right to Grant: Kleven is the sole and absolute owner of the Project, any and all applicable copyrights pertaining thereto and all rights associated with or relating to its production, distribution and Exploitation and has the absolute right to grant to and vest in the Joint Venture, all the rights, licenses and privileges granted to the Joint Venture under this Agreement, and Kleven has not heretofore sold, assigned, licensed, granted, encumbered or utilized the Picture, the Project or any of the literary or musical properties used therein in any way that may affect or impair the rights, licenses and privileges granted to the Joint Venture hereunder and Kleven will not sell, assign, license, grant or encumber or utilize the rights, licenses and privileges granted to Joint Venture hereunder.

(2) Trademarks, Trade names, Copyrights, Licenses, Privileges:

(a)   The IP will be valid and subsisting during the Term, and no part of any thereof is in the public domain.

(b)   Kleven has not heretofore transferred its ownership in and to any or all of the IP throughout the world, including, without limitation, the rights to secure copyright and trademark registration and all other necessary rights and licenses anywhere in the world with respect to the IP and to secure any renewals and extensions thereof wherever and whenever permitted. Kleven warrants that upon delivery of the IP granted to Producers hereunder, Kleven will own all such IP throughout the world for the full period of the IP and all extensions and renewals thereof.

(c)   The Joint Venture shall have the right to take all reasonable steps to protect such Rights from Infringement by unauthorized parties and in particular, to take such action and proceedings as may be reasonable to prevent any unauthorized use, reproduction, performance, exhibition or exploitation by third parties of the IP or any part thereof or the material on which the same is based which may be in contravention of the exclusive rights granted to Producers and the Joint Venture hereunder.

(d)   No Infringement:  To the best of Kleven's knowledge and belief the Picture, no part of the IP nor the exercise of any right, license or privilege herein granted, violates or will violate or infringe or will infringe any trademark, trade name, contract, agreement, copyright (whether common law or statutory), patent, literary, artistic, dramatic, personal, private, civil or property right or right of privacy or "moral rights of authors" or any other right whatsoever of or slanders or libels any person, firm, corporation or association whatsoever.

(e)   No Impairment of Rights Granted:   There are and will be no agreements, commitments or arrangements whatever with any person, firm, corporation or association that may in any manner or to any extent affect Producer's rights hereunder or Producers' share of the proceeds of the Picture or IP.  Kleven has not and will not exercise any right or take any action which might tend to derogate from, impair or compete with the rights, licenses and privileges herein granted to the Joint Venture.

(f)   Peaceful Enjoyment: Producers and the Joint Venture will be fully entitled to the quiet and peaceful enjoyment and possession of each and all of the Rights herein granted or purported to be granted to the Joint Venture throughout the Term without interference by any third Party.

11.  Indemnification. Each Party hereby indemnifies and holds harmless the other Party from and against any and all claims, liabilities, damages and costs (including but not limited to reasonable attorneys' fees and court costs) arising from any breach by such Party of any representation, warranty or agreement made by such Party hereunder.

12.  Exclusivity: None of the Parties shall be exclusive to the Joint Venture and each Party may develop other properties and engage in other activities in the entertainment and other industries separate and apart from the Joint Venture and the other Parties. However, it is agreed by the

Parties that each Party shall devote as much time as shall be reasonably necessary to fulfill its duties and obligations in connection with the Joint Venture and the Exploitation of the IP.

13.  Dissolution and Termination of the Joint Venture:

a.   The Joint Venture shall be dissolved and terminate and its business wound up upon the first to occur of the following:

(1)  The expiration of the term referred to in Paragraph 2, above;

(2)  Mutual agreement of the Parties;

(3)  Operation of law;

(4)  Material breach of this Agreement by any Party, which breach is not cured within fifteen (15) days after written notice thereof from the non-defaulting Party; provided, however, it is understood that only the non-defaulting Party shall have the right to terminate the Joint Venture pursuant to this paragraph. Such termination shall not release the defaulting Party from any obligations or liabilities to the other Party, whether pursuant to the provisions of this Agreement or at law or in equity.

b.   Upon termination of the Joint Venture, the business of the Joint Venture shall be wound up and assets and properties of the Joint Venture shall be liquidated. Upon the happening of any one of the events mentioned in Paragraph 13.a hereof, the Joint Venture shall engage in no further business, other than that necessary to protect the assets of the Joint Venture, wind-up its business and distribute its assets as provided herein.

14.  Distribution of Assets on Dissolution and Liquidation: Upon any dissolution and liquidation of the Joint Venture, the assets of the Joint Venture shall be liquidated in an orderly manner (subject, however, to the terms of Paragraph 19. c hereof), with a view toward maximizing the proceeds from such liquidation, and the proceeds thereof shall be distributed in the following order of priority:

a.   First, the expenses of liquidation and the debts of the Joint Venture, other than debts owing to the Parties, shall be paid;

b.   Second, debts owing to the Parties, if any;

c.   Third, any funds remaining after the amounts described in the foregoing sub-paragraphs a. and b. have been paid shall be distributed to the Parties in the proportion in which the Parties share the net proceeds of the Joint Venture at the time of such distribution.

d.   If the Parties have not sold the assets of the Joint Venture, except as otherwise provided in this paragraph, within two (2) years following dissolution, then the remaining assets shall be distributed to the Parties as tenants in common in accordance with their above-described interests.

15.  Gain or Loss During Dissolution: Any gain or loss arising out of the disposition of assets of the Joint Venture during the course of dissolution shall be borne by the Parties in the same proportions as such gain or loss was shared by the Parties hereunder immediately prior to the dissolution.

16.  Opportunities and Conflicts of Interest:

a.   Any of the Parties may engage or possess an interest in any other business venture of every kind, nature and description, including ventures or enterprises which may be competitive in nature with the Joint Venture, and neither the Joint Venture nor any of the Parties shall have any rights in and to said business ventures, or to the income or profits derived therefrom.

b. No Party shall be obligated to offer any investment or business opportunities to the other Parties or to the Joint Venture. Any Party may invest or otherwise participate in such opportunities without notice to the Joint Venture or to the other Party, without affording the Joint Venture or the other Parties an opportunity of participating in same and without any liability whatsoever to the Joint Venture or to any other Party. Each Party hereby waives any right he may have against the other Party(s) for capitalizing on information learned as a consequence of its connection with the affairs of the Joint Venture.

17. Miscellaneous:

a. In the event of a default by either Party, the non-defaulting Party shall give written notice to the defaulting Party of said default. The defaulting Party shall have Fifteen (15) days to cure such default unless the parties agree in writing otherwise to a longer cure period. In the event the default cannot reasonably be cured in Fifteen (15) days, the defaulting Party shall have a reasonable time to cure such default unless (1) such default and/or additional time will result in damage to the non-defaulting Party or (2) the defaulting Party does not with all due speed seek to cure the default or (3) the default was intentional or resulted from the gross negligence or recklessness of the defaulting Party, in which case(s) no additional time shall be afforded the defaulting Party to cure.

b. All notices which any Party is required or may desire to serve hereunder shall be in writing and shall be served by personal delivery to the other Party or by prepaid registered or certified mail addressed to the other Party as follows:

To Kleven: ( *Kia Klein* )
*3/50 Cedar Rd Agua Dol. 4390*

To Producers: *Jeff Miller c/o Interrogate Films*
*6374 Arizona Circle*
*Los Angeles, CA 90045*

c. The captions of the various paragraphs and sections of the Agreement are intended to be used solely for convenience of reference and are not intended and shall not be deemed for any purpose whatsoever to modify or explain or to be used as an aid in the construction of any provisions.

d. ANY AND ALL DISPUTES ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT OR ITS PERFORMANCE OR INTERPRETATION SHALL BE EXCLUSIVELY SETTLED BY ARBITRATION TO BE HELD IN LOS ANGELES, CALIFORNIA UNDER THE COMMERCIAL ARBITRATION RULES OF THE AMERICAN ARBITRATION ASSOCIATION (THE "AAA RULES). IF A PARTY DESIRES TO COMMENCE ARBITRATION, IT SHALL GIVE THE OTHER PARTY AND THE AAA WRITTEN NOTICE OF SUCH DESIRE, AND THE PARTIES SHALL JOINTLY APPOINT ONE (1) ARBITRATOR (WHO SHALL EITHER BE A RETIRED JUDGE OR AN ATTORNEY WITH AT LEAST TEN (10) YEARS OF EXPERIENCE IN THE MOTION PICTURE INDUSTRY). IF THE PARTIES CANNOT AGREE ON AN ARBITRATOR WITHIN THIRTY (30) DAYS OF SUCH NOTICE, THEN ON THE WRITTEN REQUEST OF EITHER PARTY TO THE AAA (A COPY OF WHICH SHALL BE SIMULTANEOUSLY SENT TO THE OTHER PARTY), SUCH ARBITRATOR SHALL BE APPOINTED IN ACCORDANCE WITH THE AAA RULES. PENDING A SUBMISSION OF A DISPUTE TO ARBITRATION AND, THEREAFTER, UNTIL THE ARBITRATOR PUBLISHES AN AWARD, THE PARTIES SHALL CONTINUE TO PERFORM ALL OF THEIR RESPECTIVE OBLIGATIONS UNDER THIS AGREEMENT WITHOUT PREJUDICE TO A FINAL JUDGMENT




m. This Agreement contains the sole and only agreement of the Parties relating to the Joint Venture and correctly sets forth the rights, duties and obligations of each to the other(s) as of its date. Any prior agreements, promises, amendments, negotiations or representations not expressly set forth in this Agreement are of no force and effect.

By signing in the spaces provided below, the parties accept and agree to all the terms and conditions of this Agreement as of the effective date set forth above.

_____
Max Klever

_____
Sasha Jenson

_____
Casey La Scala

_____
Jeff Miller

# EXHIBIT "B"



# AMENDMENT TO CONFIRMATION OF ASSIGNMENT OF RIGHTS AND JOINT VENTURE AGREEMENT

This Amendment to Confirmation of Assignment of Rights and Joint Venture Agreement (this "Amendment") is effective as of February 27, 2013, by and between Max Kleven ("Kleven"), Sasha Jenson (and/or related entity/assignee) ("Jenson"), Casey La Scala (and/or related entity/assignee) ("La Scala") and Jeff Miller (and/or related entity/assignee) ("Miller") (Jenson, La Scala and Miller are sometimes collectively referred to herein as "Producers," and all four parties hereto are collectively referred to herein as the "Parties" and singularly as "Party"), with reference to the following:

## RECITALS:

A.   Effective as of February 1, 2013, the Parties entered into that certain Confirmation of Assignment of Rights and Joint Venture Agreement (the "JV Agreement") with respect to the formation of a Joint Venture to exploit the entirety of the intellectual property based upon, in connection with, related to, associated with and/or involving the icon "Rin-Tin-Tin" of whatever kind or nature, world-wide, including, without limitation, the story, published works, titles, themes, contents, characters, trademarks, copyrights, trade dress, all characters and ideas associated therewith and any and all related intellectual property and brands, including without limitation, all translations, adaptations, drafts and other versions thereof, whether now existing or hereafter created including any and all renewals and extensions of such rights that may be secured under the laws now or hereafter pertaining thereto in the United States or in any other country as well as any right to use or exploit any of the foregoing, and any other proprietary right, whether arising under the laws of the United States or any other country (collectively, the "Intellectual IP") held by Kleven (the "IP").

B.   As an integral and necessary part of the JV Agreement, Kleven granted, transferred and assigned Fifty percent (50%) of the IP to Producers in equal shares in order that the Parties may effectively and fully undertake the protection and exploitation of the IP.

C.   Since entering into the JV Agreement, Kleven has requested that the Parties agree to (1) a provision for reversion to Kleven of the IP in the event that certain goals are not reached with respect to the exploitation of the IP, (2) certain restrictions on the sale of Producer's interests in the IP, (3) clarifying the source or sources of the initial payment of One Million Dollar ($1,000,000) to Kleven, as referenced in paragraph 8 of the JV Agreement, (4) clarifying the Parties' rights and obligations in the event of Kleven's death, incapacity or disability and (5) clarifying various terms and correcting some typographical errors in the JV Agreement.

D.   Producers have agreed to acquiesce to Kleven's request, as set forth below, and under the following express terms and conditions.

## AMENDMENT:

NOW, THEREFORE, for good, adequate and mutual consideration including, without limitation, the Parties mutual covenants, and the additional representations and warranties by Kleven set forth below, it is mutually agreed by and between the Parties that the JV Agreement is and shall be amended in the following respects only, and otherwise will remain in full force and effect under all terms, covenants and conditions set forth therein:

1.   Recitals. The foregoing Recitals are hereby fully incorporated herein by this reference.

2.   Right of Reversion. Subject to and conditioned upon Kleven's full and faithful performance of his obligations set forth in the JV Agreement and the covenants, representations and warranties set forth herein, the Fifty percent (50%) of the IP previously granted, transferred and assigned to Producers shall revert back to Kleven if, within Eighteen (18) months of the final resolution of third-party trademark and IP disputes/claims including, without limitation, the disputes with and claims of Daphne Herford and Rin Tin Tin, Inc., Producers' efforts have not resulted in one or more substantive agreements for the development, licensing, production, distribution, merchandising, branding and/or licensing of and/or based upon and/or on account of the IP.

3.   Restriction on Sale During Kleven's Lifetime. Subject to and conditioned upon Kleven's full and faithful performance of his obligations set forth in the JV Agreement and the covenants, representations and warranties set forth herein, during Kleven's lifetime neither Kleven nor Producers shall sell, convey or transfer title to the IP without the express written consent of all Parties.

4.   Sources of $1,000,000 Payment to Kleven.  Subject to and conditioned upon Kleven's full and faithful performance of his obligations set forth in the JV Agreement and the covenants, representations and warranties set forth herein, the sources of the payment of One Million Dollar ($1,000,000) to Kleven referenced in paragraph 8 of the JV Agreement may include, in whole or in part, rights fees or any other source of funds received from a third-party on account of the IP.

5.   Death, Legal Incapacity or Total Disability of Kleven. Upon the death, legal incapacity or total disability of Kleven, the Joint Venture shall not dissolve but shall continue with Kleven's successor(s) in interest as a party to the Joint Venture.  Such successor(s) shall be entitled to the same economic rights, preferences as to distribution, capital and profits interest in the Joint Venture as was Kleven but shall not be entitled to vote on any Joint Venture matters or participate in the management of the Joint Venture business including, without limitation, the sale or other disposition of all or any of the Joint Venture's assets.

6.   Clarifications and Typographical and Phrasing Corrections:

   a.   At paragraph 8 of the JV Agreement, the phrase "(not to exceed 5% of the gross revenues)" is hereby changed to "(not to exceed 5% of the gross revenues upon which payment of residuals would be based)";

   b.   At paragraph 8 of the JV Agreement, the phrase ", next Kleven's initial payment of One Million Dollars ($1,000,000.00)," is hereby changed to "; next a recoupment payment to Kleven of One Million Dollars ($1,000,000.00); next, recoupment by Miller of expenses incurred in connection with protection of the IP, estimated to be approximately $75,000";

   c.   At paragraph 8 of the JV Agreement, the last word of the second to the last sentence, "Project" is hereby changed to "IP";

   d.   Paragraph 9.a of the JV Agreement is hereby replaced with the following: "At all times during the term hereof, the Parties shall keep or cause to be kept, at the principal place of business of the Joint Venture or at such other place as the Parties may determine, the books and accounting records for the business and operations of the Joint Venture. Such books shall be open to reasonable inspection by the Parties, or their authorized representatives, during reasonable working hours. The accounting for purposes of the Joint Venture, including the determination of profits and losses, shall be in accordance with generally accepted accounting

principles consistently applied. The Joint Venture shall engage the services of an accountant who shall be selected by vote of the Parties."

e.   Paragraph 9.c of the JV Agreement is hereby replaced with the following: "The accounts shall be on a calendar year basis for accounting purposes (the "fiscal year"). As soon after the close of each fiscal year as is reasonably practical, a full and accurate accounting shall be made of the affairs of the Joint Venture as of the close of each fiscal year. On such accounting being made, the net profit or the net loss sustained by the Joint Venture during such fiscal year shall be ascertained and credited or charged, as the case may be, in the books of account of the Joint Venture in the proportions hereinabove specified."

f.   Paragraph 9.d of the JV Agreement is hereby replaced with the following: "From time to time, but no less than annually, the Joint Venture shall make distributions to the Parties from that portion of the Joint Venture's capital, if any, which exceeds the amount of capital necessary for the ongoing reasonable needs of the Joint Venture for working capital and reserves."

g.   Paragraph 10 of the JV Agreement is hereby replaced with the following: "Management and Responsibilities of the Parties. Subject to the provisions of paragraph 5 of the Amendment, all matters under this Agreement and with respect to any and all Joint Venture matters and management including, without limitation, the management of the Joint Venture business, policies, objectives, procedures, methods, decisions and actions, Exploitation of the IP, and all subsidiary and ancillary rights thereto and all Exploitation thereof, shall be decided by a majority   vote of the Parties, each of the four (4) Parties having a single, equal vote, irrespective of each Party's ownership interest";

h.   At paragraphs 11.b (1) and 11.b (2) (d) and (e) of the JV Agreement, the words "Project" and "Picture" are hereby changed to "IP";

i.   The second paragraph 11 entitled "Indemnification" in the JV Agreement is hereby made a part of the prior paragraph 11 and renumbered as paragraph 11.c;

j.   At paragraph 14 of the JV Agreement, the following phrase is hereby deleted: "(subject, however, to the terms of Paragraph 19. c hereof)";

k.   At paragraph 17.b of the JV Agreement, the following names and addresses are hereby inserted:

| | | |
|---|---|---|
| To Kleven: | Max Kleven 33150 Barber Road Agua Dulce, CA 91390 | |
| | with copy to: | Richard LeRoy 10340 Santa Monica Blvd Los Angeles, CA 90025 |
| To Producers: | Sasha Jenson, Casey La Scala and Jeff Miller c/o Interrogate 6374 Arizona Circle Los Angeles, CA 90045 | |
| | with copy to: | David L. Gernsbacher 9107 Wilshire Blvd Ste 450 Beverly Hills CA 90210 |

7.   Further Representations and Warranties. · With respect to the· JV Agreement and this Amendment, each of the four Parties agrees, and represents and warrants to the other Parties that:

a.   Each of the Parties affirms the terms and conditions of the JV Agreement and this Amendment and that the same are fully in force, binding and enforceable.

b.   Each of the Parties has had the opportunity to review the JV Agreement and this Amendment and consult with said Party's legal or other advisers concerning the JV Agreement and this Amendment, and has relied solely upon the advice of said Party's own legal and other advisers, and said Party's own reading and understanding of the JV Agreement and this Amendment, and not upon any representation or statement by the other Party or such Party's attorneys or agents.

c.   The terms of the JV Agreement and this Amendment have been drafted and reviewed with the mutual negotiation and cooperation of each of the Parties and shall not be construed for or against any Party by reason of such Party's participation or lack of participation in the drafting of the JV Agreement and this Amendment.

8.   JV Agreement.  Save and except as specifically set forth above, the terms and conditions of the JV Agreement are and shall remain in full force and effect, binding and enforceable.

_____
Max Kleven

_____
Sasha Jenson

_____
Casey La Scala

_____
Jeff Miller

7.   Further Representations and Warranties.   With respect to the JV Agreement and this Amendment, each of the four Parties agrees, and represents and warrants to the other Parties that:

a.   Each of the Parties affirms the terms and conditions of the JV Agreement and this Amendment and that the same are fully in force, binding and enforceable.

b.   Each of the Parties has had the opportunity to review the JV Agreement and this Amendment and consult with said Party's legal or other advisers concerning the JV Agreement and this Amendment, and has relied solely upon the advice of said Party's own legal and other advisers, and said Party's own reading and understanding of the JV Agreement and this Amendment, and not upon any representation or statement by the other Party or such Party's attorneys or agents.

c.   The terms of the JV Agreement and this Amendment have been drafted and reviewed with the mutual negotiation and cooperation of each of the Parties and shall not be construed for or against any Party by reason of such Party's participation or lack of participation in the drafting of the JV Agreement and this Amendment.

8.   JV Agreement.   Save and except as specifically set forth above, the terms and conditions of the JV Agreement are and shall remain in full force and effect, binding and enforceable.


Max Kleven


Sasha Jenson


Casey La Scala


Jeff Miller

## INTELLECTUAL PROPERTY ASSIGNMENT

This Intellectual Property Assignment is entered into freely by and between Max Kleven ("Kleven") on the one hand, and Sasha Jensen and/or Producers(s), Casey La Scala and/or Producers(s) and Jeff Miller and/or Producers(s) (collectively, "Producers"), on the other hand, with reference to the following:

A.    On or about February 1, 2013, the parties hereto entered into that certain Confirmation of Assignment of Rights and Joint Venture Agreement (the "Joint Venture Agreement") and effective as of, by and between Max Kleven ("Kleven") on the one hand, and Sasha Jensen and/or Producers(s), Casey La Scala and/or Producers(s) and Jeff Miller and/or Producers(s) (collectively, "Producers"), on the other hand;

B.    Pursuant to the terms of the Joint Venture Agreement, Kleven represented and warranted to Producers that he solely and exclusively owned all right, title, and interest in and to all intellectual property based upon, in connection with, related to, associated with and/or involving the icon "Rin-Tin-Tin" of whatever kind or nature, world-wide, including, without limitation, the story, published works, titles, themes, contents, characters, trademarks, copyrights, trade dress, all characters and ideas associated therewith and any and all related intellectual property and brands, including without limitation, all translations, adaptations, drafts and other versions thereof, whether now existing or hereafter created including any and all renewals and extensions of such rights that may be secured under the laws now or hereafter pertaining thereto in the United States or in any other country as well as any right to use or exploit any of the foregoing, and any other proprietary right, whether arising under the laws of the United States or any other country (collectively, the "IP");

C.    Further pursuant to the terms of the Joint Venture Agreement, Kleven irrevocably granted, transferred and assigned to Producers in equal shares, without reservation all right, title, and interest, Fifty percent (50%) of the IP;

D.    Further pursuant to the terms of the Joint Venture Agreement, Kleven agreed to execute such documentation as necessary to give full and complete effect to such grant, transfer and assignment of the IP including, without, limitation, any and all applicable assignments, grants and transfers as necessary and required by Producers in their discretion in the United States or in any other country;

E.    Further pursuant to the terms of the Joint Venture Agreement, Producers have requested that Kleven execute this Intellectual Property Assignment.

NOW, THEREFORE, in consideration of the payment of [Ten] Dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, including, without limitation, the mutual promises, covenants and agreements set forth in the Joint Venture Agreement Assignment. Kleven does hereby irrevocably grant, transfer and assign to Producers in equal shares, without reservation all right, title, and interest, Fifty percent (50%) of all right, title, and interest in, to and under any and all registration rights with respect to the IP, and the registrations and applications therefor, together with the goodwill of the business connected with the use of the IP; and together with all claims, damages and/or causes of action for the infringement and/or wrongful use and registration of the IP, past, present and future. as well as all rights to prepare derivative marks, all goodwill and all other rights, in and to the IP; as well as fully undertake the protection and Exploitation of the IP. The term "Exploitation" shall be given the broadest meaning possible and shall include, without limitation, the development, licensing, sale and distribution of the IP in any and all medium, now and hereinafter known and

all ancillary sources of revenue derived from, without limitation, all live action, animated and mixed theatrical, video, pay television, DVD, VOD, free television, audio, literary, sound tract, licensing, music, live performance, animation, merchandising, branding, sequels/spin-offs, television, digital and electronic productions and ventures, all licensing and, merchandising of goods and services in connection with, based upon and or arising from the IP and any and all other and further Exploitation of the IP.

In addition to the representations and warranties by Kleven to Producers set forth the Joint Venture Agreement, Kleven hereby represents and warrants to Producers as follows:

(1)   Kleven has the right, power and authority to enter into and execute this Intellectual Property Assignment;

(2)   Kleven is the exclusive owner of all right, title and interest, including all intellectual property rights, in the IP;

(3)   The IP is free of any liens, security interests, encumbrances or licenses;

(4)   The IP and any and all exploitation of same does not infringe the rights of any person or entity;

(5)   There are no claims, pending or threatened, with respect to Kleven's rights in the IP, with the exception of claims of Daphne Hereford;

(6)   This Intellectual Property Assignment is valid, binding and enforceable in accordance with its terms in all jurisdictions pertaining hereto; and

(7)   Kleven is not subject to any agreement, judgment or order inconsistent with the terms of this Intellectual Property Assignment.


Dated: _____        _____
                                      Max Kleven


State of California       ))
County of Los Angeles ))

On _____ before me, _____, notary, personally appeared Max Kleven, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

Witness my hand and official seal.


_____
Notary

**EXHIBIT "C"**

Rin Tin Tin Deal Memorandum Agreement

This Rin Tin Tin Deal Memorandum Agreement (the "Deal Memo") is an outline of the principal material terms of the agreement between Shamrock Entertainment, Ltd. ("Shamrock") and James P Tierney ("Tierney"), on the one hand, and Max Kleven, Rin, Inc. and its 3 principals, Jeff Miller, Casey LaScala, and Sasha Jenson (sometimes collectively "Rin"), on the other hand (collectively, the "Parties").

Whereas the Parties have each asserted certain claims against the Daphne Hereford, Rin Tin Tin, Inc. and Belleair Trading International, LLC ("Defendants") in the pending federal lawsuit in the Central District of California ("the Central District litigation") that includes Shamrock's claims for trademark infringement and unfair competition, and Rin's and Kleven's claims to establish the invalidity and/or rescission of a previous settlement agreement and for unfair competition; and

*Never*

Whereas Shamrock and Kleven have been previously cooperating in connection with the development of Rin Tin Tin projects and the Parties now believe it is in their best interest to contribute, develop and exploit their respective Rin Tin Tin Intellectual Property assets (RTT IP) in a new company ("NewCo") which will be formed immediately upon the successful conclusion of the Central District litigation against all defendants; and

Whereas Rin has developed a contemporary, full length Rin Tin Tin motion picture property ("the Rescue Dog Movie") and has requested that Shamrock defer the development and exploitation of new Rin Tin Tin motion picture and television projects based on the existing television series entitled "Rin Tin Tin K-9 Cop" and the Lee Duncan authorized biography entitled "The Rin Tin Tin Story", and Shamrock is willing to contribute these unproduced properties to NewCo for future development;

Whereas Kleven, Rin, Miller, LaScala and Jensen have each been advised to consult, and provided the opportunity to consult, with independent counsel of his or its own choosing regarding their prior dealings and agreements and this Deal Memo;

The Parties agree to the following terms and conditions:

1.  The Central District Litigation:

    a.  Kleven and Rin, Inc. shall transfer their RTT IP and claims against Defendants to Shamrock, subject to Shamrock's agreement (i) not to transfer or encumber Kleven's and/or Rin, Inc.'s RTT IP or claims and (ii) to transfer Kleven's and Rin, Inc.'s RTT IP and claims to NewCo upon the conclusion of the Central District Litigation as provided in paragraph 2, below.

    b.  Shamrock, Kleven and Rin, recognizing that they share substantial common interests, agree to cooperate in the prosecution of the claims against Defendants in the Central District Litigation. Further, to the extent reasonable and appropriate, Shamrock agrees to cooperate with Kleven and Rin in Kleven's and Rin's defense of the counterclaims that Daphne Hereford and Rin Tin Tin, Inc. have asserted against Kleven and Rin in the Central District Litigation.

1

c. Upon the execution of this Deal Memo by the Parties, the Parties shall stipulate to Shamrock's dismissal, without prejudice, of Kleven and Rin, Inc.

2. Upon the conclusion of the Central District Litigation in favor of the Parties, Shamrock's, Kleven's and Rin, Inc.'s RTT IP, including any and all of claims against third parties arising from their respective acquisition of rights in RTT IP ("third party claims"), shall be transferred to NewCo which will own and control (singularly or through a series of special purpose entities) the world wide exploitation of the RTT IP. The term "in favor of the Parties" shall mean a resolution under which the Parties own and/or control 100% of all RTT IP rights and interests in dispute in the Central District Litigation "Exploitation" shall be given the broadest meaning possible and shall include, without limitation, the licensing, sale, distribution of all RTT-related live and recorded productions and all ancillary sources of revenue including, without limitation, all theatrical, video, pay television, free television, audio, literary, sound tract, merchandising, branding, sequels/spin-offs and any and all other and further exploitation of the RTT IP. In the event that the conclusion of the Central District Litigation is not in favor of the Parties, NewCo shall transfer to Shamrock, Kleven and Rin, Inc. their respective RTT IP.

a. Equity ownership in NewCo to be held as follows:

(1) Shamrock (singularly or through Tierney or a related entity) .................... 17.0%

(2) Kleven (individually or through a related entity) ........................................ 17.0%

(3) Miller (individually or through Rin, Inc. or a related entity) ....................... 17.0%

(4) Jenson (individually or through Rin, Inc. or a related entity) .................... 17.0%

(5) LaScala (individually or through Rin, Inc. or a related entity) ................... 17.0%

(6) David Gernsbacher and/or his entity assignee ("Gernsbacher") ................ 8.0%

(7) Reserve for future settlements/deals.......................................................... 5.0%

(8) Graham Kaye and/or his entity assignee ("Kaye")...................................... 2.0%

b. The above equity interests in NewCo shall not be dilutable unless Shamrock, Miller, Jenson and LaScala unanimously agree to dilution, in which event the above equity interests shall be diluted by the same percentage;

c. Each of the equity owners listed in paragraph 1(a) above shall receive a share of NewCo's distributable profits in the same percentage as their equity ownership. ;

d. Tierney to be on NewCo's board and compensation committee (if any), and hold an office (not less than Exec. V.P.) in NewCo;

e. NewCo will provide no perks, fringes or salaries except as approved beforehand by a vote of Shamrock, Miller, Jensen and LaScala;

f. Control of NewCo will be by majority decision based on one (1) vote each per Shamrock, Kleven, Miller, Jenson and LaScala or, except in the case of Kleven, their respective successors.

3. Notwithstanding anything in this Deal Memo to the contrary:

   a. Upon NewCo's formation, NewCo shall grant to Shamrock an exclusive and irrevocable worldwide license in perpetuity to fully promote and exploit, in any and all media without limitation, for Shamrock's sole and exclusive account, all rights with respect to the existing 106 episodes of the "Rin Tin Tin K-9 Cop" television series;

   b. Notwithstanding any other provision of this Deal Memo to the contrary, Shamrock shall retain and exclusively hold all rights and claims pertaining to the previously produced and released motion picture entitled "Finding Rin Tin Tin;"

   c. Shamrock shall retain as it sole and separate property the "Mail Rats" story idea but without the name, image or likeness of the "Rin Tin Tin" canine character; and

4. Payment of $1,000,000 to Shamrock:

   a. Upon the formation of NewCo, NewCo shall deliver to Shamrock a promissory note in the sum of $1 million secured by the RTT IP which debt shall be in first position and be due and payable as follows:

      i. $500,000, upon funding of the first RTT IP project which must occur not later than 2 years after the final resolution of the Central District Litigation in favor of the Parties (the "Initial Payment Period"); provided however, that NewCo can extend the 2-year period by one year upon the payment to Shamrock of the nonreturnable sum of $100,000, which shall be credited against the $500,000 payment to Shamrock (the "Extended Payment Period"); and provided further that NewCo can extend the Extended Payment Period by one additional year upon the payment to Shamrock of the nonreturnable sum of $100,000, of which $50,000 shall be credited against the $500,000 payment to Shamrock (the "Second Extended Payment Period"); and

      ii. $250,000 upon funding of the second RTT IP project; and

      iii. the final $250,000 upon funding of the third RTT IP project.

     Unless Shamrock, in Shamrock's sole discretion, consents in writing beforehand, NewCo cannot be sold prior to the time that Shamrock has been paid in full the $1,000,000 referenced herein.

   b. In the event that NewCo is prevented from proceeding with an RTT IP project because of a claim by someone other than Belleair, Daphne Hereford or Rin Tin Tin, Inc., or a WGA, DGA or SAG strike or other event or occurrence beyond the reasonable anticipation and/or control of Newco:

      i. The running of the Initial Payment Period, Extended Payment Period and Second Extended Payment Period, as the case may be, shall be suspended for the duration of the time during which NewCo is unable to proceed, provided, however, that this suspension shall not relieve NewCo of the obligations to pay to Shamrock the $100,000 payments as and when payable to Shamrock pursuant to subparagraph 4(a)(i) above.

3

    ii.  In the event the suspension extends beyond a date five years after the final resolution of the Central District Litigation in favor of the Parties, Shamrock will be entitled, at Shamrock's election in its sole discretion, to require that NewCo return to Shamrock for Shamrock's sole account and benefit, all RTT IP, including third party claims, that Shamrock contributed to NewCo.

  c.  In the event that Shamrock does not timely receive a payment as required under subparagraphs 4(a) and 4(b) above, then all of NewCo's RTT IT, including any and all third party claims, shall be irrevocably transferred to Shamrock, provided, however, that:

    i.  NewCo may retain and transfer to Rin or its designee, the Rescue Dog Movie script, provided, further, that any movie, television or other production thereafter based on the Rescue Dog Movie script shall not include or utilize the name, image or likeness of Rin Tin Tin; and

    ii.  Prior to the first day of production of any motion picture, television or other production based on RTT IT contributed to NewCo by Rin, Rin shall be an reimbursed Rin's legal fees and costs actually incurred and paid in connection with the prosecution of the Central District Litigation, not to exceed $400,000.

5.  **Film and Television Credits and Compensation.** The Parties will receive credits and compensation therefor on RTT-related film and TV productions as set forth below:

  a.  Miller, Jenson, LaScala and Tierney shall each receive Producer credits and compensation on all RTT-related film projects and Executive Producer credits and compensation on all RTT-related TV projects. The credit and compensation provided to Tierney under this paragraph shall not be less than the credit and compensation provided to Jeff Miller, Casey LaScala and Sasha Jenson on the RTT-related projects. Notwithstanding the foregoing, Producer compensation to Tierney on any motion picture or television project utilizing RTT IP cannot be less than 7% of the compensation paid to all producers on the project;

  b.  Kleven shall receive Executive Producer credit and compensation on all "Rin Tin Tin: K-9 Cop" and "The Rin Tin Tin Story" film projects and Producer credit and compensation on all other RTT-related film projects. Kleven shall receive Co-Executive Producer credit and compensation on all "Rin Tin Tin: K-9 Cop" and "The Rin Tin Tin Story" TV projects and Executive Producer credit and compensation on all other RTT-related TV projects;

  c.  Gernsbacher shall receive Co-Executive Producer credit and compensation on all Rin Tin Tin: K-9 Cop and The Rin Tin Tin Story film projects and Executive Producer credit and compensation on all other RTT-related film projects. Gernsbacher shall receive Associate-Executive Producer credit and compensation on all Rin Tin Tin: K-9 Cop and The Rin Tin Tin Story TV projects and Co-Executive Producer credit and compensation on all other RTT-related TV projects;

  d.  Kaye shall receive Executive Producer credit and compensation on the first RTT-related film production.

4

e. Producer Compensation: Producer compensation shall be determined as follows:

    (1) Films Productions: Executive Producer compensation shall be no less than one-half the amount of Producer compensation, and Co-Executive Producer compensation shall be no less than one-half the amount of Executive Producer compensation; and

    (2) TV Productions: Co-Executive Producer compensation shall be no less than one-half the amount of Executive Producer compensation and Associate Executive Producer compensation shall be no less than one-half the amount of Co-Executive Producer compensation.

(f) Except as to Tierney, whose compensation and credit shall be deemed fully vested, all compensation and credit provided from in this paragraph 5 are subject to studio-financier-broadcaster-distributor approval.

6. NewCo shall grant to Shamrock and Tierney a first-position security interest in the RTT IP securing full and faithful performance of the covenants and monetary obligations to Shamrock and Tierney set forth in sub-paragraphs 2.b. through 2.e., sub-paragraph 3.a. and paragraphs 4, 5 and 7 of this Deal Memo. Any notice of default must be in writing and set forth with specificity the nature of any breach or default. Within 20 days of receipt of that notice of default, NewCo shall respond in writing and (a) identify any breaches that are conceded by NewCo, in which event NewCo shall have 60 days from the date of the notice of default to cure the breaches, and/or (b) identify any breaches that are disputed by NewCo and stating with specificity the reasons the breaches are disputed, in which event Shamrock and/or Tierney shall have a right to commence an expedited arbitration in accordance with paragraph 9, below.

7. Legal Fees and Expenses.

a. Shamrock shall be entitled to reimbursement for its pre-March 1, 2014 actual cash out-of-pocket legal fees, costs and expenses incurred to perfect and protect all RTT IP trademarks and copyrights and/or in connection with the Central District Litigation, capped at $50,000, which reimbursement shall be recoupable as a Right's Fee from development budget of the first project utilizing the RTT IP;

b. Rin shall finance the post-March 1, 2014 legal fees, costs and expenses incurred to prosecute the Central District Litigation to conclusion and, along with Rin's previous actual cash out-of-pocket legal fees, costs and expenses incurred to perfect and protect all RTT IP trademarks and copyrights and/or in connection with the Central District Litigation, shall be recoupable as a Right's Fee from development budget after reimbursement and recoupment by Shamrock as set forth in paragraph 4.a., above.

8. Kleven represents and warrants that any and all RTT IP acquired under the name of Kleven Productions, Inc., was and is solely owned by Kleven and included with the RTT IP within that certain Confirmation of Assignment of Rights, that certain Joint Venture Agreement, that certain Amendment to Confirmation of Assignment of Rights and Joint Venture Agreement and related agreements by and between Kleven, Miller, Jerison

5

and LaScala (collectively, the "Kleven-Rin Inc. Agreements"), and included within the RTT IP to be contributed to NewCo under this Deal Memo.

9. Kleven shall be entitled to receive the first $1 million of NewCo's adjusted gross revenue derived from the exploitation of motion pictures or television projects, as well as from any and all ancillary rights, including merchandising, utilizing the RTT IP (other than revenue from any "Rin Tin Tin K-9 Cop" or "Rin Tin Tin Story" project), reduced by all legal and related expenditures incurred in connection with the claims asserted in the Central District Litigation and any other claims arising out of or inconsistent with Kleven's representations and warranties in the Kleven-Rin Inc. Agreements." As used in this subparagraph, "NewCo's adjusted gross revenue" means NewCo's adjusted gross receipts less all rights payments and other payments required under this Deal Memo, all out of pocket legal fees and costs incurred by NewCo in connection with the Central District Litigation and its resolution, and NewCo's cost of development, production, promotion and distribution, interest and premiums to investors, usual and ordinary conversion costs, checking costs, collection costs, residuals, trade dues, licenses, and taxes.

10. Any and all disputes arising out of the interpretation or enforcement of this Agreement shall be resolved by arbitration under the then-current rules of the American Arbitration Association. The arbitrator will have no jurisdiction however with respect to punitive damages. Prevailing party will be entitled to attorney's fees.

11. This Agreement shall be and is binding on the Parties' respective heirs, successors and assigns.

12. The Kleven v. Hereford Action and related TTAB Litigation: Shamrock shall dismiss its Complaint-in-Intervention with prejudice in favor of Kleven and Rin, Inc. and the Parties will cooperate in (a) the prosecution of Kleven and Rin, Inc.'s action against Daphne Hereford ("Hereford"), Rin Tin Tin, Inc. ("RTT Inc.") and Belleair Trading International, LLC ("Belleair"), (b) the defense of Hereford and RTT Inc.'s counter-claim against Kleven and Rin, Inc. and (c) the prosecution of Shamrock's complaint-in-intervention against Hereford, RTT Inc. and Belleair. In addition, the Parties will cooperate and assist each other in connection with the pending but stayed TTAB litigation between Kleven and Rin, Inc, on the one hand, and Hereford, RTT Inc. and Belleair, on the other hand. In this regard, Kleven and Rin, Inc. will endeavor to reach mutually acceptable arrangements for Peter Anderson's continuing or expanded involvement in the Central District Litigation.

13. Trademarks and Copyrights: The Parties will cooperate and assist each other in the application, registration, maintenance and protection of all trademarks and copyrights (domestic and foreign) as necessary to fully protect the exploitation of the RTT IP.

14. Kleven-Rin Inc. Agreements. To the extent the terms of that certain Confirmation of Assignment of Rights, that certain Joint Venture Agreement, that certain Amendment to Confirmation of Assignment of Rights and Joint Venture Agreement and related agreements by and between Kleven, Miller, Jenson and LaScala (collectively, the "Kleven-Rin Inc. Agreements"), differ in any respect from this Deal Memo, the terms of

6

this Deal Memo shall control and the Kleven-Rin Inc. Agreements are hereby amended with respect to and incorporate by reference the terms of this Deal Memo.

15. Kleven and Rin, Inc. each release and waive as to Shamrock and Tierney and their respective heirs, successors and assignees, any and all claims and rights in or as to Route 66 and Naked City, and Kleven and Rin, Inc. shall assign any and all such claims as to others to NewCo upon NewCo's formation.

16. The Parties agree that the terms and provisions of this Deal Memo are confidential and shall not be disclosed to any other person or entity, other than (a) to a Party's own lawyers or accountants; (b) as is necessary or appropriate to give effect to the Parties' agreements and undertakings in this Deal Memo; provided that the recipient agrees to maintain the confidentiality of the information received; or (c) in response to a subpoena or other discovery request, provided, however, that each Party agrees to notify the other Parties of the subpoena or other discovery request prior to any disclosure and in sufficient time to provide the other Parties an opportunity to seek a protective order or otherwise oppose or limit the disclosure.

17. The foregoing comprises an outline of the principal material terms of the Parties' agreement. The Parties intend to negotiate promptly, reasonably and in good faith all remaining necessary and ordinary terms and conditions to be memorialized in a final written agreement or series of agreements, all of which shall constitute the Parties' agreement with regard to the RTT IP and related matters.

SHAMROCK:
Shamrock Entertainment, Ltd.

By: _____
James Tierney

TIERNEY:

_____
James Tierney

KLEVEN:

_____
Max Kleven

7

RIN, INC.:

Rin, Inc.

By: _____
    Jeff Miller

By: _____
    Sasha Jenson

By: _____
    Casey LaScala


_____
Jeff Miller

_____
Sasha Jenson

_____
Casey LaScala


Approved and Accepted:

_____
David Gernsbacher


_____
Graham Kaye

8

**EXHIBIT "D"**



**EXHIBIT "E"**

CATHERINE R. LOMBARDO
ATTORNEY

LAW OFFICE OF
**CATHERINE R. LOMBARDO**
**A LAW CORPORATION**
269 W. BONITA AVENUE, SUITE C
CLAREMONT, CA 91711
EMAIL CATHERINE@THELOMBARDOLAWOFFICE.COM

TEL: (909)482-0384
FAX: (877)301-6139

January 30, 2015

David L. Gernsbacher
Law Office of David L. Gernsbacher
9107 Wilshire Boulevard, Suite 450
Beverly Hills, California 90210-5535

RE: NOTICE OF RESCISSION OF AGREEMENTS CIVIL CODE SECTION 1691(a)

Dear Mr. Gernsbacher:

Pursuant to Civil Code section 1691(a), you are hereby notified that effective immediately, Mr. Kleven is unilaterally rescinding the undated Rin Tin Deal Memorandum Agreement, the initial Confirmation of Assignment of Rights and Joint Venture Agreement (dated February 1, 2013) and its subsequent Amendment (dated February 27, 2013)[the "Agreements"].

The grounds for rescission of the Agreements, include, but are not limited to, the following:

" A contract is subject to unilateral rescission by a party whose consent to the contract (or the consent of another party jointly contracting with the rescinding party) was given by mistake or obtained through duress, fraud or undue influence exercised by or with the connivance of the party against whom rescission is sought or any other party to the contract jointly interested with the party against whom rescission is sought." Civil Code section 1689(b)(1).

Very truly yours,

LAW OFFICE OF
CATHERINE R. LOMBARDO

Catherine R. Lombardo
Attorney

CRL/tll