1
2
3
4
5
6
7
8                    UNITED STATES DISTRICT COURT
9                   CENTRAL DISTRICT OF CALIFORNIA

10  MAX KLEVEN et al.                    Case No. CV 13-02783-AB (AGRx)

11              Plaintiff,               **FINDINGS OF FACT AND
                                         CONCLUSIONS OF LAW**
12  v.

13  DAPHNE HEREFORD et al.
                                         **TRIAL DATE: DECEMBER 2, 2014**
14              Defendants.

15

16          This matter was tried before this Court, sitting without a jury, on December 2,

17  2014.  David Gernsbacher appeared on behalf of Plaintiffs Max Kleven and Rin, Inc.

18  Kirk Hallam appeared on behalf of Plaintiff-in-intervention Shamrock Entertainment,

19  Ltd.  Lora Friedemann, Cynthia Moyer, Paul Thomas, and Deborah Sirias appeared on

20  behalf of Defendant Belleair Trading International, LLC.

21          Having heard and reviewed the admissible evidence presented by the parties,

22  the arguments of counsel, and the supplemental briefing, and having considered the

23  demeanor and credibility of the witnesses and all papers and exhibits presented by the

24  parties for purposes of this trial, including admissions in various entries of Defaults

25  and in the Final Pretrial Conference Order, the Court makes the following findings of

26  fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil

27  Procedure.

28

### FINDINGS OF FACT[1]

**A.**   **The Parties**

1.     Plaintiffs Max Kleven and Rin, Inc. initiated the instant action in April 2013.  (Dkt. No. 1.)  Plaintiff-in-intervention Shamrock Entertainment, Ltd. ("Shamrock") intervened in this case in December 2013.  (Dkt. No. 41.)  Max Kleven, Rin, Inc., and Shamrock, when referred to collectively, shall be referred to herein after as "Plaintiffs."

2.     Defendants Daphne Hereford (*pro se* defendant) and Rin Tin Tin, Inc. ("RTTI") (unrepresented corporate defendant) have had default entered against them. (Dkt. Nos. 1, 11, 47, 49, 106-107.)  Defendant Belleair Trading International, LLC ("Belleair") is the only actively litigating defendant in this case.

**B.**   **Instant and Prior Lawsuits**

3.     The instant lawsuit is the latest in a series of lawsuits that have been filed by the parties and their predecessors relating to the Rin Tin Tin trademark.

4.     *Herbert B. Leonard v. Daphne Hereford*, Case No. 2:94-cv-02281-CBM (JRx), was filed in April 1994 in federal district court for the Central District of California.  The case was resolved in 1996.  (*See infra* Factual Findings Nos. 28-36.)

5.     *Max Kleven v. Daphne Hereford*, 2:06-cv-0785-CBM (JTLx), was filed in February 2006 in federal district court for the Central District of California and resolved the same year.  (*See infra* Factual Findings Nos. 53-59.)

---

[1] Following the bench trial, both parties filed and lodged proposed findings of fact and conclusions of law.  (Dkt. Nos 205-206.)  Neither Plaintiffs nor Belleair filed objections to the opposing parties' proposed findings of fact and conclusions of law, as permitted by the Central District of California Local Rule 52-7.  The Court has reviewed the proposed factual findings and conclusions of law submitted by all parties.  To the extent any party submitted a proposed factual finding inconsistent with this Order, the Court deemed that proposal to be unsupported and/or inconsistent with the Court's review and understanding of the evidence.

6.     *Rin Tin Tin, Inc. et al. v. First Look Studios, Inc.*, Case No. 08-cv-02853, was filed in September 2008 in federal district court for the Southern District of Texas.  The case was resolved in 2009.  (*See infra* Factual Finding Nos. 60-66.)

7.     In the instant lawsuit, Plaintiffs assert various claims against Defendant Belleair.  The December 2, 2014 trial and this Order addresses only Plaintiffs' claims for cancellation of trademark registrations that were initially obtained by Hereford and RTTI and that are currently owned by Belleair, namely:

a.     "RIN TIN TIN" Mark (stylized), Reg. No. 1763135 ("Registration '135"), registered to Hereford on April 6, 1993, International Class 031 for live German Shepherd puppies.  (Trial Exs. 74, 111.)

b.     "RIN TIN TIN CANINE AMBASSADOR CLUB," Reg. No. 2384745 ("Registration '745"), registered to RTTI on June 20, 2000, International Class 041 for the promotion of responsible dog ownership through programs presented to schools and groups.  (Trial Ex. 75, 114.)

c.     "RIN TIN TIN," Reg. No. 2538312 ("Registration '312"), registered to Hereford on February 12, 2002, International Class 041 for mail order fan club service providing materials promoting the breeding, training, raising, and showing of authentic Rin Tin Tin German Shepherd dog lineage.  (Trial Ex. 76.)

d.     "RIN TIN TIN," Reg. No. 2969852 ("Registration '852"), registered to Hereford on July 19, 2005, International Class 016 for printed publications, namely, magazines, pamphlets, books, and comic books about German Shepherd dogs; activity and coloring books, posters, stickers, business cards, and cards in the nature of greeting cards and trading cards; International Class 028 for playing cards; and International Class 41 for entertainment services in the nature of an ongoing television series in the field of variety and motion pictures featuring a German Shepherd dog as a live or animated character.  (Trial Exs. 77, 113.)

3.

1          e.    "RIN TIN TIN," Reg. No. 3111161 ("Registration '161"),

2    registered to Hereford on July 4, 2006, International Class 016 for printed

3    publications, namely children's books.[2]  (Trial Ex. 78, 108.)

4          f.    "RIN TIN TIN," Reg. No. 3215700 ("Registration '700"),

5    registered to Hereford on March 6, 2007, International Class 018 for dog clothing, dog

6    collars, dog leashes, dog shoes, handbags, purses, and tote bags; International Class

7    021 for bowls, brushes for pets, cups, mugs, pet brushes, and pet feeding brushes;

8    International Class 025 for caps, hats, jackets, muffs, scarves, slippers, sweat shirts,

9    and t-shirts; and International Class 028 for board games, dog toys, plush toys,

10   puzzles, and soft sculpture plush toys.  (Trial Ex. 79.)

11         g.    "RIN TIN TIN," Reg. No. 3380788 ("Registration '788"),

12   registered to Hereford on February 12, 2008, International Class 031 for dog food.

13   (Trial Ex. 80.)

14         h.    "RIN TIN TIN," Reg. No. 3582436 ("Registration '436"),

15   registered to Hereford on March 3, 2009, International Class 031 for live German

16   Shepherd dogs of Rin Tin Tin lineage; and International Class 041 for animal

17   exhibitions and live animal performances featuring a German Shepherd dog.  (Trial

18   Exs. 81, 109.)

19         i.    "RIN TIN TIN," Reg. No. 4263551 ("Registration '551"),

20   registered to Hereford on December 25, 2012, International Class 041 for

21   entertainment services in the field of motion pictures featuring a German Shepherd

22   dog.  (Trial Exs. 83, 110.)

23

24

25        [2] Registration '161 was granted on July 19, 2005.  Prior to the 2006 Settlement

26   Agreement, *see infra* Factual Finding Nos. 55-59, Registration '161 was still pending
     as U.S. trademark registration application No. 78393500 (Application '500).  For ease

27   of reference, Registration '161 will be referred to as Registration '161, even in the
     context of when it was still pending as Application '500.

28

8.     Of the nine registrations, seven had been registered for more than five years at the time this lawsuit was filed: Registrations '135, '745, '312, '852, '161, '700, and '788.

**C.     Rin Tin Tin – The Dog**

9.     Rin Tin Tin was a German Shepherd dog that lived from 1918 to 1932. (Trial Ex. 50 at 1.)  Rin Tin Tin's owner was Lee Duncan, an American soldier who found the dog in France during World War 1.  (*Id.*; Trial Tr. 100:23-101:2 (J. Tierney).)  Duncan named the dog "Rin Tin Tin" after a French good-luck charm. (Trial Tr. at 101:3-5 (J. Tierney).)

10.     After the war, Duncan brought his dog to the United States where, under Duncan's training and supervision, Rin Tin Tin appeared in movies for Warner Bros. starting in the 1920s.  (Trial Tr. at 101:10-15 (J. Tierney).)  Rin Tin Tin became well known throughout the United States after he starred in these motion pictures.  (Trial Ex. 50 at 2.)  Plaintiffs do not claim any rights in the Rin Tin Tin movies from the 1920s and 1930s.  (Trial Tr. at 102:6-103:3 (J. Tierney).)

**D.     Herbert Leonard and Herbert B. Leonard Productions, Inc.**

11.     Herbert B. Leonard was a television and motion picture producer, writer, and director who produced, among other things, the television series *Route 66* and *Naked City*.  (Dkt. No. 150-1 ("Tierney Trial Decl."), ¶ 4; Trial Ex. 68.)

12.     On March 21, 1954, Duncan entered into a written agreement with Herbert B. Leonard Productions, Inc. (Leonard Productions), the production company owned by Leonard.  (Trial Ex. 1.)  The agreement provides:

a.  Duncan has the "sole and exclusive ownership of and right to use the name and title RIN TIN TIN, which was the name of the former canine motion picture performer and is the name of certain other dogs owned by [Duncan]; and [Duncan has] the sole and exclusive ownership of the character and likeness of RIN TIN TIN; and the name, title, character and likeness of RIN TIN TIN are herein for convenience collectively referred to as the 'tradename.'"

     b.  Duncan was "the sole and exclusive owner of a German Shepherd dog named RIN TIN TIN and other dogs of similar appearance, which dogs have been and will be trained by [Duncan] for motion picture work, and these dogs as well as other German Shepherd dogs hereinafter owned by [Duncan] are herein for convenience collectively referred to as RIN TIN TIN."

     c.  Duncan then licensed to Leonard Productions the exclusive rights to use the trade name and character Rin Tin Tin in connection with the production, distribution, and exploitation of television shows.

     13.    On March 24, 1955, Duncan and Leonard Productions entered into another written agreement, wherein Duncan assigned his rights to tell the "Rin Tin Tin Story," a literary work written by James W. English, and Duncan's life story rights. The March 24, 1995 agreement was amended by written agreements dated October 3, 1955 and March 1, 1957.  (Tierney Trial Decl. ¶ 5(c); Trial Exs. 2-4.)

     14.    The March 24, 1955 agreement was followed by a copyright assignment in "The Story of Rin Tin Tin" from English to Leonard Productions, which was renewed on September 30, 1955, and an assignment of those rights from Leonard Productions to Leonard individually on August 30, 1962.  (Tierney Trial Decl., ¶ 5(d-e); Trial Exs. 5-7.)

**E.    "The Adventures of Rin Tin Tin"**

     15.    Beginning in the 1950s, Leonard and Leonard Productions created and produced 164 half-hour black and white television episodes of the ABC Television Series *The Adventures of Rin Tin Tin* that featured the fictional canine character Rin Tin Tin.  (Tierney Trial Decl. ¶¶ 4, 7; Trial Exs. 53, 57.)

     16.    Dog food and dog treats products endorsed or sponsored by Rin Tin Tin during the 1950s included Nabisco's Milk Bone Dog Biscuits, Ken-L-Ration, and Gravy Train.  (Tierney Trial Decl., 10; Dkt. No 150-5 ("Miller Trial Decl."), ¶ 12.)

     17.    During the 1970s, Leonard updated *The Adventures of Rin Tin Tin* television series by filming and adding contemporary "wraparound" scenes in color to

introduce and close each episode so that original cast members would appear in a rustic setting and explain some aspect of life in the 1880s at Fort Apache, Arizona to a group of multicultural children.  This updated version of the series was syndicated with *The Mickey Mouse Club* television series.  (Tierney Trial Decl. ¶¶ 7-8.)

18.    During the mid-1990s, *The Adventures of Rin Tin Tin* television series, which was originally filmed in black and white, was colorized and currently remains in distribution.  (Tierney Trial Decl., ¶ 9.)

19.    After Duncan's death, and pursuant to three written agreements each dated April 4, 1978, Duncan's widow, Eva Duncan transferred all remaining Rin Tin Tin rights to Leonard, including the right to produce and exploit motion pictures, television shows, and books, using the name, title, likeness, and image of the motion picture and television character Rin Tin Tin, including associated merchandising. (Tierney Trial Decl. ¶ 6; Trial Exs. 8-10, 19 at 5:4-6.)

**F.    "Rin Tin Tin K-9 Cop"**

20.    Between 1988 and 1992, Leonard created and produced 106 episodes of a new Rin Tin Tin television series entitled *Rin Tin Tin K-9 Cop*, which was broadcast on different television stations in the United States, including The Family Channel. (Tierney Trial Decl. ¶ 10.)

21.    Commercial sponsors of *Rin Tin Tin K-9 Cop* included Ralston Purina, a manufacturer of dog food and dog treats.  (Tierney Trial Decl. ¶ 10.)

22.    The *Rin Tin Tin K-9 Cop* television series has been in distribution since its original release.  The series is available on DVD – pursuant to a licensing distribution agreement by Shamrock – and it is now being distributed throughout the world exclusively by CBS Television Distribution.  (Tierney Decl., ¶ 11-12; Trial Tr. 106:14-20 (J. Tierney); Trial Exs. 56, 104.)

**G.    Disney's Option To Make a Rin Tin Tin Motion Picture**

23.    In 1994, Walt Disney Pictures ("Disney") and Leonard entered into an option agreement, whereby Disney paid Leonard $100,000 for the option to license the right to make a Rin Tin Tin motion picture based on a script with the working title *Rin Tin Tin and the River of Gold*, which featured the struggles and adventures of a young boy who travels across the United States during the gold rush days searching for his father with his companion and protector, Rin Tin Tin.  (Tierney Trial Decl. ¶ 13; Trial Ex. 14.)  Were Disney to exercise the option, the initial purchase price was set at $1,000,000 and included other financial incentives for Leonard.

24.    During discussions surrounding the option agreement, Disney representatives expressed their attraction to the positive and heroic character traits of the Rin Tin Tin character, and their past successful association with Leonard on the television syndication package of *The Mickey Mouse Club* and *The Adventures of Rin Tin Tin*.  (Tierney Trial Decl. ¶ 13.)

25.    Sometime in 1994, Leonard saw an advertisement that Hereford had placed in either the Hollywood Reporter or Daily Variety that offered to license rights in Rin Tin Tin, including motion picture and television rights.  (Tierney Trial Decl. ¶ 16.)

26.    As of 1994, Hereford had only one trademark registration, Registration '135, which was issued to her in her individual capacity on April 6, 1993 for live German Shepherd puppies.  (Trial Exs. 74, 111.)

27.    Upon learning that Hereford was claiming ownership in the Rin Tin Tin trademark, Disney opted not to exercise its option and shelved the *Rin Tin Tin and the River of Gold* project.  (Tierney Trial Decl. ¶ 16.)

**H.    Leonard's 1994 Lawsuit Against Hereford and Rin Tin Tin, Inc.**

28.    Disney's decision not to exercise its option was financially devastating to Leonard, who was otherwise broke.  Beginning in 1994, James Tierney began loaning Leonard a minimum of $10,000 per month to cover his expenses.  Tierney's law firm

1   had represented Leonard in various intellectual property matters, and the two had

2   become good friends.  Plaintiff Max Kleven and director Irvin Kershner, who was best

3   known for directing *Star Wars: the Empire Strikes Back*, were also good friends with

4   Leonard and often loaned him substantial sums of money.  (Tierney Decl., ¶¶ 17-18.)

5       29.     In 1994, Tierney, on behalf of Leonard, filed an action against Hereford

6   and RTTI in federal district court in the Central District of California, *Herbert B.*

7   *Leonard v. Daphne Hereford et al*, Case No. 94-cv-0221-CBM, for damages and

8   injunctive relief based on Hereford's alleged violation of Leonard's trademark rights

9   in the name, character, and title Rin Tin Tin (herein after referred to as the "1994

10  Lawsuit").

11      30.     The parties engaged in extensive discovery as part of the 1994 Lawsuit.

12  During the course of discovery, Tierney (representing Leonard) learned that

13  Hereford's claimed rights in the character Rin Tin Tin arose from the purchase of a

14  descendant of Rin Tin Tin IV by her grandmother from Lee Duncan in the late 1940s.

15  Duncan bred and sold or gave away hundreds of German Shepherd dogs.  Rin Tin Tin

16  IV appeared infrequently in *The Adventures of Rin Tin Tin*, but the dog was not a

17  descendant of the original Rin Tin Tin.  (Tierney Trial Decl. ¶ 20.)

18      31.     After discovery was complete, Leonard filed a motion for summary

19  judgment.  On January 8, 1996, the day of the hearing on Leonard's motion, the

20  parties settled the case, and the material terms of the stipulated settlement agreement

21  ("1996 Settlement Agreement") were put on the record.  (Tierney Trial Decl. ¶ 21;

22  Trial Ex. 19.)

23      32.     The following are six key provisions of the 1996 Settlement Agreement

24  stipulation, which were read in open court and agreed to by the parties (Trial Ex. 19 at

25  4:17-5:15):

26          a.      Leonard has common law trademark rights in Rin Tin Tin.

27          b.      Hereford has bred, raised, and trained, and sold German Shepherd

28  dogs descended from Rin Tin Tin IV since at least 1977.

9.

c.    Rin Tin Tin IV is not a genetic descendant of the original Rin Tin Tin brought back from Europe by Duncan.

d.    Duncan assigned the rights in the Rin Tin Tin trademark and character to Leonard in the 1950s.

e.    Leonard acquired the all residual rights from Eva Duncan (Duncan's widow) in the Rin Tin Tin trademark and character pursuant to agreements dated April 4, 1978.

f.    So long as Hereford's use of the Rin Tin Tin mark is limited to identifying her dogs as descendants of Rin Tin Tin IV in connection with the breeding, raising, training, and selling of German Shepherd dogs, such use is not likely to cause confusion with Leonard's use of the Rin Tin Tin trademark and character.

33.    Upon the reading of these six stipulated terms in open court, the district court accepted the stipulation and adopted the stipulated terms as the court's actual findings.  (Trial. Ex. 19 at 5:16-22.)

34.    The parties also stipulated and agreed to additional terms as part of a separate settlement agreement, which the parties intended to reduce to writing following the January 8, 1996 hearing.  The terms of the parties' separate agreement were as follows (Trial Ex. 19 at 6:3-16, 7:5-8, 15:16-18:3, 18:16-23):

a.    Leonard (the plaintiff in the 1994 Lawsuit) dismisses the complaint with prejudice.

b.    Hereford (the counter-claimant in the 1994 Lawsuit) dismisses the counter claims with prejudice.

c.    Hereford assigns the Rin Tin Tin fan club service trademark in international class 042 to Leonard.

d.    Leonard grants Hereford a royalty-free, non-exclusive license in perpetuity for use of the Rin Tin Tin trademark in connection with fan club services,

1    provided that Hereford identifies any such fan club as being under license from

2    Leonard.

3            e.      Hereford consents to a permanent injunction as follows: (A)

4    Hereford shall not state or imply that her dogs are affiliated with any Rin Tin Tin

5    television shows or movies without written permission of Leonard, other than to state

6    that Rin Tin Tin IV was one of the four dog actors in the Rin Tin Tin series in the

7    1950s; (B) Hereford may not represent that any dogs bred, raised, trained, or sold by

8    her were used in any Rin Tin Tin television show or Rin Tin Tin movie, unless it

9    becomes true in the future; and (C) Hereford may not use the Rin Tin Tin mark,

10   except with the Roman Numeral IV, to describe her dogs as line-bred descendants of

11   Rin Tin Tin IV; acceptable uses by Hereford are "Rin Tin Tin® IV German Shepherd

12   dogs, line-bred descendants of Rin Tin Tin IV" or "Rin Tin Tin® under license from

13   Herbert B. Leonard."

14           f.       Hereford consents that Leonard may name dog actors as Rin Tin

15   Tin for any and all entertainment vehicles, including personal appearances, so long as

16   he does not attempt to sell the live German Shepherd dogs as "Rin Tin Tin."

17           g.      Any and all cross-licenses between Hereford and Leonard are in

18   perpetuity and apply to all heirs and assigns, and all royalty free.

19       35.    The parties stipulated and agreed to these additional terms in open court,

20   and the district court accepted the stipulation.  Hereford, who was present at the

21   January 8, 1996 hearing, stated in open court that she had an understanding of the

22   terms and conditions of the settlement that had been reached and put on the record.

23   (Trial Ex. 19 at 19:4-9, 30:9-12.)

24       36.    Following the January 8, 1996 hearing, the parties never reduced their

25   separate settlement agreement to writing because Hereford thought it was

26   unnecessary.  During a telephone call between the two parties, Hereford assured

27   Tierney (acting as Leonard's attorney) that "all she wanted to do was breed and sell

28   her dogs, that she did not want to pay money to attorneys to review formal

1 documentation, and that [Tierney] had her word she would live up to the terms of the

2 Settlement Agreement as agreed in court."  In light of this, Leonard opted not to

3 expend the time and expense in reducing the parties' separate settlement agreement to

4 writing.  (Tierney Trial Decl., ¶¶ 29-30.)

5 **I.    Shamrock's Acquisition of Rights in Rin Tin Tin**

6        37.    Plaintiff-in-intervention Shamrock is a California corporation wholly

7 owned by Tierney, who in 1973 began representing Leonard and his various

8 companies while practicing law at a private law firm.  (Tierney Trial Decl., ¶¶ 3, 17.)

9        38.    By 1997, Leonard owed Tierney over $1.5 million as a result of

10 Tierney's personal loans to Leonard and Leonard's unpaid legal fees to Tierney's law

11 firm.  (Tierney Trial Decl. ¶¶ 32-34.)

12       39.    In 2000, Leonard and Tierney reached a settlement agreement with

13 respect to Leonard's outstanding loans and unpaid legal fees to Tierney.  (Tierney

14 Trial Decl. ¶ 35; Trial Ex. 30.)

15       40.    As part of their settlement agreement, Leonard executed a Short Form

16 Quitclaim of Rights ("Quitclaim") in the *Rin Tin Tin K-9 Cop* television series, a copy

17 of which was recorded with the U.S. Copyright Office on March 29, 2006.  (Tierney

18 Trial Decl. ¶ 36; Trial Ex. 31.)  The Quitclaim provides that Leonard quitclaimed,

19 transferred, and assigned to Tierney all Leonard's rights, title, and interest in and to:

20       (i) "K-9 Cop" a/k/a "Katts and Dog" television series, (ii) any and all

21       derivative works based thereon (including without limitation, any and all

22       treatments and screenplays based thereon and any and all motion picture

23       projects or versions thereof) and (iii) all copyrights, copyrightable

24       interests and all contract rights and benefits related to any of the

25       foregoing, whatsoever, and without reservation (collectively, the

26       'Transferred Rights"), including without limitation, the sole and

27       exclusive theatrical motion picture rights, and the television motion

28       picture and television rights relating thereto, the right to produce,

1    distribute and otherwise exploit such Transferred Rights and any

2    derivative works based thereon in all media now known or hereafter

3    devised, in perpetuity and throughout the Universe, and all copyrights

4    and copyrightable interests relating to the foregoing . . . .

5  (Trial Ex. 31.)

6        41.    Leonard confirmed in writing to CBS Broadcast International that

7  Tierney had succeeded in Leonard's rights in the *Rin Tin Tin K-9 Cop* television series

8  (Tierney Trial Decl., ¶ 37, Trial Ex. 33); and Tierney's rights in the *Rin Tin Tin K-9*

9  *Cop* television series were again confirmed in a June 2003 agreement with

10 International Family Entertainment, Inc. ("IFE"), the licensed broadcaster of *Rin Tin*

11 *Tin K-9 Cop* television series on the Family Channel.  (Tierney Trial Decl., ¶ 38, Trial

12 Ex. 36.)

13       42.    Also in 1994, Leonard owed a separate $550,000 debt to Finance

14 Company, N.V. ("Finaco").  As collateral, Finaco and Tierney (before Tierney settled

15 Leonard's debt to him) obtained security interests on Leonard's entertainment assets.

16 (Tierney Trial Decl., ¶¶ 32-33; Trial Ex. 16.)  The entertainment assets over which

17 Finaco and Tierney had security interests included revenue from programs owned by

18 Leonard, including *Rin Tin Tin K-9 Cop* and *The Adventures of Rin Tin Tin*.  (Trial

19 Ex. 16.)  A copy of the written security agreement between Leonard, Finaco, and

20 Tierney was recorded with the U.S. Copyright Office in 1997.  (Tierney Trial Decl.,

21 ¶ 33; Trial Ex. 16.)

22       43.    In 1997, in partial satisfaction of Leonard's debt to Fianco, Leonard

23 assigned to Fianco the rights to make two full-length motion pictures based upon *The*

24 *Rin Tin Tin Story* by James English, including merchandising rights, and rights in and

25 to the book entitled *The Rin Tin Tin Story* by James English (*see supra* Factual

26 Finding 13).  (Tierney Trial Decl., ¶ 39; Exs. 21-23.)

27

28

44.     As part of the December 2000 settlement agreement between Leonard and Tierney (*see supra*, Factual Finding No. 39), Leonard assigned to Tierney the *Rin Tin Tin Story* rights he had not assigned to Fianco.  (Tierney Trial Decl., ¶ 39.)

45.     In November 2002, Fianco assigned to Tierney the *Rin Tin Tin Story* rights it had acquired from Leonard.  (Tierney Trial Decl., ¶ 39; Trial Ex. 34.)

46.     In January 2004, Tierney assigned to Shamrock (Tierney's wholly-owned corporation) the rights Tierney had received in the *Rin Tin Tin K-9 Cop* television series and *The Rin Tin Tin Story*.  (Tierney Trial Decl., ¶ 40; Trial Ex. 37.)  As a result of the foregoing, Shamrock acquired ownership of all rights in the *Rin Tin Tin K-9 Cop* television series and *The Rin Tin Tin Story*.

**J.     Kleven's Acquisition of Rights in Rin Tin Tin**

47.     As mentioned above, Kleven also loaned substantial sums of money to Leonard after Disney's decision not to exercise its option on the *Rin Tin Tin and the River of Gold* project.  (*See supra* Factual Finding No. 27.)

48.     In 2005, in satisfaction of his debt to Kleven and pursuant to a written agreement dated December 10, 2005, Leonard and his companies assigned to Kleven and TRG Management, LLC ("TRG"), all rights, including adaption and merchandising rights, in *The Adventures of Rin Tin Tin* television series.  (Miller Trial Decl., ¶ 9; Trial Ex. 65; Trial Tr. at 146:13 – 148:1 (J. Miller).)

49.     Sometime prior to March 2008, Kleven was "shopping around" a script for a movie about Rin Tin Tin and had made certain agreements with various individuals and companies, *i.e.*, TRG Management, RTT Movie One LLC, Rodney Rosa, and Ronnie Belarmino.  There was a falling out as between these individuals and companies, on the one hand, and Max Kleven and his production company, on the other hand.  To resolve any disputes between them, in March 2008, the parties entered into an Intellectual Property Assignment Agreement, whereby Max Kleven, through his company Kleven Productions, Inc. ("Kleven Productions"), received all rights (including the copyright, trademark rights, and all other rights, title, and interest) in

14.

Rin Tin Tin that he previously received from Leonard, and that he should have always had, namely:

> any manifestations of the character "Rin Tin Tin" in any manner or
> context whatsoever, . . . [including but not limited to]:
> (a) the mark "Rin Tin Tin,"
> (b) the words, name and character Rin Tin Tin,
> (c) the television series "The Adventures of Rin Tin Tin,"'
> (d) motion picture(s) or television program(s) based on Rin Tin Tin,
> (e) the good will associated with Rin Tin Tin,
> (g) the right to produce motion picture(s) or television program(s) based
> on Rin Tin Tin,
> (h) all other rights, title, and interest in and to the goodwill and all other
> intangible assets associated with Rin Tin Tin . . .,
> (i) all Internet Sites and Domain Names associated, related, concerning or
> referring in any manner to Rin Tin Tin.

(Trial Ex. 73; Trial Tr. at 151:9 – 152:14.)

## K. <u>Hereford and RTTI's Applications for Trademark Registrations After The 1996 Settlement Agreement</u>

50.     Again, as part of the 1996 Settlement Agreement, Hereford and RTTI stipulated that Leonard had total and unqualified trademark and merchandising rights in the Rin Tin Tin Mark, subject to Hereford's narrow right to breed, advertise, and sell German Shepherd puppies as linear descendants of Rin Tin Tin IV, when truthful. (See *supra* Factual Finding Nos. 32-34.)  Despite the stipulation and court findings, beginning in 2000, Hereford obtained the following trademark registrations:

a.     "Rin Tin Tin" Registration '745 (2000) for the promotion of responsible dog ownership through programs presented to schools and groups.  (Trial Ex. 75.)

b.      "Rin Tin Tin" Registration '312 (2002) for mail order fan club service providing materials promoting the breeding, training, raising, and showing of authentic Rin Tin Tin German Shepherd dog lineage.  (Trial Ex. 76.)

c.      "Rin Tin Tin" Registration '852 (2005) for printed publications, namely magazines, pamphlets, books, and comic books about German Shepherd dogs; activity and coloring books, posters, stickers, business cards, and trading cards; playing cards; and entertainment services in the nature of an ongoing television series in the field of variety and motion pictures featuring a German Shepherd dog as a live or animated character.  (Trial Ex. 77.)

d.      "Rin Tin Tin" Registration '161 (2006) for printed publications, namely children's books.  (Trial Ex. 78.)

51.    In each of the trademark registration applications for Registrations '745, '312, '852, and '161, Hereford provided a sworn declaration as to the following (*see* Trial Exs. 75-78):

a.      Hereford believed she was the owner of the "Rin Tin Tin" trademarks sought to be registered, and that she was entitled to use the marks in commerce;

b.      To the best of Hereford's knowledge and belief, "no other person, firm, corporation or association has the right to use the mark in commerce";

c.      That Hereford's use of the "Rin Tin Tin" marks were not likely to cause confusion;

d.      That all statements based on Hereford's knowledge are true; and

e.      That all statements based on Hereford's information and belief are believed to be true.

52.    In her sworn declarations, Hereford did not disclose to the USPTO the court findings and stipulations related to the 1996 Settlement Agreement, thus concealing that she had previously admitted that Leonard owned common law trademark rights to the Rin Tin Tin mark; that she admitted her rights were limited to

16.

the breeding, raising, training, and selling of German Shepherd dogs descended from

Rin Tin Tin IV, which is not a descendant of the original Rin Tin Tin brought back

from Europe by Duncan; and that she had acknowledged the prior uses of the Rin Tin

Tin mark by Leonard, his predecessors, and his successors-in-interest, including uses

for movies, television, and merchandising.

**L.**   **Kleven's 2006 Lawsuit Against Hereford and Rin Tin Tin, Inc.**

53.   Upon learning of Hereford's Registration '852 for "[e]ntertainment

services in the nature of an ongoing television series in the field of variety and motion

pictures featuring a German Shepherd dog as a live or animated character," Kleven

and Leonard filed an action against Hereford and RTTI in federal district court in the

Central District of California, *Kleven et al. v. Daphne Hereford, et al.*, Case No. 06-

cv-785-CBM ("2006 Lawsuit"), which included a cause of action for cancellation of

Registrations '135, '745, '312, '852, and '161.  (Trial Tr. at 118:5-119:1 (J. Tierney).)

54.   The parties resolved the 2006 Lawsuit pursuant to a written Settlement

Agreement, dated May 1, 2006 ("2006 Settlement Agreement").  (Trial Ex. 98.)

55.   The 2006 Settlement Agreement provided, among other things:

a.   The parties agreed to dismiss their respective lawsuits with

prejudice (2006 Settlement Agreement section 2.1).

b.   Hereford agreed to assign to Kleven, Leonard, and Kleven

Productions all rights to Registration '852 for the Rin Tin Tin mark in International

Class 042 for use of the mark in "motion pictures, television programs or series, or

any newly derived processes that provide a dynamic visual image, as well as the

exclusive right to the mark Rin Tin Tin for any products or services that derive from

said motion pictures, television programs or series, or any newly derived processes"

(2006 Settlement Agreement section 2.2.1).

c.   "[A]s to licenses for use in motion pictures, television programs or

series, or any newly derived processes that provide a dynamic visual image made by

Hereford prior to April 24, 2006, all of which have been disclosed by Hereford and

17.

1  which are delineated in Appendix "1" herein [namely, Todd Moore, Susan Orlean,

2  Darryl Rehr, MPH Entertainment, and Kendra Waters], those licenses remain valid

3  and enforceable by Hereford, and all payments due thereunder shall be entirely

4  Hereford's own property" (2006 Settlement Agreement section 2.2.2).

5         d.     "Hereford may exercise any other intellectual property rights

6  owned by Hereford as to the use of the mark Rin Tin Tin against anyone, other than

7  those relating to motion pictures, television, or other video products, or other products

8  related thereto, produced by Kleven [including Leonard and Kleven Productions] or

9  its successors, assigns, and licensees. . . .  In the event that both Hereford and Kleven

10  [including Leonard and Kleven Productions] desire to preclude the production or

11  distribution of any motion picture or television series, by way of example James

12  Tierney's Story of Rin Tin Tin, they may cooperate but each party shall bear its own

13  costs and attorneys' fees" (2006 Settlement Agreement section 2.2.3).

14         e.     "With regard to any products or services [that] derive from said

15  motion pictures, television programs or series, or any newly derived processes, thus

16  including, for example, stuffed animals, books, costumes, video and computer games,

17  song books and all other manner of toys for the relevant age group, Hereford shall be

18  entitled to ten percent (10%) of the net proceeds received by Kleven [including

19  Leonard and Kleven Productions]" (2006 Settlement Agreement section 2.2.4).

20         f.     The parties agreed that the 2006 Settlement Agreement "contains

21  all the promises which have been made in connection with this settlement.  There are

22  no hidden terms, and everything that is important to this release is specified in writing

23  herein [in the text of the 2006 Settlement Agreement].  The matters set forth herein [in

24  the 2006 Settlement Agreement] shall be binding upon and inure to the benefit of the

25  executors, administrators, personal representatives, heirs, successors and assigns of

26  each party" (2006 Settlement Agreement section 2.4).

27         g.     The parties agreed "not to sue one another hereafter for any reason

28  other than a breach of this Agreement [the 2006 Settlement Agreement], which is

18.

1  intended as a full and complete final settlement of any and all disputes, asserted or

2  not, known or unknown, now existing or hereafter arising" (2006 Settlement

3  Agreement 2.9).

4       56.    Prior the execution of the 2006 Settlement Agreement, Kleven and his

5  attorney advised Tierney that the purpose and effect of the agreement was to confirm

6  Kleven and Leonard's rights to secure the transfer of the motion picture and television

7  trademark from Hereford and confirm Kleven's merchandising rights (as obtained

8  from Leonard), to allow Hereford and RTTI to honor any existing contracts, and to

9  allow Hereford to exercise her existing Rin Tin Tin intellectual property rights against

10  third parties, that ironically included, pursuant to a demand by Hereford, the right to

11  bring a lawsuit against Tierney based on his forthcoming *Finding Rin Tin Tin* motion

12  picture based on the life story of Rin Tin Tin because it featured a German Shepherd

13  dog.  To aid in settling the lawsuit, Tierney consented to this arrangement.  (Trial Tr.

14  at 119:10 – 120:22, 139:17 – 142:7, 143:12-24 (J. Tierney).)

15       57.    As part of the 2006 Settlement Agreement, Hereford retained

16  Registration '852 in International Class 016 (printed publications, namely, magazines,

17  pamphlets, books, and comic books about German Shepherd dogs; activity and

18  coloring books, posters, stickers, business cards, and cards in the nature of greeting

19  cards and trading cards) and International Class 028 (playing cards), as well as

20  Registrations '135, '745, '312, '042, and '161, to the extent those Registrations did

21  not interfere with Kleven, Kleven Productions, and Leonard's Registration '852 for

22  motion pictures, television programs or series, and associated derived processes and

23  products and services.

24       58.    Tierney, though not a party to the 2006 Lawsuit or 2006 Settlement

25  Agreement, was aware of the settlement agreement and its terms.  (Trial Tr. at 119:20

26  – 120:4.)  Tierney was also aware that Hereford obtained additional Rin Tin Tin

27  trademark registrations after the 1996 Settlement Agreement but before July 2004.

28  (Trial Tr. at 112:8-14 (J. Tierney).)

59.     Belleair is not a party to the 2006 Settlement Agreement, and neither the March 22, 2013 nor August 1, 2013 Agreement/Bill of Sales (*see infra* Factual Finding Nos. 80-85, 93-101) assigned Belleair any rights under the 2006 Settlement Agreement.  (Trial Exs. 94, 95, 98.)  Erickson (Belleair's only witness at trial) offered no testimony that he or Belleair had any knowledge of or relied upon the existence of the 2006 Settlement Agreement at any relevant time period.

**M.      Shamrock's Authorization of a Movie Based on *The Rin Tin Tin Story* and Hereford's 2008 Lawsuit Against the Film**

60.     Shamrock authorized the production and distributions of a motion picture based on the life story adaption rights Shamrock owned in *The Rin Tin Tin Story*. Tierney received a writing credit and served as an executive producer, and he retained consultation rights regarding script changes and the production and distribution of the motion picture.  (Tierney Trial Decl., ¶¶ 43, 45; Trial Ex. 38.)

61.     The film was produced in 2006, released to the public in 2007 under the title *Finding Rin Tin Tin*, and remains in distribution through the usual video on-demand outlets and home-video market to this day.  (Tierney Trial Decl., ¶ 45; Trial Ex. 40.)

62.     In 2008, Hereford and RTTI filed an action against the producer and distributor of the Shamrock-authorized motion picture in federal district court in the Southern District of Texas, *Rin Tin Tin, Inc. et al. v. First Look Studios, Inc.*, Case No. 08-cv-02853, alleging unfair competition, trademark infringement, and trademark dilution ("2008 Lawsuit").  (Tierney Trial Decl., ¶ 46; Trial Ex. 47.)

63.     In their 2008 Lawsuit, Hereford and RTTI alleged, among other things, that Rin Tin Tin IV was a descendant of the original Rin Tin Tin, and that Lee Duncan gave Rin Tin Tin IV to Hereford's grandmother to begin a breeding program of German Shepherd dogs "to carry on the bloodline of Rin Tin Tin for future generations"; that Hereford has "vigorously and consistently pursued the Rin Tin Tin German Shepherd dog breeding program," and she has shown many dogs "that she

20.

has bred from the Rin Tin Tin bloodline"; that Hereford owns the Rin Tin Tin property rights with respect to the Rin Tin Tin bloodline and the Rin Tin Tin name associated with that bloodline, with respect to German Shepherd dogs and puppies; and that because of the efforts of Hereford and RTTI, "the famous German Shepherd [d]og named Rin Tin Tin and his story continue to be famous and to have fans to this day, and the Rin Tin Tin trademarks and service marks have become associated with [Hereford and RTTI]."  (Trial Ex. 47 at ¶¶ 11-12, 14-15, 19.)  In light of Hereford's stipulation on the record in connection with the 1996 Settlement Agreement (*see supra* Factual Finding Nos. 32-34), Hereford and RTTI's allegations in the complaint for the 2008 lawsuit were false.

64.    The defendants to Hereford's 2008 Lawsuit filed counterclaims for declaratory relief, cancellation of trademark registrations, and enforcement of the 1996 Settlement Agreement.  The counterclaims included a detailed history of the parties' prior litigation, including the principal terms of the 1996 Settlement Agreement, and Hereford's subsequent application for Registration '852 for use of the Rin Tin Tin mark in connection with use of services in the field of motion pictures and television series productions, which Hereford subsequently assigned to Kleven, Kleven Productions, and Leonard as part of the 2006 Settlement Agreement. (Tierney Trial Decl., ¶ 47; Trial Ex. 49.)

65.    The district court dismissed Hereford's claims on summary judgment and dismissed the case without reaching the defendants' counter claims.  (Tierney Trial Decl., ¶ 47; Trial Ex. 50.)

66.    On October 3, 2008, a copy of the complaint associated with Hereford and RTTI's 2008 Lawsuit was sent to the USPTO and electronically appended to all existing Rin Tin Tin trademark files, including (without limitation) Registrations '852 for dog food and '700 for miscellaneous dog specific productions (Trial Ex. 48), which were the two trademarks registrations purchased by Belleair from Hereford and RTTI in March 2013.  (*See infra* Factual Finding Nos. 80-85.)

## N.   Hereford and RTTI's Applications for Trademark Registrations After The 2006 Settlement Agreement

67.   Following the 2006 Settlement Agreement and beginning in 2007, Hereford again filed a series of trademark applications for the use of the Rin Tin Tin mark in connection with various goods or services.  As a result of those applications, Hereford obtained the following trademark registrations:

a.   "Rin Tin Tin" Registration '700 (2007) for dog clothes, dog collars, dog leashes, dog shoes, handbags, purses, and tote bags (purportedly based on actual use in commerce in March 2004); bowls, brushes for pets, cups, mugs, pet brushes, pet and feeding dishes (purportedly based on actual use in commerce in March 2004); hats, jackets, muffs, scarves, slippers, sweat shirts, and t-shirts (purportedly based on actual use in commerce in March 2004); and board games, dog toys, plush toys, puzzles, and soft sculpture plush toys (purportedly based on actual use in commerce in February 2006, four months prior to the execution of the 2006 Settlement Agreement).  (Trial Ex. 79.)

b.   "Rin Tin Tin" Registration '788 (2008) for dog food (purportedly based on actual use in commerce in May 1998, approximately two years after the 1996 Settlement Agreement in which Hereford disclaimed any right to the Rin Tin Tin trademark except for Hereford's narrow right to breed, advertise, and sell German Shepherd puppies as linear descendants of Rin Tin Tin IV, when truthful).  (Trial Ex. 80.)

c.   "Rin Tin Tin" Registration '436 (2009) for live German Shepherd dogs of the Rin Tin Tin lineage (purportedly based on actual use in commerce in December 1980, despite Hereford's stipulations and the court findings that Hereford has only ever bred and sold German Shepherd dogs descended from Rin Tin Tin IV, which is not a genetic descendant of the original Rin Tin Tin), and animal exhibitions and live animal performances featuring a German Shepherd dog (purportedly based on actual use in commerce also in December 1980).  (Trial. Ex. 81.)

d.   "Rin Tin Tin" Registration '551 (2012) for entertainment services in the field of motion pictures featuring a German Shepherd dog (purportedly based on actual use in commerce in April 2007).  (Trial Ex. 83.)

68.   Hereford filed the trademark registration application for Registration '700 nine (9) days after signing on the 2006 Settlement Agreement, on May 10, 2006. This application sought registration for, among other things, dog toys and plush toys, products that were specific examples of the merchandising rights retained by Kleven, Leonard, and Kleven Productions under section 2.2.4 of the 2006 Settlement Agreement.  Hereford's trademark registration application for Registration '700 did not disclose the trademark rights of Leonard, Kleven, and/or Kleven Productions as provided in the 1996 and 2006 Settlement Agreements.  (Trial Ex. 79.)

69.   In each of the trademark registration applications for Registrations '700, '788, '436, and '551, Hereford provided the same sworn declaration as above (*see supra* Factual Finding No. 51), namely that she believed she was the owner of the "Rin Tin Tin" marks she sought to register, and that she was entitled to use the marks in commerce; to the best of Hereford's knowledge and belief, no one else had the right to use the marks in commerce; that Hereford's marks were not likely to cause confusion; that all statements based on Hereford's knowledge were true; and that all statements based on Hereford's information and belief are believed to be true.  (Trial Ex. 79-91, 83.)  These applications did not disclose to the USPTO the courts findings and stipulations related to the 1996 and 2006 Settlement Agreements, thus concealing that Hereford had previously admitted that Leonard owned common law trademark rights to the Rin Tin Tin mark; that she admitted her rights were limited to the breeding, raising, training, and selling of German Shepherd dogs descended from Rin Tin Tin IV, which was not a descendant of the original Rin Tin Tin brought back from Europe by Duncan; and that she had acknowledged the prior uses of the Rin Tin Tin mark by Leonard, his predecessors, and his successors-in-interest, including uses for movies, television, and merchandising.

23.

70.     With respect to Registration '436, Hereford claimed that her first use of the mark for live German Shepherd dogs of the Rin Tin Tin lineage was in 1980, approximately the time when she took over her grandmother's breeding business. This statement was knowingly false in light of Hereford's stipulations in open court in connection with the 1996 Settlement Agreement, *i.e.*, that Hereford has bred, raised, trained, and sold German Shepherd dogs descended from Rin Tin Tin IV since 1977, and Rin Tin Tin IV is not a genetic descendant of the original Rin Tin Tin brought back from Europe by Duncan.

71.     With respect to Registration '551, Hereford claims that her first use of the mark for entertainment services in the field of motion pictures featuring a German Shepherd dog was in September 2006 (Trial Ex. 83), five (5) months after she executed the 2006 Settlement Agreement in which she assigned the same mark to Kleven, Leonard, and Kleven productions.  Hereford concealed material facts from the USPTO with respect to her application for Registration '551, namely Kleven and Leonard's rights to Registration '852 for the Rin Tin Tin mark in International Class 042 for use of the mark in "motion pictures, television programs or series, or any newly derived processes that provide a dynamic visual image, as well as the exclusive right to the Rin Tin Tin mark for any products or services that derive from said motion pictures, television programs or series, or any newly derived processes."

72.     In or around September 2008, Tierney became aware that Hereford obtained Registrations '700, '788, and '436.  (Trial Tr. at 122:23 – 123:9 (J. Tierney).)

**O.     Hereford and RTTI's 2012 License to Belleair**

73.     Dwight Erickson, President and founder of Belleair, approached Hereford for a dog food license after reading Susan Orlean's 2011 book entitled, *Rin Tin Tin: The Life and the Legend*.  Erickson was struck by the remarkable story of Rin Tin Tin and thought that the dog's life would create an attractive back-story to a brand of high-quality dog treats.  Through online research, Erickson found the website rintintin.com, which at the time was operated by RTTI, a company owned by

24.

Hereford.  The website included a section regarding licensing the Rin Tin Tin trademark.  Erickson made contact with the company through the website and began discussing a licensing agreement between RTTI and Belleair.  (Dkt. No. 149 ("Erickson Trial Decl."), ¶¶ 3-4.)

74.   Belleair acquired ownership of the Registrations at issue in this case in three phases.  As part of the first phase, on April 10, 2012, Belleair entered into written Merchandising and Licensing Agreement with RTTI, in which RTTI licensed to Belleair the exclusive right to use the Rin Tin Tin mark in the manufacture and retail sale of dog treats, dog snacks, and related food items.  The agreement provided that Belleair would acquire no ownership rights in the Rin Tin Tin mark and that all of the goodwill that adhered to the Rin Tin Tin mark through Belleair's license would be owned by RTTI.  In the agreement, RTTI represented that it was the sole owner of the Rin Tin Tin trademark registrations subject to the license.  (Trial Exs. 93, 106; Trial Tr. at 56:22 – 57:9 (D. Erickson).)

75.   Prior to entering into the Merchandising and Licensing Agreement, Belleair did not investigate who owned or distributed *The Adventures of Rin Tin Tin* series, and Belleair did not independently confirm what trademark registrations Hereford and RTTI owned, if any.  Additionally, at the time Belleair entered into the agreement, Erickson had never purchased any of Hereford's purported commercial dog food, he never sought or obtained any formula or ingredient list for Hereford's purported commercial dog food, and he had no personal knowledge that Hereford or RTTI actually sold and distributed any dog food using the Rin Tin Tin mark. (Erickson Trial Decl., ¶¶ 10-12; Trial Tr. at 56:11 – 57:4, 63:21 – 64:4; 65:22 – 66:18 (D. Erickson).)

76.   That Erickson was not offered proof of, for example, dog food sales by Hereford is consistent with Hereford's inability to establish sales of her dog food products to which she claimed trademark ownership during discovery in this case.

a.  Specifically, Shamrock served interrogatories on Hereford, which asked: "If you [Hereford] contend that you used the phrase 'Rin Tin Tin' as a mark in commerce, please set forth all facts upon which you base that contention, including the dates and nature of each use," and "If you [Hereford] contend that you have acquired rights to use the phrase 'Rin Tin Tin' as a mark in commerce, please set forth all facts upon which you base that contention."

b.  Following objections that the interrogatories were overbroad and unduly burdensome,[3] Hereford responded to the interrogatories as follows: "Defendant's use of the marks in Interstate Commerce are a matter of public record through various Internet sites that are readily accessible to [Shamrock]."  (Dkt. No. 150-8 ("Gernsbacher Trial Decl."), ¶ 5 at 3:26 – 4:17.)  Not only did Hereford fail to answer the interrogatory, but Hereford provided no information regarding the unspecified uses or the identity or location of these "various Internet sites." Separately, Shamrock served a request for production on Hereford, requesting that she provide "[o]ne representative example of every use you have made in commerce of the phrase 'Rin Tin Tin.'"  Hereford responded that "the information sought . . . can be obtained by public access to the Internet.  (Gernsbacher Trial Decl., ¶ 6 at 5:8-15; Tierney Trial Decl., ¶ 56.)

77.  Both James Tierney and Jeff Miller conducted thorough searches on the Internet for examples of any uses in commerce of the phrase "Rin Tin Tin" in connection with any trademarked goods or services and for any Rin Tin Tin motion pictures authorized or licensed by Hereford and/or RTTI.  Following Tierney's searches, he only found references to a single 2011 book entitled, *Rin Tin Tin: The Lineage and Legacy*, attributed to Hereford as the author, and to Rin Tin Tin memorabilia, such as statutes of German Shepherd dogs without visible trademarks.

---

[3] The Court overrules any objection that the referenced discovery requests were overbroad or unduly burdensome.

1   Tierney also found reference to a single documentary film entitled, *RIN TIN TIN: a*

2   *living legacy*, that was used by Hereford to secure Registration '551 in 2012 for

3   entertainment services in the field of motion pictures featuring a German Shepherd

4   dog.  The reference was merely a copy of a DVD cover filed with the USPTO, which

5   listed RTTI and an unrelated third party as co-copyright proprietors.  Tierney searched

6   the records of the U.S. Copyright Office and found no copyright registration for the

7   purported documentary film, and there was no record of any copyright transfer for the

8   film.  Additionally, Tierney searched Amazon.com and was unable to find a single

9   new or used copy of the documentary film for purchase, whether by Amazon itself or

10  any third party.  (Tierney Trial Decl., ¶¶ 57-58.)

11      78.   Miller also conducted Internet searches for evidence of Hereford's use of

12  the Rin Tin Tin mark in commerce, and was unable to find any such evidence.  (Miller

13  Trial Decl., ¶ 26.)

14      79.   Given Hereford's claim that evidence of her use in commerce and

15  acquired rights to use in commerce the Rin Tin Tin mark were readily accessible on

16  the Internet, and thorough searches of the Internet resulted in no such evidence (other

17  than the specimens attached Hereford and RTTI's trademark registration applications

18  filed with the USPTO), the Court finds that there is no evidence of any use by

19  Hereford and/or RTTI of the Rin Tin Tin mark in commerce.[4]

20  _____

21      [4] Indeed, neither Tierney nor Miller used the "WayBack" Internet archive
    program or any other comparable programs when conducting their Internet searches.
22  (Trial Tr. at 131:7-24 (J. Miller) and 161:14 – 162:3 (J. Tierney).).  But they were not
    obligated to do so, especially in light of Hereford's discovery response that all
23  information related to her use in commerce was readily accessible by public access to
    the Internet, and use of an Internet archive program is inconsistent with the fact that
24  something is readily accessible by public access to the Internet.  Additionally, the fact
    that Rin, Inc. and Shamrock opted not to depose Hereford carries little weight against
25  the Court's finding that Hereford and RTTI are unable to establish use in commerce of
    the Rin Tin Tin mark: Hereford and RTTI's answers have been stricken (Dkt. Nos. 11,
26  49), and default has been entered against them (Dkt. Nos. 107), which means they are
    deemed to have admitted the well-pleaded factual allegations in Plaintiffs' complaints.
27
28

27.

**P.     Hereford and RTTI's Assignment of Registrations '700 and '788 to Belleair**

80.    The second stage of Belleair's acquisition of rights in Hereford's Registrations was pursuant to a March 22, 2013 Agreement/Bill of Sale between Hereford and Belleair, in which Hereford assigned Registrations '700 (non-food related products, *e.g.*, dog leashes and dog collars) and '788 (dog food) to Belleair. (Trial Ex. 94.)  The Agreement/Bill of Sale was recorded with the USPTO.  (Erickson Trial Decl, ¶ 19.)

81.    Before the March 2013 Agreement/Bill of Sale was executed, and during the first year of the licensing agreement, Hereford approached Belleair about purchasing Rin Tin Tin, Inc. and all of the trademarks the company owned.  Hereford has a very serious lung disease and she wanted to leave the business.  Belleair considered purchasing Rin Tin Tin, Inc. and the associated trademarks but ultimately decided to purchase only the rights corresponding with the registrations for dog food (Registration '788) and for dog related products, clothing, and toys (Registration '700.)  (Erickson Trial Decl. ¶ 18.)

82.    The March 2013 Agreement/Bill of Sale makes no reference to any goodwill associated with Registrations '700 and '788, and Erickson's understanding of RTTI's business dealings was limited to a review of the company's tax returns for the prior seven years, which showed that RTTI was not a profitable company. (Erickson Trial Decl., ¶ 20.)  Indeed, Erickson provided no testimony that he had any

*Vogel v. Rite Aid Corp.*, 992 F. Supp. 2d 998, 1005 (C.D. Cal. 2014) ("Once a party's default has been entered, the factual allegations of the complaint, except those concerning damages, are deemed to have been admitted by the non-responding party.")  Additionally, the fact that Hereford claimed prior and initial use of Rin Tin Tin marks in her trademark registration applications, in direct contradiction to stipulations and agreements made in connection with the 1996 and 2006 Settlement Agreements, subsequent statements by Hereford (for example, her discovery responses) are incredible and are entitled to little evidentiary weight.

28.

1  knowledge that Hereford or RTTI manufactured, distributed, marketed, and/or sold

2  Rin Tin Tin dog food or treats prior to executing the Agreement/Bill of Sale.

3      83.    Registration '700 was the mark issued to Hereford in 2007 pursuant to an

4  application filed nine (9) days after Hereford executed the 2006 Settlement

5  Agreement, and it includes four classes of goods, including the class covering "plush

6  toys."  Registration '788 was the mark issued to Hereford in 2008 for dog food.  (*See*

7  *supra* Factual Finding Nos. 67.b.)

8      84.    Erickson testified that he entered into the Agreement/Bill of Sale only

9  after Belleair's outside intellectual property counsel completed a review RTTI's

10  trademark registrations.  (Erickson Trial Decl., ¶ 20.)  To the extent Erickson's

11  testimony could be construed as evidence that Belleair conducted adequate due

12  diligence with respect to Hereford/RTTI's rights to Registrations '700 and '788, the

13  Court finds Erickson's testimony incredible and entitled to little weight for the

14  following reasons:  Registrations '700 and '788 were issued to Hereford not RTTI

15  (*see supra* Factual Finding No. 67); RTTI was not a party to or signatory on the

16  Agreement/Bill of Sale (Trial Ex. 94); and Belleair's outside counsel did investigate

17  Rin Tin Tin trademarks owned by Hereford in her individual capacity beyond

18  Registrations '700 and '788, as confirmed by an email sent by the attorney to

19  Erickson, notifying him that there was a pending trademark registration cancellation

20  proceeding for Registration '551 (owned by Hereford).  (Trial Tr. at 84:16 – 87:3 (D.

21  Erickson).)  Additionally, the Agreement/Bill of Sale provided that Belleair would

22  accept full responsibility for any future liability arising out of Registrations '700 and

23  '788.  Specifically, Belleair agreed to purchase Registrations '700 and '788 on an "as

24  is" basis, Hereford "ma[de] no warranties whatsoever" with respect to the

25  Registrations, and Hereford "disclaim[ed] any liability with regard to future

26  possession or use of the Registrations.  (Trial Ex. 94.)  Thus, Belleair was on actual

27  notice of a pending cancellation proceeding for Registration '551 and constructive

28

1   notice of other potential title defects with respect to other Registrations owned by

2   Hereford.

3      85.    After the March 2013 Agreement/Bill of Sale was executed, Belleair

4   continued to use the Rin Tin Tin mark to sell dog treats, and Belleair also began

5   selling items like sweatshirts, t-shirts, flip-flops, and puzzles.  (Trial Tr. at 61:17-25.)

6   Belleair's sales of Rin Tin Tin dog treats began to take off after it acquired

7   Registrations '700 and '788; the dog treats were placed in retail grocery stores with

8   220 locations in five states.  (Erickson Trial Decl., ¶ 22.)

9   **Q.   Rin, Inc.'s Involvement With and Exploitation of Rin Tin Tin Intellectual**

10      **Property Rights**

11      86.    Beginning in 2012, Kleven, Sasha Jenson, Casey LaScala, and Miller

12   agreed to form a joint venture to own and pursue the Rin Tin Tin rights Kleven

13   acquired through Leonard, including (without limitation) the right to produce and

14   distribute new versions or adaptations of *The Adventures of Rin Tin Tin* television

15   series.  Specifically, Kleven assigned Jenson, LaScala, and Miller a 50% interest of

16   Kleven's Rin Tin Tin rights.  The joint venture agreement was memorialized in a

17   written Confirmation of Assignment of Rights and Joint Venture Agreement dated

18   February 1, 2013 and amended in writing on February 27, 2013, and in a Trademark

19   Assignment dated March 26, 2013.  (Miller Trial Decl., ¶¶ 7-9; Trial Exs. 58, 62-64.)

20      87.    Jenson, LaScala, and Miller are the three principals of Rin, Inc., a

21   California corporation and Plaintiff in this action.  Rin, Inc. was formed with the

22   purpose of holding Jenson, LaScala, and Miller's Rin Tin Tin rights and has since

23   succeeded in those rights.  (Miller Trial Decl., ¶¶ 2-3, 8.)

24      88.    Beginning in 2009, Kleven in conjunction with Rin, Inc. and/or its

25   principals, Jenson, LaScala, and Miller, actively pursued a new Rin Tin Tin movie

26   project; among other things, they prepared scripts for the project, shopped the scripts,

27   and met with film and television producers, agencies, managers, and advertising and

28   marketing agencies.  (Miller Trial Decl., ¶¶ 6, 13-14.)

89.     While financing a movie entails promising the financier or studio the chance to recoup its investment from receipts from the exploitation of a movie, the ability to also receive payment for merchandise associated with the movie greatly increases the ability to obtain financing and a studio's interest.  For example, the producers of the *Star Wars* films and many other movies are able to generate substantial monies from the sale of merchandise associated with the movies long after the movies have left the theaters.  These products could, in turn, maintain enough interest to warrant further movie and television productions, thus further enhancing Rin Tin Tin's appeal to both the public and the companies whose products the public buys.  (Miller Trial Decl., ¶¶ 10-12.)

90.     In pursuit of financing their new Rin Tin Tin project, Kleven, Jenson, LaScala, and/or Miller met with various talent and advertising agencies whose clients include manufacturers of well-known dog food and dog care lines, including William Morris Endeavor Agency; BBDO, an advertising agency that handles the Pedigree account for Mars, Inc.; Fallon Advertising, who handles the Purina (Nestle) account; and Saatchi & Saatchi, who handles Iams.  Each of these agencies and manufacturers expressed interest in the Rin Tin Tin project and brand.  (Miller Trial Decl., ¶¶ 13-14.)

91.     In October 2012, Rin, Inc. filed with the USPTO an application for an intent-to-use registration for the Rin Tin Tin mark in International Class 041 for movies, television shows, live performances, live shows, plays, videos, books, comic books, graphic novels, licensing, merchandising, marketing, and advertising for third parties, all featuring the image of and/or text having as the subject the television and movie icon and character Rin Tin Tin and related characters and written publications. In February 2014, the UPSTO rejected Rin, Inc.'s application "because of a likelihood of confusion with a family of registered marks," referring to Hereford's Rin Tin Tin Registrations.  (Miller Trial Decl., ¶¶ 22-23; Trial Exs. 91-92.)

92.     Kleven and Rin, Inc. have been unable to make progress on their Rin Tin Tin projects due to the Defendants' claimed Rin Tin Tin trademark registrations. (Miller Trial Decl., ¶ 14.)

**R.     Hereford and RTTI's Second Assignment of Registrations to Belleair**

93.     The final stage of Belleair's acquisition of rights in Hereford's Registrations occurred pursuant to an August 1, 2013 Agreement/Bill of Sale.

94.     The final stage came about during the second quarter of 2013, when Belleair's relationship with Hereford became somewhat strained because Hereford behaved as though she had the right to control Belleair's use of the Rin Tin Tin mark in connection with Registrations '788 and '700.  (Erickson Trial Decl., ¶ 23.)

95.     Belleair believed that Hereford would continue to attempt to control Belleair's use of the Rin Tin Tin mark unless Belleair purchased all of Hereford and RTTI's remaining Rin Tin Tin trademark registrations, as well as the website rintintin.com.  Belleair's decision to purchase the remaining trademark registrations was motivated by a desire to have the freedom to operate and to make business decisions without having to continue to interact with Hereford.  (Erickson Trial Decl., ¶ 24.)

96.     Pursuant to the August 2013 agreement, Belleair purchased the seven remaining Registrations owned by Hereford (Registrations '551, '135, '745, '312, '436, '161, and '852), the only trademark registrations owned by RTTI (Registration ' 458), and "all Trademark rights, common law and otherwise, in Rin Tin Tin." Hereford and RTTI made "no warranties whatsoever" with respect to the Registrations, and Belleair agreed to purchase these Registrations on an "as is" basis and indemnify Hereford and/or RTTI for any financial responsibility specifically associated with their respective defense in the pending litigation.[5]  (Trial Ex. 95.)  The

---

[5] The August 2013 agreement was executed after this action had been initiated and after Belleair, Hereford, and RTTI appeared in this action.

agreement makes no mention of or otherwise purports to transfer any goodwill associated with any of these Registrations, and it makes no mention of or otherwise purports to assign Hereford or RTTI's rights in the 2006 Settlement Agreement to Belleair.  Belleair, Hereford, and RTTI executed a separate trademark assignment confirming that Belleair acquired "all right, title, and interest" in the Rin Tin Tin trademark as reflected in Registrations '161, '852, '436, '745, '312, '135, and '551.  Hereford also assigned to Belleair the rintintin.com website; and she agreed not to compete with Belleair and to dissolve RTTI.

97.    Belleair began using the rintintin.com website after acquiring it from Hereford.  (Erickson Trial Decl., ¶ 27.)  Belleair recorded both the March 2013 and August 2013 Agreement/Bill of Sales with the UPSTO.  (Erickson Trial Decl., ¶ 19, 26.)

98.    Hereford dissolved RTTI in June 2014.  (Trial. Ex. 103.)

99.    By the end of 2013, Belleair's Rin Tin Tin dog treats were on the shelves in more than 700 retail grocery stores in nine states.  (Erickson Trial Decl., ¶ 28.)

100.   On the back packaging of Belleair's Rin Tin Tin dog treats is a narrative about the historical Rin Tin Tin character, which reads as follows:

The Legendary Rin Tin Tin:

Rescued from a bombed out World War I German War Dog kennel . . . this German Shepherd Dog would go on to become the most famous canine in the world.  Corporal Lee Duncan . . . took him and the rest of the litter back to his camp that fateful day, and named his new puppy after a popular French hand puppet, RIN TIN TIN.  Returning to California after the war, Duncan was astonished at the dog's intelligence and agility which landed him a starring role in 26 movies.  Rin Tin Tin was nominated for an Academy Award, has a star on the Hollywood Walk of Fame, and was noted in *Anne Frank's Diary*.  He was also credited with saving from bankruptcy a small

33.

1     motion picture studio named Warner Bros.

2     The legacy continued as Rin Tin Tin starred in the TV series "The

3     Adventures of Rin Tin Tin" from 1954 to 1959 and served as the

4     mascot for the Boy Scouts of America.

5 (Trial Tr. at 69:11 – 72:14 (D. Erickson); Trial Ex. 107.)  Belleair included this

6 narrative, in addition to a picture of Rin Tin Tin from the "Adventures of Rin Tin Tin"

7 television series, on packaging of their dog treats so that customers would know about

8 the legacy of the Rin Tin Tin character and the *Adventures of Rin Tin Tin* television

9 series, and associate Belleair's products with the Rin Tin Tin character.  (Trial Tr. at

10 70:14-21, 71:10-24, 72:5-14.)

11     101.   Belleair has no intention of making movies or television programs using

12 the Rin Tin Tin mark, and Belleair has always been willing to relinquish its rights in

13 Registration '551.  Belleair's acquisition of Hereford's remaining Registrations and

14 other purported trademark rights was motivated by a desire to buy-out Hereford

15 completely so that Belleair could have freedom to operate its business without

16 interference by Hereford and not by a desire to produce movies or television.

17 (Erickson Trial Decl., ¶ 31.)

18 **S.**     **Procedural History in this Action**

19     102.   On April 19, 2013, Max Kleven, in his individual capacity, and Rin, Inc.

20 initiated this action by filing their complaint against Hereford, RTTI, and Belleair.

21 (Dkt. No. 1.)  On May 15, 2013, Belleair first appeared in this case and filed,

22 collectively with Hereford and RTTI, an answer to Kleven and Rin, Inc.'s complaint.

23 (Dkt. No. 11.)

24     103.   Shamrock intervened as a plaintiff, and on January 14, 2014, Shamrock

25 filed its first amended complaint in intervention.  (Dkt. Nos. 41, 47.)  On January 22,

26 2014, Belleair filed an answer to Shamrock's complaint in intervention.  (Dkt. No.

27 48.)  On February 4, 2014, Hereford filed an answer to Shamrock's complaint in

28 intervention.  (Dkt. No. 49.)

104.   On July 15, 2014, the Court struck the Answers filed by Hereford and RTTI and entered defaults against Hereford and RTTI with respect to Kleven and Rin, Inc.'s complaint and Shamrock's first amended complaint in intervention.  (Dkt. Nos. 11, 19, 106, 107.)  Accordingly, Hereford and RTTI are deemed to have admitted the well-pleaded factual allegations in Kleven and Rin, Inc.'s complaint and Shamrock's first amended complaint in intervention.  *See* Fed. R. Civ. Proc. 8(b)(6); *Geddes v. United Fin. Group*, 559 F.2d 557, 560 (9th Cir. 1977).

105.   With respect to Shamrock's first amended complaint in intervention, Hereford and RTTI are deemed to have admitted the following: (1) in connection with the 1996 Settlement Agreement, Hereford and RTTI, in open court and on the record, stipulated to the court findings and other settlement terms with respect to their limited rights related to the Rin Tin Tin trademark; (2) Hereford and RTTI have used the Rin Tin Tin mark in direct contradiction of the stipulated findings and agreements and obtained and/or claimed rights under various federal trademark registrations in Rin Tin Tin, *i.e.*, the Registrations cited and referenced herein; and (3) the Registrations at issue in this case were obtained and are being used deceptively and contrary to the settlement and court findings in connection with the 1996 Settlement Agreement because the claimed uses would cause confusion and deception and because Hereford and RTTI have not, in fact, used the Rin Tin Tin trademark in connection with, for example motion pictures or television series.  (Dkt. No. 47 at ¶¶ 34, 39-40, 42.)

106.   With respect to Kleven and Rin, Inc.'s complaint, Hereford and RTTI are deemed to have admitted the following: (1) the circumstances surrounding the 1994 Lawsuit, as well as Hereford's stipulations in open court in connection with the 1996 Settlement Agreement, as described above; (2) the iconic fictional German Shepherd character named Rin Tin Tin featured in multiple copyrighted works was famous well before Hereford and RTTI filed their trademark registration applications, and Hereford and RTTI were, in fact, referencing the famous Rin Tin Tin character in their applications; (3) the Kleven and Rin, Inc. are the owners of multiple copyrighted

1  works that feature the iconic fictional German Shepherd dog character Rin Tin Tin,

2  and those works are not associated with Hereford, RTTI, or Belleair; (4) due to the

3  fame of the iconic fictional German Shepherd dog character Rin Tin Tin, any use of

4  the Registrations by Belleair, Hereford, and RTTI is likely to cause consumers to

5  presume a connection between Defendants and the iconic fictional German Shepherd

6  dog character Rin Tin Tin, and Defendants' representations on their website have

7  intended that consumers make such a connection; (5) when Hereford and RTTI filed

8  each of the trademark registration applications associated with the Registrations at

9  issue in this case, they swore oaths as described above regarding their right to use such

10  marks in commerce (*see supra* Factual Findings 51, 69), and they knew these sworn

11  representations to be untrue at the time they were made with the explicit purpose of

12  deceiving the USPTO and inducing it to grant the Registrations; (6) the USPTO

13  materially relied on Hereford and RTTI's materially false misrepresentations when it

14  granted the Registrations; and (7) the Registrations harm consumers by creating

15  source and affiliation confusion.  (Dkt. No. 1 at ¶¶ 31, 33-36, 157, 160-162, 164, 166-

16  167, 170-174.)

17      107.   Additionally, Hereford and RTTI are deemed to have admitted the facts

18  alleged against them with respect to Kleven and Rin, Inc.'s claims for breach of the

19  2006 Settlement Agreement, specific performance of the 2006 Settlement Agreement,

20  and rescission of the 2006 Settlement Agreement, including that they breached the

21  2006 Settlement Agreement.  (Dkt. No. 1 at ¶¶ 216-239.)

22      108.   On December 1, 2014, Belleair assigned Registration '551 to Kleven in

23  his individual capacity.  (Dkt. No. 167.)

24                          **CONCLUSIONS OF LAW**

25  **A.**   **Jurisdiction and Venue**

26      1.    Jurisdiction and venue are proper in this Court.

27      2.    The Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331

28  because the Plaintiffs assert a claim under § 43 of the federal Lanham Act, 15 U.S.C.

§ 1125(a), and there is supplemental jurisdiction pursuant to 28 U.S.C. § 1367 with respect to the parties' common law and state law claims.

3. The Court also has diversity of citizenship jurisdiction pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000, and there is complete diversity between Plaintiffs, on the one hand, and Defendants, on the other hand.

4. Venue is proper in the Central District of California pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims occurred in this District.

**B.   Legal Standard for Cancellation of Trademark Registrations**

5. A party seeking cancellation of a trademark registration must prove two elements: (1) that it has standing to petition for cancellation; and (2) that there is a valid ground why the trademark should not continue to be registered. *Star-Kist Foods, Inc. v. P.J. Rhodes & Co.*, 735 F.2d 346, 348 (9th Cir. 1984) (citations and internal quotation marks omitted).

**C.   Plaintiffs Have Standing To Bring Their Cancellation Claims**

6. Rin, Inc. and Shamrock have standing to bring the instant claims for cancellation of trademark registration.

7. "Standing is the more liberal of the two elements and requires only that a party believe that it is likely to be damaged by the registration." *Cunningham v. Laser Golf Corp.*, 222 F.3d 943, 945 (Fed. Cir. 2000). Section 14 of the Lanham Act confers standing to cancel a trademark registration on "any person who believes that he is or will be damaged . . . by the registration of a mark. . . ." 15 U.S.C. § 1604. "[T]here is no requirement that damage be proved in order to establish standing." *Star-Kist Foods, Inc.*, 735 F.2d at 349 (citations and internal quotation marks omitted). The cancellation petitioner need only show "a 'real interest' in the proceedings," which requires a demonstration that it "is more than an intermeddler but rather has a personal interest [in the cancellation], and that there is a real controversy

37.

between the parties." *Id.* (citations and internal quotation marks omitted). "The petitioner . . . must show a real and rational basis for [its] belief that [it] would be damaged by the registration sought to be cancelled, stemming from an actual commercial or pecuniary interest in his own mark." *Id.*; *see also Lipton Indus., Inc. v. Ralston Purina Co.*, 670 F.2d 1024, 1028-29 (C.C.P.A. 1982) ("The purpose in requiring standing is to prevent litigation where there is no real controversy between the parties, where a plaintiff . . . is no more than an intermeddler."). A party can typically show standing if it has a pending or soon-to-be filed trademark registration application for a mark that has been or likely will be rejected on the basis of the challenged registrations. 3 McCarthy on Trademarks and Unfair Competition ("McCarthy") § 20:46 (4th ed.). Additionally, a party can also typically show standing if it has alleged a likelihood of confusion between its mark and the registered mark that "is not wholly without merit." McCarthy at § 20.46 (quoting *Lipton Industries, Inc.*, 670 F.2d at 1029).

8.     There is a reasonable basis to believe that Rin, Inc. and Shamrock will be damaged by the challenged registrations. Rin, Inc. owns 50% of the Rin Tin Tin mark that Kleven Productions obtained vis-à-vis Max Kleven from Herbert Leonard,[6] in addition to the words, name, and character Rin Tin Tin, the television series *The Adventures of Rin Tin Tin* (which remains in distribution today), motion picture(s) or television program(s) based on Rin Tin Tin, and the right to produce motion picture(s) or television program(s) based on Rin Tin Tin; Rin, Inc. intends to pursue its right to produce and distribute new versions or adaptations of *The Adventures of Rin Tin Tin* television series; and the USPTO denied Rin, Inc.'s October 2012 intent-to-use registration application for the mark because of a likelihood of confusion with the "family of registered marks" associated with Hereford and RTTI.

---

[6] Because standing only requires a reasonable belief that the moving party will be damaged by the challenged registrations, the Court need not decide at this time whether Rin, Inc.'s purported trademark rights in the Rin Tin Tin mark are valid.

9.      Shamrock owns all rights in the *Rin Tin Tin K-9 Cop* television series and the right to make two full-length motion pictures based upon the Rin Tin Tin Story by James English, including merchandising rights.  When Shamrock exercised its right to make the first full-length motion picture, the 2007 film *Finding Rin Tin Tin*, Hereford and RTTI filed a lawsuit against the producer and distributor of the Shamrock-authorized motion picture and alleged unfair competition, trademark infringement, and trademark dilution based on Hereford's then-existing trademark registrations.  To the extent Shamrock seeks to exercise its right to make a second full-length motion picture, companies involved in the picture's production and distribution may face additional litigation in light of the challenged trademark registrations.

10.     There is a reasonable basis to believe that Rin, Inc. and Shamrock will be damaged by the challenged registrations, and that they have a real interest in the outcome of this proceeding.  The marks at issue are virtually identical, and the goods are arguably related, *i.e.*, they involve goods or services related to German Shepherd dogs and/or a German Shepherd dog character named Rin Tin Tin.  This is a sufficient showing that a likelihood of confusion claim is not wholly without merit.  Additionally, the USPTO denied Rin, Inc.'s registration application for the mark on the basis of the challenged registrations.  Based on the foregoing, Rin, Inc. and Shamrock have established standing to bring the pending cancellation of trademark registrations claims.

11.     Max Kleven, the individual, on the other hand, has not established standing to bring cancellation of trademark registrations.  Max Kleven transferred any interest he had in the Rin Tin Tin mark and *Adventures of Rin Tin Tin* television series to Kleven Productions, which in turn assigned a 50% interest in those rights to Rin, Inc.  While Kleven Productions would likely have standing to bring the pending claims for cancellation of trademark registrations for the reasons articulated above, Kleven Productions is not a party to this action, and the parties have identified no basis by which Max Kleven (the individual) can assert claims on behalf of Kleven

39.

1   Productions.  Accordingly, to the extent Max Kleven brings claims in his individual

2   capacity against any Defendant for cancellation of trademark registrations, those

3   claims (only those brought by Kleven) are dismissed.

4       **D.    Valid Grounds to Cancel Trademark Registration**

5       12.    Regarding the valid grounds for why a trademark should not continue to

6   be registered, for the first five years, a trademark registration may be challenged for

7   any reason that would have been sufficient to refuse the original registration.  15

8   U.S.C. § 1064(1).  Once a trademark has been registered for more than five years, the

9   grounds available to cancel the registration narrow significantly, *i.e.*, as applicable to

10  this case, (1) that the registration has been abandoned, (2) that the registration is being

11  used to misrepresent the source of the goods or services in connection with which it is

12  used, or (3) that the registration was fraudulently obtained.  15 U.S.C. § 1054(3).

13          **a.    Cancellation based on abandonment**

14      13.    A mark is deemed abandoned if the party seeking cancellation proves the

15  following:

16          When [the mark's] use has been discontinued with intent not to

17          resume such use.  Intent not to resume may be inferred from

18          circumstances.  Nonuse for three consecutive years shall be prima

19          facie evidence of abandonment.  "Use" of a mark means the bona fide

20          use of such mark made in the ordinary course of trade, and not made

21          merely to reserve a right in a mark.

22  15 U.S.C. § 1127.

23      14.    "Section 1127 . . . provides that 'use' of a trademark defeats an allegation

24  of abandonment when: the use includes placement on goods sold or transported in

25  commerce; is bonafide; is made in the ordinary course of trade; and is not made

26  merely to reserve a right in a mark." *Electro Source, LLC v. Brandess-Kalt-Aetna*

27  *Grp., Inc.*, 458 F.3d 931, 936 (9th Cir. 2006).  The prima facie case of abandonment

28  (proof of non-use for three consecutive years) "eliminates the challenger's burden to

1    establish the intent element of abandonment as an initial part of [its] case," and creates

2    a rebuttable presumption that the registrant has abandoned the mark without intent to

3    resume. *Levi Strauss & Co. v. GTFM, Inc.*, 196 F. Supp. 2d 971, 976 (N.D. Cal.

4    2002) (quoting *Imperial Tobacco, Ltd. v. Philip Morris, Inc.*, 899 F.2d 1575, 1579

5    (Fed.Cir.1990).  Once created, a prima facie case of abandonment may be rebutted by

6    showing valid reasons for nonuse or lack of intent to abandon the mark. *Id.* (citing

7    *Abdul–Jabbar v. Gen'l Motors Corp.*, 85 F.3d 407, 411 (9th Cir. 1996)).

8        15.    Where a party seeks to cancel a trademark registration that has been

9    subsequently assigned on the grounds that use of the mark has been abandoned, the

10   Court must first determine whether the registration was properly assigned, *i.e.*, that it

11   was not an assignment in gross, before determining the issue of abandonment.

12   *interState Net Bank v. NetB@nk, Inc.*, 348 F. Supp. 2d 340, 352 (D.N.J. 2004).  "As

13   the Lanham Act states the principle, a mark is 'assignable with the goodwill of the

14   business in which the mark is used, or with that part of the goodwill of the business

15   connected with the use of and symbolized by the mark.'" *E. & J. Gallo Winery v.

16   Gallo Cattle Co.*, 967 F.2d 1280, 1289 (9th Cir. 1992) (quoting 15 U.S.C. § 1060).  A

17   purported trademark that is assigned without either the goodwill of the assignor's

18   business or the goodwill connected with the use of the mark, the assignment is an

19   invalid assignment in gross. *Id.*  "The purpose behind requiring that goodwill

20   accompany the assigned mark is to maintain the continuity of the product or service

21   symbolized by the mark and thereby avoid deceiving or confusing consumers." *Id.*

22   (citation omitted).

23        **b.    Registration '135 is ordered cancelled on the grounds**

24            **that it has been abandoned**

25        16.    In this case, the only goodwill associated with Registration '135 was

26   Hereford's breeding, raising, training, and selling of German Shepherd puppies, a

27   business she had been involved with since at least 1977.  When it acquired

28   Registration '135, Belleair did not acquire any goodwill Hereford had in the breeding,

41.

1  raising, training, and selling German Shepherd puppies.  Rather, Belleair sought only

2  to acquire the naked Rin Tin Tin trademark registration so that Belleair could buy out

3  Hereford and operate its business without Hereford's interference.  Belleair did not

4  acquire and was not interested in acquiring the breeding business, and Hereford's

5  breeding product is not of the same nature and quality as Belleair's dog treat business.

6  Because Belleair did not acquire any goodwill in Hereford's breeding business,

7  Hereford's assignment of Registration '135 to Belleair was an invalid assignment in

8  gross.  Thus, Registration '135 is deemed reverted to Hereford, and the ultimate issue

9  of abandonment turns on whether Hereford (not Belleair) has abandoned the

10  registered mark, *i.e.*, whether Hereford has ceased commercial use of Registration

11  '135 with no intent to resume.

12      17.   The Court finds that Hereford has ceased commercial use of the Rin Tin

13  Tin mark, as authorized by Registration '135, with no intent to resume, and therefore

14  she has abandoned any right to the registered mark.  That Hereford has ceased

15  commercial use is evidenced by the fact that Hereford claimed that all evidence of her

16  commercial use of the Rin Tin Tin mark in connection with live German Shepherd

17  puppies is readily accessible on the Internet, and thorough searches on the Internet

18  resulted in no such evidence other than the specimens attached to Hereford and

19  RTTI's trademark registration applications filed with the USPTO.

20      18.   Hereford's intent not to resume commercial use of the mark is evidenced

21  by Hereford's business dealings with Belleair.  During the first year of Belleair's

22  licensing agreement, Hereford offered to sell Registration '135 to Belleair (along with

23  all of her other Rin Tin Tin Registrations) because she was suffering from a serious

24  lung disease and wanted to leave her business.  Hereford ultimately sold Registration

25  '135, and Belleair purchased the registration in order to completely buy out Hereford

26  so that Belleair could have the freedom to operate its business without any

27  interference by Hereford.  Additionally, as part of the sale to Belleair, Hereford agreed

28  not to compete with Belleair, Hereford has since dissolved her business, and there is

1   no evidence suggesting that Hereford intends to resume use of the Rin Tin Tin mark

2   authorized by Registration '135 in the future.

3        19.    That Rin, Inc. and Shamrock did not present direct evidence of

4   Hereford's intent to cease using or abandon the mark – *i.e.*, testimony by Hereford –

5   does not change the analysis.  Intent not to resume use may be established by

6   circumstances, *see* 15 U.S.C. § 1127, and the circumstances above, particularly the

7   fact that Hereford assigned and gave away her right to Registration '135

8   (notwithstanding the fact that it was an invalid assignment) is sufficient circumstantial

9   evidence of Hereford's intent not to resume commercial use of Rin Tin Tin mark

10  authorized by Registration '135.

11              **c.    Cancellation based on fraud**

12       20.    To succeed on a cancellation claim based on fraud, the petitioner must

13  prove: "(1) a false representation regarding a material fact; (2) the registrant's

14  knowledge or belief that the representation is false; (3) the registrant's intent to induce

15  reliance upon the misrepresentation; (4) actual, reasonable reliance on the

16  misrepresentation; and (5) damages proximately caused by that reliance." *Hokto*

17  *Kinoko Co. v. Concord Farms, Inc.*, 738 F.3d 1085, 1097 (9th Cir. 2013) (citing *Robi*

18  *v. Five Platters, Inc.*, 918 F.2d 1439, 1444 (9th Cir. 1990)).  The burden to prove

19  fraud is "heavy," *Robi*, 918 F.2d at 1439, and must be shown by clear and convincing

20  evidence.  *In re Bose Corp.*, 580 F.3d 1240, 1243 (Fed. Cir. 2009).

21       21.    "A false representation in the original trademark application or an

22  affidavit accompanying a renewal application may be grounds for cancellation if all

23  five requirements are met."  *Id.* (citing McCarthy § 20:58).  "[A]n applicant or

24  registrant may not make a statement he/she knew or should have known was false or

25  misleading."  *Hachette Filipacchi Presse v. Elle Belle LLC*, 85 U.S.P.Q2d 1090, 1094

26  (TTAB 2007) (emphasis added).  The "appropriate inquiry is . . . not into the

27  registrant's subjective intent, but rather into the objective manifestations of that

28  intent."  *Medinol Ltd.*, 67 U.S.P.Q.2d 1205, 1209 (P.T.O. May 13, 2003).  "[P]roof of

specific intent to commit fraud is not required, rather, fraud occurs when an applicant or registrant makes a false material representation that the applicant or registrant knew or should have known was false[.]" *Id.* (internal quotation marks omitted). Intent can be inferred from indirect and circumstantial evidence. *In re Bose Corp.*, 580 F.3d at 1245. "When drawing an inference of intent, the involved conduct, viewed in light of all the evidence . . . must indicate sufficient culpability to require a finding of intent to deceive." *Id.* (internal quotation marks and citation omitted).

22.   "[T]he falsity and intent prongs are separate, so absent the requisite intent to mislead the [US]PTO, even a material misrepresentation would not qualify as fraud under the Lanham Act warranting cancellation. Deception must be willful to constitute fraud, and mere negligence is not sufficient to infer fraud or dishonesty." *Spin Master, Ltd. v. Zobmondo Entm't, LLC*, 778 F. Supp. 2d 1052, 1061 (C.D. Cal. 2011) (quoting *In re Bose Corp.*, 580 F.3d at 1243-45) (internal citations and quotation marks omitted); *eCash Technologies, Inc. v. Guagliardo*, 210 F. Supp. 2d 1138, 1149 (C.D. Cal. 2001) ("A statement in an application or representation to the [US]PTO may be 'false,' without being 'fraudulent.' Statements of honest, but perhaps incorrect belief or innocently made inaccurate statements of fact do not constitute 'fraud.' Fraud arises only when the party making a false statement of fact knows that the fact is false ...").

23.   Under its usual meaning, "[a] fact is 'material' if the fact may affect the outcome of the case." *Far Out Productions, Inc. v. Oskar*, 247 F.3d 986, 992 (9th Cir. 2001). "[I]n the trademark context, a material misrepresentation arises only if the registration should not have issued if the truth were known to the examiner." *Alphaville Design, Inc. v. Knoll, Inc.*, 627 F.Supp.2d 1121, 1132 (N.D. Cal. 2009) (Patel, J.) (quotation marks omitted). A registrant is "obligated to confirm the meaning and accuracy of the statements contained in the application before signing the declaration prior to the submission to the USPTO." *Hachette Filipacchi Presse*, 85 U.S.P.Q2d at 1094. Misrepresentations of fact made on the statement of use are,

44.

1   by their nature, "material" because "the statement of use would not have been

2   accepted nor would registration have issued but for [the applicant's] misrepresentation

3   . . . ." *Medinol Ltd*., 67 U.S.P.Q.2d 1205, 1208.

4   **d.**   **Registrations '745, '312, '852, '161, '700, 788, '436,**

5   **and '551 are ordered cancelled on the grounds that**

6   **they were obtained by fraud**

7   24.   In light of Hereford's factual admissions in connection with the 1996

8   Settlement Agreement and her agreements in connection with the 1996 and 2006

9   Settlement Agreements, Hereford fraudulently obtained each of the post-1996

10   registrations.

11   25.   In connection with the 1996 Settlement Agreement, Hereford admitted

12   that Leonard had superior common law trademark rights in Rin Tin Tin; at the time of

13   the settlement agreement, Leonard had acquired all residual rights in the Rin Tin Tin

14   trademark and character; and Hereford only had a narrow right to breed, advertise, and

15   sell German Shepherd puppies as linear descendants of Rin Tin Tin IV (which was not

16   a descendant of the original Rin Tin Tin), when truthful.

17   26.   Despite Hereford's factual admissions in connection with the 1996

18   Settlement Agreement, she subsequently applied for and obtained Registrations '745

19   (for the promotion of responsible dog ownership), '312 (for mail order fan club

20   service providing materials promoting the breeding, training, raising, and showing of

21   authentic Rin Tin Tin German Shepherd dog lineage), '852 (for printed publications,

22   activity and coloring books, games and toys, and entertainment services), and '161

23   (printed publications) for the Rin Tin Tin mark.  In each registration application,

24   Hereford provided a sworn declaration that she believed she was the owner of and

25   entitled to use the Rin Tin Tin trademarks, that no one else had a right to use the

26   marks in commerce, and that Hereford's uses of the marks were not likely to cause

27   confusion.

28

27.     In light of Hereford's factual admissions in connection with the 1996 Settlement Agreement, Hereford's sworn statements in the applications for Registrations '745, '312, '852, and '161 were knowingly and materially false and made with the intent to deceive the USPTO into issuing the registrations.  Hereford knew and acknowledged that Leonard had superior rights to a confusingly similar (and in some cases, an identical) Rin Tin Tin mark, Hereford did not disclose Leonard's superior rights to the USPTO with the intent to induce the USPTO into issuing the registrations, and the USPTO materially relied on Hereford's false statements and would not have issued the registrations had Hereford disclosed the truth regarding the facts as stipulated to and court findings with respect to the 1996 Settlement Agreement, *i.e.*, that Hereford's trademark rights were limited to the breeding, raising, training, and selling of German Shepherd dogs descended from Rin Tin Tin IV, which is not a descendent of the original Rin Tin Tin brought back from Europe by Duncan. That Hereford's knowingly false statements and intentional concealments were material to the USPTO's decisions to issue the Registrations is further supported by the fact that the USPTO denied Plaintiff Rin, Inc.'s October 2012 application for an intent-to-use registration for the Rin Tin Tin mark in International Class 041 on the grounds that Rin, Inc.'s application would result in a likelihood of confusion with Hereford's family of registered marks.

28.     These findings are not affected by the terms of the 2006 Settlement Agreement, in which Kleven, Kleven Productions, and Leonard agreed to allow Hereford to retain Registration '852 for printed publications and playing cards and Registrations '135, '745, '312, '042, and '161, to the extent those Registrations did not interfere with Kleven, Kleven Productions, and Leonard's Registration '852 for motion pictures, television programs or series, and associated derived processes and products and services.  There is no evidence that, in agreeing to these terms, Kleven, Kleven Productions, and Leonard were conceding that Hereford had any rights in the Rin Tin Tin mark.

46.

29.     The Court makes similar findings with respect to the registrations Hereford applied for and obtained following the 2006 Settlement Agreement: Registrations '700 (for dog clothes, collars, leashes, and shoes; various clothing and accessories; and games and toys, including plush toys), '788 (for dog food), '436 (for live German Shepherd dogs of the Rin Tin Tin lineage), and '551 (for entertainment services in the field of motion pictures featuring a German Shepherd dog).  As with Hereford's pre-2006 Registrations, in connection with her applications for Registrations '700, '788, '436, and '551, Hereford provided a sworn declaration that she believed she was the owner of and entitled to use the Rin Tin Tin trademarks, that no one else had a right to use the mark in commerce, and that Hereford's use of the mark were not likely to cause confusion.  In light of Hereford's factual admissions in connection with the 1996 Settlement Agreement, Hereford's sworn statements in the applications for Registrations '700, '788, '436, and '551 were knowingly and materially false and made with the intent to deceive the USPTO into issuing the registrations for the same reasons stated above with respect to Registrations '745, '312, '852, and '161.

30.     A finding of fraud is further supported by the timing and nature of Registrations '700, '788, '436, and '551, which underscore that Hereford's sworn declarations were knowingly false and made with intent to deceive the USPTO.  For example, Hereford filed the trademark registration application for Registration '700 nine (9) days after signing the 2006 Settlement Agreement, and Registration '700 sought registrations for, among other things, dog toys and plush toys, products that were specifically acknowledged to be examples of the merchandising rights retained by Kleven, Leonard, and Kleven Productions under section 2.2.4 of the 2006 Settlement Agreement, and Hereford provided in her sworn declaration that the registration was based on her actual use of the mark in commerce in February 2006, four months prior to execution of the 2006 Settlement Agreement.  In connection with Registration '788 for dog food, Hereford provided in her sworn declaration that the

47.

registration was based on actual use in May 1998, two years after the 1996 Settlement Agreement, in which Hereford disclaimed any right to the Rin Tin Tin mark except for her narrow right to breed, advertise, and sell German Shepherd puppies as linear descendants of Rin Tin Tin IV, when truthful.  In connection with Registration '436 for live German Shepherd dogs of the Rin Tin Tin lineage, Hereford provided in her sworn declaration that the registration was based on actual use in commerce in December 1980, despite Hereford's stipulations and the court findings that Hereford has only ever bred and sold German Shepherd dogs descended from Rin Tin Tin IV, which is not a genetic descendant of the original Rin Tin Tin.  Finally, in connection with Registration '551 for entertainment services in the field of motion pictures featuring a German Shepherd dog, Hereford provided that it was based on actual use in commerce in April 2007 and made no mention of the 2006 Settlement Agreement, in which Hereford assigned to Kleven, Kleven Productions, and Leonard all rights to Registration '852 for use of the Rin Tin Tin mark in motion pictures, television programs or series, and the exclusive right to use the Rin Tin Tin mark for any products or services that derive from those motion pictures, television programs or series, or any newly derived processes.[7]

31.    Finally, with respect to each of the post-1996 Registrations, Hereford provided a sworn declaration that she was the first to use and had actually used the mark in commerce on the dates specified in her registration applications.  Yet when Plaintiffs served Hereford with interrogatories asking her to identify all facts upon which she based her contention regarding use of the Rin Tin Tin mark in commerce,

---

[7] The Court rejects Belleair's contention that the issue of Registration '551 is moot because Belleair voluntarily assigned the registration to Max Kleven in his individual capacity: Kleven transferred any interest he had in the Rin Tin Tin mark and *Adventures of Rin Tin Tin* television series to Kleven Production, he does not have standing to bring the instant claims for cancellation of trademark registrations, and the assignment does not resolve the issue with respect to Rin, Inc. and Shamrock, which do have standing to bring claims for cancellation of trademark registrations.

1    Hereford responded simply that her uses of the marks "are a matter of public record

2    through various Internet sites that are readily accessible."  Thorough Internet searches

3    by Tierney and Miller, however, resulted in no such evidence other than the

4    specimens attached to Hereford and RTTI's trademark registration applications filed

5    with the USPTO.  Additionally, when Belleair entered into the initial licensing

6    agreement with Hereford, Erickson had no personal knowledge that Hereford or RTTI

7    actually sold and distributed dog food (or any other commercial product) using the

8    Rin Tin Tin mark.  This, in conjunction with the above-stated circumstances

9    supporting the finding that the post-1996 Registrations were obtained by fraud, the

10   Court draws a negative inference from the lack of evidence of Hereford's commercial

11   use of the Rin Tin Tin trademarks and finds that Hereford's sworn statements

12   regarding her purported commercial use of the Rin Tin Tin mark were knowingly and

13   materially false statements made with the intent to induce the USPTO into issuing

14   each of the post-1996 Registrations.

15       **E.       Belleair Lacks Standing to Enforce the 2006 Settlement Agreement**

16            32.     Belleair argues that the 2006 Settlement Agreement controls this case

17   because the agreement expressly states that it "contains all the promises which have

18   been made in connection with this settlement" and that "everything that is important

19   to this release is specified in writing herein" (Trial Ex. 98 ¶ 2.4), and therefore,

20   Belleair's argument goes, the 2006 Settlement Agreement was the exclusive

21   embodiment of the parties' agreement regarding the Rin Tin Tin mark and supersedes

22   the earlier 1996 Settlement Agreement on the same subject matter.  (Def's PFFCL at

23   26).

24            33.     Enforcement of a settlement agreement is an affirmative defense to be

25   pled by a party with standing to enforce the settlement agreement.  *See Corkland v.*

26   *Boscoe*, 156 Cal. App. 3d 989, 993 (1984).  A stipulation for settlement can be

27   enforced by any party to the action who benefits from it, even if indirectly, such as

28   a third party beneficiary.  *Provost v. Regents of Univ. of Cal.*, 201 Cal. App. 4th 1289,

1299, 135 Cal. Rptr. 3d 591, 601 (2011).  However, to enforce a settlement agreement the third party must be an intended beneficiary of the agreement.  *Performance Plastering v. Richmond Am. Homes of California, Inc.*, 153 Cal. App. 4th 659, 665-66, 63 Cal. Rptr. 3d 537, 542-43 (2007).

34.     Belleair is not a party to the 2006 Settlement Agreement, and it offers no evidence or argument that it otherwise has standing to enforce the terms of the agreement, *i.e.*, that it was an intended beneficiary of the agreement.  Neither the March 2013 nor August 2013 Agreements/Bills of Sale mentions or purports to assign Hereford and RTTI's rights in the 2006 Settlement Agreement to Belleair; Belleair purchased the Registrations on an "as is" basis, and Hereford made no warranties whatsoever with respect to the Registrations and disclaimed any liability with regard to future possession or use of the Registrations; and Belleair offers no evidence that it otherwise relied on the terms of the 2006 Settlement Agreement when it entered into the Agreements/Bills of Sale.[8]

35.     That Belleair has not established standing to enforce the 2006 Settlement Agreement is not inconsistent with the Court's reliance on Hereford's factual admissions made pursuant to the 1996 Settlement Agreement, even absent a finding

---

[8] In fact, Belleair purchased the remaining registrations through the August 2013 Agreement/Bill of Sale on an "as is" basis four months after Plaintiffs initiated this lawsuit (Dkt. No. 1) and three months after Belleair filed its answer.  (Dkt. No. 11.)  Belleair argues that it has relied on the 2006 Settlement Agreement since the beginning of this case, citing it in its answer and attaching a copy of the agreement as an exhibit to the answer.  Reliance on the 2006 Settlement Agreement throughout this proceeding does not confer standing to enforce the agreement.  In any event, a review of the docket shows that Hereford, RTTI, and Belleair jointly filed an answer to the initial complaint.  (Dkt. No. 11.)  Included in the answer were counterclaims brought by Hereford and RTTI only (not Belleair), and the 2006 Settlement Agreement is mentioned and referenced only in connection with Hereford and RTTI's counterclaims for breach of contract and fraud.  (Dkt. No. 11 at ¶¶ 101-115.)  On July 15, 2014, Hereford and RTTI's answer and counterclaims filed at docket entry 11 were stricken.  (Dkt. No. 106.)

that Rin, Inc. and Shamrock have standing to enforce the 1996 Settlement Agreement. Hereford's statements made in connection with the 1996 Settlement Agreement were factual admissions regarding her limited rights in the Rin Tin Tin mark, *i.e.*, Hereford admitted that Leonard had common law trademark rights in Rin Tin Tin, and Hereford's only rights were in the breeding and selling of German Shepherd dogs descended from Rin Tin Tin IV, which was not a genetic descendant of the original Rin Tin Tin. Hereford's factual admissions are different in kind than any agreed-upon contractual promises by the parties in the 1996 and 2006 Settlement Agreements, and the Court need not find that Rin, Inc. and Shamrock have standing to enforce the 1996 Settlement Agreement in order to rely on Hereford's factual admissions made in connection with that settlement agreement.

## F.    **Belleair's Laches Defense Fails**

36.    Belleair fails to establish the affirmative defense of laches.

37.    Laches is a recognized defense in a trademark registration cancellation proceeding. *Miller v. Glenn Miller Prods., Inc.*, 454 F.3d 975, 997 (9th Cir. 2006) ("It is well established that laches is a valid defense to Lanham Act claims for both monetary damages and injunctive relief.") (citing *Jarrow Formulas, Inc. v. Nutrition Now, Inc.*, 304 F.3d 829, 840 (9th Cir. 2002)). "In order to succeed on a defense of laches, a defendant must prove both: (1) an unreasonable delay by plaintiff in bringing suit, and (2) prejudice to himself. *Id.* (citing *Couveau v. American Airlines, Inc.*, 218 F.3d 1078 (9th Cir. 2000) (per curiam). "In considering whether a plaintiff's delay was unreasonable, courts consider: (1) the length of the delay, measured from the time the plaintiff knew or should have known about his potential cause of action, and (2) whether the plaintiff's delay was reasonable, including whether the plaintiff has proffered a legitimate excuse for his delay." *Id.* (citing *Jarrow Formulas*, 304 F.3d at 838). "If a plaintiff files suit within the applicable period of limitations for his claim, there is a strong presumption that laches does not bar the claims. Conversely, if any part of the alleged wrongful conduct occurred outside of the limitations period, courts

51.

presume that the plaintiff's claims are barred by laches." *Id.* (citation omitted). "A defendant may establish prejudice by showing that during the delay, it invested money to expand its business or entered into business transactions based on his presumed rights." *Id.* at 999 (citing *Whittaker Corp. v. Execuair Corp.*, 736 F.2d 1341, 1347 (9th Cir. 1984)).

38.    Belleair contends that the statute of limitations for Plaintiffs' cancellation claims is four years because the Ninth Circuit has held that there is a four-year statute of limitations to trademark infringement claims under the Lanham Act, *see Miller v. Glenn Miller Prods.*, Inc., 454 F.3d 975, 997 n.11 (9th Cir. 2006), and therefore there is a strong presumption that the cancellation claims are barred by laches. The Court rejects this argument. A claim for cancellation of trademark registration is distinct from a claim for trademark infringement, and the Lanham Act specifically provides that there is no limitation on when a party can bring a cancellation claim based on abandonment and fraud. *See* 15 U.S.C. § 1054(3).

39.    Belleair also contends that Plaintiffs' delay in bringing the instant cancellation claims was unreasonable because Hereford obtained her registrations from four to twenty years ago, and Plaintiffs were aware of the registrations and "yet did nothing about them." The Court rejects that the delay was unreasonable, particularly any contention that Rin, Inc. and Shamrock did "nothing" about Hereford's registrations. Rin, Inc. and Shamrock and their predecessors in interest have consistently and aggressively pursued their purported rights in the Rin Tin Tin mark, beginning with the 1994 Lawsuit, which Leonard promptly pursued after learning that Hereford was advertising to license the Rin Tin Tin mark. Any delays between the 1994 and 2006 lawsuits and the 2006 and the instant lawsuits were reasonable because the Plaintiffs and their predecessors in interest, in good faith, attempted to settle their disputes with Hereford by entering into the 1996 and 2006 Settlement Agreements. After each settlement agreement, Hereford fraudulently obtained a series of trademark registrations, and the Plaintiffs and their predecessors

52.

1  in interest pursued cancellation claims following each series of trademark

2  registrations, culminating with Registration '852 in 2006 and Registration '551 in

3  2012 for entertainment services featuring a German Shepherd dog.

4      40.    Belleair also has not proven that it suffered prejudice as a result of Rin,

5  Inc. and Shamrock's delay in pursuing their cancellation claims.  While Belleair has

6  invested in the Rin Tin Tin mark – paying Hereford to purchase her registrations and

7  investing in a business formed around the mark – Belleair was on notice of the title

8  defects in Hereford's registration, Belleair purchased the registrations on an "as is"

9  basis, Hereford made no warranties whatsoever with respect to the registrations and

10  disclaimed any liability with regard to future possession or use of the registrations,

11  and, most importantly, Belleair purchased most of the registrations *after* Belleair had

12  been served with the summons and complaint and appeared in this action.

13      41.    In light of the foregoing, Belleair has failed to carry its burden of proving

14  the affirmative defense of laches.

15  **G.    Belleair's Waiver Defense Fails**

16      42.    Belleair also fails to establish the affirmative defense of waiver.

17      43.    Waiver is the "intentional relinquishment of a known right with

18  knowledge of its existence and the intent to relinquish it."  *Gibson Brands, Inc. v.*

19  *John Hornby Skewes & Co. Ltd.*, 2014 WL 5419512 (C.D. Cal. Oct. 23, 2014).

20      44.    Belleair argues that Rin, Inc. and Shamrock knowingly gave up any

21  objection to Registrations '135, '745, '312, '852, and '161 when their predecessors in

22  interest entered into the 2006 Settlement Agreement, in which they consented to

23  Hereford's continued use and registration of the Rin Tin Tin mark.  The Court rejects

24  this contention.  Plaintiffs' consent to Hereford's continued use and registration of the

25  Rin Tin Tin mark in connection with Registrations '135, '745, '312, '852, and '161

26  was part of an agreement to settle the 2006 Lawsuit and contingent on Hereford's

27  compliance with the terms of the 2006 Settlement Agreement.  After executing the

28  2006 Settlement Agreement, Hereford then fraudulently obtained Registrations '700,

53.

'788, '436, and '551 and made statements in her applications for those registrations that directly contradicted her factual admissions in connection with the 1996 Settlement Agreement and the terms of the 2006 Settlement Agreement, thus (from Plaintiffs' perspective) vitiating the consideration and purpose of the settlement agreement.  Following this, Plaintiffs were then reasonably prompt in filing the instant lawsuit, asserting (among other causes of action) claims for breach of the 2006 Settlement Agreement, rescission of the 2006 Settlement Agreement, and cancellation of trademarks.  Under these circumstances, Plaintiffs cannot be said to have waived their right to cancel the trademark registrations at issue.

**H.    Belleair's Estoppel Defense Fails**

45.    To the extent Belleair continues to pursue this defense, Belleair also fails to establish the affirmative defense of estoppel.[9]

46.    To establish the affirmative defense of equitable estoppel, the party asserting the defense must prove:

(1) The party to be estopped must know the facts; (2) he must intend that his conduct shall be acted upon or must so act that the party asserting the estoppel has a right to believe it is so intended; (3) the latter must be ignorant of the true facts and (4) he must rely on the former's conduct to his injury.

*Morgan v. Gonzalez*, 495 F.3d 1084, 1092 (9th Cir. 2007).

47.    In March 2013, when Belleair purchased Registrations '700 and '788 from Hereford, Belleair was on actual notice of a pending cancellation proceeding for Registration '551 and constructive notice of other potential defects with respect to other Registrations owned by Hereford.  In August 2013, when Belleair purchased the remaining Registrations, Belleair had already appeared as a defendant in this lawsuit,

[9] Belleair offers no proposed conclusions of law in support of this affirmative defense.

54.

1   which includes claims for cancellation of all of Hereford's Registrations.  Thus, even

2   assuming Plaintiffs intended that their conduct (presumably entering into the 2006

3   Settlement Agreement and waiting until 2013 to file the instant lawsuit) be acted upon

4   by Belleair – there is no evidence of this – Belleair has not proven that it was ignorant

5   of Plaintiffs' purported rights in the Rin Tin Tin mark or that Belleair relied on

6   Plaintiffs' conduct to its detriment.

7           THEREFORE, the Court concludes that Rin, Inc. and Shamrock have standing

8   to pursue their claims for cancellation of trademark registration, and they have carried

9   their burden of proving that Hereford abandoned Registration '135, and that Hereford

10  and/or RTTI fraudulently obtained Registrations '745, '312, '852, '161, '700, 788,

11  '436, and '551.  Belleair failed to prove its affirmative defenses of laches, waiver, and

12  estoppel.

13          Registrations '135, '745, '312, '852, '161, '700, 788, '436, and '551 are hereby

14  ordered cancelled.

15          In light of these findings of fact and conclusions of law, Belleair's motion for

16  judgment pursuant to Federal Rule of Civil Procedure 52(c) is hereby denied as moot.

17

18

19          **IT IS SO ORDERED**.

20

21  Dated:  August 21, 2015                    _____

22                                               HONORABLE ANDRÉ BIROTTE JR.
                                                 UNITED STATES DISTRICT COURT JUDGE

23

24

25

26

27

28